# IN THE UNITED STATES DISTRICCT COURT, NORTHERN DISTRCOICT OF GEORGIA, ATLANTA DIVISION

| | |
|---|---|
| **CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, , CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM, and BRIAN JAY VAN GUNDY,**<br><br>       **Plaintiffs.**<br><br>**v.**<br><br>**BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N.SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board,**<br><br>       **Defendants.** | **CASE NO.** |

## COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

## NATURE OF THE ACTION

This civil action brings to light a massive election fraud, multiple violations of Georgia laws, including O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1 and §21-2-522, and multiple Constitutional violations, as shown by fact witnesses to specific incidents, multiple expert witnesses and the sheer mathematical impossibilities found in the Georgia 2020 General Election.[1]

1.

As a civil action, the plaintiff's burden of proof is a "preponderance of the evidence" to show, as the Georgia Supreme Court has made clear that, *"[i] was not incumbent upon [Plaintiff] to show how the [] voters would have voted if their [absentee] ballots had been regular. [Plaintiff] only had to show that there were enough irregular ballots to place in doubt the result." Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (2004) (*citing Howell v. Fears*, 275 Ga. 627, 571 S.E.2d 392 (2002).

---

[1]   The same pattern of election fraud and voter fraud writ large occurred in all the swing states with only minor variations, see expert reports, regarding Michigan, Pennsylvania, Arizona and Wisconsin. (See William M. Briggs Decl., attached here to as Exh. 1, Report with Attachment).  Indeed, we believe that in Arizona at least 35,000 votes were illegally added to Mr. Biden's vote count.

2.

The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to make certain the election of Joe Biden as President of the United States.

3.

The fraud was executed by many means,[2] but the most fundamentally troubling, insidious, and egregious is the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. Mathematical and statistical anomalies rising to the level of impossibilities, as shown by affidavits of multiple witnesses, documentation, and expert testimony evince this scheme across the state of Georgia. Especially egregious conduct arose in Forsyth, Paulding, Cherokee, Hall, and Barrow County. This scheme and artifice to defraud affected tens of thousands of votes in Georgia alone and "rigged" the election in Georgia for Joe Biden.

---

[2] 50 USC § 20701 requires Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation, but as will be shown wide pattern of misconduct with ballots show preservation of election records have not been kept; and Dominion logs are only voluntary, with no system wide preservation system.

4.

The massive fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") only recently purchased and rushed into use by Defendants Governor Brian Kemp, Secretary of State Brad Raffensperger, and the Georgia Board of Elections. Sequoia voting machines were used in 16 states and the District of Colombia in 2006. Smartmatic, which has revenue of about $100 million, focuses on Venezuela and other markets outside the U.S. [3]

After selling Sequoia, Smartmatic's chief executive, Anthony Mugica. Mr. Mugica said, he hoped Smartmatic would work with Sequoia on projects in the U.S., though Smartmatic wouldn't take an equity stake." Id.

5.

Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  (*See* Redacted whistleblower affiant, *attached as Exh*. 2)  Notably, Chavez "won" every election thereafter.

---

[3] *See WSJ.com, Smartmatic to Sell U.S. Unit, End Probe into Venezuelan Links, by Bob Davis, 12/22/2006,* h*ttps://www.wsj.com/articles/SB116674617078557263*

6.

As set forth in the accompanying whistleblower affidavit, the

Smartmatic software was designed to manipulate Venezuelan elections in

favor of dictator Hugo Chavez:

> Smartmatic's electoral technology was called "Sistema de Gestión
> Electoral" (the "Electoral Management System"). Smartmatic was a
> pioneer in this area of computing systems. Their system provided for
> transmission of voting data over the internet to a computerized
> central tabulating center. The voting machines themselves had a
> digital display, fingerprint recognition feature to identify the voter,
> and printed out the voter's ballot. The voter's thumbprint was linked
> to a computerized record of that voter's identity. Smartmatic created
> and operated the entire system.

7.

A *core requirement* of the Smartmatic software design was the

*software's ability to hide its manipulation of votes from any audit.*  As the

whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a
> way that the system could change the vote of each voter without
> being detected. He wanted the software itself to function in such a
> manner that if the voter were to place their thumb print or
> fingerprint on a scanner, then the thumbprint would be tied to a
> record of the voter's name and identity as having voted, but that voter
> would not be tracked to the changed vote. He made it clear that the
> system would have to be setup to not leave any evidence of the
> changed vote for a specific voter and that there would be no evidence
> to show and nothing to contradict that the name or the fingerprint or
> thumb print was going with a changed vote. Smartmatic agreed to
> create such a system and produced the software and hardware that

5

accomplished that result for President Chavez. (See Id., see also Exh. 3, Aff. Cardozo, attached hereto)).

8.

The design and features *of* the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.  (*See* Hursti August 2019 Declaration, attached hereto as Exh. 4, at pars. 45-48; and attached hereto, as Exh. 4B, October 2019 Declaration in Document 959-4, at p. 18, par. 28).

9.

Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log. There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to

the internet in violation of professional standards and state and federal laws.

(*See Id.*)

## 10.

Moreover, lies and conduct of Fulton County election workers about a delay in voting at State Farm Arena and the reasons for it evince the fraud.

## 11.

Specifically, video from the State Farm Arena in Fulton County shows that on November 3rd after the polls closed, election workers falsely claimed a water leak required the facility to close.  All poll workers and challengers were evacuated for several hours at about 10:00 PM.  However, several election workers remained unsupervised and unchallenged working at the computers for the voting tabulation machines until after 1:00 AM.

## 12.

Defendants Kemp and Raffensperger rushed through the purchase of Dominion voting machines and software in 2019 for the 2020 Presidential Election[4].  A certificate from the Secretary of State was awarded to Dominion

---

[4]   Georgia Governor Inks Law to Replace Voting Machines, The Atlanta Journal-Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press, June 2019. https://www.ajc.com/blog/politics/georgia-governor-inks-law-replace-voting-machines/xNXs0ByQAOvtXhd27kJdqO/

Voting Systems but is undated.  (*See* attached hereto Exh. 5, copy

Certification for Dominion Voting Systems from Secretary of State).

Similarly a test report is signed by Michael Walker as Project Manager but is

also undated.  (See Exh. 6, Test Report for Dominion Voting Systems,

Democracy Suite 5-4-A)

13.

Defendants Kemp and Raffensperger disregarded all the concerns that

caused Dominion software to be rejected by the Texas Board of Elections in

2018, namely that it was vulnerable to undetected and non-auditable

manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of

Computer Science and Election Security Expert has recently observed, with

reference to Dominion Voting machines: "I figured out how to make a slightly

different computer program that just before the polls were closed, it switches

some votes around from one candidate to another. I wrote that computer

program into a memory chip and now to hack a voting machine you just need

7 minutes alone with it and a screwdriver." (Attached hereto Exh. 7, Study,

Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters by

Andrew W. Appel Princeton University, Richard A. DeMillo, Georgia Tech

Philip B. Stark, for the  Univ. of California, Berkeley, December 27, 2019).[5]

---

[5] Full unredacted copies of all exhibits have been filed under seal with the Court and Plaintiffs have simultaneously moved for a protective order.

14.

As explained and demonstrated in the accompanying redacted declaration of  a former electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020.  This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer is listed as the first of the inventors of Dominion Voting Systems.  (See Attached hereto as Exh. 8, copy of redacted witness affidavit, 17 pages, November 23, 2020).

15.

Expert Navid Keshavarez-Nia explains that US intelligence services had developed tools to infiltrate foreign voting systems including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states.  He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden.  (Exh. 26).

16.

Additionally, incontrovertible evidence Board of Elections records
demonstrates that at least 96,600 absentee ballots were requested and
counted but were never recorded as being returned to county election boards
by the voter. *Thus, at a minimum, 96,600 votes must be disregarded.* (See
Attached hereto, Exh. 9, R. Ramsland Aff.).

17.

The Dominion system used in Georgia erodes and undermines the
reconciliation of the number of voters and the number of ballots cast, such
that these figures are permitted to be unreconciled, opening the door to ballot
stuffing and fraud. The collapse of reconciliation was seen in Georgia's
primary and runoff elections this year, and in the November election, where
it was discovered during the hand audit that 3,300 votes were found on
memory sticks that were not uploaded on election night, plus in Floyd county,
another 2,600 absentee ballots had not been scanned. These "found votes"
reduced Biden's lead over Donald Trump[6].

---

[6] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and
David Wickert,11/19/20.  https://www.ajc.com/politics/recount-finds-thousands-of-georgia-
votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

18.

Georgia's election officials and poll workers exacerbated and helped, whether knowingly or unknowingly, the Dominion system carry out massive voter manipulation by refusing to observe statutory safeguards for absentee ballots.  Election officials failed to verify signatures and check security envelopes.  They barred challengers from observing the count, which also facilitated the fraud.

19.

Expert analysis of the actual vote set forth below demonstrates that at least 96,600 votes were illegally counted during the Georgia 2020 general election.  All of the evidence and allegation herein is more than sufficient to place the result of the election in doubt.  More evidence arrives by the day and discovery should be ordered immediately.

20.

Georgia law, (OCGA 21-5-552) provides for a contest of an election where:

> (1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result; . . . (3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result; (4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or (5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

21.

As further set forth below, all of the above grounds have been satisfied and compel this Court to set aside the 2020 General Election results which fraudulently concluded that Mr. Biden defeated President Trump by 12,670 votes.

22.

Separately, and independently, there are sufficient Constitutional grounds to set aside the election results due to the Defendants' failure to observe statutory requirements for the processing and counting of absentee ballots which led to the tabulation of more than fifty thousand illegal ballots.

**THE PARTIES**

23.

