## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

| | |
|---|---|
| **CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM and BRIAN JAY VAN GUNDY,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N. SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board,**<br><br>**Defendants.** | **CASE NO.**<br>**1:20-cv-4809-TCB** |

## PLAINTIFFS' EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF AND MEMORANDUM IN SUPPORT THEREOF

# TABLE OF CONTENTS

Table of Authorities ........................................................................................... iii

Statement of Facts ............................................................................................. 1

   I.   Mail-In Ballots and a Pattern of Fraud ............................................... 2

   II.   Ballot Stuffing .................................................................................... 7

Argument and Citation of Authority ................................................................ 14

   I.   Plaintiffs Have Standing ................................................................... 14

   II.   Plaintiffs are Entitled to Injunctive Relief. ...................................... 15

      1.   Plaintiffs Have a Substantial Likelihood of Success on the Merits. ....... 16

      2.   The Plaintiffs Will Suffer Irreparable Harm. ......................... 21

      3.   Weighing Harm to the Opposing Party and the Public Interest. ............ 21

Font Certificate .............................................................................................. 24

Certificate of Service ..................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. United States,* 417 U.S. 211 (1974) .................................................. 18

*Baker v. Carr*, 369 U.S. 186 (1962) ..................................................................... 19

*Burson v. Freeman*, 504 U.S. 191 (1992) ............................................................ 18

*Bush v. Gore*, 531 U.S. 98 (2000) ................................................................. 16, 20

*Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70 (2000) ........................... 15

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) ................................................ 15

*Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (11th Cir. 2018) ....... 15, 21

*Cunningham v. Adams*, 808 F.2d 815 (11th Cir. 1987 ........................................ 16

*Dunn v. Bloomstein*, 405 U.S. 330 (1972) ........................................................... 20

*Ex parte Yarbrough*, 110 U.S. 651 (1884) .......................................................... 18

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir. 1995)...... 15

*McPherson v. Blacker*, 146 U.S. 1 (1892) ........................................................... 15

*Mead v. Sheffield*, 278 Ga. 268 (1994) ............................................................... 15

*New Ga. Project v. Raffensperger*, 2020 U.S. Dist. LEXIS 155901 (N.D. Ga. Aug. 31, 2020) .......................................................................................................... 21

*Nken v. Holder*, 556 U.S. 418, 129 S. Ct. 1749 (2009) ........................................ 21

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ............................................................ 18

*Prichard v. United States*, 181 F.2d 326 (6th Cir. 1950) ..................................... 19

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ............................................................... 18

*Reynolds v. Sims,* 377 U.S. 533 (1964) ..................................................... 17, 18, 19

*Slaughter-House Cases*, 83 U.S. 36 (1873) .......................................................... 17

*Twining v. New Jersey*, 211 U.S. 78 (1908) ......................................................... 17

*United States v. Classic*, 313 U.S. 299 (1941) .................................................... 18

*United States v. Lambert*, 695 F.2d 536 (11th Cir. 1983) .................................... 16

**Statutes**

O.C.G.A. § 21-2-31 .............................................................................................. 16

O.C.G.A. § 21-2-386 ................................................................. 17

O.C.G.A. § 21-2-520 ............................................................ 14, 15

O.C.G.A. § 21-2-522 ................................................................. 20

O.C.G.A. § 24-4-404 ................................................................... 4

O.C.GA. § 21-2-33.1 ................................................................. 16

**Other Authorities**

Joint Cybersecurity Advisory Iranian Advanced Persistent Threat Actor Identified Obtaining Voter Registration Data ................................................... 10

**Rules**

Fed. Rules of Evidence 404(b) ..................................................... 4

## PLAINTIFFS' EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF AND MEMORANDUM IN SUPPORT THEREOF

COMES NOW Plaintiffs, by and through their undersigned counsel, and file this Emergency Motion for Declaratory, Emergency, And Permanent Injunctive Relief and Memorandum of Law in Support Thereof, respectfully requesting relief for the following reasons:

## STATEMENT OF FACTS

The facts establishing the Plaintiffs' right to the relief sought herein are set forth in detail in the Complaint and its accompanying exhibits, all of which are incorporated herein by reference. We present only a summary of certain highlighted facts for the convenience of the court, and because the Complaint is in excess of 100 pages with 29 exhibits.

