## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM and BRIAN JAY VAN GUNDY, | CIVIL ACTION FILE NO. 1:20-cv-04809-TCB |
| Plaintiffs, | |
| v. | |
| BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N. SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board, | |
| Defendants. | |

## PROPOSED INTERVENOR-DEFENDANTS' AMENDED PROPOSED ANSWER TO PLAINTIFFS' AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Proposed Intervenor-Defendants, the Democratic Party of Georgia, Inc. ("DPG"), the DSCC, and the DCCC (collectively, the "Political Party Committees") by and through their attorneys, answer Plaintiffs' Amended Complaint for declaratory and injunctive relief (hereafter, "Plaintiffs' Complaint") as set forth below. Unless expressly admitted, each allegation in the complaint is denied, and the Political Party Committees demand strict proof thereof.

## NATURE OF THE ACTION

Responding to the unnumbered introductory paragraph and the footnote referenced therein, the Political Party Committees deny the allegations.

1.        Paragraph 1 of Plaintiffs' Complaint states:

As a civil action, the Plaintiffs' burden of proof is a "preponderance of the evidence" to show, as the Georgia Supreme Court has made clear that, *"[i] was not incumbent upon [Plaintiff] to show how the [] voters would have voted if their [absentee] ballots had been regular. [Plaintiff] only had to show that there were enough irregular ballots to place in doubt the result." Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (2004) (*citing Howell v. Fears*, 275 Ga. 627, 571 S.E.2d 392 (2002).

**Answer**:  The Political Party Committees admit that the quoted language is from *Mead*. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited cases, the Political Party Committees deny the allegations.

2.        Paragraph 2 of Plaintiffs' Complaint states:

The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to make certain the election of Joe Biden as President of the United States.

**Answer**:  Denied.

3.      Paragraph 3 of Plaintiffs' Complaint states:

The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious is the systemic adaptation of old-fashioned "ballot-stuffing."  It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose.  Mathematical and statistical anomalies rising to the level of impossibilities, as shown by affidavits of multiple witnesses, documentation, and expert testimony evince this scheme across the state of Georgia.  Especially egregious conduct arose in Forsyth, Paulding, Cherokee, Hall, and Barrow County. This scheme and artifice to defraud affected tens of thousands of votes in Georgia alone and "rigged" the election in Georgia for Joe Biden.

**Answer**: Denied.

4.      Paragraph 4 of Plaintiffs' Complaint states:

The massive fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") only recently purchased and rushed into use by Defendants Governor Brian Kemp, Secretary of State Brad Raffensperger, and the Georgia Board of Elections. Sequoia voting machines were used in 16 states and the District of Colombia in 2006. Smartmatic, which has revenue of about $100 million, focuses on Venezuela and other markets outside the U.S. After selling Sequoia, Smartmatic's chief executive, Anthony Mugica. Mr. Mugica said, he hoped Smartmatic would work with Sequoia on projects in the U.S., though Smartmatic wouldn't take an equity stake." *Id.*

**Answer**:  The Political Party Committees deny that any fraud occurred with

respect to the Dominion Voting Systems Corporation ("Dominion") election

software and hardware. The Political Party Committees lack sufficient information to admit or deny the remaining allegations in Paragraph 4 of Plaintiffs' Complaint and on that basis deny the same.

5.      Paragraph 5 of Plaintiffs' Complaint states:

Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election. (*See* Redacted whistleblower affiant, *attached as Exh. 2*) Notably, Chavez "won" every election thereafter.

**Answer**: Denied.

6.      Paragraph 6 of Plaintiffs' Complaint states:

As set forth in the accompanying whistleblower affidavit, the Smartmatic software was designed to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system.

**Answer**: The Political Party Committees admit that the quoted language is from the affidavit attached to Plaintiffs' Complaint. The Political Party Committees lack knowledge and information sufficient to form a belief about

the truth of the substance of the quoted language or any other or different allegation in Paragraph 6 and, on that basis, deny the same.

7.      Paragraph 7 of Plaintiffs' Complaint states:

A core *requirement* of the Smartmatic software design was the *software's ability to hide its manipulation of votes from any audit*.  As the whistleblower explains:

Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not be tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. (See *Id.*, see also Exh. 3, Aff. Cardozo, attached hereto)).

**<u>Answer</u>**: The Political Party Committees admit that the quoted language is from the affidavit attached to Plaintiffs' Complaint. The Political Party Committees lack knowledge and information sufficient to form a belief as to the truth of the substance of the quoted language and of each and every other allegation in Paragraph 7 and, on that basis, deny the same.

8.      Paragraph 8 of Plaintiffs' Complaint states:

The design and features *of* the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events. Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.  (*See* Hursti August 2019 Declaration, attached hereto as Exh. 4, at pars. 45-48; and attached hereto, as Exh. 4B, October 2019 Declaration in Document 959-4, at p. 18, par. 28).

**Answer**: The Political Party Committees lack sufficient information to admit or deny the allegations in Paragraph 8 of Plaintiffs' Complaint and on that basis deny the same.

9.      Paragraph 9 of Plaintiffs' Complaint states:

Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log. There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to the internet in violation of professional standards and state and federal laws. (*See Id.*)

**Answer**: The Political Party Committees deny that there is any physical evidence, much less incontrovertible physical evidence, that the standards of physical security of the voting machines and the software were breached. The Political Party Committees lack sufficient information to admit or deny the

remaining allegations in Paragraph 9 of Plaintiffs' Complaint and on that basis

deny the same.

10.      Paragraph 10 of Plaintiffs' Complaint states:

Moreover, lies and conduct of Fulton County election workers about a delay in voting at State Farm Arena and the reasons for it evince the fraud.

**Answer**: Denied.

11.      Paragraph 11 of Plaintiffs' Complaint states:

Specifically, video from the State Farm Arena in Fulton County shows that on November 3rd after the polls closed, election workers falsely claimed a water leak required the facility to close.  All poll workers and challengers were evacuated for several hours at about 10:00 PM.  However, several election workers remained unsupervised and unchallenged working at the computers for the voting tabulation machines until after 1:00 AM.

**Answer**: The Political Party Committees admit that news reports reported that

a pipe burst at the State Farm Arena at approximately 6:00 AM on November

3. The Political Party Committees deny they have knowledge that election

workers falsely claimed that such a water leak occurred. The Political Party

Committees lack knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of Paragraph 11 and, on that basis, deny

the same.

12.      Paragraph 12 of Plaintiffs' Complaint states:

Defendants Kemp and Raffensperger rushed through the purchase of
Dominion voting machines and software in 2019 for the 2020 Presidential
Election.  A certificate from the Secretary of State was awarded to Dominion
Voting Systems but is undated.  (*See* attached hereto Exh. 5, copy
Certification for Dominion Voting Systems from Secretary of State).
Similarly a test report is signed by Michael Walker as Project Manager but is
also undated.  (See Exh. 6, Test Report for Dominion Voting Systems,
Democracy Suite 5-4-A)

**Answer**: The Political Party Committees admit that the copy of the Certificate

for Dominion Voting Systems in Plaintiffs' Exhibit 5 and the copy of the test

report in Plaintiffs' Exhibit 6 are undated. The Political Party Committees lack

knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 12 and, on that basis, deny the same.

13.      Paragraph 13 of Plaintiffs' Complaint states:

Defendants Kemp and Raffensperger disregarded all the concerns that
caused Dominion software to be rejected by the Texas Board of Elections in
2018, namely that it was vulnerable to undetected and non-auditable
manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of
Computer Science and Election Security Expert has recently observed, with
reference to Dominion Voting machines: "I figured out how to make a
slightly different computer program that just before the polls were closed, it
switches some votes around from one candidate to another. I wrote that
computer program into a memory chip and now to hack a voting machine
you just need 7 minutes alone with it and a screwdriver." (Attached hereto
Exh. 7, Study, Ballot-Marking Devices (BMDs) Cannot Assure the Will of
the Voters by Andrew W. Appel Princeton University, Richard A. DeMillo,
Georgia Tech Philip B. Stark, for the Univ. of California, Berkeley,
December 27, 2019).

**Answer**: The Political Party Committees deny that the quoted language is from Plaintiffs' Exhibit 7. The Political Party Committees lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 13 and, on that basis, deny the same.

14.     Paragraph 14 of Plaintiffs' Complaint states:

As explained and demonstrated in the accompanying redacted declaration of a former electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020.  This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer is listed as the first of the inventors of Dominion Voting Systems.  (See Attached hereto as Exh. 8, copy of redacted witness affidavit, 17 pages, November 23, 2020).

**Answer**: The Political Party Committees admit that the copy of the patent records for Dominion Systems in Exhibit 8 (erroneously labeled by Plaintiffs as Exhibit 7) list Eric Coomer as the first of the inventors of the ballot security features patent assigned by Dominion Voting Systems Corporation and deny the remaining allegations in Paragraph 14.

15.     Paragraph 15 of Plaintiffs' Complaint states:

Expert Navid Keshavarez-Nia explains that US intelligence services had developed tools to infiltrate foreign voting systems including Dominion.  He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states.  He concludes that hundreds of thousands of votes that

8

were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden.  (Exh. 26).

**Answer**:  Denied.

16.      Paragraph 16 of Plaintiffs' Complaint states:

Additionally, incontrovertible evidence Board of Elections records demonstrates that at least 96,600 absentee ballots were requested and counted but were never recorded as being returned to county election boards by the voter.  *Thus, at a minimum,  96,600 votes must be disregarded*.  (See Attached hereto, Exh. 9, R. Ramsland Aff.).

**Answer**: Denied.

17.      Paragraph 17 of Plaintiffs' Complaint states:

The Dominion system used in Georgia erodes and undermines the reconciliation of the number of voters and the number of ballots cast, such that these figures are permitted to be unreconciled, opening the door to ballot stuffing and fraud. The collapse of reconciliation was seen in Georgia's primary and runoff elections this year, and in the November election, where it was discovered during the hand audit that 3,300 votes were found on memory sticks that were not uploaded on election night, plus in Floyd county, another 2,600 absentee ballots had not been scanned. These "found votes" reduced Biden's lead over Donald Trump.

**Answer**: The Political Party Committees admit that recounts discovered

previously uncounted votes and deny every remaining allegation in Paragraph

17.

18.      Paragraph 18 of Plaintiffs' Complaint states:

Georgia's election officials and poll workers exacerbated and helped, whether knowingly or unknowingly, the Dominion system carry out massive

voter manipulation by refusing to observe statutory safeguards for absentee ballots. Election officials failed to verify signatures and check security envelopes. They barred challengers from observing the count, which also facilitated the fraud.

**Answer**: Denied.

19.      Paragraph 19 of Plaintiffs' Complaint states:

Expert analysis of the actual vote set forth below demonstrates that at least 96,600 votes were illegally counted during the Georgia 2020 general election. All of the evidence and allegation herein is more than sufficient to place the result of the election in doubt. More evidence arrives by the day and discovery should be ordered immediately.

**Answer**: Denied.

20.      Paragraph 20 of Plaintiffs' Complaint states:

Georgia law, (OCGA 21-5-552) provides for a contest of an election where:

(1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result; . . . (3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result; (4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or (5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

**Answer**: The Political Party Committees affirmatively state that the quoted language is from O.C.G.A. § 21-2-522 and deny each other or different allegation.

21.      Paragraph 21 of Plaintiffs' Complaint states:

As further set forth below, all of the above grounds have been satisfied and compel this Court to set aside the 2020 General Election results which fraudulently concluded that Mr. Biden defeated President Trump by 12,670 votes.

**Answer**: Denied.

22.      Paragraph 22 of Plaintiffs' Complaint states:

Separately, and independently, there are sufficient Constitutional grounds to set aside the election results due to the Defendants' failure to observe statutory requirements for the processing and counting of absentee ballots which led to the tabulation of more than fifty thousand illegal ballots.

**Answer**: Denied.

## THE PARTIES

23.      Paragraph 23 of Plaintiffs' Complaint states:

Plaintiff Coreco Ja'Qan ("CJ") Pearson, is a registered voter who resides in Augusta, Georgia. He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.  He has standing to bring this action under *Carson v. Simon*, 2020 US App Lexis 34184 (8th Cir. Oct. 29, 2020).  He brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Georgia Secretary of State on November 20, 2020.  The certified results showed a plurality of 12,670 votes in favor of former Vice-President Joe Biden over President Trump.

**Answer**: The Political Party Committees lack knowledge or information

sufficient to form a belief as to the truth of the allegations in the first sentence

of Paragraph 23. The Political Party Committees admit that Plaintiff Coreco

Ja'Qan Pearson is listed as a nominee of the Republican Party to be a

11

Presidential Elector on the Georgia Secretary of State's website. The Political

Party Committees deny that Plaintiff Coreco has Article III standing to bring

this action. The Political Party Committees admit the last sentence of

Paragraph 23.

24.     Paragraph 24 of Plaintiffs' Complaint states:

Plaintiff Vikki Townsend Consiglio, is a registered voter who resides in
Henry County, Georgia.  She is a nominee of the Republican Party to be a
Presidential Elector on behalf of the State of Georgia.

**Answer**: The Political Party Committees lack knowledge or information

sufficient to form a belief as to the truth of the allegations in the first sentence

of Paragraph 24. The Political Party Committees admit that Plaintiff Vikki

Townsend Consiglio is listed as a nominee of the Republican Party to be a

Presidential Elector on the Georgia Secretary of State's website.

