# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| L. Lin Wood, Jr., <br><br>    Plaintiff, <br>v. <br><br> Brad Raffensperger, in his official capacity as Secretary of the State of Georgia, et al., <br><br>    Defendants. | CIVIL ACTION FILE NO. <br> 20-cv-04651-SDG |

## AFFIDAVIT OF SARA GHAZAL

Personally appeared before me, the undersigned subscribing officer, duly authorized to administer oaths, Sara Tindall Ghazal, who being duly sworn, deposed and stated as follows:

1. My name is Sara Tindall Ghazal.

2. I am over the age of 18, and I am a licensed attorney in the state of Georgia, and a resident and registered voter of Cobb County, Georgia.

3. From February 2018 until December 2019, I served as the voter protection director for the Democratic Party of Georgia.

4. In 2017, I served as the Cobb County Democratic Party's representative on the Cobb Elections Vote Review Panel during the Sixth District Special Election.

5. In 2020, I was a candidate for State House in Georgia.

6. Beginning on midday Wednesday, November 4, through Monday, November 9, I observed Cobb County officials undertake the intake, signature verification, separation of ballots from their envelopes, duplication and adjudication as necessary, and tabulation of absentee and provisional ballots, as a member of the public.

7. Beginning Friday, November 13, through Monday, November 16, I observed the audit of the Presidential race in Cobb County on behalf of the Democratic Party of Georgia at Jim Miller Park, which was used as the main site for Cobb County election processing, albeit not as a polling precinct.

8. On Wednesday, November 4, and subsequent days, I observed from the public observation area as Cobb County officials examined incoming absentee ballots that had arrived on Election Day in Room A of the Jim Miller Park facility.

9. I observed poll workers scan the bar codes with a hand-held bar code scanner, which subsequently pulled up the individual voter record. Poll workers at that point compared the voters' signatures on the back of the absentee ballot envelope with the signatures that were held on file.

10. While I could generally see the process of intake and signature comparison, I was not close enough to the poll workers to be able to evaluate any signature personally.

11. Monitors of each party who had been accredited in advance by their political party had access to this room. I observed credentialed monitors from both the Democratic Party of Georgia and the Georgia Republican Party present in the facility.

12. I observed that after absentee ballots had been accepted based on the verification of signatures from the outside of the ballot envelope against the exemplars that were maintained on file, these ballots were then taken to a machine in the back of room C that opened the envelopes in a rapid manner.

13. I understand, but did not personally witness, that after the envelopes were opened, the ballots were separated from the envelopes with signatures in such a manner as to guarantee the secrecy of the ballot, as is guaranteed under the Georgia Constitution, Art. II Sec. 1(1)

14. After these ballots were separated, I witnessed poll workers organizing them according to precinct. This batching process was conducted in room B.

15. In room C I witnessed multiple boxes that contained the ballot envelopes with signatures, stacked in the back of the room. I was told by Cobb County Registrar Beau Gunn that these documents must be retained for two years.

16. I witnessed batches of ballots then run through scanners in room C. In most batches that were run through the scanners, one or more ballots could not be read by the scanner. These ballots that could not be scanned were pulled from the stack of ballots and set aside.

17. I witnessed the ballots that were unable to be scanned by the scanners were subsequently delivered to tables, also in room C, where teams of two individuals supervised by a third staff person duplicated the unreadable ballots onto new, fresh absentee ballots that were not creased and had not been folded.

18. The process by which the rejected ballots were duplicated was as follows: one staff person read out the voter's choice while the other staff person filled in the bubble carefully. The third supervisor would thereafter compare the original ballot as completed by the voter against the duplicated ballot as completed by the staff person. These staff people all used black pens to complete the duplicated ballots.

19. In cases where the voter's intent was unclear, or where the voter had changed their mark, both the original unscannable ballot and the duplicated ballot

were submitted to a vote review panel, make up of representatives of both the county Democratic and the county Republican Party. On at least one occasion I also witnessed a representative of the Libertarian party on a vote review panel.

20. I witnessed the conduct of numerous vote review panels over the course of the five days that I observed the original processing and tabulation of absentee and provisional ballots. I did not observe a single occasion in which party officials disagreed about the voter intent.