Plaintiff Coreco Ja'Qan ("CJ") Pearson, is a registered voter who resides in Augusta, Georgia. He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.  He has standing to bring this action under *Carson v. Simon*, 2020 US App Lexis 34184 (8th Cir. Oct. 29, 2020).  He brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Georgia Secretary of State on November 20, 2020.  The certified results showed a plurality of 12,670 votes in favor of former Vice-President Joe Biden over President Trump.

24.

Plaintiff Vikki Townsend Consiglio, is a registered voter who resides in Henry County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

25.

Plaintiff Gloria Kay Godwin, is a registered voter who resides in Pierece County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

26.

Plaintiff James Kenneth Carroll, is a registered voter who resides in Dodge County, Georgia.  He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

27.

Plaintiff Carolyn Hall Fisher, is a registered voter who resides in Forsyth County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

28.

Plaintiff Cathleen Alston Latham, is a registered voter who resides in Coffee County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

29.

Plaintiff Jason M. Shepherd is the Chairman of the Cobb County Republican Party and brings this action in his official capacity on behalf of the Cobb County Republican Party.

30.

Plaintiff Brian Jay Van Gundy is registered voter in Gwinnett County, Georgia.  He is the Assistant Secretary of the Georgia Republican Party.

31.

Defendant Governor Brian Kemp (Governor of Georgia) is named herein in his official capacity as Governor of the State of Georgia.  On or about June 9, 2019, Governor Kemp bought the new Dominion Voting Systems for Georgia, budgeting 150 million dollars for the machines.  Critics are quoted, "Led by Abrams, Democrats fought the legislation and pointed to cybersecurity experts who warned it would leave Georgia's elections susceptible to hacking and tampering." And "Just this week, the Fair Fight voting rights group started by [Stacy] Abrams launched a television ad critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."[7]

---

[7] *Georgia Governor Inks Law to Replace Voting Machines*, The Atlanta Journal-Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press, June 2019

14

32.

Defendant Brad Raffensperger ("Secretary Raffensperger") is named

herein in his official capacity as Secretary of State of the State of Georgia and

the Chief Election Official for the State of Georgia pursuant to Georgia's

Election Code and O.C.G.A. § 21-2-50. Secretary Raffensperger is a state

official subject to suit in his official capacity because his office "imbues him

with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634

F.3d 1314, 1319 (11th Cir. 2011).  Secretary  Raffensperger  serves as the

Chairperson of Georgia's State Election Board,  which  promulgates  and

enforces rules and regulations to (i) obtain uniformity in the practices and

proceedings of election officials as well as legality and purity in all primaries

and general elections, and (ii) be conducive to the fair, legal, and orderly

conduct of primaries and general elections. *See* O.C.G.A. §§ 21-2-30(d), 21-2-

31, 21-2-33.1. Secretary Raffensperger, as Georgia's chief elections officer, is

further responsible for the administration of the state laws affecting voting,

including the absentee voting system. *See* O.C.G.A. § 21-2-50(b).

33.

Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn,

and Anh Le (hereinafter the "State Election Board") are members of the State

Election Board in Georgia, responsible for "formulating, adopting, and

promulgating such rules and regulations, consistent with law, as will be

conducive to the fair, legal, and orderly conduct of primaries and elections."

O.C.G.A. § 21-2-31(2). Further, the State Election Board "promulgate[s] rules

and regulations to define uniform and nondiscriminatory standards

concerning what constitutes a vote and what will be counted as a vote for

each category of voting system" in Georgia. O.C.G.A. § 21-2-31(7). The State

Election Board, personally and through the conduct of the Board's employees,

officers, agents, and servants, acted under color of state law at all times

relevant to this action and are sued for emergency declaratory and injunctive

relief in their official capacities.

## JURISDICTION AND VENUE

### 34.

This Court has subject matter jurisdiction under 28 U.S.C. 1331 which

provides, "The district courts shall have original jurisdiction of all civil

actions arising under the Constitution, laws, or treaties of the United States.

### 35.

This Court also has subject matter jurisdiction under 28 U.S.C. 1343

because this action involves a federal election for President of the United

States. "A significant departure from the legislative scheme for appointing

Presidential electors presents a federal constitutional question." *Bush v.*

*Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*,

285 U.S. 355, 365 (1932).

36.

The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57 and 65, Fed. R. Civ. P. 7.

37.

This Court has jurisdiction over the related Georgia Constitutional claims and State law claims under 28 U.S.C. 1367.

38.

In Georgia, the "legislature" is the General Assembly.  *See* Ga. Const. Art.  III, § I, Para. I.

39.

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Raffensperger, have no authority to  exercise that power unilaterally, much less flout existing legislation or the Constitution itself.

## STATEMENT OF FACTS

40.

Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under Georgia law, O.C.G.A. § 21-2-522 to remedy deprivations of rights,

privileges, or immunities secured by the Constitution and laws of the United

States and to contest the election results.

41.

The United States Constitution sets forth the authority to regulate

federal elections, the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and
> Representatives, shall be prescribed in each State by the Legislature
> thereof; but the Congress may at any time by Law make or alter such
> Regulations, except as to the Places of choosing Senators. U.S.
> CONST. art. I, § 4 ("Elections Clause").

42.

With respect to the appointment of presidential electors, the

Constitution provides: Each State shall appoint, in such Manner as the

Legislature thereof may direct, a Number of Electors, equal to the whole

Number of Senators and Representatives to which the State may be entitled

in the Congress: but no Senator or Representative, or Person holding an

Office of Trust or Profit under the United States, shall be appointed an

Elector.  U.S. CONST. art. II, § 1 ("Electors Clause").

43.

Neither Defendant is a "Legislature" as required under the Elections

Clause or Electors Clause. The Legislature is "'the representative body which

ma[kes] the laws of the people.'" *Smiley* 285 U.S. 365.  Regulations of

congressional and presidential elections, thus, "must be in accordance with

18

the method which the state has prescribed for legislative enactments." Id. at

367; see also *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576

U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

44.

While the Elections Clause "was not adopted  to  diminish  a State's

authority to determine its own lawmaking processes," *Ariz.  State Legislature,*

135 S. Ct. at 2677, it does hold states accountable to their chosen processes

when it comes to regulating federal elections, *id.* at 2668. "A significant

departure from the legislative scheme for appointing Presidential electors

presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist,

C.J., concurring); *Smiley,* 285 U.S. at 365.

45.

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522,

Grounds for Contest:

A result of a primary or election may be contested on one or more of
the following grounds:

(1) Misconduct, fraud, or irregularity by any primary or election
official or officials sufficient to change or place in doubt the result;

(2) When the defendant is ineligible for the nomination or office in
dispute;

(3) When illegal votes have been received or legal votes rejected at
the polls sufficient to change or place in doubt the result;

(4) For any error in counting the votes or declaring the result of the
primary or election, if such error would change the result; or

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

O.C.G.A. § 21-2-522.

46.

Under O.C.G.A. *§* 21-2-10, Presidential Electors are elected.

47.

Under O.C.G.A. *§* 21-2-386(a)(l)(B), the Georgia Legislature instructed the county registrars and clerks (the "County Officials") to handle the absentee ballots as directed therein. The Georgia Legislature set forth the procedures to be used by each municipality for appointing the absentee ballot clerks to ensure that such clerks would "perform the duties set forth in this Article." *See* O.C.G.A. *§* 21-2-380.1.

48.

The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk ***shall*** write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk ***shall*** then compare the identifying information on the oath with the information on file in his or her office, ***shall*** compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and ***shall,*** if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the

voter's oath. Each elector's name so certified shall be listed by the registrar or clerk on the numbered list of absentee voters prepared for his or her precinct.

O.C.G.A. *§* 21-2-386(a)(l )(B) (emphasis added).

49.

Under O.C.G.A. *§* 21-2-386(a)(l)(C), the Georgia Legislature also established a clear and efficient process to be used by County Officials if they determine that an elector has failed to sign the oath on the outside envelope enclosing the ballot or that the signature does not conform with the signature on file in the registrar's or clerk's office (a "defective absentee ballot").

50.

The Georgia Legislature also provided for the steps to be followed by County Officials with respect to defective absentee ballots:

> ***If the elector has failed to sign the oath, or if the signature does not appear to be valid***, or if the elector has failed to furnish required information ***or information so furnished does not conform with that on file in the registrar's or clerk's office***, or if the elector is otherwise found disqualified to vote, the registrar or clerk shall write across the face of the envelope "Rejected," giving the reason therefor. The board of registrars or absentee ballot clerk *shall* promptly ***notify the elector of such rejection***, a copy of which notification ***shall*** be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2 -386(a) (l)(C) (emphasis added).

# I.    DEFENDANTS' UNAUTHORIZED ACTIONS VIOLATED THE GEORGIA ELECTION CODE AND CAUSED THE PROCESSING OF DEFECTIVE ABSENTEE BALLOTS.

51.

Notwithstanding the clarity of the applicable statutes and the constitutional authority for the Georgia Legislature's actions, on March 6, 2020, the Secretary of State of the State of Georgia, Secretary Raffensperger, and the State Election Board, who administer the state elections (the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (collectively, the "Democrat Party Agencies"), setting forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia8.

52.

Under the Settlement, however, the Administrators agreed to change the statutorily prescribed manner of handling absentee ballots in a manner that is not consistent with the laws promulgated by the Georgia Legislature for elections in this state.

---

[8] *See Democratic Party of Georgia, Inc., et al. v. Raffensperger,  et al.,* Civil Action File No. 1:l 9-cv-05028-WMR, United States District Court for the  Northern District of Georgia, Atlanta Division, Doc.  56-1.

53.

The Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to county Administrators overriding the statutory procedures prescribed for those officials. That power, however, does not belong to the Secretary of State under the United States Constitution.

54.

The Settlement also changed the signature requirement reducing it to a broad process with discretion, rather than enforcement of the signature requirement as statutorily required under O.C.G.A. 21-2-386(a)(l).

55.