After a general election and hand recount audit, Vice President Biden was declared the winner of Georgia's General Election for President by a margin of 12,670 votes on November 20, 2020. But the vote count certified by the Defendants on November 20 is wrong. Tens of thousands of votes counted toward Vice President Biden's final tally were the product of illegality, and physical and computer-based fraud leading to "outright ballot stuffing."

On November 27, 2020, Union County officials advised that they are going to wipe the voting machines of all data and bring the count back to zero on

Monday, November 30, 2020. Resetting the machines would destroy relevant evidence now existing on each voting machine. This cannot be allowed.

## I.   MAIL-IN BALLOTS AND A PATTERN OF FRAUD

Sworn affidavit testimony and detailed analyses of reported election results demonstrate that 96,600 mail-in votes were illegally cast. (See Compl. Exh. 9, Ramsland Aff., par. 11). As Plaintiffs' expert, Russel Ramsland, explains:

> The first red flag comes from mail-in ballots dates. The voter records of the counties show that 96,600 mail-in ballots were voted, yet the county records show they were never received back. Further, 42 mail-in ballots were received back completed *before* they were mailed out to the voter by the county, 1,887 mail-in ballots were received back completed *the same day* they were mailed out to the voter by the county, 1,786 mail-in ballots were received back completed *one day after* they were mailed out to the voter by the county and 2,275 mail-in ballots were received back completed only *two days after* they were mailed out to the voter by the county. This impossible phenomenon occurred throughout the counties of Georgia and were not an isolated event. Following is a summary:

GEORGIA MAIL-IN BALLOT ISSUES

| | |
|---|---|
| Ballots received back completed BEFORE they were mailed out | 42 |
| Ballots received back completed THE SAME DAY they were mailed out | 1,887 |
| Ballots received back completed ONE day after they were mailed out | 1,786 |
| Ballots received back completed TWO days after they were mailed out | 2,275 |
| Total Ballots with impossible mail out and received back completed dates | 5,990 |

| | |
|---|---:|
| Ballots with NO RETURN RECORD AT ALL | 231,188 |
| Ballots with NO RETURN RECORD & Cancelled | -134,588 |
| Ballots with NO RETURN RECORD & Voted | 96,600 |

(See Ex. 9 at pars. 15 – 19.)

Separately, evidence gathered by Matt Braynard in the form of recorded calls and declarations of voters, and analyzed by Plaintiffs' expert, William M. Briggs, Ph.D., shows that, based on a statistically significant sample, **the total number of mail ballots that voters mailed in, but were never counted, have a 95% likelihood of falling between 31,559 and 38,886 total lost votes.** This range exceeds the margin of loss of President Trump of 12,670 votes by at least 18,889 lost votes and by as many as 26,196 lost votes. (See Ex. 1, Dr. Briggs' Report).

Further, as calculated by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state. Specifically, these persons were shown on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes. (See Compl. at par. 120).

Additionally, Plaintiffs have presented evidence of a wide-spread fraud in a pattern of incidents that shows an absence of mistake – and always in the favor of

Vice President Biden. Rules of Evidence, 404(b), applicable to civil matters makes clear that, "(b) Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." O.C.G.A. § 24-4-404; Fed. Rules of Evidence 404(b).

Specifically, an Affiant testified about the lack of process and the hostility only towards the Republican party, which is a violation of the Equal Protection Clause:

> I also observed throughout my three days in Atlanta, not once did anyone verify these ballots. In fact, there was no authentication process in place and no envelopes were observed or allowed to be observed. I saw hostility towards Republican observers but never towards Democrat observers. Both were identified by badges.

(*See* Compl. at par. 86; Exh. 18 at par. 12, Aff. of Carlos Silva).