25.     Paragraph 25 of Plaintiffs' Complaint states:

Plaintiff Gloria Kay Godwin, is a registered voter who resides in Pierece
County, Georgia.  She is a nominee of the Republican Party to be a
Presidential Elector on behalf of the State of Georgia.

**Answer**: The Political Party Committees lack knowledge or information

sufficient to form a belief as to the truth of the allegations in the first sentence

of Paragraph 25. The Political Party Committees admit that Plaintiff Gloria

Kay Godwin is listed as a nominee of the Republican Party to be a Presidential Elector on the Georgia Secretary of State's website.

26.      Paragraph 26 of Plaintiffs' Complaint states:

Plaintiff James Kenneth Carroll, is a registered voter who resides in Dodge County, Georgia.  He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

**Answer**: The Political Party Committees lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 26. The Political Party Committees admit that Plaintiff James Kenneth Carroll is listed as a nominee of the Republican Party to be a Presidential Elector on the Georgia Secretary of State's website.

27.      Paragraph 27 of Plaintiffs' Complaint states:

Plaintiff Carolyn Hall Fisher, is a registered voter who resides in Forsyth County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

**Answer**: The Political Party Committees lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 27. The Political Party Committees admit that Plaintiff Carolyn Hall Fisher is listed as a nominee of the Republican Party to be a Presidential Elector on the Georgia Secretary of State's website.

28.        Paragraph 28 of Plaintiffs' Complaint states:

Plaintiff Cathleen Alston Latham, is a registered voter who resides in Coffee County, Georgia.  She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

**Answer**: The Political Party Committees lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 28. The Political Party Committees admit that Plaintiff Cathleen Alston Latham is listed as a nominee of the Republican Party to be a Presidential Elector on the Georgia Secretary of State's website.

29.        Paragraph 29 of Plaintiffs' Complaint states:

Plaintiff Jason M. Shepherd is the Chairman of the Cobb County Republican Party and brings this action in his official capacity on behalf of the Cobb County Republican Party.

**Answer**: The Political Party Committees lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff Jason M. Shepherd's status as the Chairman of the Cobb County Republican Party. These allegations are therefore denied.

30.        Paragraph 30 of Plaintiffs' Complaint states:

Plaintiff Brian Jay Van Gundy is registered voter in Gwinnett County, Georgia.  He is the Assistant Secretary of the Georgia Republican Party.

**Answer**: The Political Party Committees lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff

Brian Jay Van Gundy's residence, voter registration status, or status as the Assistant Secretary of the Georgia Republican Party. These allegations are therefore denied.

31.     Paragraph 31 of Plaintiffs' Complaint states:

Defendant Governor Brian Kemp (Governor of Georgia) is named herein in his official capacity as Governor of the State of Georgia. On or about June 9, 2019, Governor Kemp bought the new Dominion Voting Systems for Georgia, budgeting 150 million dollars for the machines. Critics are quoted, "Led by Abrams, Democrats fought the legislation and pointed to cybersecurity experts who warned it would leave Georgia's elections susceptible to hacking and tampering." And "Just this week, the Fair Fight voting rights group started by [Stacy] Abrams launched a television ad critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."

**<u>Answer</u>**: The Political Party Committees admit that Brian Kemp is the Governor of Georgia. The Political Party Committees lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31 and therefore deny the same.

32.     Paragraph 32 of Plaintiffs' Complaint states:

Defendant Brad Raffensperger ("Secretary Raffensperger") is named herein in his official capacity as Secretary of State of the State of Georgia and the Chief Election Official for the State of Georgia pursuant to Georgia's Election Code and O.C.G.A. § 21-2-50. Secretary Raffensperger is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Secretary Raffensperger serves as the

Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to (i) obtain uniformity in the practices and proceedings of election officials as well as legality and purity in all primaries and general elections, and (ii) be conducive to the fair, legal, and orderly conduct of primaries and general elections. *See* O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Secretary Raffensperger, as Georgia's chief elections officer, is further responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b).

**Answer**: The Political Party Committees admit that Brad Raffensperger is the Secretary of State of Georgia with certain responsibilities as described by law. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited cases and statutory provisions, the Political Party Committees deny the allegations. To the extent a response is otherwise required, the Political Party Committees deny the allegations.

33.     Paragraph 33 of Plaintiffs' Complaint states:

Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (hereinafter the "State Election Board") are members of the State Election Board in Georgia, responsible for "formulating, adopting, and promulgating such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). Further, the State Election Board "promulgate[s] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system" in Georgia. O.C.G.A. § 21-2-31(7). The State Election Board, personally and through the conduct of the Board's employees, officers, agents, and servants, acted under color of state law at

all times relevant to this action and are sued for emergency declaratory and injunctive relief in their official capacities.

**Answer**: The Political Party Committees admit that Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Lee are members of the State Election Board in Georgia with certain responsibilities as defined by law. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited statutory provisions, the Political Party Committees deny the allegations. To the extent a response is otherwise required, the Political Party Committees deny the allegations.

## JURISDICTION AND VENUE

34.     Paragraph 34 of Plaintiffs' Complaint states:

This Court has subject matter jurisdiction under 28 U.S.C. 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**Answer**: The Political Party Committees deny that this Court has subject-matter jurisdiction.

35.     Paragraph 35 of Plaintiffs' Complaint states:

This Court also has subject matter jurisdiction under 28 U.S.C. 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

**Answer**: The Political Party Committees deny that this Court has subject-matter jurisdiction. The Political Party Committees admit that the Plaintiff has quoted *Bush v. Gore* and deny each other or different allegation.

36.      Paragraph 36 of Plaintiffs' Complaint states:

The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57 and 65, Fed. R. Civ. P. 7.

**Answer**: Denied because the Court lacks subject-matter jurisdiction.

37.      Paragraph 37 of Plaintiffs' Complaint states:

This Court has jurisdiction over the related Georgia Constitutional claims and State law claims under 28 U.S.C. 1367.

**Answer**: Denied because the Court lacks subject-matter jurisdiction.

38.      Paragraph 38 of Plaintiffs' Complaint states:

In Georgia, the "legislature" is the General Assembly.  See Ga. Const. Art. III, § I, Para. I.

**Answer**: The Political Party Committees admit that the General Assembly is granted "legislative power" by Ga. Const. Art. III, § I, Para. 1, and deny each other or different allegation.

39.      Paragraph 39 of Plaintiffs' Complaint states:

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to

Secretary Raffensperger, have no authority to exercise that power unilaterally, much less flout existing legislation or the Constitution itself.

**Answer**: Paragraph 39 of Plaintiffs' Complaint contains legal contentions, characterizations, and opinions to which no response is required. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited provisions, the Political Party Committees deny the allegations.

## STATEMENT OF FACTS

40.     Paragraph 40 of Plaintiffs' Complaint states:

Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under Georgia law, O.C.G.A. § 21-2-522 to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results.

**Answer**: The Political Party Committees admit that Plaintiffs' are asserting claims under 42 U.S.C. §§ 1983 and 1988 and under O.C.G.A. § 21-2-522. The Political Party Committees deny that Plaintiffs have established a cognizable claim under any of these provisions.

41.     Paragraph 41 of Plaintiffs' Complaint states:

The United States Constitution sets forth the authority to regulate federal elections, the Constitution provides:

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations,

except as to the Places of choosing Senators. U.S. CONST. art. I, § 4
("Elections Clause").

**Answer**: The Political Party Committees admit that the quoted language is

from U.S. Const. Art. I, section 4 and deny each other or different allegation

in Paragraph 42.

42.       Paragraph 42 of Plaintiffs' Complaint states:

With respect to the appointment of presidential electors, the Constitution
provides: Each State shall appoint, in such Manner as the Legislature thereof
may direct, a Number of Electors, equal to the whole Number of Senators
and Representatives to which the State may be entitled in the Congress: but
no Senator or Representative, or Person holding an Office of Trust or Profit
under the United States, shall be appointed an Elector. U.S. CONST. art. II,
§ 1 ("Electors Clause").

**Answer**: The Political Party Committees admit that the quoted language is

from U.S. Const. art. II, § 1 and deny each other or different allegation in

Paragraph 43.

43.       Paragraph 43 of Plaintiffs' Complaint states:

Neither Defendant is a "Legislature" as required under the Elections Clause
or Electors Clause. The Legislature is "'the representative body which
ma[kes] the laws of the people.'" *Smiley* 285 U.S. 365. Regulations of
congressional and presidential elections, thus, "must be in accordance with
the method which the state has prescribed for legislative enactments." Id. at
367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

**Answer**:  The Political Party Committees admit the quoted language is from *Smiley* and deny each other or different allegation. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited cases, the Political Party Committees deny the allegations.

44.      Paragraph 44 of Plaintiffs' Complaint states:

While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush*, 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley*, 285 U.S. at 365.

**Answer**:  The Political Party Committees admit the quoted language is from *Ariz. State Legislature* and *Bush* and deny each other or different allegation. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited cases, the Political Party Committees deny the allegations.

45.      Paragraph 45 of Plaintiffs' Complaint states:

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522, Grounds for Contest:

A result of a primary or election may be contested on one or more of the following grounds:
(1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;

21

(2) When the defendant is ineligible for the nomination or office in dispute;
(3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;
(4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or
(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

O.C.G.A. § 21-2-522.

**Answer**:  Paragraph 45 of Plaintiffs' Complaint contains legal contentions, characterizations, and opinions to which no response is required. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited provisions, the Political Party Committees deny the allegations.

46.     Paragraph 46 of Plaintiffs' Complaint states:

Under O.C.G.A. § 21-2-10, Presidential Electors are elected.

**Answer**: Admitted.

47.     Paragraph 47 of Plaintiffs' Complaint states:

Under O.C.G.A. § 21-2-386(a)(l)(B), the Georgia Legislature instructed the county registrars and clerks (the "County Officials") to handle the absentee ballots as directed therein. The Georgia Legislature set forth the procedures to be used by each municipality for appointing the absentee ballot clerks to ensure that such clerks would "perform the duties set forth in this Article." *See* O.C.G.A. § 21-2-380.1.

**Answer**: The Political Party Committees admit that the quoted language is from O.C.G.A. § 21-2-386(a)(l)(B). Paragraph 47 of Plaintiffs' Complaint otherwise contains legal contentions, characterizations, and opinions to which no response is required. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited statute, the Political Party Committees deny the allegations.

48.     Paragraph 48 of Plaintiffs' Complaint states:

The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk *shall* write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk *shall* then compare the identifying information on the oath with the information on file in his or her office, *shall* compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and *shall*, if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath. Each elector's name so certified shall be listed by the registrar or clerk on the numbered list of absentee voters prepared for his or her precinct.

O.C.G.A. § 21-2-386(a)(l )(B) (emphasis added).

**Answer**: The Political Party Committees admit that the quoted language is from O.C.G.A. § 21-2-386(a)(l)(B). To the extent Plaintiffs' characterization

23

and interpretation of the cited law differs from the text of the cited statute, the

Political Party Committees deny the allegations. The Political Party

Committees deny each other or different allegation.

49.      Paragraph 49 of Plaintiffs' Complaint states:

Under O.C.G.A. § 21-2-386(a)(l)(C), the Georgia Legislature also
established a clear and efficient process to be used by County Officials if
they determine that an elector has failed to sign the oath on the outside
envelope enclosing the ballot or that the signature does not conform with the
signature on file in the registrar's or clerk's office (a "defective absentee
ballot").

**Answer**: The Political Party Committees admit that O.C.G.A. § 21-2-

386(a)(l)(C) relates to signatures on absentee ballot oaths. To the extent

Plaintiffs' characterization and interpretation of the cited law differs from the

text of the cited statute, the Political Party Committees deny the allegations.

50.      Paragraph 50 of Plaintiffs' Complaint states:

The Georgia Legislature also provided for the steps to be followed by
County Officials with respect to defective absentee ballots:

> *If the elector has failed to sign the oath, or if the signature does not*
> *appear to be valid*, or if the elector has failed to furnish required
> information *or information so furnished does not conform with that*
> *on file in the registrar's or clerk's office*, or if the elector is otherwise
> found disqualified to vote, the registrar or clerk shall write across the
> face of the envelope "Rejected," giving the reason therefor. The board
> of registrars or absentee ballot clerk *shall* promptly *notify the elector*
> *of such rejection*, a copy of which notification *shall* be retained in the

24

files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2 -386(a) (l)(C) (emphasis added).

**Answer**: The Political Party Committees admit that the quoted language is from O.C.G.A. § 21-2 -386(a)(l)(C). To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited statute, the Political Party Committees deny the allegations.

## I.   DEFENDANTS' UNAUTHORIZED ACTIONS VIOLATED THE GEORGIA ELECTION CODE AND CAUSED THE PROCESSING OF DEFECTIVE ABSENTEE BALLOTS

51.      Paragraph 51 of Plaintiffs' Complaint states:

Notwithstanding the clarity of the applicable statutes and the constitutional authority for the Georgia Legislature's actions, on March 6, 2020, the Secretary of State of the State of Georgia, Secretary Raffensperger, and the State Election Board, who administer the state elections (the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (collectively, the "Democrat Party Agencies"), setting forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia.