21. I also witnessed Uniformed and Overseas Citizen Absentee Voting ACT (UOCAVA) ballots being processed.

22. Based on my knowledge and experience in Georgia election law, I am aware that Georgia law allows for UOCAVA ballots to be emailed to overseas and military voters. Voters then use their personal printers to print out their ballot on normal paper, then complete these ballots by hand.

23. I witnessed UOCAVA ballots that had been printed on a home printer being duplicated onto the normal absentee ballot forms so that they could be read by a scanner.

24. I did not witness any actions or behavior that led me to believe that poll workers were undertaking any activity aside from adhering to normal election procedures in processing and tabulating absentee ballots.

25. Beginning the morning of Friday, November 13, through Monday, November 16, I acted as an accredited monitor for the Democratic Party of Georgia.

26. Based on previous statements from Georgia Secretary of State Brad Raffensperger and conversations with Cobb County Election Supervisor Janine Eveler, I had understood that a statewide race other than the Presidential election would be selected for an audit, as per the requirements of OCGA 21-2-498.

27. I was quite surprised to learn that the race to be selected for an audit was the Presidential race. Given my understanding of Risk Limiting Audits (RLAs,) I knew that this meant a huge number of ballots would have to be pulled in order to ascertain whether the tabulation process had correctly identified the winner of that race.

28. It is my understanding that based on the extreme challenges of pulling more than 1,000,000 randomly selected ballots, the exercise of auditing the Presidential race would instead consist of hand-examining every ballot that was cast in that race.

29. Because Georgia law does not allow for a hand-recount of ballots except for the extremely limited circumstances of a court order or a lack of any functioning scanners, I am not aware of any pre-existing procedures to conduct an audit (or a hand-recount) of all ballots in Georgia.

30. In the absence of any written procedures, I witnessed Cobb officials instructing poll workers who had been brought back in on very short notice to recount the ballots without providing specific instruction as to how that counting should be conducted.

31. I heard a poll manager admonish poll workers to keep talking to a minimum so as not to distract the staff from the task at hand.

32. I witnessed up to 40 teams of individual poll workers hand reviewing and hand counting both machine-marked and absentee ballots.

33. I witnessed occasional mistakes caused by human error and fatigue, such as placing a single ballot in the wrong pile or ballots sticking together and being counted as a single sheet of paper. In every instance of a human error that I personally witnessed, another poll worker was able to correct this mistake.

34. During the process of the audit, I also witnessed additional vote review panels re-adjudicating duplicated ballots against the original ballots as completed by the voter to confirm both that the ballots had been accurately duplicated, and that the duplicated ballots had been accurately tabulated.

35. I witnessed Cobb officials pulling both the original ballots that had been rejected by the scanners, as well as the duplicated ballots that had been adjudicated during the original processing and subsequently tabulated.

36. The vote review panels first were presented with both the original ballot and the duplicated ballot, when they confirmed that the serial number that was provided to each matched, and that the Presidential race was accurately duplicated from the original to the new ballot.

37. After confirming that each duplicated ballot was matched up to its corresponding original ballot, each pile was counted to confirm a match.

38. The vote review panel members then separated the ballots according to the presidential candidate chosen by the voter, and thereafter counted the number of ballots for each candidate and recorded these numbers on their tally sheet.

39. Several of these panels adjudicated UOCAVA ballots as a part of their duties. Based on the comments of the panelists that I heard as observing, I believe that these vote review panel members did not understand how UOCAVA ballots are transmitted to overseas voters, or why they have to be duplicated onto a ballot paper that can be read by a scanner.

40. The same procedures were followed over multiple days and multiple panels.

41. I am aware that several affidavits submitted by the Plaintiff in this case suggest there was something suspicious or irregular about the fact that certain ballots appeared "pristine" or "impeccab[ly]" filled in, and that those same ballots lacked

folds or creases. However, as described above, both damaged ballots and certain UOCAVA ballots must be duplicated by election officials to be read by the vote tabulation scanners. These duplicated ballots are not folded, as they have not been mailed, are neatly filled in by election workers, and are clearly marked and tracked to as to indicate that they are official duplicates.

42. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

43. I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Executed this 18th day of November 2020.

_____ (signed)

Sara Tindall Ghazal

Sworn to and subscribed to before me this 18th day of November 2020.

_____
Notary Public

My commission expires: 05/17/2024



Notarized online using audio-video communication
Electronic Notary Public