The Georgia Legislature instructed county registers and clerks (the "County Officials") regarding the handling of absentee ballots in O.C.G.A. S 21-2-386(a)(1)(B), 21-2-380.1.  The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each absentee ballot, a registrar or clerk shall write the day and hour of the receipt of the ballot on its envelope.  The registrar or clerk shall then compare the identifying information on the oath with the information on file in his or her office, shall compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absent elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and shall, if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath …

O.C.G.A. S 21-2-386(a)(1)(B).

56.

The Georgia Legislature prescribed procedures to ensure that any request for an absentee ballot must be accompanied by sufficient identification of the elector's identity. *See* O.C.G.A. *§* 21-2-38 l(b )(1) (providing,  in pertinent  part, "In  order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21-2-417 ...").

57.

An Affiant testified, under oath, that "It was also of particular interest to me to see that signatures were not being verified and that there were no corresponding envelopes seen in site."  (Attached hereto as Exh. 10, Mayra Romera, at par. 7).

58.

To reflect the very reason for process, it was documented that in the primary election, prior to the November 3, 2020 Presidential election, many ballots got to voters after the election.  Further it was confirmed that "Untold thousands of absentee ballot requests went unfulfilled, and tens of thousands of mailed ballots were rejected for multiple reasons including arriving too late

to be counted.  See the Associated Press, *Vote-by-Mail worries: A leaky pipeline in many states*, August 8, 2020.[9]

59.

Pursuant to the Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith only partisan-based training - "additional guidance and training materials" drafted by the Democrat Party Agencies' representatives contradicting O.C.G.A. § 21-2-31.

### B. Unlawful Early Processing of Absentee Ballots

60.

In April 2020, the State Election Board adopted on a purportedly "Emergency Basis" Secretary of State Rule 183-1-14-0.9-.15, Processing Ballots Prior to Election Day. Under this rule, county election officials are authorized to begin processing absentee ballots up to three weeks befoe election day. Thus, the rule provides in part that "(1) Beginning at 8:00 AM on the third Monday prior to Election Day, the county election superintendent **shall be authorized to open the outer envelope of accepted absentee ballots** …" (Emphasis added).

---

[9]        *https://apnews.com/article/u-s-news-ap-top-news-election-2020-technology-politics-52e87011f4d04e41bfffccd64fc878e7*

61.

Rule 183-1-14-0.9-.15 is in direct and irreconcilable conflict with

O.C.G.A. § 21-2-386(a)(2), which prohibits the opening of absentee ballots

until election day:

> **After the opening of the polls** on the day of the primary, election,
> or runoff, the registrars or absentee ballot clerks **shall be
> authorized to open the outer envelope** on which is printed the
> oath of the elector in such a manner as not to destroy the oath printed
> thereon; provided, however, that the registrars or absentee ballot
> clerk shall not be authorized to remove the contents of such outer
> envelope or to open the inner envelope marked "Official Absentee
> Ballot," except as otherwise provided in this Code section.

(Emphasis added).

62.

In plain terms, the statute clearly prohibits opening absentee ballots

prior to election day, while the rule authorizes doing so three weeks before

election day. There is no reconciling this conflict. The State Election Board

has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and

regulations, but no authority to promulgate a regulation that is directly

contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore

plainly and indisputably unlawful.

63.

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on

November 23, 2020 for the upcoming January 2021 runoff election.

## C. UNLAWFUL AUDIT PROCEDURES

64.

According to Secretary Raffensperger, in the presidential general election, 2,457,880 votes were cast in Georgia for President Donald J. Trump, and 2,472,002 votes were cast for Joseph R.  Biden, which narrowed in Donald Trump's favor after the most recent recount.

65.

Secretary Raffensperger declared that for the Hand Recount:

Per the instructions given to counties as they conduct their audit triggered full hand recounts, designated monitors will be given complete access to observe the process from the beginning. While the audit triggered recount must be open to the public and media, designated monitors will be able to observe more closely. The general public and the press will be restricted to a public viewing area. Designated monitors will be able to watch the recount while standing close to the elections' workers conducting the recount.

Political parties are allowed to designate a minimum of two monitors per county at a ratio of one monitor per party for every  ten  audit boards in a county... Beyond being able to  watch  to ensure  the recount is conducted fairly and securely, the two-person audit boards conducting the hand recount call out the votes as they are recounted , providing monitors and the public an additional way to keep tabs on  the process.[10]

---

[10] *Office of Brad Raffensperger, Monitors Closely Observing Audit-Triggered Full Hand Recount: Transparency is Built Into Process*,
https://sos.ga.gov/index.php/elections/monitors_closely_observing_audit-triggered_full_hand_recount_transparency_is_built_into_process

66.

The audit was conducted O.C.G.A. § 21-2-498. This code section
requires that audits be completed "in public view" and authorizes the State
Board of Elections to promulgate regulations to administer an audit "to
ensure that collection of validly cast ballots is complete, accurate and
trustworthy throughout the audit."

67.

Plaintiffs can show that Democrat-majority counties provided political
parties and candidates, including the Trump Campaign, no meaningful
access or actual opportunity to review and assess the validity of mail-in
ballots during the pre-canvassing meetings.  While in the audit or recount,
they witnessed Trump votes being put into Biden piles.

68.

Non-parties Amanda Coleman and Maria Diedrich are two individuals
who volunteered to serve as designated monitors for the Donald J. Trump
Presidential Campaign, Inc. (the "Trump Campaign") on behalf of the
Georgia Republican Party (the "Republican Party") at the Hand Recount.
(Attached hereto and incorporated herein as Exhibits 2 and 3), respectively,
are true and correct copies of (1) the Affidavit of Amanda Coleman in Support
of Plaintiffs' Motion for Temporary Restraining Order (the "Coleman
Affidavit"), and (2) the Affidavit of Maria Diedrich in Support of Plaintiffs'

Motion for Temporary Restraining Order (the "Diedrich Affidavit").  (See

Exh. 11, Coleman Aff.,2; Exh. 12, Diedrich Aff., 2.)

69.

The Affidavits set forth various conduct amounting to federal crimes,

clear improprieties, insufficiencies, and improper handling of ballots by

County Officials and their employees that Ms. Coleman and Ms. Diedrich

personally observed while monitoring the Hand Recount.  *(See* Exh. 11,

Coleman Aff., 3-10; Exh. 12, Diedrich Aff., 4-14.)

70.

As a result of her observations of the Hand Recount as a Republican

Party monitor, Ms. Diedrich declared, "There had been no meaningful way to

review or audit any activity" at the Hand Recount. *(See* Exh. 12, Diedrich

Aff.,14.)

71.

As a result of their observations of the Hand Recount as Republican

Party monitors, Ms. Coleman likewise declared, "There was no way to tell if

any counting was accurate or if the activity was proper." (See Exh. 12,

Coleman Aff.,10).

72.

On Election Day, when the Republican poll watchers were, for a limited

time, present and allowed to observe in various polling locations, they

29

observed and reported numerous instances of election workers failing to follow the statutory mandates relating to two critical requirements, among other issues:

(1) a voter's right to spoil their mail-in ballot at their polling place on election day and to then vote in-person, and

(2) the ability for voters to vote provisionally on election day when a mail-in ballot has already been received for them, but when they did not cast those mail-in ballots, who sought to vote in person during early voting but was told she already voted; she emphasized that she had not.  The clerk told her he would add her manually with no explanation as to who or how someone voted using her name. (Attached hereto as Exh. 13, Aff. Ursula Wolf)

73.

Another observer for the ballot recount testified that "*at no time did I witness any Recounter or individual participate in the recount verifying signatures [on mail-in ballots].*" (Attached hereto as Exh. 14, Nicholas Zeher Aff).

74.

In some counties, there was no actual "hand" recounting of the ballots during the Hand Recount, but rather, County Officials and their employees

simply conducted another machine count of the *same* ballots. (See. Exh. 9,

10).  That will not reveal the massive fraud of which plaintiffs complain.

75.

A large number of ballots were identical and likely fraudulent.  An

Affiant explains that she observed a batch of utterly pristine ballots:

> 14. Most of the ballots had already been handled; they had been written on by people, and the edges were worn. They showed obvious use. However, one batch stood out. It was pristine. There was a difference in the texture of the paper - it was if they were intended for absentee use but had not been used for that purposes. There was a difference in the feel.

> 15. These different ballots included a slight depressed pre-fold so they could be easily folded and unfolded for use in the scanning machines. There were no markings on the ballots to show where they had com~ from, or where they had been processed. These stood out.

> 16. In my 20 years of experience of handling ballots, I observed that the markings for the candidates on these ballots were unusually uniform, perhaps even with a ballot-marking device.  By my estimate in observing these ballots, approximately 98% constituted votes for Joe Biden.  I only observed two of these ballots as votes for President Donald J. Trump."  (See Exh. 15 Attached hereto).

76.

The same Affiant further testified specifically to the breach of the chain

of custody of the voting machines the night before the election stating:

> we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed.  **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day.**

31

The Milton precinct received its machines at 1:00 AM in the morning on Election Day.  This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id*.

## II. EVIDENCE OF FRAUD

### A PATTERN SHOWING THE ABSENCE OF MISTAKE

77.

The stunning pattern of the nature and acts of fraud demonstrate an absence of mistake.

78.

The same Affiant further explained, in sworn testimony, that the breach included: "when we did receive the machines, they were not sealed or locked, the serial numbers were not what were reflected on the related documentation…" *See Id.*

79.

An affiant testified that "While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden, I witnessed this happen at table "A".' (See Exh. 14, par. 27).

80.

The Affiant further testified, that "when this was brought to Ms. Pitts attention, it was met with extreme hostility.  At no time did I witness any ballot cast for Joseph Biden be placed in the pile for Donald Trump.  (See Exh. 14, par. 28).

32

81.

Another Affiant in the mail-in ballot and absentee ballot recounting process, testified in her sworn affidavit, that "on November 16, 2020 … It was also of particular interest to me to see that signatures were not being verified and there were no corresponding envelopes seen in sight." (See Exh. 10, at Par. 7).