Another Affiant explained that his ballot was not only not processed in accordance with election law, he witnessed people reviewing his ballot to decide where to place it, which violated the privacy of his ballot, and when he tried to report it to a voter fraud line, he never received any contact or cooperation:

> I voted early on October 12 at the precinct at Lynwood Park … Because of irregularities at the polling location, I called the voter fraud line to ask why persons were discussing my ballot and reviewing it to decide where to place it. When I called the state fraud line, I was directed to a worker in the office of the Secretary of State…

4

(Exh. 19, Andrea ONeal Aff, at par. 3)*. This Affiant further testified that when they were an Observer at the Lithonia location, they saw many irregularities, and specifically **"saw an auditor sort Biden votes that he collected and sorted into ten ballot stacks, which [the auditor] did not show anyone**." (*Id*. at par. 8).

Another Affiant testified about the use of different paper for ballots, that would constitute fraud, stating:

> I noticed that almost all of the ballots I reviewed were for Biden. Many batches went 100% for Biden. I also observed that the watermark on at least 3 ballots were solid gray instead of transparent, leading me to believe the ballot was counterfeit. I challenged this and the Elections Director said it was a legitimate ballot and was due to the use of different printers. Many ballots had markings for Biden only, and no markings on the rest of the ballot.

(*See* Compl. at par. 85).

An Affiant, who attended the Audit testified: "While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden. I witnessed this happen at table 'A'". (*See* Exh. 13, at par. 29).

Another Affiant testified that

> I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray. I also witnessed the same two poll workers putting the already separated paper receipt ballots in the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray. They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet.

(See Exh. 17, Johnson Aff., pars. 4-5).

5

Another Affiant, a Democrat, testified in his sworn affidavit, before he was forced to move back to where he could not see, that he had in fact seen "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes. This occurred a few times." (See Compl. at par. 132).

"A Republican National Committee monitor in Georgia's election recount, Hale Soucie, told an undercover journalist there are individuals counting ballots who have made continuous errors," writes O'Keefe. Project Veritas, Watch:  Latest Project Veritas Video reveals "Multiple Ballots Meant for Trump Went to Biden in Georgia.[1]  (See Compl. at par. 88). An Affiant in his sworn affidavit testified, that while at the Audit in Henry County, **"I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden. I witnessed this happen at table "A"'**. (*See* Compl. at par. 76).

The expert analysis of Dr. Shiva Ayyadurai explains that the electronic data files must be analyzed before any wiping of data occurs.

> This Declaration has presented, in multiple counties in Georgia, a consistent pattern of "High Republican, Low Trump" vote pattern anomalies that are improbable. In addition, it was discovered that when ethnic distributions were applied to three (3) counties, the only plausible

---

[1] https://hannity.com/media-room/watch-latest-project-veritas-video-reveals-multiple-ballots-meant-for-trump-went-to-biden-in-georgia/

explanation for the vote distribution was that President Trump received near zero Black votes, which is also highly improbable.

Analysis of DeKalb County enabled the discovery of a "weighted race" algorithm that transferred, using a "weight" of 1.22, approximately 48,000 votes from President Trump to Mr. Biden. In DeKalb County, 373,000 votes were cast. The approximate 48,000 votes transferred to Mr. Biden represents approximately 13% of the total votes cast in DeKalb County.

When one considers the entire State of Georgia, the number of votes cast in DeKalb county represents a mere 7.5% of the total number of votes cast in the entire State of Georgia, which was reported by the Secretary of State of Georgia to be 4,998,482 votes. The analysis herein reveals the number of voters may likely not equal of the number of votes given algorithms were in place to manipulate the tabulation of votes. This result demands that ballot images, log files, CVR, and electronic data files from each precinct be reviewed to validate the integrity of the election in Georgia. Until that time, the election results are unverifiable.

 (See Ex. A to this Motion, at par. 121).

The expert analyses of proven illegal ballots counted from mail-in votes together with first-hand testimonials of fraudulent activity by election officials compels the conclusion that the Defendants' certification of the election in Vice President Biden's favor must be reversed.

## II.   BALLOT STUFFING

Georgia's election process depends entirely on voting machines, tabulators and software purchased from Dominion Voting Systems Corporation ("Dominion") that was compromised. Computerized vote recording and tabulations are controlled by software programs that were designed to cheat, and which were open to human

manipulation. In 2020, ballot stuffing is not simply counting votes of dead people, illegal aliens or out of state residents -- all of which clearly occurred here. See Exh. 1, Briggs Report; Exh. 9, Ramsland Affid. Instead, sworn affidavit testimony and detailed analyses of reported election results demonstrate that over 135,000 votes were illegally transferred from President Trump to Vice President Biden through an algorithm embedded in Dominion's software. (See Exh. 9, Ramsland Aff., para.11).