**Answer**: The Political Party Committees admit that on March 6, 2020, Secretary Raffensperger, the state Election Board, Democratic Party of

Georgia, DSCC, and DCCC entered into a settlement agreement. The Political

Party Committees deny each other or different allegation.

52.      Paragraph 52 of Plaintiffs' Complaint states:

Under the Settlement, however, the Administrators agreed to change the statutorily prescribed manner of handling absentee ballots in a manner that is not consistent with the laws promulgated by the Georgia Legislature for elections in this state.

**Answer**:  Denied.

53.      Paragraph 53 of Plaintiffs' Complaint states:

The Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to county Administrators overriding the statutory procedures prescribed for those officials. That power, however, does not belong to the Secretary of State under the United States Constitution.

**Answer**: Denied.

54.      Paragraph 54 of Plaintiffs' Complaint states:

The Settlement also changed the signature requirement reducing it to a broad process with discretion, rather than enforcement of the signature requirement as statutorily required under O.C.G.A. 21-2-386(a)(l).

**Answer**: Denied.

55.      Paragraph 55 of Plaintiffs' Complaint states:

The Georgia Legislature instructed county registers and clerks (the "County Officials") regarding the handling of absentee ballots in O.C.G.A. S 21-2-386(a)(1)(B), 21-2-380.1. The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

Upon receipt of each absentee ballot, a registrar or clerk shall write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk shall then compare the identifying information on the oath with the information on file in his or her office, shall compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absent elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and shall, if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath …

O.C.G.A. S 21-2-386(a)(1)(B).

**Answer**: The Political Party Committees admit that the quoted language is from O.C.G.A. § 21-2-386(a)(l)(B). To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited statute, the Political Party Committees deny the allegations. The Political Party Committees deny each other or different allegation.

56.     Paragraph 56 of Plaintiffs' Complaint states:

The Georgia Legislature prescribed procedures to ensure that any request for an absentee ballot must be accompanied by sufficient identification of the elector's identity. *See* O.C.G.A. § 21-2-38 l(b)(1) (providing, in pertinent part, "In order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21-2-417 ... ").

**Answer**: The Political Party Committees admit that the quoted language is from O.C.G.A. § 21-2-38l(b)(1). To the extent Plaintiffs' characterization and

interpretation of the cited law differs from the text of the cited statute, the

Political Party Committees deny the allegations. The Political Party

Committees deny each other or different allegation.

57.       Paragraph 57 of Plaintiffs' Complaint states:

An Affiant testified, under oath, that "It was also of particular interest to me
to see that signatures were not being verified and that there were no
corresponding envelopes seen in site." (Attached hereto as Exh. 10, Mayra
Romera, at par. 7).

**Answer**: The Political Party Committees admit that the quoted language is

from Exhibit 10, Paragraph 7 to Plaintiffs' Complaint. The Political Party

Committees deny each other or different allegation.

58.       Paragraph 58 of Plaintiffs' Complaint states:

To reflect the very reason for process, it was documented that in the primary
election, prior to the November 3, 2020 Presidential election, many ballots
got to voters after the election. Further it was confirmed that "Untold
thousands of absentee ballot requests went unfulfilled, and tens of thousands
of mailed ballots were rejected for multiple reasons including arriving too
late to be counted. *See* the Associated Press, Vote-by-Mail worries: A leaky
pipeline in many states, August 8, 2020.

**Answer**: Political Party Committees admit the quote comes from the

referenced Associated Press article. Political Party Committees are without

sufficient information to understand the "very reason for the process" being

alleged in the first sentence of Paragraph 58 and therefore deny the same.

59.     Paragraph 59 of Plaintiffs' Complaint states:

Pursuant to the Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith only partisan-based training - "additional guidance and training materials" drafted by the Democrat Party Agencies' representatives contradicting O.C.G.A. § 21-2-31.

**Answer**: Denied.

**UNLAWFUL EARLY PROCESSING OF ABSENTEE BALLOTS**

60.     Paragraph 60 of Plaintiffs' Complaint states:

In April 2020, the State Election Board adopted on a purportedly "Emergency Basis" Secretary of State Rule 183-1-14-0.9-.15, Processing Ballots Prior to Election Day. Under this rule, county election officials are authorized to begin processing absentee ballots up to three weeks befoe [sic] election day. Thus, the rule provides in part that "(1) Beginning at 8:00 AM on the third Monday prior to Election Day, the county election superintendent **shall be authorized to open the outer envelope of accepted absentee ballots** …" (Emphasis added).

**Answer**: The Political Party Committees admit that the quoted language is from SEB Rule 183-1-14-0.9-.15. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited rule, the Political Party Committees deny the allegations. The Political Party Committees deny each other or different allegation in Paragraph 60.

61.     Paragraph 61 of Plaintiffs' Complaint states:

Rule 183-1-14-0.9-.15 is in direct and irreconcilable conflict with O.C.G.A. § 21-2-386(a)(2), which prohibits the opening of absentee ballots until election day:

> **After the opening of the polls** on the day of the primary, election, or runoff, the registrars or absentee ballot clerks **shall be authorized to open the outer envelope** on which is printed the oath of the elector in such a manner as not to destroy the oath printed thereon; provided, however, that the registrars or absentee ballot clerk shall not be authorized to remove the contents of such outer envelope or to open the inner envelope marked "Official Absentee Ballot," except as otherwise provided in this Code section.

(Emphasis added).

**Answer**: The Political Party Committees admit that the quoted language is from O.C.G.A. § 21-2-386(a)(2). To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited cases, the Political Party Committees deny the allegations. The Political Party Committees deny each other or different allegation in Paragraph 61.

62.     Paragraph 62 of Plaintiffs' Complaint states:

In plain terms, the statute clearly prohibits opening absentee ballots prior to election day, while the rule authorizes doing so three weeks before election day. There is no reconciling this conflict. The State Election Board has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and regulations, but no authority to promulgate a regulation that is directly contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore plainly and indisputably unlawful.

**Answer**: Denied.

30

63.     Paragraph 63 of Plaintiffs' Complaint states:

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on November 23, 2020 for the upcoming January 2021 runoff election.

**Answer**: Denied.

## UNLAWFUL AUDIT PROCEDURES

64.     Paragraph 64 of Plaintiffs' Complaint states:

According to Secretary Raffensperger, in the presidential general election, 2,457,880 votes were cast in Georgia for President Donald J. Trump, and 2,472,002 votes were cast for Joseph R. Biden, which narrowed in Donald Trump's favor after the most recent recount.

**Answer**: The Political Party Committees admit that President-Elect Joe Biden had more votes cast for him during the 2020 General Election in Georgia than President Donald Trump. The Political Party Committees deny each other or different allegation in Paragraph 64.

65.     Paragraph 65 of Plaintiffs' Complaint states:

Secretary Raffensperger declared that for the Hand Recount:

> Per the instructions given to counties as they conduct their audit triggered full hand recounts, designated monitors will be given complete access to observe the process from the beginning. While the audit triggered recount must be open to the public and media, designated monitors will be able to observe more closely. The general public and the press will be restricted to a public viewing area. Designated monitors will be able to watch the recount while standing close to the elections' workers conducting the recount.
>
> Political parties are allowed to designate a minimum of two monitors per county at a ratio of one monitor per party for every ten audit boards in a county... Beyond being able to watch to ensure the recount

31

is conducted fairly and securely, the two-person audit boards conducting the hand recount call out the votes as they are recounted , providing monitors and the public an additional way to keep tabs on the process.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 65 and, on that basis, deny the same.

66.     Paragraph 66 of Plaintiffs' Complaint states:

The audit was conducted O.C.G.A. § 21-2-498 [sic]. This code section requires that audits be completed "in public view" and authorizes the State Board of Elections to promulgate regulations to administer an audit "to ensure that collection of validly cast ballots is complete, accurate and trustworthy throughout the audit."

**Answer**: Paragraph 66 of Plaintiffs' Complaint contains legal contentions, characterizations, and opinions to which no response is required. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited provisions, the Political Party Committees deny the allegations. The Political Party Committees deny each other or different allegation in Paragraph 66.

67.     Paragraph 67 of Plaintiffs' Complaint states:

Plaintiffs can show that Democrat-majority counties provided political parties and candidates, including the Trump Campaign, no meaningful

access or actual opportunity to review and assess the validity of mail-in ballots during the pre-canvassing meetings. While in the audit or recount, they witnessed Trump votes being put into Biden piles.

**Answer**: Denied.

68.      Paragraph 68 of Plaintiffs' Complaint states:

Non-parties Amanda Coleman and Maria Diedrich are two individuals who volunteered to serve as designated monitors for the Donald J. Trump Presidential Campaign, Inc. (the "Trump Campaign") on behalf of the Georgia Republican Party (the "Republican Party") at the Hand Recount. (Attached hereto and incorporated herein as Exhibits 2 and 3), respectively, are true and correct copies of (1) the Affidavit of Amanda Coleman in Support of Plaintiffs' Motion for Temporary Restraining Order (the "Coleman Affidavit"), and (2) the Affidavit of Maria Diedrich in Support of Plaintiffs' Motion for Temporary Restraining Order (the "Diedrich Affidavit"). (See Exh. 11, Coleman Aff.,2; Exh. 12, Diedrich Aff., 2.)

**Answer**: The Political Party Committees lack knowledge and information

sufficient to form a belief about the truth of the allegations in Paragraph 68

and, on that basis, deny the same.

69.      Paragraph 69 of Plaintiffs' Complaint states:

The Affidavits set forth various conduct amounting to federal crimes, clear improprieties, insufficiencies, and improper handling of ballots by County Officials and their employees that Ms. Coleman and Ms. Diedrich personally observed while monitoring the Hand Recount. (See Exh. 11, Coleman Aff., 3-10; Exh. 12, Diedrich Aff., 4-14.)

**Answer**: Denied.

70.      Paragraph 70 of Plaintiffs' Complaint states:

As a result of her observations of the Hand Recount as a Republican Party monitor, Ms. Diedrich declared, "There had been no meaningful way to review or audit any activity" at the Hand Recount. (See Exh. 12, Diedrich Aff.,14.)

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 70 and, on that basis, deny the same.

71.     Paragraph 71 of Plaintiffs' Complaint states:

As a result of their observations of the Hand Recount as Republican Party monitors, Ms. Coleman likewise declared, "There was no way to tell if any counting was accurate or if the activity was proper." (See Exh. 12, Coleman Aff.,10).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 71 and, on that basis, deny the same.

72.     Paragraph 72 of Plaintiffs' Complaint states:

On Election Day, when the Republican poll watchers were, for a limited time, present and allowed to observe in various polling locations, they observed and reported numerous instances of election workers failing to follow the statutory mandates relating to two critical requirements, among other issues:

(1) a voter's right to spoil their mail-in ballot at their polling place on election day and to then vote in-person, and

(2) the ability for voters to vote provisionally on election day when a mail-in ballot has already been received for them, but when they did not cast those mail-in ballots, who sought to vote in person during early voting but was told she already voted; she emphasized that she had not. The clerk told her he would add her manually with no explanation as to who or how someone voted using her name. (Attached hereto as Exh. 13, Aff. Ursula Wolf)

**<u>Answer</u>**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 72 and, on that basis, deny the same.

73.     Paragraph 73 of Plaintiffs' Complaint states:

Another observer for the ballot recount testified that "*at no time did I witness any Recounter or individual participate in the recount verifying signatures [on mail-in ballots].*" (Attached hereto as Exh. 14, Nicholas Zeher Aff).

**<u>Answer</u>**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 73 and, on that basis, deny the same.

74.     Paragraph 74 of Plaintiffs' Complaint states:

In some counties, there was no actual "hand" recounting of the ballots during the Hand Recount, but rather, County Officials and their employees simply

conducted another machine count of the same ballots. (See. Exh. 9, 10). That will not reveal the massive fraud of which plaintiffs complain.

**Answer**: Denied.

75.      Paragraph 75 of Plaintiffs' Complaint states:

A large number of ballots were identical and likely fraudulent. An Affiant explains that she observed a batch of utterly pristine ballots:

14. Most of the ballots had already been handled; they had been written on by people, and the edges were worn. They showed obvious use. However, one batch stood out. It was pristine. There was a difference in the texture of the paper - it was if they were intended for absentee use but had not been used for that purposes. There was a difference in the feel.

15. These different ballots included a slight depressed pre-fold so they could be easily folded and unfolded for use in the scanning machines. There were no markings on the ballots to show where they had com~ from, or where they had been processed. These stood out.

16. In my 20 years of experience of handling ballots, I observed that the markings for the candidates on these ballots were unusually uniform, perhaps even with a ballot-marking device. By my estimate in observing these ballots, approximately 98% constituted votes for Joe Biden. I only observed two of these ballots as votes for President Donald J. Trump." (See Exh. 15 Attached hereto).

**Answer**: The Political Party Committees deny that a "large number" of ballots were "likely fraudulent." The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the remaining allegations contained in Paragraph 75 and, on that basis, deny the same.

36

76.     Paragraph 76 of Plaintiffs' Complaint states:

The same Affiant further testified specifically to the breach of the chain of custody of the voting machines the night before the election stating:

> we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed. **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day.**

The Milton precinct received its machines at 1:00 AM in the morning on Election Day. This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id*.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 76 and, on that basis, deny the same.