82.

Yet another Affiant, in the recount process, testified that he received push back and a lack of any cooperation and was even threatened as if he did something wrong, when he pointed out the failure to follow the rules with the observers while open mail-in ballot re-counting was occurring, stating:

> "However, as an observer, I observed that the precinct had twelve (12) counting tables, but only one (1) monitor from the Republican Party. I brought it up to Erica Johnston since the recount rules provided for one (1) monitor from each Party per ten (10) tables or part thereof…"

(See Attached hereto, Exh. 16, Ibrahim Reyes Aff.)

83.

Another Affiant explains a pattern of behavior that is alarming, in his position as an observer in the recount on absentee ballots with barcodes, he testified:

> ***I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray.*** I also witnessed the same two poll workers putting the already separated paper receipt b*a*llots in

33

the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray,  They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet.

(See Attached hereto, Exh.17, pars. 4-5, Aff. of Consetta Johson).

84.

Another Affiant, a Democrat, testified in his sworn affidavit, that before he was forced to move back to where he could not see, he had in fact seen "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times".  (See attached hereto, Exh. 18 at Par. 12, Aff. of Carlos Silva).

85.

Yet another Affiant testified about the lack of process and the hostility only towards the Republican party, which is a violation of the Equal Protection Clause.   He testified:

I also observed throughout my three days in Atlanta, not once did anyone verify these ballots.  In fact, there was no authentication process in place and no envelopes were observed or allowed to be observed.  I saw hostility towards Republican observers but never towards Democrat observers.  Both were identified by badges.

(See Id., at pars. 13-14).

86.

Another Affiant explained that his ballot was not only not processed in accordance with Election law, he witnessed people reviewing his ballot to decide where to place it, which violated the privacy of his ballot, and when he

34

tried to report it to a voter fraud line, he never received any contact or

cooperation stating:

> "I voted early on October 12 at the precinct at Lynwood Park …
> Because of irregularities at the polling location, I called the voter
> fraud line to ask why persons were discussing my ballot and
> reviewing it to decide where to place it.  When I called the state fraud
> line, I was directed to a worker in the office of the Secretary of
> State…"

(See Attached hereto, Exh. 19, Andrea ONeal Aff, at par. 3).

87.

He further testified that when he was an Observer at the Lithonia

location, he saw many irregularities, and specifically "saw an auditor sort

Biden votes that he collected and sorted into ten ballot stacks, which [the

auditor] did not show anyone."  Id. at p. 8.

88.

Another Affiant testified about the use of different paper for ballots,

that would constitute fraud stating:

> I noticed that almost all of the ballots I reviewed were for Biden.
> Many batches went 100% for Biden.   I also observed that the
> watermark on at least 3 ballots were solid gray instead of
> transparent, leading me to believe the ballot was counterfeit.   I
> challenged this and the Elections Director said it was a legitimate
> ballot and was due to the use of different printers.  Many ballots had
> markings for Biden only, and no markings on the rest of the ballot.

(See Attached hereto, Exh. 20, Aff of Debra J. Fisher, at pars. 4, 5, 6).

89.

An Affiant testified, that while at the Audit, '**While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden.  I witnessed this happen at table "A"'**.  (*See* attached hereto as Exh. 22, Kevin Peterford, at par. 29).    Another Affiant testified, that "I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray. I also witnessed the same two poll workers putting the already separated paper receipt abllots in the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray,  They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet. (See Exh. 17, Johnson, pars. 4-5).

90.

Another Affiant, a Democrat, testified in his sworn affidavit, before he was forced to move back to where he could not see, he had in fact seen**, "*I also saw absentee ballots for Trump inserted**

*into Biden's stack, and counted as Biden votes.  This occurred a few times".*  (See Exh. 18, Par. 12).

91.

A Republican National Committee monitor in Georgia's election recount, Hale Soucie, told an undercover journalist there are individuals counting ballots who have made continuous errors," writes O'Keefe. Project Veritas, Watch:  Latest Project Veritas Video reveals "Multiple Ballots Meant for Trump Went to Biden in Georgia.[11]

### B.   THE VOTING MACHINES, SECRECY SOFTWARE USED BY VOTING MACHINES THROUGHOUT GEORGIA IS CRUCIAL

92.

These violations of federal and state laws impacted the election of November 3, 2020 and set the predicate for the evidence of deliberate fraudulent conduct, manipulation, and lack of mistake that follows. The commonality and statewide nature of these legal violations renders certification of the legal vote untenable and warrants immediate

---

[11]     https://hannity.com/media-room/watch-latest-project-veritas-video-reveals-multiple-ballots-meant-for-trump-went-to-biden-in-georgia/

impoundment of voting machines and software used throughout Georgia for expert inspection and retrieval of the software.

93.

An Affiant, who is a network & information cyber-security expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that the information about scanned **ballots can be tracked inside the software system for Dominion**:

> (a)     When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.

(*See* attached hereto Exh 22, Declaration of Ronald Watkins, at par. 11).

94.

**Affiant further explains that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "(*Id.* at par. 8).

95.

Affiant further testifies that the Dominion/ Smartmatic user manual itself makes clear that the system allows for threshold settings to be set to mark all ballots as "problem ballots" for *discretionary determinations* on where the vote goes.  It states:

> *During the scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages". Through creatively tweaking the oval coverage threshold settings it should be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder. It is possible for an administrator of the ImageCast Central work station to view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system.*

*Id.* at pars. 9-10.

96.

The Affiant further explains the vulnerabilities in the system when the copy of the selected ballots that are approved in the Results folder are made

to a flash memory card – and that is connected to a Windows computer

stating:

> It is possible for an administrator of the "ImageCast Central"
> workstation to view and delete any individual ballot scans from the
> "NotCastImages" folder by simply using the standard Windows delete
> and recycle bin functions provided by the Windows 10 Pro operating
> system. … The upload process is just a simple copying of a "Results"
> folder containing vote tallies to a flash memory card connected to the
> "Windows 10 Pro" machine. The copy process uses the standard drag-
> n-drop or copy/paste mechanisms within the ubiquitous "Windows
> File Explorer". While a simple procedure, this process may be error
> prone and **is very vulnerable to malicious administrators**.

*Id*. at par. 11-13 (emphasis supplied).

97.

It was announced on "Monday, [July 29, 2019], [that] Governor Kemp

awarded a contract for 30,000 new voting machines to Dominion Voting

Systems, scrapping the state's 17-year-old electronic voting equipment and

replacing it with touchscreens that print out paper ballots."[12]  Critics are

quoted: "Led by Abrams, Democrats fought the legislation and pointed to

cybersecurity experts who warned it would leave Georgia's elections

susceptible to hacking and tampering." And "Just this week, the Fair Fight

voting rights group started by [Stacy] Abrams launched a television ad

---

[12] *Georgia Buys New Voting Machines for 2020 Presidential Election, by Mark Niesse, the Atlanta Journal-Constitution, July 30, 2019, https://www.ajc.com/news/state--regional-govt--politics/georgia-awards-contract-for-new-election-system-dominion-voting/tHh3V8KZnZivJoVzZRLO4O/*

critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."[13]

98.

It was further reported in 2019 that the new Dominion Voting Machines in Georgia "[w]ith Georgia's current voting system, there's **no way to guarantee that electronic ballots accurately reflect the choices of voters because there's no paper backup to verify results**, with it being reported that:

(a)     Recounts are meaningless on the direct-recording electronic voting machines because they simply reproduce the same numbers they originally generated.

(b)     But paper ballots alone won't protect the sanctity of elections on the new touchscreens, called ballot-marking devices.

(c)     The new election system depends on voters to verify the printed text of their choices on their ballots, a step that many voters might not take. The State Election Board hasn't yet created regulations for how recounts and audits will be conducted. And paper ballots embed selections in bar codes that are only readable by scanning machines, leaving Georgians uncertain whether the bar codes match their votes.[14]

---

[13] *Georgia Governor Inks Law to Replace Voting Machines, The Atlanta Journal-Constitution, AJC News Now, by Greg Bluestein and Mark Niesse, June 14, 2019; Credit: Copyright 2019 The Associated Press, June 2019*

*i.*   *As part of the scheme and artifice to defraud the plaintiffs, the candidates and the voters of undiminished and unaltered voting results in a free and legal election, the Defendants and other persons known and unknown committed the following violations of law:*

50 U.S.C. § 20701 requires the retention and preservation of records

and papers by officers of elections under penalty of fine and imprisonment:

**§ 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation**

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

50 U.S.C.§ 20701.

99.

In the primaries it was confirmed that, "The rapid introduction of new

technologies and processes in state voting systems heightens the risk of

foreign interference and insider tampering.  That's true even if simple human error or local maneuvering for political advantage are more likely threats[15].

100.

A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience."[16]

101.

As evidence of the defects or features of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a **lack of evidence of efficiency and accuracy and to be safe from fraud or unauthorized manipulation.**[17]

---

[15] *See Threats to Georgia Elections Loom Despite New Paper Ballot Voting, By Mark Niesse, The Atlanta Journal-Constitution and (The AP, Vote-by-Mail worries: A leaky pipeline in many states, August 8, 2020).*

[16] Penn Wharton Study by Matt Caufield, The Business of Voting, July 2018.

[17] Attached hereto, Exh. 23, copy of Report of Review of Dominion Voting Systems Democracy Suite 5.5-A Elections Division by the Secretary of State's office, Elections Division, January 24, 2020.

102.

Plaintiffs have since learned that the "glitches" in the Dominion system—that have the uniform effect of taking votes from Trump and shifting them to Biden—have been widely reported in the press and confirmed by the analysis of independent experts.

103.