Manipulation of votes was apparent shortly after the polls closed on November 3, 2020. At approximately 10:00 pm, election officials evacuated State Farm arena where votes were being counted. Fulton County election officials claimed that a plumbing leak represented a threat. This was a lie. Video of the location at the time shows that there was no flood and no emergency. Instead, after all challengers and other personnel left, several election workers stayed behind and continued to feed votes into Dominion tabulators for over three hours, until 1:00 a.m. on November 4. (Compl. at par. 117).

Without supervision or challengers, election officials could have processed tens of thousands of votes from phony vote machine memory cards and thumb drives. They could also have processed thousands of illegal mail-in ballots that were cast by third-parties or even blank ballots that were counted over and over. This kind of voter manipulation would not be uncovered during a recount because

the voting ballots and memory cards with the phony information would just be counted again and run through the same tainted tabulation machines.

The election software and hardware from Dominion, only recently purchased and rushed into use by Defendants Governor Brian Kemp, Secretary of State Brad Raffensperger, and the Georgia Board of Elections, was unsecure, and capable of being manipulated. (See Compl. at par. 4). This is shown by compelling evidence presented in *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 and reviewed in a lengthy order by Judge Totenberg at Doc. No. 964. It is also shown by the expert testimony presented with the Complaint, particularly Exhibits 8[2] ("Spider Declaration") and 9 (Ramsland Affidavit).

Sworn testimony by a former military intelligence expert is consistent with the above Federal Government advisory, and confirms foreign interference through the electronic Voting Systems:

> I was an electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence. I have extensive experience as a white hat hacker used by some of the top election specialists in the world. The methodologies I have employed represent industry standard cyber operation toolkits for digital forensics and OSINT, which are commonly used to certify connections between servers, network nodes and other digital properties and probe to network system vulnerabilities.

---

[2] Exhibit 8 to the Complaint had a slip sheet that erroneously labeled it Exh. 7.

9

In my professional opinion, this affidavit presents unambiguous evidence that Dominion Voter Systems and Edison Research have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, these organizations neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. This represents a complete failure of their duty to provide basic cyber security. This is not a technological issue, but rather a governance and basic security issue: if it is not corrected, future elections in the United States and beyond will not be secure and citizens will not have confidence in the results.

(See Compl. Exh. 8, Aff. at pars. 1 and 21).

The Federal government issued the following Advisory on October 20, 2020:

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(Joint Cybersecurity Advisory Iranian Advanced Persistent Threat Actor Identified

Obtaining Voter Registration Data, Attached as Exhibit B).

The Advisory further states,

Following the review of web server access logs, CISA analysts, in coordination with the FBI, found instances of the cURL and FDM User Agents sending GET requests to a web resource associated with voter

registration data. The activity occurred between September 29 and
October 17, 2020. Suspected scripted activity submitted several hundred
thousand queries iterating through voter identification values and
retrieving results with varying levels of success [Gather Victim Identity
Information (T1589)]. A sample of the records identified by the FBI
reveals they match information in the aforementioned propaganda video.

*(Id*. at pp. 4-5).

Defendants Kemp and Raffensperger rushed through the purchase of

Dominion voting machines and software in 2019 for the 2020 Presidential

Election[3]. The certificate was awarded to Dominion but is undated. (*See* Compl. at

par. 12). Similarly, a test report is signed by Michael Walker as Project Manager

but it too is undated. (See *Id*.). They disregarded all the concerns that caused

Dominion software to be rejected by the Texas Board of elections in 2018 because

it was deemed vulnerable to undetected and non-auditable manipulation. They also

ignored House Bill, HR 2722, that passed the House in 2019 mandating certain

security precautions for voting machines, including that they not be connected to

the internet and have security controls such as paper ballots, unlike those in the

Dominion Voting Systems Democracy Suite package: "*This bill addresses election*

---

[3] Georgia Governor Inks Law to Replace Voting Machines, The Atlanta Journal-
Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press, June
2019. https://www.ajc.com/blog/politics/georgia-governor-inks-law-replace-
voting-machines/xNXs0ByQAOvtXhd27kJdqO/

*security through grant programs and requirements for voting systems and paper ballots"* (See Compl. at par. 112).