77.     Paragraph 77 of Plaintiffs' Complaint states:

The stunning pattern of the nature and acts of fraud demonstrate an absence of mistake.

**Answer**: Denied.

78.     Paragraph 78 of Plaintiffs' Complaint states:

The same Affiant further explained, in sworn testimony, that the breach included: "when we did receive the machines, they were not sealed or

locked, the serial numbers were not what were reflected on the related documentation…" *See Id*.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 78 and, on that basis, deny the same.

79.    Paragraph 79 of Plaintiffs' Complaint states:

An affiant testified that "While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden, I witnessed this happen at table "A".' (See Exh. 14, par. 27).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 79 and, on that basis, deny the same.

80.    Paragraph 80 of Plaintiffs' Complaint states:

The Affiant further testified, that "when this was brought to Ms. Pitts attention, it was met with extreme hostility. At no time did I witness any ballot cast for Joseph Biden be placed in the pile for Donald Trump. (See Exh. 14, par. 28).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted

language or any other allegation in Paragraph 80 and, on that basis, deny the same.

81.      Paragraph 81 of Plaintiffs' Complaint states:

Another Affiant in the mail-in ballot and absentee ballot recounting process, testified in her sworn affidavit, that "on November 16, 2020 … It was also of particular interest to me to see that signatures were not being verified and there were no corresponding envelopes seen in sight." (See Exh. 10, at Par. 7).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 81 and, on that basis, deny the same.

82.      Paragraph 82 of Plaintiffs' Complaint states:

Yet another Affiant, in the recount process, testified that he received push back and a lack of any cooperation and was even threatened as if he did something wrong, when he pointed out the failure to follow the rules with the observers while open mail-in ballot re-counting was occurring, stating:

"However, as an observer, I observed that the precinct had twelve (12) counting tables, but only one (1) monitor from the Republican Party. I brought it up to Erica Johnston since the recount rules provided for one (1) monitor from each Party per ten (10) tables or part thereof…"

(See Attached hereto, Exh. 16, Ibrahim Reyes Aff.)

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted

language or any other allegation in Paragraph 82 and, on that basis, deny the same.

83.     Paragraph 83 of Plaintiffs' Complaint states:

Another Affiant explains a pattern of behavior that is alarming, in his position as an observer in the recount on absentee ballots with barcodes, he testified:

> *I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray*. I also witnessed the same two poll workers putting the already separated paper receipt ballots in the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray, They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet.

(*See* Attached hereto, Exh.17, pars. 4-5, Aff. of Consetta Johson).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 83 and, on that basis, deny the same.

84.     Paragraph 84 of Plaintiffs' Complaint states:

Another Affiant, a Democrat, testified in his sworn affidavit, that before he was forced to move back to where he could not see, he had in fact seen "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes. This occurred a few times". (See attached hereto, Exh. 18 at Par. 12, Aff. of Carlos Silva).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 84 and, on that basis, deny the same. The Political Party Committees deny each other allegation in Paragraph 84.

85.      Paragraph 85 of Plaintiffs' Complaint states:

Yet another Affiant testified about the lack of process and the hostility only towards the Republican party, which is a violation of the Equal Protection Clause. He testified:

> I also observed throughout my three days in Atlanta, not once did anyone verify these ballots. In fact, there was no authentication process in place and no envelopes were observed or allowed to be observed. I saw hostility towards Republican observers but never towards Democrat observers. Both were identified by badges.

(*See Id.*, at pars. 13-14).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 85 and, on that basis, deny the same.

86.      Paragraph 86 of Plaintiffs' Complaint states:

Another Affiant explained that his ballot was not only not processed in accordance with Election law, he witnessed people reviewing his ballot to decide where to place it, which violated the privacy of his ballot, and when

he tried to report it to a voter fraud line, he never received any contact or cooperation stating:

> "I voted early on October 12 at the precinct at Lynwood Park … Because of irregularities at the polling location, I called the voter fraud line to ask why persons were discussing my ballot and reviewing it to decide where to place it. When I called the state fraud line, I was directed to a worker in the office of the Secretary of State…"

(See Attached hereto, Exh. 19, Andrea ONeal Aff, at par. 3).

**<u>Answer</u>**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 86 and, on that basis, deny the same.

87.     Paragraph 87 of Plaintiffs' Complaint states:

He further testified that when he was an Observer at the Lithonia location, he saw many irregularities, and specifically "saw an auditor sort Biden votes that he collected and sorted into ten ballot stacks, which [the auditor] did not show anyone." Id. at p. 8.

**<u>Answer</u>**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 87 and, on that basis, deny the same.

88.     Paragraph 88 of Plaintiffs' Complaint states:

Another Affiant testified about the use of different paper for ballots, that would constitute fraud stating:

> I noticed that almost all of the ballots I reviewed were for Biden. Many batches went 100% for Biden. I also observed that the watermark on at least 3 ballots were solid gray instead of transparent, leading me to believe the ballot was counterfeit. I challenged this and the Elections Director said it was a legitimate ballot and was due to the use of different printers. Many ballots had markings for Biden only, and no markings on the rest of the ballot.

(See Attached hereto, Exh. 20, Aff of Debra J. Fisher, at pars. 4, 5, 6).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 88 and, on that basis, deny the same.

89.     Paragraph 89 of Plaintiffs' Complaint states:

An Affiant testified, that while at the Audit, '**While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden. I witnessed this happen at table "A"**''. (*See* attached hereto as Exh. 22, Kevin Peterford, at par. 29). Another Affiant testified, that "I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray. I also witnessed the same two poll workers putting the already separated paper receipt abllots in the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray, They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet. (See Exh. 17, Johnson, pars. 4-5).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other allegation in Paragraph 89 and, on that basis, deny the same.

90.     Paragraph 90 of Plaintiffs' Complaint states:

Another Affiant, a Democrat, testified in his sworn affidavit, before he was forced to move back to where he could not see, he had in fact seen, "***I also saw absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes. This occurred a few times***". (See Exh. 18, Par. 12).

**Answer**: The Political Party Committees admit that the quoted language is from Exhibit 18 to the Plaintiffs' Complaint. The Political Party Committees deny each other or different allegation in Paragraph 90.

91.     Paragraph 91 of Plaintiffs' Complaint states:

A Republican National Committee monitor in Georgia's election recount, Hale Soucie, told an undercover journalist there are individuals counting ballots who have made continuous errors," writes O'Keefe. Project Veritas, Watch: Latest Project Veritas Video reveals "Multiple Ballots Meant for Trump Went to Biden in Georgia.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 91 and, on that basis, deny the same.

92.      Paragraph 92 of Plaintiffs' Complaint states:

These violations of federal and state laws impacted the election of November 3, 2020 and set the predicate for the evidence of deliberate fraudulent conduct, manipulation, and lack of mistake that follows. The commonality and statewide nature of these legal violations renders certification of the legal vote untenable and warrants immediate impoundment of voting machines and software used throughout Georgia for expert inspection and retrieval of the software.

**Answer**: Denied.

93.      Paragraph 93 of Plaintiffs' Complaint states:

An Affiant, who is a network & information cyber-security expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that the information about scanned **ballots can be tracked inside the software system for Dominion**:

(a) When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.

(*See* attached hereto Exh 22, Declaration of Ronald Watkins, at par. 11).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 93 and, on that basis, deny the same.

94.      Paragraph 94 of Plaintiffs' Complaint states:

**Affiant further explains that the central operator can remove or discard batches of votes**. "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "(Id. at par. 8).

<u>**Answer**</u>: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 94 and, on that basis, deny the same.

95.      Paragraph 95 of Plaintiffs' Complaint states:

Affiant further testifies that the Dominion/ Smartmatic user manual itself makes clear that the system allows for threshold settings to be set to mark all ballots as "problem ballots" for *discretionary determinations* on where the vote goes. It states:

*During the scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages". Through creatively tweaking the oval coverage threshold settings it should be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder. It is possible for an administrator of the ImageCast Central work station to view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named*

*"NotCastImages" which holds ballot scans of "problem ballots". It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system.*

*Id*. at pars. 9-10.

**Answer**:  The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 95 and, on that basis, deny the same.

96.      Paragraph 96 of Plaintiffs' Complaint states:

The Affiant further explains the vulnerabilities in the system when the copy of the selected ballots that are approved in the Results folder are made to a flash memory card – and that is connected to a Windows computer stating:

*It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. ... The upload process is just a simple copying of a "Results" folder containing vote tallies to a flash memory card connected to the "Windows 10 Pro" machine. The copy process uses the standard drag-n-drop or copy/paste mechanisms within the ubiquitous "Windows File Explorer". While a simple procedure, this process may be error prone and **is very vulnerable to malicious administrators**.*

*Id*. at par. 11-13 (emphasis supplied).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted

language or any other or different allegation in Paragraph 96 and, on that basis, deny the same.

97.      Paragraph 97 of Plaintiffs' Complaint states:

It was announced on "Monday, [July 29, 2019], [that] Governor Kemp awarded a contract for 30,000 new voting machines to Dominion Voting Systems, scrapping the state's 17-year-old electronic voting equipment and replacing it with touchscreens that print out paper ballots."12 Critics are quoted: "Led by Abrams, Democrats fought the legislation and pointed to cybersecurity experts who warned it would leave Georgia's elections susceptible to hacking and tampering." And "Just this week, the Fair Fight voting rights group started by [Stacy] Abrams launched a television ad critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."

**Answer**: The Political Party Committees admit that Georgia awarded Dominion Voting Systems a contract for voting machines and these machines have touchscreens. The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 97 and, on that basis, deny the same.

98.      Paragraph 98 of Plaintiffs' Complaint states:

It was further reported in 2019 that the new Dominion Voting Machines in Georgia "[w]ith Georgia's current voting system, there's **no way to guarantee that electronic ballots accurately reflect the choices of voters because there's no paper backup to verify results**, with it being reported that:

(a) Recounts are meaningless on the direct-recording electronic voting machines because they simply reproduce the same numbers they originally generated.

(b) But paper ballots alone won't protect the sanctity of elections on the new touchscreens, called ballot-marking devices.

(c) The new election system depends on voters to verify the printed text of their choices on their ballots, a step that many voters might not take. The State Election Board hasn't yet created regulations for how recounts and audits will be conducted. And paper ballots embed selections in bar codes that are only readable by scanning machines, leaving Georgians uncertain whether the bar codes match their votes.

> *i. As part of the scheme and artifice to defraud the plaintiffs, the candidates and the voters of undiminished and unaltered voting results in a free and legal election, the Defendants and other persons known and unknown committed the following violations of law:*

50 U.S.C. § 20701 requires the retention and preservation of records and papers by officers of elections under penalty of fine and imprisonment:

> **§ 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation**
>
> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election**, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place,

then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

50 U.S.C.§ 20701.

**Answer**: The Political Party Committees admit that the quoted statutory language is from 52 U.S.C. § 20701. As to the 2019 report regarding Dominion machines, the Political Party Committees lack knowledge and information sufficient to form a belief about the truth of these allegations and, on that basis, deny the same. Political Party Committees deny each other or different allegation.

99.      Paragraph 99 of Plaintiffs' Complaint states:

In the primaries it was confirmed that, "The rapid introduction of new technologies and processes in state voting systems heightens the risk of foreign interference and insider tampering. That's true even if simple human error or local maneuvering for political advantage are more likely threats.

**Answer**: The Political Party Committees admit that the quoted language is from the cited articles and deny each other or different allegation.

100.     Paragraph 100 of Plaintiffs' Complaint states:

A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity

of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience."

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the allegation in Paragraph 100 and, on that basis, deny the same.

101.     Paragraph 101 of Plaintiffs' Complaint states:

As evidence of the defects or features of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a **lack of evidence of efficiency and accuracy and to be safe from fraud or unauthorized manipulation**.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 101 and, on that basis, deny the same.

102.     Paragraph 102 of Plaintiffs' Complaint states:

Plaintiffs have since learned that the "glitches" in the Dominion system–that have the uniform effect of taking votes from Trump and shifting them to Biden—have been widely reported in the press and confirmed by the analysis of independent experts.

**Answer**: Denied.

103.     Paragraph 103 of Plaintiffs' Complaint states:

Plaintiffs can show, through expert and fact witnesses that:

**c. Dominion/ Smartmatic Systems Have Massive End User Vulnerabilities.**

51

1. Users on the ground have full admin privileges to machines and software. Having been created to "rig" elections, the Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, results in a ballot being rejected. It is then handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for purely discretionary and improper vote "adjudication."

2. Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation to insure Venezuelan dictator Hugo Chavez never lost an election and he saw it work. Id.

"The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government."

(See Exh. 2, pars. 6, 9, 10).

**Answer**: Denied.

104.     Paragraph 104 of Plaintiffs' Complaint states:

Smartmatic's incorporators and inventors have backgrounds evidencing their foreign connections, including Venezuela and Serbia, specifically its identified inventors:

Applicant: SMARTMATIC, CORP.

Inventors: Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 104 and, on that basis, deny the same.

105.    Paragraph 105 of Plaintiffs' Complaint states:

The presence of Smartmatic in the United States—owned by foreign nationals, and Dominion, a Canadian company with its offices such as the Office of General Counsel in Germany, would have to be approved by CFIUS. CFIUS was created in 1988 by the Exon-Florio Amendment to the Defense Production Act of 1950. CFIUS' authorizing statute was amended by the Foreign Investment and National Security Act of 2007 (FINSA).