Plaintiffs can show, through expert and fact witnesses that:

**c.    Dominion/ Smartmatic Systems Have Massive End User Vulnerabilities.**

1.  Users on the ground have full admin privileges to machines and software.  Having been created to "rig" elections, the Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election.  Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder.  Any anomaly, such as pen drips or bleeds, results in a ballot being rejected.  It is then handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for purely discretionary and improper vote "adjudication."

2.  Affiant witness (name redacted for security reasons[18]), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation to insure Venezuelan dictator Hugo Chavez never lost an election and he saw it work. Id.

    "The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against

persons running the Venezuelan government to votes in their favor in order to maintain control of the government."

(*See* Exh. 2, pars. 6, 9, 10).

104.

Smartmatic's incorporators and inventors have backgrounds evidencing their foreign connections, including Venezuela and Serbia, specifically its identified inventors:

Applicant: SMARTMATIC, CORP.

Inventors: Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso.[19]

105.

The presence of Smartmatic in the United States—owned by foreign nationals, and Dominion, a Canadian company with its offices such as the Office of General Counsel in Germany, would have to be approved by CFIUS. CFIUS was created in 1988 by the Exon-Florio Amendment to the Defense Production Act of 1950. CFIUS' authorizing statute was amended by the Foreign Investment and National Security Act of 2007 (FINSA).

As amended, section 721 of the DPA directs "the President, acting through [CFIUS]," to review a **"covered transaction to determine the effects of the transaction on the national security of the United States."** 50 U.S.C. app. § 2170(b)(1)(A). Section 721 defines

---

19 https://patents.justia.com/assignee/smartmatic-corp

a covered transaction as "any merger, acquisition, or takeover …, by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." Id. § 2170(a)(3).  *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 302, 411 U.S. App. D.C. 105, 111, (2014).  Review of covered transactions under section 721 begins with CFIUS. As noted, CFIUS is chaired by the Treasury Secretary and its members include the heads of various federal agencies and other high-ranking Government officials with foreign policy, national security and economic responsibilities.

106.

Then Congresswoman Carolyn Maloney wrote October 6, 2006 to the Secretary of Treasury, Henry M. Paulson, Jr., Objecting to approval of Dominion/Smartmatic by CFIUS because of its corrupt Venezuelan origination, ownership and control.  (See attached hereto as Exh. 24, Carolyn Maloney Letter of October 6, 2006).  Our own government has long known of this foreign interference on our most important right to vote, and it had either responded with incompetence, negligence, willful blindness, or abject corruption.  In every CFIUS case, there are two TS/SCI reports generated. One by the ODNI on the threat and one by DHS on risk to critical infrastructure.  Smartmatic was a known problem when it was nonetheless approved by CFIUS.

107.

The Wall Street Journal in 2006 did an investigative piece and found that, "Smartmatic came to prominence in 2004 when its machines were used

in an election to recall President Chávez, which Mr. Chávez won handily --

and which the Venezuelan opposition said was riddled with fraud.

Smartmatic put together a consortium to conduct the recall elections,

including a company called Bizta Corp., in which Smartmatic owners had a

large stake. For a time, the Venezuelan government had a 28% stake in Bizta

in exchange for a loan.'[20] …"Bizta paid off the loan in 2004, and Smartmatic

bought the company the following year. But accusations of Chávez

government control of Smartmatic never ended, especially since Smartmatic

scrapped a simple corporate structure, in which it was based in the U.S. with

a Venezuelan subsidiary, for a far more complex arrangement. The company

said it made the change for tax reasons, but critics, including Rep. Carolyn

Maloney (D., N.Y.) and TV journalist Lou Dobbs, pounded the company for

alleged links to the Chávez regime.  *Id.*  Since its purchase by Smartmatic,

Sequoia's sales have risen sharply to a projected $200 million in 2006, said

Smartmatic's chief executive, Anthony Mugica." *Id.*

108.

Indeed, Mr. Cobucci testified, through his sworn affidavit, that he born

in Venezuela, is cousins with Antonio ('Anthony') Mugica, and he has

---

[20] *See WSJ.com, Smartmatic to Sell U.S. Unit, End Probe into Venezuelan Links, by Bob Davis, 12/22/2006,* h*ttps://www.wsj.com/articles/SB116674617078557263*

personal knowledge of the fact that Anthony Mugica incorporated Smartmatic in the U.S. in 2000 with other family members in Venezuela listed as owners.  He also has personal knowledge that Anthony Mugica manipulated Smartmatic to ensure the election for Chavez in the 2004 Referendum in Venezuela.  He also testified, through his sworn affidavit, that Anthony Mugica received tens of millions of dollars from 2003- 2015 from the Venezuelan government to ensure Smartmatic technology would be implemented around the world, including in the U.S.  (See attached hereto, Exh. 25, Juan Carlos Cobucci Aff.)

109.

Another Affiant witness testifies that in Venezuela, she was in an official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed.  Corroborating the testimony of our secret witness, and our witness Mr. Cobucci, cousin of Anthony Mugica, who began Smartmatic, and this witness explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations.  (See Exh. 3, Diaz Cardozo Aff).

110.

Specific vulnerabilities of the systems in question that have been documented or reported include:

48

a. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box.  This opens up a very serious security vulnerability:  the voting machine can make the paper ballot (to add votes or spoil already-cast votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Exh. 7). [21]

b. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

c. We … discovered that at least some jurisdictions were not aware that their systems were online," said Kevin Skoglund, an independent security consultant who conducted the research with nine others, all of them long-time security professionals and academics with expertise in election security. Vice. August 2019. [22]

---

[21] *Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters,* Andrew W. Appel, Richard T. DeMillo, University of California, Berkeley, 12/27/2019.
[22] *Exclusive:  Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

d. October 6, 2006 – Congresswoman Carolyn Maloney called on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.  (See Exh. 24)

e. Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatica now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are."  *Id.*

f. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire[23].

g. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software

---

[23] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions, Access Wire, August 10, 2017, https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.*

inventory provided by Smartmatic is inadequate, … which brings into question the software credibility…"[24]

h.  Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion).[25].

i.  Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election—the biggest automated election run by a private company.  The international community hailed the automation of that first election in the Philippines.[26] The results' transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local election law requirements, Smartmatic and Dominion were required to provide the source code of

---

[24]  *Smartmatic-TIM running out of time to fix glitches, ABS-CBN News, May 4, 2010*
*https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches*
[25] *The Business of Voting*, Penn Wharton, Caufield, p. 16.
[26] *Smartmatic-TIM running out of time to fix glitches, ABS-CBN News, May 4, 2010*
*https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches*

the voting machines prior to elections so that it could be independently verified.[27]

j.  In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden, and House Member Mark Pocan wrote about their *'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience*," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See attached hereto as Exh. 26, copy of Senator Warren, Klobuchar, Wyden's December 6, 2019 letter).

k.  Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county

---

[27] Presumably the machiens were not altered following submission of the code. LONDON, ENGLAND / ACCESSWIRE / August 10, 2017, *Voting Technology Companies in the U.S. - Their Histories and Present Contributions*

election offices, many of whom do not employ a single cybersecurity specialist."[28]

### 111.

An analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. (See Exh. 7).

### 112.

An expert witness in pending litigation in the United States District Court, Northern District Court of Georgia, Atlanta Div., 17-cv-02989 specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on October 4, 2020, (See Exh. 4B, Document 959-4

---

[28] *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

attached hereto, paragraph. 18 and 20 of p. 28, Exh. 4, Hursti Declaration).

wherein he testified or found:

1)      The failure of the Dominion software "*to meet the methods and processes for national standards for managing voting system problems and should not be accepted for use in a public election under any circumstances.*"

2)      In Hursti's declaration he explained that "There is evidence of remote access and remote troubleshooting which presents a grave security implication and certified identified vulnerabilities should be considered an "extreme security risk."  *Id.* Hari Hursti also explained that USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election. *Id.* The fact that there are no controls of the USB drives was seen recently seen the lack of physical security and compliance with professional standards, " in one Georgia County, where it is reported that 3,300 votes were found on memory sticks not loaded plus in Floyd county, another 2,600 were unscanned, and the "found votes" reduced Biden's lead over Donald Trump[29].

(a)      In the prior case against Dominion, supra, further implicating the secrecy behind the software used in Dominion Systems,

---

[29] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and David Wickert,11/19/20.  https://www.ajc.com/politics/recount-finds-thousands-of-georgia-votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

Dr. Eric Coomer, a Vice President of Dominion Voting Systems, testified that even he was not sure of what testing solutions were available to test problems or how that was done, " *I have got to be honest, we might be a little bit out of my bounds of understanding the rules and regulations…* and in response to a question on testing for voting systems problems in relation to issues identified in 2 counties, he explained that "*Your Honor, I'm not sure of the complete test plan… Again Pro V&V themselves determine what test plan in necessary based on their analysis of the code itself.*"  (*Id.* at Document 959-4, pages 53, 62 L.25- p. 63 L3).

113.

Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system."

(See Paragraph 49 of Hursti Declaration).

114.

Rather than engaging in an open and transparent process to give credibility to Georgia's brand-new voting system, the election processes were

55

hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Georgia's Election Code and federal law.

115.

The House of Representatives passed H.R. 2722 in an attempt to address these very risks identified by Hursti, on June 27, 2019:

> *This bill addresses election security through grant programs and requirements for voting systems and paper ballots.*
>
> *The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.*

## ADDITIONAL SPECIFIC FRAUD

116.

On November 4, 2020, the Georgia GOP Chairman issued the following statement:

> *"Let me repeat.  Fulton County elections officials told the media and our observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night to continue counting ballots in secret until 1:00 a.m. [30]*

56

117.