An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert recently observed with reference to Dominion voting machines: "**I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with it and a screwdriver**." (*See* Compl. at par. 13).

Evidence of a pattern of voter manipulation from the lack of physical security and compliance with professional standards, "the breaches" and the "glitches" recently seen in a Dominion system used in one Georgia County, where it is reported that 3,300 votes were found on memory sticks not loaded plus in Floyd county, another 2,600 were unscanned, and the "found votes" reduced Vice President Biden's lead over President Trump[4]. (See Compl. at par. 112).

The opportunity to perform the unauthorized manipulation of votes

---

[4] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and David Wickert,11/19/20. https://www.ajc.com/politics/recount-finds-thousands-of-georgia-votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

presented on multiple occasions, including when it was widely reported that as of 7

p.m. on Wednesday Fulton County Elections officials said 30,000 absentee ballots

were not processed due to a pipe burst. Officials reassured voters that none of the

ballots were damaged and the water was quickly cleaned up. (See Compl. at par.

81). But the emergency delayed officials from processing ballots between 5:30

a.m. and 9:30 a.m. Officials say they continued to count beginning at 8:30 a.m.

Wednesday. The statement from Fulton County continued:

> Tonight, Fulton County will report results for approximately 86,000
> absentee ballots, as well as Election Day and Early Voting results. These
> represent the vast majority of ballots cast within Fulton County.
>
> As planned, Fulton County will continue to tabulate the remainder of
> absentee ballots over the next two days. Absentee ballot processing
> requires that each ballot is opened, signatures verified, and ballots
> scanned. This is a labor-intensive process that takes longer to tabulate
> than other forms of voting. Fulton County did not anticipate having all
> absentee ballots processed on Election Day. Officials said they will work
> to ensure every vote is counted and all laws and regulations are
> followed.[5]

(See Compl. at par. 114.)

Plaintiffs have learned that the representation that "a water leak affecting the

room where absentee ballots were counted" was false. The only water leak that

---

[5] 4,000 remaining absentee ballots being counted in Fulton County, Fox 5
Atlanta, November 3, 2020, https://www.fox5atlanta.com/news/pipe-burst-at-
state-farm-arena-delays-absentee-ballot-processing

needed repairs at State Farm Arena from November 3 to November 5 was a toilet overflow that occurred on November 3. It did not affect the room with ballot counting, but the water break representation led to "everyone being sent home." Nonetheless, first six (6) people, then three (3) people stayed until 1:05 a.m. working on the computers. (See Compl. at par. 115)

In sum, there are multiple independent bases for concluding that the Defendants' certification of the election in Vice President Biden's favor was incorrect. With only12,670 votes separating the candidates out of a total of 4,998,482 cast, the evidence shows far more illegal or fraudulent ballots than necessary to change the results. Defendant's certification of the election must be set aside.

## ARGUMENT AND CITATION OF AUTHORITY

### I.    PLAINTIFFS HAVE STANDING

Plaintiffs Pearson, Consiglio, Godwin, Carroll, Fisher and Latham are registered Georgia voters and are nominees of the Republican Party to be Presidential Electors on behalf of the State of Georgia. (Complaint, pars. 23-28). They each have standing to bring this action as voters and as candidates for the office of Elector under O.C.G.A. § 21-2-520, et seq. (election procedures for Georgia election contests). Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n

14

inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of secretaries of state in implementing or modifying state election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

## II.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF.

Under Georgia state law, the Georgia Supreme Court has made clear that, *"[Plaintiffs] need not show how the [] voters would have voted if their [absentee] ballots had been regular. [they] only had to show that there were enough irregular ballots to place in doubt the result." Mead v. Sheffield*, 278 Ga. 268, 272 (1994) (citing O.C.G.A. § 21-2-520, et seq.) (emphasis added).