As amended, section 721 of the DPA directs "the President, acting through [CFIUS]," to review a "**covered transaction to determine the effects of the transaction on the national security of the United States**." 50 U.S.C. app. § 2170(b)(1)(A). Section 721 defines a covered transaction as "any merger, acquisition, or takeover …, by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." Id. § 2170(a)(3). *Ralls Corp. v. Comm. on Foreign Inv*., 758 F.3d 296, 302, 411 U.S. App. D.C. 105, 111, (2014). Review of covered transactions under section 721 begins with CFIUS. As noted, CFIUS is chaired by the Treasury Secretary and its members include the heads of various federal agencies and other high-ranking Government officials with foreign policy, national security and economic responsibilities.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the apparently quoted language or any other or different allegation in Paragraph 105 and, on that basis, deny the same.

106.     Paragraph 106 of Plaintiffs' Complaint states:

Then Congresswoman Carolyn Maloney wrote October 6, 2006 to the Secretary of Treasury, Henry M. Paulson, Jr., Objecting to approval of Dominion/Smartmatic by CFIUS because of its corrupt Venezuelan origination, ownership and control. (See attached hereto as Exh. 24, Carolyn Maloney Letter of October 6, 2006). Our own government has long known of this foreign interference on our most important right to vote, and it had either responded with incompetence, negligence, willful blindness, or abject corruption. In every CFIUS case, there are two TS/SCI reports generated. One by the ODNI on the threat and one by DHS on risk to critical infrastructure. Smartmatic was a known problem when it was nonetheless approved by CFIUS.

**Answer**: The Political Party Committees admit that Exhibit 24 is a letter sent by Congresswoman Maloney to Secretary Paulson and deny each other or different allegation in paragraph 106 of Plaintiffs' complaint.

107.     Paragraph 107 of Plaintiffs' Complaint states:

The Wall Street Journal in 2006 did an investigative piece and found that, "Smartmatic came to prominence in 2004 when its machines were used in an election to recall President Chávez, which Mr. Chávez won handily -- and which the Venezuelan opposition said was riddled with fraud. Smartmatic put together a consortium to conduct the recall elections, including a company called Bizta Corp., in which Smartmatic owners had a large stake.

For a time, the Venezuelan government had a 28% stake in Bizta in exchange for a loan.' …"Bizta paid off the loan in 2004, and Smartmatic bought the company the following year. But accusations of Chávez government control of Smartmatic never ended, especially since Smartmatic scrapped a simple corporate structure, in which it was based in the U.S. with a Venezuelan subsidiary, for a far more complex arrangement. The company said it made the change for tax reasons, but critics, including Rep. Carolyn Maloney (D., N.Y.) and TV journalist Lou Dobbs, pounded the company for alleged links to the Chávez regime. *Id*. Since its purchase by Smartmatic, Sequoia's sales have risen sharply to a projected $200 million in 2006, said Smartmatic's chief executive, Anthony Mugica." *Id*.

**Answer**: The Political Party Committees admit that the quoted language is from a Wall Street article but lack knowledge and information sufficient to form a belief about the truth of the substance of the language and, on that basis, deny the same. The Political Party Committees deny each other or different allegation in Paragraph 107.

108.    Paragraph 108 of Plaintiffs' Complaint states:

Indeed, Mr. Cobucci testified, through his sworn affidavit, that he born in Venezuela, is cousins with Antonio ('Anthony') Mugica, and he has personal knowledge of the fact that Anthony Mugica incorporated Smartmatic in the U.S. in 2000 with other family members in Venezuela listed as owners. He also has personal knowledge that Anthony Mugica manipulated Smartmatic to ensure the election for Chavez in the 2004 Referendum in Venezuela. He also testified, through his sworn affidavit, that Anthony Mugica received tens of millions of dollars from 2003- 2015 from the Venezuelan government to ensure Smartmatic technology would be implemented around the world, including in the U.S. (See attached hereto, Exh. 25, Juan Carlos Cobucci Aff.)

**Answer**: The Political Party Committees admit that the referenced allegations are from Exhibit 25 of Plaintiffs' complaint but lack knowledge and information sufficient to form a belief about the truth of the substance of the allegations, on that basis, deny the same. The Political Party Committees deny each other or different allegation in Paragraph 108.

109.     Paragraph 109 of Plaintiffs' Complaint states:

Another Affiant witness testifies that in Venezuela, she was in an official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. Corroborating the testimony of our secret witness, and our witness Mr. Cobucci, cousin of Anthony Mugica, who began Smartmatic, and this witness explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Exh. 3, Diaz Cardozo Aff).

**Answer**: The Political Party Committees admit that the referenced allegations are from Exhibit 3 of Plaintiffs' complaint but lack knowledge and information sufficient to form a belief about the truth of the substance of the allegations, on that basis, deny the same. The Political Party Committees deny each other or different allegation in Paragraph 109.

110.     Paragraph 110 of Plaintiffs' Complaint states:

Specific vulnerabilities of the systems in question that have been documented or reported include:

a. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-cast votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Exh. 7).

b. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

c. We … discovered that at least some jurisdictions were not aware that their systems were online," said Kevin Skoglund, an independent security consultant who conducted the research with nine others, all of them long-time security professionals and academics with expertise in election security. Vice. August 2019.

d. October 6, 2006 – Congresswoman Carolyn Maloney called on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela. (See Exh. 24)

e. Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatica now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are." *Id*.

f. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire.

g. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility…"

h. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion).

i. Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election—the biggest automated election run by a private company. The international community hailed the automation of that first election in the Philippines. The results' transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified.

j. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden, and House Member Mark Pocan wrote about their *'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience,"* in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See attached hereto as Exh. 26, copy of Senator Warren, Klobuchar, Wyden's December 6, 2019 letter).

k. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."

**Answer**: The Political Party Committees admit that Plaintiffs have cited various studies, news articles, and letters, but lack knowledge and information sufficient to form a belief about the truth of the of the allegations in Paragraph 110 and, on that basis, deny the same.

111.    Paragraph 111 of Plaintiffs' Complaint states:

An analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees conected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. (See Exh. 7).

**Answer**: The Political Party Committees admit that the referenced allegations are from an exhibit to Plaintiffs' Complaint. The Political Party Committees deny each other or different allegation in Paragraph 111.

112.    Paragraph 112 of Plaintiffs' Complaint states:

An expert witness in pending litigation in the United States District Court, Northern District Court of Georgia, Atlanta Div., 17-cv-02989 specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on October 4, 2020, (See Exh. 4B, Document 959-4 attached hereto, paragraph. 18 and 20 of p. 28, Exh. 4, Hursti Declaration). wherein he testified or found:

1) The failure of the Dominion software "*to meet the methods and processes for national standards for managing voting system problems and should not be accepted for use in a public election under any circumstances*."

2) In Hursti's declaration he explained that "There is evidence of remote access and remote troubleshooting which presents a grave security implication and certified identified vulnerabilities should be considered an "extreme security risk." *Id*. Hari Hursti also explained that USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election. *Id*. The fact that there are no controls of the USB drives was seen recently seen the lack of physical security and compliance with professional standards, " in one Georgia County, where it is reported that 3,300 votes were found on memory sticks not loaded plus in Floyd county, another 2,600 were unscanned, and the "found votes" reduced Biden's lead over Donald Trump.

(a) In the prior case against Dominion, supra, further implicating the secrecy behind the software used in Dominion Systems, Dr. Eric Coomer, a Vice President of Dominion Voting Systems, testified that even he was not sure of what testing solutions were available to test problems or how that was done, "*I have got to be honest, we might be a little bit out of my bounds of understanding the rules and regulations*… and in response to a question on testing for voting systems problems in relation to issues identified in 2 counties, he explained that "*Your Honor, I'm not sure of the complete test plan… Again Pro V&V themselves determine what test plan in necessary based on their analysis of the code itself*." (*Id*. at Document 959-4, pages 53, 62 L.25- p. 63 L3).

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the apparently quoted language or any other or different allegation in Paragraph 112 and, on that basis, deny the same.

113.    Paragraph 113 of Plaintiffs' Complaint states:

Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system."

(See Paragraph 49 of Hursti Declaration).

**Answer**: The Political Party Committees admit that the quoted language is from the Exhibit 4, paragraph 49. The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 113 and, on that basis, deny the same.

114.    Paragraph 114 of Plaintiffs' Complaint states:

Rather than engaging in an open and transparent process to give credibility to Georgia's brand-new voting system, the election processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Georgia's Election Code and federal law.

**Answer**: Denied.

115.     Paragraph 115 of Plaintiffs' Complaint states:

The House of Representatives passed H.R. 2722 in an attempt to address these very risks identified by Hursti, on June 27, 2019:

> *This bill addresses election security through grant programs and requirements for voting systems and paper ballots.*
>
> *The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.*

**Answer**: The Political Party Committees admit that the quoted language is from Congressional Research Service's bill summary for H.R. 2722 and deny each other or different allegation in Paragraph 115.

116.     Paragraph 116 of Plaintiffs' Complaint states:

On November 4, 2020, the Georgia GOP Chairman issued the following statement:

> *"Let me repeat. Fulton County elections officials told the media and our observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night to continue counting ballots in secret until 1:00 a.m.*

**Answer**: The Political Party Committees admit that the quoted language is from a statement of the Georgia GOP Chairman and deny each other or different allegation in Paragraph 116.

117.     Paragraph 117 of Plaintiffs' Complaint states:

It was widely reported that "As of 7 p.m. on Wednesday Fulton County Elections officials said 30,000 absentee ballots were not processed due to a pipe burst." Officials reassured voters that none of the ballots were damaged and the water was quickly cleaned up. But the emergency delayed officials from processing ballots between 5:30 a.m. and 9:30 a.m. Officials say they continued to count beginning at 8:30 a.m. Wednesday. The statement from Fulton County continues:

> "Tonight, Fulton County will report results for approximately 86,000 absentee ballots, as well as Election Day and Early Voting results. These represent the vast majority of ballots cast within Fulton County.

> "As planned, Fulton County will continue to tabulate the remainder of absentee ballots over the next two days. Absentee ballot processing requires that each ballot is opened, signatures verified, and ballots scanned. This is a labor-intensive process that takes longer to tabulate than other forms of voting. Fulton County did not anticipate having all absentee ballots processed on Election Day." Officials said they will work to ensure every vote is counted and all laws and regulations are followed.

**Answer**: The Political Party Committees admit that the quoted language appears in the cited news articles and deny each other or different allegation in Paragraph 117.

118.     Paragraph 118 of Plaintiffs' Complaint states:

Plaintiffs have learned that the representation about "a water leak affecting the room where absentee ballots were counted" was not true. The only water leak that needed repairs at State Farm Arena from November 3 – November 5 was a toilet overflow that occurred earlier on November 3. It had nothing to do with a room with ballot counting, but the false water break representation led to "everyone being sent home." Nonetheless, first six (6) people, then three (3) people stayed until 1:05 a.m. working on the computers.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 118 and, on that basis, deny the same. The Political Party Committees deny each other or different allegation in Paragraph 118.

119.     Paragraph 119 of Plaintiffs' Complaint states:

An Affiant recounts how she was present at State Farm Arena on November 3, and saw election workers remaining behind after people were told to leave. (See Exh. 28, Affidavit of Mitchell Harrison; Exh. 29, Affid. of Michelle Branton)

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 119 and, on that basis, deny the same.

120.     Paragraph 120 of Plaintiffs' Complaint states:

Plaintiffs have also learned through several reports that in 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering. According to his bio, Coomer graduated from the University of California, Berkeley with a

Ph.D. in Nuclear Physics. Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has since been removed from the Dominion page of directors. Dominion altered its website after Colorado resident Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA, a domestic terrorist organization where he recorded Eric Coomer representing: "Don't worry. Trump won't win the election, we fixed that." – as well as social media posts with violence threatened against President Trump. (See Joe Oltmann interview with Michelle Malkin dated November 13, 2020 which contains copies of Eric Coomer's recording and tweets).

**Answer**: The Political Party Committees lack information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 120 and, on that basis, deny the same.

121.    Paragraph 121 of Plaintiffs' Complaint states:

While the bedrock of American elections has been transparency, almost every crucial aspect of Georgia's November 3, 2020, General Election was shrouded in secrecy, rife with "errors," and permeated with anomalies so egregious as to render the results incapable of certification:

**Answer**: Denied.

122.    Paragraph 122 of Plaintiffs' Complaint states:

As evidenced by numerous public reports, expert reports, and witness statements, Defendants egregious misconduct has included ignoring legislative mandates concerning mail-in and ordinary ballots and led to disenfranchisement of an enormous number of Georgia voters. Plaintiffs experts can show that, consistent with the above specific misrepresentations, analysis of voting data reveals the following:

(a) Regarding uncounted mail ballots, based on evidence gathered by Matt Braynard in the form of recorded calls and declarations of voters, and analyzed by Plaintiff's expert, Williams M. Briggs, PhD, shows, based on a

statistically significant sample, **that the total number of mail ballots that voters mailed in, but were never counted, have a 95% likelihood of falling between 31,559 and 38,886 total lost votes**. This range exceeds the margin of loss of President Trump of 12,670 votes by at least 18,889 lost votes and by as many as 26,196 lost votes. (See Exh. 1, Dr. Briggs' Report, with attachments).