It was widely reported that "As of 7 p.m. on Wednesday Fulton County

Elections officials said 30,000 absentee ballots were not processed due to a

pipe burst."[31] Officials reassured voters that none of the ballots were

damaged and the water was quickly cleaned up.  But the emergency delayed

officials from processing ballots between 5:30 a.m. and 9:30 a.m.  Officials say

they continued to count beginning at 8:30 a.m. Wednesday.  The statement

from Fulton County continues:

> "Tonight, Fulton County will report results for approximately 86,000 absentee ballots, as well as Election Day and Early Voting results. These represent the vast majority of ballots cast within Fulton County.
>
> "As planned, Fulton County will continue to tabulate the remainder of absentee ballots over the next two days. Absentee ballot processing requires that each ballot is opened, signatures verified, and ballots scanned.  This is a labor-intensive process that takes longer to tabulate than other forms of voting. Fulton County did not anticipate having all absentee ballots processed on Election Day." Officials said they will work to ensure every vote is counted and all laws and regulations are followed.[32]

---

[31] "4,000 remaining absentee ballots being counted in Fulton County", Fox 5 Atlanta, November 3, 2020,  https://www.fox5atlanta.com/news/pipe-burst-at-state-farm-arena-delays-absentee-ballot-processing

[32]  4,000 remaining absentee ballots being counted in Fulton County, Fox 5 Atlanta, November 3, 2020,  https://www.fox5atlanta.com/news/pipe-burst-at-state-farm-arena-delays-absentee-ballot-processing

118.

Plaintiffs have learned that the representation about "a water leak affecting the room where absentee ballots were counted" was not true. The only water leak that needed repairs at State Farm Arena from November 3 – November 5 was a toilet overflow that occurred earlier on November 3.  It had nothing to do with a room with ballot counting, but the false water break representation led to "everyone being sent home."  Nonetheless, first six (6) people, then three (3) people stayed until 1:05 a.m. working on the computers.

119.

An Affiant recounts how she was present at State Farm Arena on November 3, and saw election workers remaining behind after people were told to leave.  (See Exh. 28, Affidavit of Mitchell Harrison; Exh. 29, Affid. of Michelle Branton)

120.

Plaintiffs have also learned through several reports that in 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering.  According to his bio, Coomer graduated from the University of California, Berkeley with a Ph.D. in Nuclear Physics. Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has since been removed from the Dominion page of directors.  Dominion altered its website after

Colorado resident Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA, a domestic terrorist organization where he recorded Eric Coomer representing: "Don't worry. Trump won't win the election, we fixed that." – as well as social media posts with violence threatened against President Trump. (See Joe Oltmann interview with Michelle Malkin dated November 13, 2020 which contains copies of Eric Coomer's recording and tweets).[33]

121.

While the bedrock of American elections has been transparency, almost every crucial aspect of Georgia's November 3, 2020, General Election was shrouded in secrecy, rife with "errors," and permeated with anomalies so egregious as to render the results incapable of certification.

**MULTIPLE EXPERT REPORTS AND STATISTICAL ANALYSES PROVE HUNDREDS OF THOUSANDS OF VOTES WERE LOST OR SHIFTED THAT COST PRESIDENT TRUMP AND THE REPUBLICAN CANDIDATES OF CONGRESSIONAL DISTRICTS 6 AND 7 THEIR RACES.**

122.

As evidenced by numerous public reports, expert reports, and witness statements, Defendants egregious misconduct has included ignoring legislative mandates concerning mail-in and ordinary ballots and led to

---

[33] *Malkin Live: Election Update, Interview of Joe Oltmann,* by Michelle Malkin, November 13, 2020, *available at:*
https://www.youtube.com/watch?v=dh1X4s9HuLo&fbclid=IwAR2EaJc1M9RT3DaUraAjsycM0uPKB3uM_-MhH6SMeGrwNyJ3vNmlcTsHxF4

disenfranchisement of an enormous number of Georgia voters.  Plaintiffs experts can show that, consistent with the above specific misrepresentations, analysis of voting data reveals the following:

(a)      Regarding uncounted mail ballots, based on evidence gathered by Matt Braynard in the form of recorded calls and declarations of voters, and analyzed by Plaintiff's expert, Williams M. Briggs, PhD, shows, based on a statistically significant sample, **that the total number of mail ballots that voters mailed in, but were never counted, have a 95% likelihood of falling between 31,559 and 38,886 total lost votes.**  This range exceeds the margin of loss of President Trump of 12,670 votes by at least 18,889 lost votes and by as many as 26,196 lost votes. (See Exh. 1, Dr. Briggs' Report, with attachments).

(b)      Plaintiff's expert also finds that **voters received tens of thousands of ballots that they never requested.**   (See Exh. 1). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an absentee ballot that they did not request ranges from 16,938 to 22,771.  **This range exceeds the margin of loss of**

**President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.** *Id.*

(c)     This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here.  See O.G.C.A. 21-2-522. **These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud down ballot as well.**

(d)     **Further, as calculated by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state.**  (See Id., attachment to report).  Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

(e)     Applying *pro-rata* the above calculations separately to Cobb

County based on the number of unreturned ballots, a range of 1,255

and 1,687 ballots ordered by 3rd parties and a range of 2,338 and 2,897

lost mail ballots, plus 10,684 voters documented in the NCOA as

having moved, **for a combined minimum of 14,276 missing and**

**unlawful ballots, and maximum of 15,250 missing and unlawful**

**ballots, which exceeds the statewide Presidential race total**

**margin by a range of as few as 1,606 ballots and as many as**

**2,580 in the County of Cobb alone impacting the Cobb County**

**Republican Party ("Cobb County Republicans").**

123.

As seen from the **expert analysis of Eric Quinnell**, mathematical

anomalies further support these findings, when in various districts within

Fulton County such as vote gains that exceed reasonable expectations

when compared to 2016, and a failure of gains to be normally distributed

but instead shifting substantially toward the tail of the distribution in

what is known as a platykurtic distribution.  Dr. Quinell identifies

numerous anomalies such as votes to Biden in excess of 2016 exceed the

registrations that are in excess of 2016.  Ultimately, he identifies the

counties in order of their excess performance over what would have fit in a

normal distribution of voting gains, revealing a list of the most anomalous counties down to the least.  These various anomalies provide evidence of voting irregularities.  (See Exh.27, Declaration of Eric Quinnell, with attachments).

124.

In sum, with the expert analysis of William M. Briggs PhD based on recorded calls and declarations, the extent of missing AND unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism.  In short, tens of thousands of votes did not count while the pattern of fraud makes clear that tens of thousands were improperly counted.  This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

125.

Cobb county, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race.  These election results must be reversed.

126.

Applying *pro-rata* the above calculations separately to Cobb County based on the number of unreturned ballots, a range of 1,255 and 1,687 ballots

63

ordered by 3rd parties and a range of 2,338 and 2,897 lost mail ballots, plus 10,684 voters documented in the NCOA as having moved, **for a combined minimum of 14,276 missing and unlawful ballots, and maximum of 15,250 missing and unlawful ballots, which exceeds the statewide Presidential race total margin by a range of as few as 1,606 ballots and as many as 2,580 in the County of Cobb alone impacting the Cobb County Republican Party ("Cobb County Republicans").** (See Exh. 1).

127.

Mr. Braynard also found a pattern in Georgia of voters registered at totally fraudulent residence addresses, including shopping centers, mail drop stores and other non-residential facilities[34].

128.

In sum, with the expert analysis of William M. Briggs PhD based on extensive investigation, recorded calls and declarations collected by Matt Braynard, (See attachments to Exh. 1, Briggs' report) the extent of missing and unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism. In

---

[34] Matt Braynard, https://twitter.com/MattBraynard/status/1331324173910761476; https://twitter.com/MattBraynard/status/1331299873556086787?s=20; (a)
https://twitter.com/MattBraynard/status/1331299873556086787?s=20

short, tens of thousands of votes did not count while the pattern of fraud and mathematical anomalies that are impossible absent malign human agency makes clear that tens of thousands were improperly counted. This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

129.

Cobb county, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race.

130.

**Russell Ramsland confirms that data breaches in the Dominion software permitted rogue actors to penetrate and manipulate the software during the recent general election.  He further concludes that at least 96,600 mail-in ballots were illegally counted as they were not cast by legal voters.**

131.

In sum, as set forth above, for a host of independent reasons, the Georgia certified election results concluding that Joe Biden received 12,670 more votes that President Donald Trump must be set aside.

# COUNT I

## DEFENDANTS VIOLATED THE ELECTIONS CLAUSE AND 42 U.S.C. § 1983

132.

Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

133.

The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. Art. II, § 1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Art. I, § 4, cl. 1 (emphasis added).

134.

The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. at 193.  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

135.

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to "tak[ing] care that the laws be faithfully executed." Pa. Const. Art. IV, § 2.  Because the United States Constitution reserves for the General Assembly the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

136.

Defendants are not the legislature, and their unilateral decision to create a "cure procedure" violates the Electors and Elections Clauses of the United States Constitution.

137.

The Secretary of State and the State Election Board are not the legislature, and their decision to permit early processing of absentee ballots in direct violation of the unambiguous requirements of O.C.G.A. § 21-2-386(a)(2) violates the Electors and Elections Clauses of the United States Constitution.

138.

Many Affiants testified to many legal infractions in the voting process, including specifically switching absentee ballots or mail-in ballots for Trump to Biden.  Even a Democrat testified in his sworn affidavit that before he was forced to move back to where he could not see, he had in fact seen, "*I also saw absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times*".  (See Exh. 18, Par. 12).

139.

Plaintiff's expert also finds that voters received tens of thousands of ballots that they never requested. (See Exh. 1, Dr. Briggs' Report). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an absentee ballot that they did not request one ranges from 16,938 to 22,771.   This range exceeds the margin of loss of President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.

140.

This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not

68

be in the database of unreturned ballots analyzed here.  *See* O.G.C.A. 21-2-522. These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud.

141.

Further, as shown by data collected by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state.  Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state.  The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

142.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clauses of the Constitution.  Accordingly, the results for President and Congress in the November 3, 2020 election must be set aside.  The results are infected with Constitutional violations.