The Eleventh Circuit recently held that, "To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1288 (11th Cir. 2018) (*citing Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). To obtain a preliminary injunction the movant must satisfy four elements: 1) the likelihood of success on the merits; 2) irreparable harm; 3) the balance of equities favors the movant; and 4) whether the relief sought is in the public interest. *Cunningham v. Adams*, 808 F.2d 815, 818-19 (11th Cir.

15

1987*); see also United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983). All elements are met here.

"When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000). The evidence shows not only that the Defendants failed to administer the November 3, 2020 election in compliance with the Georgia Election Code, but also that illegal or fraudulent votes were counted to make certain the election of Vice President Biden as President of the United States. This conduct violated Plaintiffs' equal protection and due process rights as well their rights under Georgia law.

1. PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Through detailed fact and expert testimony, including documentary evidence contained in the Complaint and its exhibits, Plaintiffs have made a compelling showing the rights of Georgia citizens to select their leaders under the process established by the Georgia Legislature were violated. Indeed, they have committed election frauds and illegalities that violated Georgia laws intended to establish and maintain "the legality and purity of elections," including O.C.G.A. §§ 21-2-31, 21-2-33.1, Article 10 of Chapter 2 of Title 21 of the Georgia Code pertaining to

16

absentee voting, including particularly the absentee ballot processing and signature match requirements of O.C.G.A. § 21-2-386, and Part 5 of Article 11 of Chapter 5 of Title 21 of the Georgia Code pertaining to voting by Optical Scanning Voting Equipment. These acts also violated the Equal Protection Clause of the United States Constitution.

The tally of ballots certified by Defendants giving Vice President Biden a 12,670 vote margin cannot possibly stand in light of the thousands of illegal mail-in ballots that were improperly counted and the vote manipulation caused by the Dominion software and the lack of election law procedure.

Plaintiffs' equal protection claim is straightforward. The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *See Reynolds v. Sims,* 377 U.S. 533, 554 (1964) (The Fourteenth Amendment protects "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the *Slaughter-House Cases*, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte*

17

*Yarbrough*, 110 U.S. 651, 663-64 (1884)); *see also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

The fundamental right of citizens to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

"Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n. 29, *quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting).

"Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States,* 417 U.S. 211, 227 (1974); *see*

18

*also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *Id.* at 227.

"The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Id.* at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir. 1950), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

Practices that promote the casting of illegal or fraudulent ballots, or that fail to contain basic minimum guarantees against such, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

States may not, by arbitrary action or other unreasonable impairment, burden a citizen's right to vote. *See Baker v. Carr*, 369 U.S. 186, 208 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). "Having once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment,

value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05

(2000). Among other things, "specific rules designed to ensure uniform treatment"

in order to prevent "arbitrary and disparate treatment of voters" are required. *Id*. at

106-07; *see also Dunn v. Bloomstein*, 405 U.S. 330, 336 (1972) (providing that

each citizen "has a constitutionally protected right to participate in elections on an

equal basis with other citizens in the jurisdiction").

Additionally, as candidates for election, Plaintiffs seek redress under

Georgia law, O.C.G.A. § 21-2-522, which provides:

> A result of a primary or election may be contested on one or more of the following grounds:
>
> (1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;
>
> (2) When the defendant is ineligible for the nomination or office in dispute;
>
> (3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;
>
> (4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or
>
> (5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

As set forth above, all of the conditions in these subsections, except for

subsection (2) which is not applicable, support the relief Plaintiffs seek.

Accordingly, Plaintiffs have established a likelihood of success on the

20

merits.

2. THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM.

"It is well-settled that an infringement on the fundamental right to vote amounts to an irreparable injury." *New Ga. Project v. Raffensperger*, 2020 U.S. Dist. LEXIS 155901, at 86, (N.D. Ga. Aug. 31, 2020). The irreparable nature of the harm to Plaintiffs is apparent. If the Georgia count was defective, including defective absentee ballots and illegal out of state voters in an amount sufficient to place the outcome in doubt, then Georgia's election results are improper and suspect, resulting in Georgia's electoral college votes going to Democrats, including Vice President Biden, contrary to the votes of the majority of Georgia's qualified electors. Consequently, Plaintiffs will be directly and irreparably harmed by the wrongful denial of their right to cast their votes in the Electoral College for President Trump.