(b) Plaintiff's expert also finds that voters received tens of thousands of ballots that they never requested. (See Exh. 1). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an absentee ballot that they did not request ranges from 16,938 to 22,771. **This range exceeds the margin of loss of President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.** *Id.*

(c) This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here. See O.G.C.A. 21-2-522. **These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud down ballot as well.**

(d) **Further, as calculated by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state.** (See Id., attachment to report). Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

(e) Applying pro-rata the above calculations separately to Cobb County based on the number of unreturned ballots, a range of 1,255 and 1,687 ballots ordered by 3rd parties and a range of 2,338 and 2,897 lost mail ballots, plus 10,684 voters documented in the NCOA as having moved, **for a**

66

**combined minimum of 14,276 missing and unlawful ballots, and maximum of 15,250 missing and unlawful ballots, which exceeds the statewide Presidential race total margin by a range of as few as 1,606 ballots and as many as 2,580 in the County of Cobb alone impacting the Cobb County Republican Party ("Cobb County Republicans").**

**Answer**: Denied.

123.    Paragraph 123 of Plaintiffs' Complaint states:

As seen from the expert analysis of Eric Quinnell, mathematical anomalies further support these findings, when in various districts within Fulton County such as vote gains that exceed reasonable expectations when compared to 2016, and a failure of gains to be normally distributed but instead shifting substantially toward the tail of the distribution in what is known as a platykurtic distribution. Dr. Quinell identifies numerous anomalies such as votes to Biden in excess of 2016 exceed the registrations that are in excess of 2016. Ultimately, he identifies the counties in order of their excess performance over what would have fit in a normal distribution of voting gains, revealing a list of the most anomalous counties down to the least. These various anomalies provide evidence of voting irregularities. (See Exh.27, Declaration of Eric Quinnell, with attachments).

**Answer**: The Political Party Committees admit that Eric Quinnell makes the referenced allegations but deny the substance of those allegations and any other or different allegation in paragraph 123.

124.    Paragraph 124 of Plaintiffs' Complaint states:

In sum, with the expert analysis of William M. Briggs PhD based on recorded calls and declarations, the extent of missing AND unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism. In short, tens of thousands of votes did not count while the pattern of fraud makes clear that

tens of thousands were improperly counted. This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

**Answer**: The Political Party Committees admit that Joseph R. Biden won the

presidential election and deny any other or different allegation in paragraph

124.

125.     Paragraph 125 of Plaintiffs' Complaint states:

Cobb county, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race. These election results must be reversed.

**Answer**: Denied.

126.     Paragraph 126 of Plaintiffs' Complaint states:

Applying *pro-rata* the above calculations separately to Cobb County based on the number of unreturned ballots, a range of 1,255 and 1,687 ballots ordered by 3rd parties and a range of 2,338 and 2,897 lost mail ballots, plus 10,684 voters documented in the NCOA as having moved, **for a combined minimum of 14,276 missing and unlawful ballots, and maximum of 15,250 missing and unlawful ballots, which exceeds the statewide Presidential race total margin by a range of as few as 1,606 ballots and as many as 2,580 in the County of Cobb alone impacting the Cobb County Republican Party ("Cobb County Republicans").** (See Exh. 1).

**Answer**: Denied.

127.     Paragraph 127 of Plaintiffs' Complaint states:

Mr. Braynard also found a pattern in Georgia of voters registered at totally fraudulent residence addresses, including shopping centers, mail drop stores and other non-residential facilities.

**Answer**: The Political Party Committees t deny the substance of the referenced findings  and any other or different allegation in paragraph 127.

128.     Paragraph 128 of Plaintiffs' Complaint states:

In sum, with the expert analysis of William M. Briggs PhD based on extensive investigation, recorded calls and declarations collected by Matt Braynard, (See attachments to Exh. 1, Briggs' report) the extent of missing and unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism. In short, tens of thousands of votes did not count while the pattern of fraud and mathematical anomalies that are impossible absent malign human agency makes clear that tens of thousands were improperly counted. This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

**Answer**: Denied.

129.     Paragraph 129 of Plaintiffs' Complaint states:

Cobb county, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race.

**Answer**: Denied.

130.     Paragraph 130 of Plaintiffs' Complaint states:

Russell Ramsland confirms that data breaches in the Dominion software permitted rogue actors to penetrate and manipulate the software during the

recent general election. He further concludes that at least 96,600 mail-in ballots were illegally counted as they were not cast by legal voters.

**Answer**: The Political Party Committees admit that Exhibit makes these allegations about Dominion software but deny the substance of those allegations and any other or different allegations in Paragraph 130.

131.     Paragraph 131 of Plaintiffs' Complaint states:

In sum, as set forth above, for a host of independent reasons, the Georgia certified election results concluding that Joe Biden received 12,670 more votes that President Donald Trump must be set aside.

**Answer**: Denied.

## COUNT I

## DEFENDANTS VIOLATED THE ELECTIONS CLAUSE AND 42 U.S.C. § 1983

132.     Paragraph 132 of Plaintiffs' Complaint states:

Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

**Answer**: The Political Party Committees incorporate the responses to the foregoing paragraphs as if fully set forth herein.

133.     Paragraph 133 of Plaintiffs' Complaint states:

The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. Art. II, § 1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Art. I, § 4, cl. 1 (emphasis added).

**<u>Answer</u>**: The Political Party Committees admit that the quoted language is from U.S. Const. Art. II § 1, cl. 2 and Art. I § 4, cl. 1 and deny each other or different allegation in Paragraph 43.

134.     Paragraph 134 of Plaintiffs' Complaint states:

The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. at 193.  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id. at 367; see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

**<u>Answer</u>**: The Political Party Committees admit that the quoted language is from *Smiley*. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited cases, the Political Party Committees deny the allegations.

135.     Paragraph 135 of Plaintiffs' Complaint states:

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to "tak[ing] care that the laws be faithfully executed." Pa. Const. Art. IV, § 2.  Because the United States Constitution reserves for the General Assembly the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

**<u>Answer</u>**: The Political Party Committees admit that the Defendants are not part of the General Assembly. The Political Party Committees further admit

71

that Article IV § 2 of the Pennsylvania Constitution charges the Governor of that state with "tak[ing] care that the laws be faithfully executed" but denies that this provision of the Pennsylvania Constitution limits Defendants' power or is otherwise relevant to this case. The remaining allegations of Paragraph 135 contain characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent a response is required the Political Party Committees deny the same.

136.    Paragraph 136 of Plaintiffs' Complaint states:

Defendants are not the legislature, and their unilateral decision to create a "cure procedure" violates the Electors and Elections Clauses of the United States Constitution.

**<u>Answer</u>**: The Political Party Committees admit that the Defendants are not the legislature. The remaining allegations of Paragraph 136 contain characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent a response is required, the Political Party Committees deny the same.

137.    Paragraph 137 of Plaintiffs' Complaint states:

The Secretary of State and the State Election Board are not the legislature, and their decision to permit early processing of absentee ballots in direct violation of the unambiguous requirements of O.C.G.A. § 21-2-386(a)(2) violates the Electors and Elections Clauses of the United States Constitution.

**Answer**: The Political Party Committees admit that the Secretary of State and the State Election Board are not the legislature. The remaining allegations of Paragraph 137 contain characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent a response is required, the Political Party Committees deny the same.

138.　　Paragraph 138 of Plaintiffs' Complaint states:

Many Affiants testified to many legal infractions in the voting process, including specifically switching absentee ballots or mail-in ballots for Trump to Biden.  Even a Democrat testified in his sworn affidavit that before he was forced to move back to where he could not see, he had in fact seen, "*I also saw absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times*".  (See Exh. 18, Par. 12).

**Answer**: The Political Party Committees admit that the quoted language is from Exhibit 18, Paragraph 12 to Plaintiffs' Complaint. The Political Party Committees deny the substance of the quoted language and further deny each other or different allegation in Paragraph 138.

139.　　Paragraph 139 of Plaintiffs' Complaint states:

Plaintiffs' expert also finds that voters received tens of thousands of ballots that they never requested. (See Exh. 1, Dr. Briggs' Report).  Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an absentee ballot that they did not request one ranges from 16,938 to 22,771.   This range exceeds the margin of loss of President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.

**Answer**: The Political Party Committees admit that the data in Paragraph 139 is from Exhibit 1 to Plaintiffs' Complaint. Plaintiffs lack information or knowledge sufficient to form a belief as to the truth of each other or different allegation in Paragraph 139 and, on that basis, deny the same.

140.    Paragraph 140 of Plaintiffs' Complaint states:

This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here.  See O.G.C.A. 21-2-522. These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud.

**Answer**: Denied.

141.    Paragraph 141 of Plaintiffs' Complaint states:

Further, as shown by data collected by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state.  Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state.  The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

**Answer**:    Political Party Committees lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 141 and, on that basis, deny the same

74

142.     Paragraph 142 of Plaintiffs' Complaint states:

Plaintiffs have no adequate remedy at law and will suffer serious and
irreparable harm unless the injunctive relief requested herein is granted.
Defendants have acted and, unless enjoined, will act under color of state law
to violate the Elections Clauses of the Constitution.  Accordingly, the results
for President and Congress in the November 3, 2020 election must be set
aside.  The results are infected with Constitutional violations.

**Answer**: Denied.

## COUNT II

## THE SECRETARY OF STATE AND GEORGIA COUNTIES VIOLATED THE FOURTEENTH AMENDMENT U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

## DENIAL OF EQUAL PROTECTION

## INVALID ENACTMENT OF REGULATIONS AFFECTING OBSERVATION AND MONITORING OF THE ELECTION

143.     Paragraph 143 of Plaintiffs' Complaint states:

Plaintiffs refer to and incorporate by reference each of the prior paragraphs
of this Complaint as though the same were repeated at length herein.

**Answer**: The Political Party Committees incorporate the responses to the

foregoing paragraphs as if fully set forth herein.

144.     Paragraph 144 of Plaintiffs' Complaint states:

The Fourteenth Amendment of the United States Constitution provides "nor
shall any state deprive any person of life, liberty, or property, without due
process of law; nor deny to any person within its jurisdiction the equal
protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104

(2000)(having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

**Answer**: The Political Party Committees admit that the quoted language is

from the Fourteenth Amendment of the United States Constitution and

*Harper*. To the extent Plaintiffs' characterization and interpretation of the

cited law differs from the text of the cited provision and cases, the Political

Party Committees deny the allegations.

145.    Paragraph 145 of Plaintiffs' Complaint states:

The Court has held that to ensure equal protection, a "problem inheres in the absence of specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary." *Bush v. Gore*, 531 U.S. 98, 106, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388 (2000).

**Answer**: The Political Party Committees admit that the quoted language is

from *Bush*. To the extent Plaintiffs' characterization and interpretation of the

cited law differs from the text of the cited case, the Political Party Committees

deny the allegations.

146.    Paragraph 146 of Plaintiffs' Complaint states:

The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.  The requirement of equal protection is

particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

**Answer**: Paragraph 146 of Plaintiffs' Complaint contains characterizations,

legal contentions, conclusions, and opinions to which no response is required.

To the extent the characterization of the law is inaccurate or intended to apply

to the claims here, the Political Party Committees deny the same.

147.    Paragraph 147 of Plaintiffs' Complaint states:

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020, General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

**Answer**: Denied.

148.    Paragraph 148 of Plaintiffs' Complaint states:

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties in each County, including the Trump Campaign, have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See*, *e.g.* In plain terms, the statute clearly prohibits opening absentee ballots prior to election day, while the rule authorizes doing so three weeks before election day. There is no reconciling this conflict. The State Election Board has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and regulations, but no authority to promulgate a regulation that is directly contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is

therefore plainly and indisputably unlawful. Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522, Grounds for Contest:

**Answer**: The Political Party Committees admit that Plaintiffs bring claims under O.C.G.A. § 21-2-522. The Political Party Committees deny that Plaintiffs have established cognizable claims under this provision. The remaining allegations of Paragraph 148 contain characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent the characterization of the law is inaccurate or intended to apply to the claims here or a response is required, the Political Party Committees deny the same.

149.    Paragraph 149 of Plaintiffs' Complaint states:

A result of a primary or election may be contested on one or more of the following grounds:

**Answer**: Admitted.

150.    Paragraph 150 of Plaintiffs' Complaint states:

(1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;

(2)     When the defendant is ineligible for the nomination or office in dispute;

(3)     When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;

(4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election. O.C.G.A. § 21-2-522.

**Answer**: The Political Party Committees admit that the Plaintiffs' quoted language is from O.C.G.A. § 21-2-522. To the extent Plaintiffs' characterization of the statute is inaccurate or intended to apply to the claims here, the Political Party Committees deny the same.

151.    Paragraph 151 of Plaintiffs' Complaint states:

Several affiants testified to the improper procedures with absentee ballots processing, with the lack of auditable procedures with the logs in the computer systems, which violates Georgia law, and federal election law. See also, 50 U.S.C. § 20701 requires the retention and preservation of records and papers by officers of elections under penalty of fine and imprisonment.

**Answer**: The Political Party Committees deny the first sentence of Paragraph 151. The remaining allegations of Paragraph 151 contain characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent a response is required, the Political Party Committees deny the same.