**COUNT II**

## THE SECRETARY OF STATE AND GEORGIA COUNTIES VIOLATED THE FOURTEENTH AMENDMENT U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF EQUAL PROTECTION

### INVALID ENACTMENT OF REGULATIONS AFFECTING OBSERVATION AND MONITORING OF THE ELECTION

143.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

144.

The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000)(having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

145.

The Court has held that to ensure equal protection, a "problem inheres in the absence of specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary." *Bush v. Gore*, 531 U.S. 98, 106, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388 (2000).

146.

The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

147.

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020, General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

148.

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties in each County, including the Trump Campaign, have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See, e.g.* In plain terms, the statute clearly prohibits opening absentee ballots prior to election day, while the rule authorizes doing so three weeks before election day. There is no reconciling this conflict. The State Election Board has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and regulations, but no authority to promulgate a regulation that is directly contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore plainly and indisputably unlawful.

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522, Grounds for Contest:

149.

A result of a primary or election may be contested on one or more of the following grounds:

150.

(1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;

(2) When the defendant is ineligible for the nomination or office in dispute;

(3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;

(4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

O.C.G.A. § 21-2-522.

151.

Several affiants testified to the improper procedures with absentee ballots processing, with the lack of auditable procedures with the logs in the computer systems, which violates Georgia law, and federal election law.  See

73

also, 50 U.S.C. § 20701 requires the retention and preservation of records and

papers by officers of elections under penalty of fine and imprisonment.

152.

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on

November 23, 2020 for the upcoming January 2021 runoff election.

153.

A large number of ballots were identical and likely fraudulent.  An

Affiant explains that she observed a batch of utterly pristine ballots:

> 14. Most of the ballots had already been handled; they had been
> written on by people, and the edges were worn. They showed obvious
> use. However, one batch stood out. It was pristine. There was a
> difference in the texture of the paper - it was if they were intended
> for absentee use but had not been used for that purposes. There was
> a difference in the feel.
>
> 15. These different ballots included a slight depressed pre-fold so
> they could be easily folded and unfolded for use in the scanning
> machines. There were no markings on the ballots to show where they
> had com~ from, or where they had been processed. These stood out.
>
> 16. In my 20 years of experience of handling ballots, I observed that
> the markings for the candidates on these ballots were unusually
> uniform, perhaps even with a ballot-marking device.  By my estimate
> in observing these ballots, approximately 98% constituted votes for
> Joe Biden.  I only observed two of these ballots as votes for President
> Donald J. Trump."  (See Exh. 15).

154.

The same Affiant further testified specifically to the breach of the chain

of custody of the voting machines the night before the election stating:

we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed. **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day.** The Milton precinct received its machines at 1:00 AM in the morning on Election Day. This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id.*

### 155.

Defendants have a duty to treat the voting citizens in each County in the same manner as the citizens in other counties in Georgia.

### 156.

As set forth in Count I above, Defendants failed to comply with the requirements of the Georgia Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Georgia voters and electors in violation of the United States Constitution guarantee of Equal Protection.

### 157.

Specifically, Defendants denied the plaintiffs equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Georgia Counties by:

(a) mandating that representatives at the pre-canvass and canvass of all absentee and mail-ballots be either Georgia barred

attorneys or qualified registered electors of the county in which
they sought to observe and monitor;

(b) not allowing watchers and representatives to visibly see and
review all envelopes containing official absentee and mail-in
ballots either at or before they were opened and/or when such
ballots were counted and recorded; and

(c) allowing the use of Dominion Democracy Suite software and
devices, which failed to meet the Dominion Certification Report's
conditions for certification.

158.

Instead, Defendants refused to credential all of the Trump Republican's
submitted watchers and representatives and/or kept Trump Campaign's
watchers and representatives by security and metal barricades from the
areas where the inspection, opening, and counting of absentee and mail-in
ballots were taking place. Consequently, Defendants created a system
whereby it was physically impossible for the candidates and political parties
to view the ballots and verify that illegally cast ballots were not opened and
counted

159.

Many Affiants testified to switching absentee ballots or mail-in ballots
for Trump to Biden, including a Democrat.  He testified in his sworn
affidavit, that before he was forced to move back to where he could not see, he

had in fact seen, "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times".  (See Exh. 18, Par. 12).

160.

Other Georgia county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Republicans and the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards and without restricting representatives by any county residency or Georgia bar licensure requirements.

161.

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, depriving them of the equal protection of those state laws enjoyed by citizens in other Counties.

162.

Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution.

163.

Defendants further violated Georgia voters' rights to equal protection

insofar as Defendants allowed the Georgia counties to process and count

ballots in a manner that allowed ineligible ballots to be counted, and through

the use of Dominion Democracy Suite, allowed eligible ballots for Trump and

McCormick to be switched to Biden or lost altogether.  Defendants thus failed

to conduct the general election in a uniform manner as required by the Equal

Protection Clause of the Fourteenth Amendment and the Georgia Election

Code.

164.

Plaintiffs seek declaratory and injunctive relief holding that the

election, under these circumstances, was improperly certified and that the

Governor be enjoined from transmitting Georgia's certified Presidential

election results to the Electoral College.  Georgia law forbids certifying a tally

that includes any ballots that were not legally cast, or that were switched

from Trump to Biden, through the unlawful use of Dominion Democracy

Suite software and devices.

165.

Alternatively, Plaintiffs seek declaratory and injunctive relief holding

that the election, under these circumstances, was improperly certified and

that the Governor be required to recertify the results declaring that Donald

Trump has won the election and  transmitting Georgia's certified Presidential election result in favor of President Trump.

166.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.  Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Georgia law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately. O.C.G.A. § 21-2-520 et seq.

167.

In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the County Election Boards to invalidate ballots cast by: 1) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; 2) all "dead votes"; and 4) all 900 military ballots in Fulton county that supposedly were 100% for Joe Biden.

## COUNT III

### FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF DUE PROCESS

### DISPARATE TREATMENT OF ABSENTEE/MAIL-IN VOTERS AMONG DIFFERENT COUNTIES

168.

Plaintiffs incorporate each of the prior allegations in this Complaint.

Voting is a fundamental right protected by the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin*, 570 F.2d at 1077-78. "[H]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

169.

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to executing the laws as passed by the legislature  Although the Georgia General Assembly may enact laws governing the conduct of elections, "no legislative enactment may

contravene the requirements of the Georgia or United States Constitutions." *Shankey*, 257 A. 2d at 898.

170.

Federal courts "possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court.").

171.

Moreover, "[t]o the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, … the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature[,] . . . particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Georgia's government." *Id.*

172.

The disparate treatment of Georgia voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.*, 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

173.

Defendants are not the legislature, and their unilateral decision to create and implement a cure procedure for some but not all absentee and mail-in voters in this State violates the Due Process Clause of the United States Constitution.  Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

## COUNT IV

### FOURTEENTH AMENDMENT, U.S. CONST. ART. I § 4, CL. 1; ART. II, § 1, CL. 2; AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF DUE PROCESS ON THE RIGHT TO VOTE

174.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

175.

The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper*, 383 U.S. at See also *Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell,* 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

176.

The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.  Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," Burson v. Freeman, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

177.

"Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means counted "at full value without dilution or discount."  *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

178.

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); see also *Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or

84

fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

179.

The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

180.

Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

181.

In Georgia, the signature verification requirement is a dead letter. The signature rejection rate for the most recent election announced by the Secretary of State was 0.15%. The signature rejection rate for absentee ballot applications was .00167% - only 30 statewide. Hancock County, Georgia,

85

population 8,348, rejected nine absentee ballot applications for signature

mismatch. Fulton County rejected eight. No other metropolitan county in

Georgia rejected even a single absentee ballot application for signature

mismatch. The state of Colorado, which has run voting by mail for a number

of years, has a signature rejection rate of between .52% and .66%.[35] The State

of Oregon had a rejection rate of 0.86% in 2016.[36] The State of Washington

has a rejection rate of between 1% and 2%.[37]If Georgia rejected absentee

ballots at a rate of .52% instead of the actual .15%, approximately 4,600 more

absentee ballots would have been rejected.

## COUNT V

### THERE WAS WIDE-SPREAD BALLOT FRAUD.

### OCGA 21-2-522

182.

Plaintiffs refer to and incorporate by reference each of the prior

paragraphs of this Complaint as though the same were repeated at length

herein.

---

[35] *See* https://duckduckgo.com/?q=colorado+signature+rejection+rate&t=osx&ia=web last
visited November 25,2020
[36] *See* https://www.vox.com/21401321/oregon-vote-by-mail-2020-presidential-election, last
visited November 25,2020.
[37] *See* https://www.salon.com/2020/09/08/more-than-550000-mail-ballots-rejected-so-far-heres-how-to-make-sure-your-vote-gets-counted/ last visited November 25, 2020.

183.

Plaintiffs contest the results of Georgia's election, with Standing conferred under pursuant to O.G.C.A. 21-2-521.

184.

Therefore, pursuant to O.G.C.A. 21-2-522, for misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result. The foundational principle that Georgia law "nonetheless allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately." *Martin v. Fulton County Bd. of Registration & Elections*, 307 Ga. 193, 194, 835 S.E.2d 245, 248 (2019).   The Georgia Supreme Court has made clear that Plaintiffs need not show how the [] voters would have voted if their [absentee] ballots had been regular. [] only had to show that there were enough irregular ballots to place in doubt the result." See OCGA § 21-2-520 et seq., *Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (1994) the Supreme Court invalidated an election, and ordered a new election because it found that,

> Thus, [i]t was not incumbent upon [the Plaintiff] to show how the [481] voters would have voted if their [absentee] ballots had been regular. He only had to show that there were enough irregular ballots to place in doubt the result. He succeeded in that task.

*Id.* at 271 (citing *Howell v. Fears*, 275 Ga. 627, 571 SE2d 392, (2002) (primary results invalid where ballot in one precinct omitted names of both qualified candidates).

185.