3. WEIGHING HARM TO THE OPPOSING PARTY AND THE PUBLIC INTEREST.

The remaining two factors for the preliminary injunction test, "harm to the opposing party and weighing the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 129 S. Ct. 1749, 1753 (2009).

The Eleventh Circuit recently addressed a claim related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (11th Cir. 2018).

The Court found,

> In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record  here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their **vote** and have their **votes** counted.

*Id.at* 1294-1295.

First,  an immediate temporary restraining order is necessary to preserve the forensic data on the voting machines, which may get "wiped" as this motion is filed.

Second, while it is true that invalidating the results of an election in which millions of people have cast valid votes is a momentous decision, it must be recognized that there is no legitimate harm to the opposing party or any legitimate public interest in enforcing the results of an election decided by illegally cast ballots – a point made indisputably clear by the availability of election invalidation as a remedy in Georgia's election contest statutes.

Plaintiffs are entitled to an order de-certifying Georgia's election results or a stay in the delivery of the certified results to the Electoral College to preserve the status quo while this case proceeds. The Plaintiffs are further entitled to an order making the voting machines available for forensic analysis before they are reset for

the machine recount, and other equitable relief, on an emergency basis, due to the irreparable harm and impending Electors' vote.

The low costs to Defendants and high potential harm to Plaintiffs make this a case with a substantial net harm that an immediate and emergent injunctive relief can prevent. Therefore, it is respectfully requested that the Court grant Plaintiffs' Motion. A proposed form of Order is attached.

Respectfully submitted, this 27th day of November 2020.

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219
(214) 707-1775
*Application for admission pro hac vice
forthcoming

Of Counsel
Emily P. Newman (VA Bar No. 84265)*
Julia Z. Haller (DC Bar No. 466921)*

CALDWELL, PROPST & DELOACH, LLP

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

CALDWELL, PROPST & DELOACH, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
(404) 843-1956 – Telephone
(404) 843-2737 – Facsimile

23

hmacdougald@cpdlawyers.com

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler
Howard Kleinhendler Esquire
New York Bar No. 2657120
369 Lexington Avenue, 12th Floor
New York, New York 10017
Office (917) 793-1188
Mobile (347) 840-2188
howard@kleinhendler.com
www.kleinhendler.com

*Application for admission pro hac vice
forthcoming

*Attorneys for Plaintiffs*

## FONT CERTIFICATE

The undersigned certifies that the foregoing document was prepared in 14-point Times New Roman font and in accordance with the margin and other requirements of Local Rule 5.1.

<u>s/ Harry W. MacDougald</u>
Harry W. MacDougald
Georgia Bar No. 463076

## CERTIFICATE OF SERVICE

This is to certify that I have on this day e-filed the foregoing document with

the Clerk of Court using the CM/ECF system, and that I have delivered the filing

to the Defendants by email and FedEx at the following addresses:

This 27th day of November, 2020.

> Governor Brian Kemp
> 206 Washington Street
> 111 State Capitol
> Atlanta, GA 30334
>
> Secretary of State Brad Raffensperger
> 214 State Capitol
> Atlanta, Georgia 30334
> brad@sos.ga.gov
> soscontact@sos.ga.gov
>
> Rebecca N. Sullivan
> Georgia Department of Administrative Services
> 200 Piedmont A venue SE
> Suite 1804, West Tower
> Atlanta, Georgia 30334-9010
> rebecca.sullivan@doas.ga.gov
>
> David J. Worley
> Evangelista Worley LLC
> 500 Sugar Mill Road
> Suite 245A
> Atlanta, Georgia 30350
> david@ewlawllc.com
>
> Matthew Mashburn
> Aldridge Pite, LLP
> 3575 Piedmont Road, N.E.
> Suite 500

Atlanta, Georgia 30305
mmashburn@aldridgepite.com

Anh Le
Harley, Rowe & Fowler, P.C.
2700 Cumberland Parkway
Suite 525
Atlanta, Georgia 30339
ale@hrflegal.com

s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

Caldwell, Propst & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
404-843-1956