152.    Paragraph 152 of Plaintiffs' Complaint states:

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on November 23, 2020 for the upcoming January 2021 runoff election.

**Answer**: Admitted.

153.     Paragraph 153 of Plaintiffs' Complaint states:

A large number of ballots were identical and likely fraudulent.  An Affiant explains that she observed a batch of utterly pristine ballots:

14.     Most of the ballots had already been handled; they had been written on by people, and the edges were worn. They showed obvious use. However, one batch stood out. It was pristine. There was a difference in the texture of the paper - it was if they were intended for absentee use but had not been used for that purposes. There was a difference in the feel.

15.     These different ballots included a slight depressed pre-fold so they could be easily folded and unfolded for use in the scanning machines. There were no markings on the ballots to show where they had com~ from, or where they had been processed. These stood out.

16.     In my 20 years of experience of handling ballots, I observed that the markings for the candidates on these ballots were unusually uniform, perhaps even with a ballot-marking device.  By my estimate in observing these ballots, approximately 98% constituted votes for Joe Biden.  I only observed two of these ballots as votes for President Donald J. Trump." (See Exh. 15).

**Answer**: The Political Party Committees deny that a large number of ballots were identical and likely fraudulent. The Political Party Committees admit that the quoted language is from Exhibit 15 to Plaintiffs' Complaint and deny each other or different allegation.

154.     Paragraph 154 of Plaintiffs' Complaint states:

The same Affiant further testified specifically to the breach of the chain of custody of the voting machines the night before the election stating:

we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed.  **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day**. The Milton precinct received its machines at 1:00 AM in the morning on Election Day.  This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id*.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief about the truth of the substance of the quoted language or any other or different allegation in Paragraph 154 and, on that basis, deny the same.

155.     Paragraph 155 of Plaintiffs' Complaint states:

Defendants have a duty to treat the voting citizens in each County in the same manner as the citizens in other counties in Georgia.

**Answer**: Paragraph 155 contains characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent the characterization of the law is inaccurate or intended to apply to the claims here or a response is required, the Political Party Committees deny the same.

156.     Paragraph 156 of Plaintiffs' Complaint states:

As set forth in Count I above, Defendants failed to comply with the requirements of the Georgia Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Georgia voters and electors in violation of the United States Constitution guarantee of Equal Protection.

**Answer**: Denied.

157.     Paragraph 157 of Plaintiffs' Complaint states:

Specifically, Defendants denied the plaintiffs equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Georgia Counties by:

(a) mandating that representatives at the pre-canvass and canvass of all absentee and mail-ballots be either Georgia barred attorneys or qualified registered electors of the county in which they sought to observe and monitor;

(b)     not allowing watchers and representatives to visibly see and review all envelopes containing official absentee and mail-in ballots either at or before they were opened and/or when such ballots were counted and recorded; and

(c)     allowing the use of Dominion Democracy Suite software and devices, which failed to meet the Dominion Certification Report's conditions for certification.

**Answer**: Denied.

158.     Paragraph 158 of Plaintiffs' Complaint states:

Instead, Defendants refused to credential all of the Trump Republican's submitted watchers and representatives and/or kept Trump Campaign's watchers and representatives by security and metal barricades from the areas where the inspection, opening, and counting of absentee and mail-in ballots were taking place. Consequently, Defendants created a system whereby it was physically impossible for the candidates and political parties to view the ballots and verify that illegally cast ballots were not opened and counted

**Answer**: Denied.

159.    Paragraph 159 of Plaintiffs' Complaint states:

Many Affiants testified to switching absentee ballots or mail-in ballots for Trump to Biden, including a Democrat.  He testified in his sworn affidavit, that before he was forced to move back to where he could not see, he had in fact seen, "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times".  (See Exh. 18, Par. 12).

**Answer**: The Political Party Committees admit that the quoted language is from Exhibit 18 to the Plaintiffs' Complaint. The Political Party Committees deny each other or different allegation in Paragraph 159.

160.    Paragraph 160 of Plaintiffs' Complaint states:

Other Georgia county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Republicans and the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards and without restricting representatives by any county residency or Georgia bar licensure requirements.

**Answer**: The Political Party Committees lack knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 160 and, on that basis, deny the same.

161.    Paragraph 161 of Plaintiffs' Complaint states:

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by

Defendants, depriving them of the equal protection of those state laws enjoyed by citizens in other Counties.

**Answer**: Denied.

162.     Paragraph 162 of Plaintiffs' Complaint states:

Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution.

**Answer**: Denied.

163.     Paragraph 163 of Plaintiffs' Complaint states:

Defendants further violated Georgia voters' rights to equal protection insofar as Defendants allowed the Georgia counties to process and count ballots in a manner that allowed ineligible ballots to be counted, and through the use of Dominion Democracy Suite, allowed eligible ballots for Trump and McCormick to be switched to Biden or lost altogether.  Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment and the Georgia Election Code.

**Answer**: Denied.

164.     Paragraph 164 of Plaintiffs' Complaint states:

Plaintiffs seek declaratory and injunctive relief holding that the election, under these circumstances, was improperly certified and that the Governor be enjoined from transmitting Georgia's certified Presidential election results to the Electoral College.  Georgia law forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden, through the unlawful use of Dominion Democracy Suite software and devices.

**Answer**: The Political Party Committees admit that Plaintiffs seek the declaratory and injunctive relief described in Paragraph 164 and deny that Plaintiffs have established cognizable claims entitling them to such relief. The remaining allegations in Paragraph 164 contain characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent the characterization of the law is inaccurate or intended to apply to the claims here or a response is required, the Political Party Committees deny the same.

165.    Paragraph 165 of Plaintiffs' Complaint states:

Alternatively, Plaintiffs seek declaratory and injunctive relief holding that the election, under these circumstances, was improperly certified and that the Governor be required to recertify the results declaring that Donald Trump has won the election and transmitting Georgia's certified Presidential election result in favor of President Trump.

**Answer**: The Political Party Committees admit that Plaintiffs seek the declaratory and injunctive relief described in Paragraph 165 and deny that Plaintiffs have established cognizable claims entitling them to such relief.

166.    Paragraph 166 of Plaintiffs' Complaint states:

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.  Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person

challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Georgia law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately. O.C.G.A. § 21-2-520 et seq.

**Answer**: Denied.

167.    Paragraph 167 of Plaintiffs' Complaint states:

In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the County Election Boards to invalidate ballots cast by: 1) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; 2) all "dead votes"; and 4) all 900 military ballots in Fulton county that supposedly were 100% for Joe Biden.

**Answer**: The Political Party Committees admit that Plaintiffs seek the injunctive relief described in Paragraph 167 and deny that Plaintiffs have established cognizable claims entitling them to such relief.

## COUNT III

## FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

## DENIAL OF DUE PROCESS

## DISPARATE TREATMENT OF ABSENTEE/MAIL-IN VOTERS AMONG DIFFERENT COUNTIES

168.    Paragraph 168 of Plaintiffs' Complaint states:

Plaintiffs incorporate each of the prior allegations in this Complaint.

86

Voting is a fundamental right protected by the Fourteenth Amendment to the United States Constitution.  The Fourteenth Amendment protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin*, 570 F.2d at 1077-78. "[H]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

**Answer**: The Political Party Committees incorporate the responses to the foregoing paragraphs as if fully set forth herein. The Political Party Committees admit that voting is a fundamental right protected by the Fourteenth Amendment to the United States Constitution, including from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. The Political Party Committees further admit that the quoted language is from *Bush*. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited provision and case, the Political Party Committees deny the allegations.

169.    Paragraph 169 of Plaintiffs' Complaint states:

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to executing the laws as passed by the legislature.  Although the Georgia General Assembly may enact laws governing the conduct of elections, "no legislative enactment may contravene the requirements of the Georgia or United States Constitutions." *Shankey*, 257 A. 2d at 898.

**Answer**: The Political Party Committees admit that the Defendants are not part of the General Assembly. The Political Party Committees further admit that the quoted language is from *Shankey*, except that *Shankey* refers to the requirements of the Pennsylvania Constitution, not the Georgia Constitution. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of *Shankey*, the Political Party Committees deny the allegations. The remainder of the allegations in Paragraph 169 contain characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent the characterization of the law is inaccurate or intended to apply to the claims here or a response is required, the Political Party Committees deny the same.

170.    Paragraph 170 of Plaintiffs' Complaint states:

Federal courts "possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc*., 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court.").

**Answer**: Admitted.

171.    Paragraph 171 of Plaintiffs' Complaint states:

Moreover, "[t]o the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, …

88

the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature[,] . . . particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Georgia's government." *Id*.

**Answer**: The Political Party Committees deny that the quoted language is from any of the cases cited in Paragraph 170 or from a case involving Georgia law or elections and further deny that the quoted language is accurate. The Political Party Committees affirmatively state that the quoted language is from *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 374 (Pa. 2020), which involves "Pennsylvania's government," not, as Plaintiffs allege and misquote, Georgia's government. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of *Boockvar*, the Political Party Committees deny the allegations.

172.    Paragraph 172 of Plaintiffs' Complaint states:

The disparate treatment of Georgia voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc*., 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co*., 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

89

**Answer**: The Political Party Committees admit that the quoted language is from *Reynolds*. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited cases, the Political Party Committees deny the allegations.

173.     Paragraph 173 of Plaintiffs' Complaint states:

Defendants are not the legislature, and their unilateral decision to create and implement a cure procedure for some but not all absentee and mail-in voters in this State violates the Due Process Clause of the United States Constitution.  Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

**Answer**: The Political Party Committees admit that the Defendants are not the legislature. The Political Party Committees deny each other or different allegation in Paragraph 173.

## COUNT IV

## FOURTEENTH AMENDMENT, U.S. CONST. ART. I § 4, CL. 1; ART. II § 1, CL. 2; AMEND. XIV, 42 U.S.C. § 1983

## DENIAL OF DUE PROCESS ON THE RIGHT TO VOTE

174.     Paragraph 174 of Plaintiffs' Complaint states:

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

**Answer**: The Political Party Committees incorporate the responses to the foregoing paragraphs as if fully set forth herein.

175.     Paragraph 175 of Plaintiffs' Complaint states:

The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution.  *Harper*, 383 U.S. at See also *Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections.").   Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress.  *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

**Answer**: Admitted.

176.     Paragraph 176 of Plaintiffs' Complaint states:

The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.  Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," Burson v. Freeman, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

**Answer**: The Political Party Committees admit that the quoted language is from *Reynolds*, *Burson*, and *Purcell*. To the extent Plaintiffs' characterization

91

and interpretation of the cited law differs from the text of the cited cases, the

Political Party Committees deny the allegations.

177.     Paragraph 177 of Plaintiffs' Complaint states:

"Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means counted "at full value without dilution or discount."  *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

**Answer**: The Political Party Committees admit that the quoted language is

from *Classic* and *Reynolds*. To the extent Plaintiffs' characterization and

interpretation of the cited law differs from the text of the cited cases, the

Political Party Committees deny the allegations.

178.     Paragraph 178 of Plaintiffs' Complaint states:

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); see also *Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

**Answer**: The Political Party Committees admit that the quoted language is

from *Anderson*. To the extent Plaintiffs' characterization and interpretation of

the cited law differs from the text of the cited cases, the Political Party Committees deny the allegations.

179.     Paragraph 179 of Plaintiffs' Complaint states:

The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

**Answer**: The Political Party Committees admit that the quoted language is from *Anderson*. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited cases, the Political Party Committees deny the allegations.

180.     Paragraph 180 of Plaintiffs' Complaint states:

Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

**Answer**: The Political Party Committees admit that the quoted language is from *Reynolds*. To the extent Plaintiffs' characterization and interpretation of the cited law differs from the text of the cited case, the Political Party Committees deny the allegations.

181.     Paragraph 181 of Plaintiffs' Complaint states:

In Georgia, the signature verification requirement is a dead letter. The signature rejection rate for the most recent election announced by the Secretary of State was 0.15%. The signature rejection rate for absentee ballot applications was .00167% - only 30 statewide. Hancock County, Georgia, population 8,348, rejected nine absentee ballot applications for signature mismatch. Fulton County rejected eight. No other metropolitan county in Georgia rejected even a single absentee ballot application for signature mismatch. The state of Colorado, which has run voting by mail for a number of years, has a signature rejection rate of between .52% and .66%.35 The State of Oregon had a rejection rate of 0.86% in 2016.36 The State of Washington has a rejection rate of between 1% and 2%.37If Georgia rejected absentee ballots at a rate of .52% instead of the actual .15%, approximately 4,600 more absentee ballots would have been rejected.

**Answer**: The Political Party Committees deny that Georgia's signature verification requirement is a "dead letter." The Political Party Committees lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 181 and, on that basis, deny the same.

## COUNT V
## THERE WAS WIDE-SPREAD BALLOT FRAUD.
### O.C.G.A. § 21-2-522

182.     Paragraph 182 of Plaintiffs' Complaint states:

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

**Answer**: Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

183.    Paragraph 183 of Plaintiffs' Complaint states:

Plaintiffs contest the results of Georgia's election, with Standing conferred under pursuant to O.G.C.A. 21-2-521.

**Answer**: The Political Party Committees admit that Plaintiffs contest the results of Georgia's election and deny that Plaintiffs have established a valid basis for doing so. The Political Party Committees further deny that Plaintiffs have standing.