The "glitches" in the Dominion system—that seem to have the uniform effect of hurting Trump and helping Biden have been widely reported in the press and confirmed by the analysis of independent experts.

186.

Prima facie evidence in multiple affidavits shows specific fraudulent acts, which directly resulted in the flipping of the race at issue:

a) votes being switched in Biden's favor away from Trump during the recount;

b) the lack of procedures in place to follow the election code, and the purchase and use, Dominion Voting System despite evidence of serious vulnerabilities;

c) a demonstration that misrepresentations were made about a pipe burst that sent everyone home, while first six, then three, unknown individuals were left alone until the morning hours working on the machines;

d) further a failure to demonstrate compliance with the Georgia's Election Codes, in maintaining logs on the Voting system for a genuine and sound audit, other than voluntary editable logs that prevent genuine audits.  While the bedrock of this Democratic Republic rests on citizens' confidence in the validity of our elections and a transparent process, Georgia's November 3, 2020 General Election remains under a pall of corruption and irregularity that reflects a pattern of the absence of mistake.  At best, the evidence so far shows ignorance of the truth; at worst, it proves a knowing intent to defraud.

187.

Plaintiff's expert also finds that voters received tens of thousands of ballots that they never requested.  (See Exh. 1, Dr. Briggs' Report). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an **absentee ballot that they did not request ranges from 16,938 to 22,771.**  This range exceeds the margin of loss of President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.

188.

This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here.  See O.G.C.A. 21-2-522. These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud.

189.

Further, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state. Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state.  The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

190.

Plaintiffs" expert Russell Ramsland concludes that at least 96,600 mail-in ballots were fraudulently cast.  He further concludes that up to

136,098 ballots were illegally counted as a result of improper manipulation of the Dominion software. (Ramsland Aff).

191.

The very existence of absentee mail in ballots created a heightened opportunity for fraud.  The population of unreturned ballots analyzed by William Briggs, PhD, reveals the probability that a far greater number of mail ballots were requested by 3rd parties or sent erroneously to persons and voted fraudulently, undetected by a failed system of signature verification. The recipients may have voted in the name of another person, may have not had the legal right to vote and voted anyway, or may have not received the ballot at the proper address and then found that they were unable to vote at the polls, except provisionally, due to a ballot outstanding in their name.

192.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin of votes between the presidential candidates in the

state.  For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

193.

The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

194.

Plaintiffs have no adequate remedy at law.  As seen from the expert analysis of William Higgs, PhD, based on actual voter data, tens of thousands of votes did not count, and tens of thousands of votes were unlawfully requested.

195.

The Fourteenth Amendment Due Process Clause protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (1st Cir. 1978).

196.

Separate from the Equal Protection Clause, the Fourteenth Amendment's due process clause protects the fundamental right to vote against "the disenfranchisement of a state electorate." *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). "When an election process 'reaches the point of patent and fundamental unfairness,' there is a  due process violation." *Florida State  Conference  of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008) (*quoting Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir.1995) (*citing Curry v. Baker*, 802 F.2d  1302, 1315 (11th Cir.1986))). *See also Griffin*, 570 F.2d at 1077 ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order."); *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994) (enjoining winning state senate candidate from exercising official authority where absentee ballots were obtained and cast illegally).

197.

Part of courts' justification for such a ruling is the Supreme Court's recognition that the right to vote and to free and fair elections is one that is preservative of other basic civil and political rights. *See Black*, 209 F.Supp.2d at 900 (quoting *Reynolds*, 377 U.S. at 561-62 ("since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.")); see also *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting … is regarded as a fundamental political right, because [sic] preservative of all rights.").

198.

"[T]he right to vote, the right to have one's vote counted, and the right to have ones vote given equal weight are basic and fundamental constitutional rights incorporated in the due process clause of the Fourteenth Amendment to the Constitution of the United States." Black, 209 F. Supp. 2d at 900 (a state law that allows local election officials to impose different voting schemes upon some portions of the electorate and not others violates due process). "Just as the equal protection clause of the Fourteenth Amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the Fourteenth amendment forbids state

officials from unlawfully eliminating that fundamental right." *Duncan*, 657 F.2d at 704.  "Having once granted the right to vote on equal terms, [Defendants] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

199.

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

200.

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties, including without limitation Plaintiff, Republicans, and the Trump Campaign, shall be "present" and have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

201.

Defendants have a duty to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering.  Rather than heeding these mandates and duties, Defendants arbitrarily and capriciously denied the Trump Campaign and Republicans meaningful access to observe and monitor the electoral process by: (a) mandating that representatives at the pre- canvass and canvass of all absentee and mail-ballots be either Georgia barred attorneys or qualified registered electors of the county in which they sought to observe and monitor; and (b) not allowing watchers and representatives to visibly see and review all envelopes containing official absentee and mail-in ballots either at the time or before they were opened and/or when such ballots were counted and recorded. Instead, Defendants refused to credential all of the Trump Campaign's submitted watchers and representatives and/or kept Trump Campaign's watchers and representatives by security and metal barricades from the areas where the inspection, opening, and counting of absentee and mail-in ballots were taking place. The lack of meaningful access with actual access to see the ballots invited further fraud and cast doubt of the validity of the proceedings.

202.

Consequently, Defendants created a system whereby it was physically impossible for the candidates and political parties to view the ballots and verify that illegally cast ballots were not opened and counted.

203.

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, and included the unlawfully not counting and including uncounted mail ballots, and that they failed to follow absentee ballot requirements when thousands of **voters received ballots that they never requested.** Defendants have acted and will continue to act under color of state law to violate the right to vote and due process as secured by the Fourteenth Amendment to the United States Constitution.

204.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

205.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these

unordered ballots may in fact have been improperly voted and also prevented

proper voting at the polls, the mail ballot system has clearly failed in the

state of Georgia and did so on a large scale and widespread basis.  The size of

the voting failures, whether accidental or intentional, are multiples larger

than the margin in the state.  For these reasons, Georgia cannot reasonably

rely on the results of the mail vote.

206.

Relief sought is the elimination of the mail ballots from counting in the

2020 election. Alternatively, the Presidential electors for the state of Georgia

should be disqualified from counting toward the 2020 election.

207.

The United States Code (3 U.S.C. 5) provides that,

> "[i]f any State shall have provided, by laws enacted prior to the day
> fixed for the appointment of the electors, for its final determination
> of any controversy or contest concerning the appointment of all or
> any of the electors of such State, by judicial or other methods or
> procedures, and such determination shall have been made at least
> six days before the time fixed for the meeting of the electors, such
> determination made pursuant to such law so existing on said day,
> and made at least six days prior to said time of meeting of the
> electors, shall be conclusive, and shall govern in the counting of the
> electoral votes as provided in the Constitution, and as hereinafter
> regulated, so far as the ascertainment of the electors appointed by
> such State is concerned.

3 USCS § 5.

## REQUEST FOR RELIEF

208.

Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

209.

In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, or (iii) are delivered in-person by third parties for non-disabled voters.

210.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented

proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Georgia cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the state of Georgia should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Georgia should be directed to vote for President Donald Trump.

211.

For these reasons,  Plaintiff asks this Court to enter a judgment in their favor and provide the following emergency relief:

1. An order directing Governor Kemp, Secretary Raffensperger and the Georgia State Board of Elections to de-certify the election results;

2. An order enjoining Governor Kemp from transmitting the currently certified election results to the Electoral College;

3. An order requiring Governor Kemp to transmit certified election results that state that President Donald Trump is the winner of the election;

4. An immediate order to impound all the voting machines and
   software in Georgia for expert inspection by the Plaintiffs.

5. An order that no votes received or tabulated by machines that were
   not certified as required by federal and state law be counted.

6. A declaratory judgment declaring that Georgia Secretary of State
   Rule 183-1-14-0.9-.15 violates the Electors and Elections Clause,
   U.S. CONST. art. I, § 4;

7. A declaratory judgment declaring that Georgia's failed system of
   signature verification violates the Electors and Elections Clause by
   working a de facto abolition of the signature verification
   requirement;

8. A declaratory judgment declaring that current certified election
   results violates the Due Process Clause, U.S. CONST. Amend. XIV;

9. A declaratory judgment declaring that mail-in and absentee ballot
   fraud must be remedied with a Full Manual Recount or statistically
   valid sampling that properly verifies the signatures on absentee
   ballot envelopes and that invalidates the certified results if the
   recount or sampling analysis shows a sufficient number of ineligible
   absentee ballots were counted;

10.     An emergency declaratory judgment that voting machines be

Seized and Impounded immediately for a forensic audit—by

plaintiffs' expects;

11.     A declaratory judgment declaring absentee ballot fraud occurred

in violation of Constitutional rights, Election laws and under state

law;

12.     A permanent injunction prohibiting the Governor and Secretary

of State from transmitting the currently certified results to the

Electoral College based on the overwhelming evidence of election

tampering;

13.     Immediate production of 36 hours of security camera recording of

all rooms used in the voting process at State Farm Arena in Fulton

County, GA from 12:00am to 3:00am until 6:00pm on November 3.

14.     Plaintiffs further request the Court grant such other relief as is

just and proper, including but not limited to, the costs of this action

and their reasonable attorney fees and expenses pursuant to 42

U.S.C. 1988.


Respectfully submitted, this 25th day of November, 2020.

CALDWELL, PROPST & DELOACH, LLP

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

CALDWELL, PROPST & DELOACH, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
(404) 843-1956 – Telephone
(404) 843-2737 – Facsimile
hmacdougald@cpdlawyers.com
Counsel for Plaintiffs

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
Julia Z. Haller *
Emily P. Newman*
Virginia Bar License No. 84265
2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler*
NEW YORK BAR NO. 2657120Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
Office (917) 793-1188
Mobile (347) 840-2188
howard@kleinhendler.com
www.kleinhendler.com

*Application for admission pro hac vice
Forthcoming

*Attorneys for Plaintiffs*