184.    Paragraph 184 of Plaintiffs' Complaint states:

Therefore, pursuant to O.G.C.A. 21-2-522, for misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result. The foundational principle that Georgia law "nonetheless allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately." *Martin v. Fulton County Bd. of Registration & Elections*, 307 Ga. 193, 194, 835 S.E.2d 245, 248 (2019).   The Georgia Supreme Court has made clear that Plaintiffs need not show how the [] voters would have voted if their [absentee] ballots had been regular. [] only had to show that there were enough irregular ballots to place in doubt the result." See OCGA § 21-2-520 et seq., *Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (1994) the Supreme Court invalidated an election, and ordered a new election because it found that,

Thus, [i]t was not incumbent upon [the Plaintiff] to show how the [481] voters would have voted if their [absentee] ballots had been regular. He only had to show that there were enough irregular ballots to place in doubt the result. He succeeded in that task.

*Id*. at 271 (citing *Howell v. Fears*, 275 Ga. 627, 571 SE2d 392, (2002) (primary results invalid where ballot in one precinct omitted names of both qualified candidates).

**Answer**: The Political Party Committees admit that the quoted language is from *Martin* and *Mead*. To the extent that Plaintiffs' characterization and interpretation of the law differs from the text of the cited cases, the Political Party Committees deny the allegations.

185.    Paragraph 185 of Plaintiffs' Complaint states:

The "glitches" in the Dominion system—that seem to have the uniform effect of hurting Trump and helping Biden have been widely reported in the press and confirmed by the analysis of independent experts.

**Answer**: Denied.

186.    Paragraph 186 of Plaintiffs' Complaint states:

Prima facie evidence in multiple affidavits shows specific fraudulent acts, which directly resulted in the flipping of the race at issue:

a)    votes being switched in Biden's favor away from Trump during the recount;

b)    the lack of procedures in place to follow the election code, and the purchase and use, Dominion Voting System despite evidence of serious vulnerabilities;

c)    a demonstration that misrepresentations were made about a pipe burst that sent everyone home, while first six, then three, unknown individuals were left alone until the morning hours working on the machines;

d) further a failure to demonstrate compliance with the Georgia's Election Codes, in maintaining logs on the Voting system for a genuine and sound

audit, other than voluntary editable logs that prevent genuine audits. While the bedrock of this Democratic Republic rests on citizens' confidence in the validity of our elections and a transparent process, Georgia's November 3, 2020 General Election remains under a pall of corruption and irregularity that reflects a pattern of the absence of mistake. At best, the evidence so far shows ignorance of the truth; at worst, it proves a knowing intent to defraud.

**Answer**: Denied.

187.    Paragraph 187 of Plaintiffs' Complaint states:

Plaintiffs' expert also finds that voters received tens of thousands of ballots that they never requested. (See Exh. 1, Dr. Briggs' Report). Specifically, Dr. Briggs found that in the state of Georgia, based on a statistically significant sample, the expected amount of persons that received an **absentee ballot that they did not request ranges from 16,938 to 22,771**. This range exceeds the margin of loss of President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.

**Answer**: The Political Party Committees admit that the data in Paragraph 139 is from Exhibit 1 to Plaintiffs' Complaint. Plaintiffs lack information or knowledge sufficient to form a belief as to the truth of each other or different allegation in Paragraph 139 and, on that basis, deny the same.

188.    Paragraph 188 of Plaintiffs' Complaint states:

This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here. See O.G.C.A. 21-2-522.

These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud.

**Answer**: Denied.

189.     Paragraph 189 of Plaintiffs' Complaint states:

Further, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state. Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state.  The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

**Answer**: Denied.

190.     Paragraph 190 of Plaintiffs' Complaint states:

Plaintiffs' expert Russell Ramsland concludes that at least 96,600 mail-in ballots were fraudulently cast.  He further concludes that up to 136,098 ballots were illegally counted as a result of improper manipulation of the Dominion software. (Ramsland Aff).

**Answer**: The Political Party Committees admit that the data in Paragraph 190 is from Exhibit 9 to Plaintiffs' Complaint. The Political Party Committees deny the truth of that data and the substance of the allegations in Paragraph 190.

191.     Paragraph 191 of Plaintiffs' Complaint states:

The very existence of absentee mail in ballots created a heightened opportunity for fraud.  The population of unreturned ballots analyzed by

William Briggs, PhD, reveals the probability that a far greater number of mail ballots were requested by 3rd parties or sent erroneously to persons and voted fraudulently, undetected by a failed system of signature verification. The recipients may have voted in the name of another person, may have not had the legal right to vote and voted anyway, or may have not received the ballot at the proper address and then found that they were unable to vote at the polls, except provisionally, due to a ballot outstanding in their name.

**Answer**: Denied.

192.     Paragraph 192 of Plaintiffs' Complaint states:

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin of votes between the presidential candidates in the state.  For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

**Answer**: Denied.

193.     Paragraph 193 of Plaintiffs' Complaint states:

The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only

the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

**Answer**: The Political Party Committees admit that the quoted language is from *Gray* and *Crawford*. To the extent that Plaintiffs' characterization and interpretation of the law differs from the text of the cited cases or Plaintiffs allege that this law applies here, the Political Party Committees deny the allegations.

194.    Paragraph 194 of Plaintiffs' Complaint states:

Plaintiffs have no adequate remedy at law.  As seen from the expert analysis of William Higgs, PhD, based on actual voter data, tens of thousands of votes did not count, and tens of thousands of votes were unlawfully requested.

**Answer**: Denied.

195.    Paragraph 195 of Plaintiffs' Complaint states:

The Fourteenth Amendment Due Process Clause protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (1st Cir. 1978).

**Answer**: Admitted.

196.    Paragraph 196 of Plaintiffs' Complaint states:

Separate from the Equal Protection Clause, the Fourteenth Amendment's due process clause protects the fundamental right to vote against "the disenfranchisement of a state electorate." *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). "When an election process 'reaches the point of

patent and fundamental unfairness,' there is a due process violation." *Florida State Conference of* N.A.A.C.P. *v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008) (*quoting Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir.1995) (*citing Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir.1986))). See also *Griffin*, 570 F.2d at 1077 ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order."); *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994) (enjoining winning state senate candidate from exercising official authority where absentee ballots were obtained and cast illegally).

**Answer**: The Political Party Committees admit that the quoted language is from *Duncan*, *Florida State Conference of N.A.A.C.P.*, and *Griffin*. To the extent that Plaintiffs' characterization and interpretation of the law differs from the text of the cited cases, the Political Party Committees deny the allegations.

197.     Paragraph 197 of Plaintiffs' Complaint states:

Part of courts' justification for such a ruling is the Supreme Court's recognition that the right to vote and to free and fair elections is one that is preservative of other basic civil and political rights. *See Black*, 209 F.Supp.2d at 900 (quoting *Reynolds*, 377 U.S. at 561-62 ("since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.")); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting … is regarded as a fundamental political right, because [sic] preservative of all rights.").

**Answer**: The Political Party Committees admit that the quoted language is from *Reynolds* and *Yick Wo*. To the extent that Plaintiffs' characterization and interpretation of the law differs from the text of the cited cases, the Political Party Committees deny the allegations.

198.     Paragraph 198 of Plaintiffs' Complaint states:

"[T]he right to vote, the right to have one's vote counted, and the right to have ones vote given equal weight are basic and fundamental constitutional rights incorporated in the due process clause of the Fourteenth Amendment to the Constitution of the United States." Black, 209 F. Supp. 2d at 900 (a state law that allows local election officials to impose different voting schemes upon some portions of the electorate and not others violates due process). "Just as the equal protection clause of the Fourteenth Amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the Fourteenth amendment forbids state officials from unlawfully eliminating that fundamental right." *Duncan*, 657 F.2d at 704.  "Having once granted the right to vote on equal terms,[Defendants] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

**Answer**: The Political Party Committees admit that the quoted language is from *Black*, *Duncan*, and *Bush*. To the extent that Plaintiffs' characterization and interpretation of the law differs from the text of the cited cases, the Political Party Committees deny the allegations.

199.     Paragraph 199 of Plaintiffs' Complaint states:

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation

Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

**Answer**: Denied.

200.     Paragraph 200 of Plaintiffs' Complaint states:

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties, including without limitation Plaintiff, Republicans, and the Trump Campaign, shall be "present" and have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

**Answer**: The allegations of Paragraph 200 contain characterizations, legal contentions, conclusions, and opinions to which no response is required. To the extent the characterization of the law is inaccurate or intended to apply to the claims here or a response is required, the Political Party Committees deny the same.

201.     Paragraph 201 of Plaintiffs' Complaint states:

Defendants have a duty to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering.  Rather than heeding these mandates and duties, Defendants arbitrarily and capriciously denied the Trump Campaign and Republicans meaningful access to observe and monitor the electoral process by: (a) mandating that representatives at the pre- canvass and canvass of all absentee and mail-ballots be either Georgia barred attorneys or qualified registered electors of the county in which they sought to observe and monitor; and (b) not allowing watchers and representatives to visibly see and

review all envelopes containing official absentee and mail-in ballots either at the time or before they were opened and/or when such ballots were counted and recorded. Instead, Defendants refused to credential all of the Trump Campaign's submitted watchers and representatives and/or kept Trump Campaign's watchers and representatives by security and metal barricades from the areas where the inspection, opening, and counting of absentee and mail-in ballots were taking place. The lack of meaningful access with actual access to see the ballots invited further fraud and cast doubt of the validity of the proceedings.

**Answer**: Denied.

202.     Paragraph 202 of Plaintiffs' Complaint states:

Consequently, Defendants created a system whereby it was physically impossible for the candidates and political parties to view the ballots and verify that illegally cast ballots were not opened and counted.

**Answer**: Denied.

203.     Paragraph 203 of Plaintiffs' Complaint states:

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, and included the unlawfully not counting and including uncounted mail ballots, and that they failed to follow absentee ballot requirements when thousands of **voters received ballots that they never requested**. Defendants have acted and will continue to act under color of state law to violate the right to vote and due process as secured by the Fourteenth Amendment to the United States Constitution.

**Answer**: Denied.

204.     Paragraph 204 of Plaintiffs' Complaint states:

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

**Answer**: Denied.

205.     Paragraph 205 of Plaintiffs' Complaint states:

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

**Answer**: Denied.

206.     Paragraph 206 of Plaintiffs' Complaint states:

Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the Presidential electors for the state of Georgia should be disqualified from counting toward the 2020 election.

**Answer**: The Political Party Committees admit that the Plaintiffs seek the

relief described in Paragraph 206 but deny that the Plaintiffs have established

any cognizable claim entitling them to such relief.

207.     Paragraph 207 of Plaintiffs' Complaint states:

The United States Code (3 U.S.C. 5) provides that,

"[i]f any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the

105

electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned. 3 USCS § 5.

**Answer**: The Political Party Committees admit that the quoted language is from 3 U.S.C. § 5 and deny each other or different allegations.

## REQUEST FOR RELIEF

**Answer**: The Political Party Committees deny that the Plaintiffs are entitled to any of the requested relief set forth in the Prayer for Relief section of Plaintiffs' Complaint.

## <u>AFFIRMATIVE DEFENSES</u>

The Political Party Committees assert the following affirmative defenses without accepting any burdens regarding them.

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part because this Court lacks jurisdiction to adjudicate Plaintiffs' claims.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs lack standing to assert their claims.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' Compliant fails, in whole or in part, to state a claim upon which relief can be granted.

The Political Party Committees reserve the right to assert any further defenses that may become evident during the pendency of this matter.

## PROPOSED INTERVENORS' REQUEST FOR RELIEF

Having answered Plaintiffs' Complaint, the Political Party Committees request that the Court:

1. Deny Plaintiffs are entitled to any relief;

2. Dismiss Plaintiffs' Complaint with prejudice;

3. Award the Political Party Committees their costs and attorneys' fees incurred in defending against Plaintiffs' claims in accordance with 42 U.S.C. § 1988; and

4. Grant such other and further relief as this Court deems just and proper.

Dated: November 30, 2020.          Respectfully submitted,

**Adam M. Sparks**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis

107

Georgia Bar No. 296261
Susan P. Coppedge
Georgia Bar No. 187251
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN AND HORST, LLC
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
coppedge@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
khamilton@perkinscoie.com
abeane@perkinscoie.com

Matthew J. Mertens*
Georgia Bar No: 870320
PERKINS COIE LLP

1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
Telephone: (503) 727-2000
mmartens@perkinscoie.com

*Counsel for Proposed Intervenor-*
  *Defendants*

*\*Pro Hac Vice Application Pending*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM, and BRIAN JAY VAN GUNDY, | CIVIL ACTION FILE NO. 1:20-cv-04809-TCB |
| Plaintiffs, |  |
| v. |  |
| BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N. SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board, |  |
| Defendants. |  |

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: December 1, 2020.                    **Adam M. Sparks**
                                            *Counsel for Proposed Intervenor-*
                                            *Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM, and BRIAN JAY VAN GUNDY, | CIVIL ACTION FILE NO. 1:20-cv-04809-TCB |
| Plaintiffs, | |
| v. | |
| BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N. SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board, | |
| Defendants. | |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: December 1, 2020.

**Adam M. Sparks**
*Counsel for Proposed Intervenor-Defendants*