**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION**

| | |
|---|---|
| CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM, and BRIAN JAY VAN GUNDY, | CIVIL ACTION FILE NO. 1:20-cv-04809-TCB |

        Plaintiffs,

v.

BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N. SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board,

        Defendants.

**INTERVENORS' MOTION TO EXCLUDE TESTIMONY OF SHIVA AYYADURAI, RUSSELL JAMES RAMSLAND, JR., MATTHEW BRAYNARD, WILLIAM M. BRIGGS, RONALD WATKINS, BENJAMIN A. OVERHOLT, ERIC QUINNELL, S. STANLEY YOUNG, AND "SPYDER"**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................................i

TABLE OF AUTHORITIES ................................................................................ ii

I.   INTRODUCTION ..........................................................................................1

II.  LEGAL STANDARD ................................................................................... 2

III. ARGUMENT ..................................................................................................4

   A.  Ayyadurai is not qualified and fails to disclose his methods. .........................4

   B.  Ramsland is not qualified and fails to disclose his methods. ...........................7

   C.  Braynard is not qualified and his report does not utilize generally accepted methodology. ..................................................................................12

   D.  Briggs' report is built on a faulty foundation and is not helpful. ...................15

   E.  Watkins is not qualified and his report rests entirely on speculation.............17

   F.  Overholt discloses no relevant qualifications and his report contains serious errors. .................................................................................19

   G.  Quinnell and Young are not qualified and their declarations are unreliable. 21

   H.  It is impossible to assess the qualifications of the unnamed individual known as "Spyder" and his declaration consists of nothing more than speculation..24

IV. CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

**C**ASES

*Bowers v. Norfolk S. Corp.*,
   300 Fed. App'x 700 (11th Cir. 2008) ..................................................8

*Chapman v. Proctor & Gamble Distrib., LLC*,
   766 F.3d 1296 (11th Cir. 2014) ................................................passim

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...............................................................2, 4

*Greater Hall Temple Church of God v. S. Mutual Church Ins. Co.*,
   820 Fed. App'x 915 (11th Cir. 2020) ..............................................25

*Horton v. Maersk Line Ltd.*,
   603 Fed. App'x 791 (11th Cir. 2015) ............................................4, 5

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ...................................12, 14, 21, 25

*McCorvey v. Baxter Healthcare Corp.*,
   298 F.3d 1253 (11th Cir. 2002) .....................................................12

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir 2004) .........................................5, 7, 9, 16

*Redmond v. City of East Point, Georgia*,
   No. 1:00-CV-2492-WEJ, 2004 WL 6060552 (N.D. Ga. Mar. 29,
   2004) ..................................................................................9

*Rider v. Sandoz Pharm. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) .......................................19, 21, 25

*Robinson v. City of Montgomery*,
   Civil Action No. 2:01cv40-CSC, 2005 WL 6743206 (M.D. Ala.
   March 2, 2005).......................................................................3

*Smith v. Ortho Pharm. Corp.*,
    770 F. Supp. 1561 (N.D. Ga. 1991)..............................................................passim

*United Fire & Cas. Co. v. Whirlpool Corp.*,
    704 F.3d 1338 (11th Cir. 2013) (per curiam) ........................................................3

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ...............................................................passim

*United States v. Wilk*,
    572 F.3d 1229 (11th Cir. 2009) ...........................................................................4

## OTHER AUTHORITIES

Chris Francescani, *The men behind QAnon* (Sept. 22,2020), ABC
    NEWS, https://abcnews.go.com/Politics/men-
    qanon/story?id=73046374 ...............................................................................18

Fed. R. Evid. 702 ...........................................................................................passim

Mark Niesse, *Absentee ballots can begin to be opened, but not
    counted, in Georgia*, The Atlanta Journal-Constitution (Oct 19,
    2020), https://www.ajc.com/politics/absentee-ballots-can-begin-to-
    be-opened-but-not-counted-in-
    georgia/BRBLHVUJOFHB5OEHAMZV34HPDA/.........................................23

## I.    INTRODUCTION

In an attempt to support their claims of a multi-national conspiracy to rig the results of the presidential election for President-Elect Joseph R. Biden, Jr.—which Plaintiffs allege was accomplished by methods ranging from "ballot stuffing" at voting machines via a hidden software algorithm to illegally processing tens of thousands of absentee ballots—Plaintiffs have filed multiple "expert" declarations and reports. But the individuals put forward by Plaintiffs as "experts" are wildly unqualified. For example, a former Trump staffer who has publicly stated that he is working hand in glove with the Trump campaign to get the election overturned and delivered to the President purports to offer a statistical analysis of election data despite having had no relevant training, skill, or experience. Others' grounding in their claimed areas of expertise is equally suspect. The analyses they offer rely on patently incomplete or faulty data. Over and over, the reports fail to disclose the methods employed by their authors, error rates, or even how underlying data was obtained. Where their methodology is discernable, Plaintiffs' "experts" regularly use methods that are not at all standard or trusted in the relevant field, and draw conclusions that are nothing more than speculation.[1]

---

[1] Some reports were attached as exhibits to the Complaint, while others are referenced in Plaintiffs' motion for temporary restraining order, and some are not

1

Plaintiffs attempt to use these unreliable reports written by unqualified individuals to seek extraordinary relief, including an order de-certifying the November 2020 election results and a declaration that Georgia's electoral college votes will be awarded to President Trump despite Georgia voters' clear decision choosing President-Elect Biden. None of these reports supports this relief, and none is sufficient to pass the *Daubert* standard for admissibility. All should be excluded.

## II.    LEGAL STANDARD

Courts may only admit expert testimony when "(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)]; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Proctor & Gamble Distrib., LLC,* 766 F.3d 1296, 1304 (11th Cir. 2014) (quotation marks and citation omitted); *see also* Fed. R. Evid. 702. As proponents of the expert testimony at issue, Plaintiffs bear the burden to establish these requirements. *Chapman*, 766 F.3d at 1304.

An expert is qualified if they can testify competently regarding the matters

---

referenced in any motion or pleading at all. It is therefore unclear which reports Plaintiffs plan to rely on in support of their motion for temporary restraining order; in any event, all should be excluded.

addressed by virtue of their education, training, experience, knowledge, or skill. *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004). Where a proposed expert fails to demonstrate experience, training, or other qualifications in the field and that methodologies that they utilize to provide their opinion, they cannot be qualified as an expert. *Smith v. Ortho Pharm. Corp*., 770 F. Supp. 1561, 1566 (N.D. Ga. 1991).

In determining whether proffered expert testimony is reliable, courts consider whether: (1) the expert's methodology has been tested or is capable of being tested; (2) the theory or technique has been subjected to peer review and publication; (3) there is a known or potential error rate of the methodology; and (4) the technique has been generally accepted in the relevant scientific community. *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (per curiam) (*citing Daubert*, 509 U.S. at 593-94). Failure to disclose the data or methodology that form the basis of an expert's conclusions warrants exclusion. *Robinson v. City of Montgomery*, Civil Action No. 2:01cv40-CSC, 2005 WL 6743206, at *3 (M.D. Ala. March 2, 2005).

Finally, and most fundamentally, the Court must ensure that the expert's testimony "is relevant to the task at hand." *Chapman*, 766 F.3d at 1306 (quotation marks and citation omitted). If the Court determines that the testimony is not

3

relevant, the Court should exclude even reliable expert testimony. *See Daubert*, 509 U.S. at 591; *United States v. Wilk*, 572 F.3d 1229, 1235 (11th Cir. 2009).

## III.   ARGUMENT

### A.   Ayyadurai is not qualified and fails to disclose his methods.

Shiva Ayyadurai is an engineer with training in mechanical engineering and biomedical engineering. He seeks to testify regarding voting patterns in certain Georgia counties. *See* Declaration of Shiva Ayyadurai, ("Ayyadurai Decl.") ECF No. 6-1, at ¶¶ 3, 15-17, 30. Ayyadurai, however, does not possess relevant education, experience or background to offer opinions on these topics and, even if he did, he fails to disclose his methodology.

Ayyadurai is not qualified to opine on voting behavior, projections, statistical analysis of ethnicity data in relation to voting behavior, or cumulative voting analysis. He has not been previously qualified to speak on these topics and his report identifies no education or experience that equips him to offer these opinions. Though Ayyadurai has degrees in engineering and computer science, applied mechanics, and systems biology, he does not explain how these credentials qualify him to offer the opinions at issue. *See Horton v. Maersk Line Ltd.*, 603 Fed. App'x 791, 798-99 (11th Cir. 2015) (finding witness unqualified to opine on corner casing defects even though witness knew how to repair corner casings). Ayyadurai claims

4

to be "an engineer" with "vast experience in engineering systems, pattern recognition, [and] mathematical and computational modeling and analysis." Ayyadurai Decl. at ¶ 2. His report, however, does not indicate how this "vast experience" qualifies him to testify about or analyze voting behavior. *See Horton*, 603 Fed. App'x at 798-99. Indeed, it appears this is the first time in his entire career that he has even contemplated these issues. His lack of qualifications alone warrants exclusion. *See*, *e.g.*, *Smith*, 770 F. Supp. at 1566; *Chapman*, 766 F.3d at 1313-14.

In addition, Ayyadurai's report is inadmissible because he fails to disclose the methods he used and, even if any method can be discerned, it is obviously unreliable. *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir 2004). Ayyadurai summarizes his conclusions as follows: (1) there are improbable vote pattern anomalies, including instances of "High Republicans, Low Trump" vote patterns in certain precincts; (2) in three counties the "only plausible explanation for the vote distribution was that President Trump received near zero Black votes," Ayyadurai Decl. at 27-28; and, (3) an unidentified "'weighted race' algorithm" transferred "approximately 48,000 votes from President Trump to Mr. Biden," *id*. at 28. As noted by Intervenor's Rebuttal Expert Jonathan Rodden, however, Ayyadurai "provides no indications about his data sources," "does not explain how he measures his variables," and "[h]is claims about race and ethnicity are, frankly,

inscrutable, and thus difficult to evaluate with data analysis." Report of Jonathan Rodden ("Rodden Rep.") at 24.[2]

For but one example, Ayyadurai summarizes demographic data from undisclosed sources purportedly related to the percentage of Republican-, Democratic-, and Independent-affiliated individuals within certain counties, as well as the "ethnic" makeup of those counties, again by percentage. Ayyadurai Decl. at ¶¶ 14-21. Ayyadurai then references graphs that he claims show that as the percentage of Republicans in certain precincts increases, the overall percentage of Republican votes for President Trump decreases. *See id.* at ¶¶ 15-21. He does not explain why this is problematic or how, as he also contends, these graphs show fraud. As Dr. Rodden notes, such a pattern is not surprising—and it certainly is not an indication of election fraud. *See* Rodden Rep. at 24-35. In fact, Ayyadurai's "phrase—'high Republican but low Trump'—describes something that we saw not only in Savannah, [Georgia], but in metro areas around Georgia and the United States: white metro-area voters who typically vote for Republican candidates continued to do so in down-ballot races, but a number of them voted for the

---

[2] Dr. Rodden is a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab. *See* Rodden Rep. He is an established expert on election data analysis and has appeared—and been credited—as an expert in numerous voting rights and election-related lawsuits and litigation across the country. Rodden Rep. at 3-6.

Democratic candidate in the presidential race." *Id.* at 30. Ayyadurai does not account for the explanation provided by Dr. Rodden, provide the methodology used to reach his conclusion or identify the source of his data.

The entirety of Ayyadurai's report suffers from the same flaws: a conspicuous failure to disclose the source(s) of the data relied on, how conclusions were reached, and what methodology, if any, underlies the opinions. *See, e.g.*, Ayyadurai Decl. ¶¶ 15(g)-(h), 16(g)-(h), 17(g)-(h) (failing to identify source or relevance of data as well as method underlying opinion); ¶¶ 30-31 (lacking reference to data source, explanation of algorithm or how votes were transferred from Trump to Biden); Rodden Rep. at 24, 32-35. The report fails to disclose enough about the methods employed or relied upon so that those methods can be reviewed, tested, duplicated, and verified. *See McDowell*, 392 F.3d at 1298. Reports that omit even a minimal disclosure of the underlying methods are inadmissible. *See Frazier*, 387 F.3d at 1260. Ayyadurai's declaration should be excluded. *Id.* at 1265 ("'[t]he court's gatekeeping function requires more than simply 'taking the expert's word for it.'"").

## B. Ramsland is not qualified and fails to disclose his methods.

Russell James Ramsland, Jr. offers opinions regarding whether the use of certain voting machines influenced the outcome of the 2020 presidential election in

Georgia. *See, e.g.*, Declaration of Russell James Ramsland, Jr. ("Ramsland Decl.") ECF No. 1-10, ¶ 8. Ramsland's report should be excluded: because Ramsland is not qualified as an expert and fails to disclose the information relied on and the methodology he (or others) utilized to reach his conclusions.

First, Ramsland is a businessman who lacks the qualifications necessary to offer expert opinion testimony on the impact, if any, on the 2020 presidential election from the use of certain voting machines. *See id.* at ¶ 2. In his declaration, Ramsland candidly admits his lack of relevant knowledge, education and experience stating that he "relied on [his current employer's] experts and resources," noting that his employer, "which provides a range of security services," "contract[s] with statisticians when needed," and employs a "wide variety of cyber and cyber forensic analysts as employees, consultants and contractors." *Id.* Ramsland does not disclose, however, who these unidentified "experts" are, which of them were utilized, the sources of data they relied upon, the manner in which they performed whatever work they might have done and in what way Ramsland, in turn, relied on that work to prepare his own report. *Id.*; *Bowers v. Norfolk S. Corp.*, 300 Fed. App'x 700, 703 (11th Cir. 2008).

Instead, Ramsland appears to be parroting analyses from other unidentified individuals who claim to possess expertise that he does not. This alone is more than

8

sufficient to exclude his report. *See Redmond v. City of East Point, Georgia*, No. 1:00-CV-2492-WEJ, 2004 WL 6060552, at *15 (N.D. Ga. Mar. 29, 2004) (noting that, under *Daubert*, "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty").

Even if Ramsland were qualified (and he assuredly is not), his report is inadmissible because it utterly fails to disclose the data or methodology he (or others) used, as well as the bases for his (or other's) analyses and conclusions. *See Frazier*, 387 F.3d at 1264-65. Indeed, the report can be searched in vain for Ramsland's data sources, the statistical analyses conducted, margins of error, or virtually *anything* that might suggest serious scholarly or expert analysis.

And, to the extent *any* methodology can be discerned from the scant information in the report, that methodology is unreliable. *McDowell*, 392 F.3d at 1298. The proffered opinions are therefore inadmissible. *See* Fed. R. Evid. 702.

For example, Ramsland references a "regression analysis" used to "develop a model/equation to predict in any county what percentage of vote could reasonably be expected to go to candidate Biden," noting that the model does a "good job" predicting Biden's percentage of votes in "most counties." Ramsland Decl. at ⁋ 8. But Ramsland fails to describe that "regression analysis," or the "model/equation" developed from it. He is remarkably silent as to the inputs for the regression

9

analysis, the method itself, any assumptions, the predictive findings, and the error rate. He claims that the undescribed model does a "good job" predicting Biden's percentage of votes in "most counties," but nothing more is provide: How accurate is a "good job"? How many counties is "most counties"? This isn't even close to an appropriate or reliable statistical analysis.

Similarly, Ramsland concludes that, in counties that used certain voting machines or devices, candidate Biden "over-performed" beyond the expected results using the undisclosed predictive model, resulting in 123,725 votes in Georgia that are "statistically invalid." *Id.* at ¶ 10. He opines that Biden's "overperformance" is "**highly indicative (and 99.9% statistically significant) that something strange is occurring with the [voting] machines**." *Id.* at ¶ 11 (emphasis in original). Again, no details regarding these calculations—including how it was determined that the results are statistically significant or how statistical significance of "strangeness" might be measured—are disclosed. The exact type of "strangeness" at issue is left to the reader's imagination. Ramsland's other opinions suffer from the same issues. *See, e.g.*, *id.* at ¶ 13 (failing to disclose data or explain method underlying plot purportedly showing widespread fraud); ¶¶ 15, 18-19 (estimating magnitude of "fraudulent[] and erroneous[]" vote attribution without providing data or explaining methodology).

Moreover, an examination of the possible methodologies underlying Ramsland's opinions reveal deep flaws. As noted in Dr. Rodden's rebuttal report, Ramsland relies on "idiosyncratic, non-standard statistical techniques" that are ill-suited for the analysis he attempts to conduct. Rodden Rep. at 36. Among the many identified by Dr. Rodden: (1) inappropriate reliance on a correlation that is driven primarily by cross-state variation; (2) failure to address causal inference problems including that Democratic leaning counties were more likely to adopt Dominion voting systems; and (3) failure to include fixed effects which is standard practice in the type of social science research Ramsland attempted. *Id*. at 36-43. In short, "the research design used in the Ramsland report is ill-equipped to detect differences in vote shares that are *caused* by use of particular voting systems." *Id*. at 46. The rebuttal report of Kenneth R. Mayer identifies additional errors including, for example, that the data Ramsland relies on from undisclosed sources does not match the actual data from the state. Report of Kenneth R. Mayer ("Mayer Rep.") at 4-5.[3]

Ramsland's failure to provide or even describe the methodology underlying his opinions as well as the lack of reliability in the methodology that can be

---

[3] Kenneth R. Mayer has a Ph.D. in political science from Yale University and is on the faculty of the political science department of the University of Wisconsin-Madison. Mayer Rep. at 2. He has authored articles on election administration and has been qualified as an expert in numerous matters. *Id.* at 2-3.

ascertained from his report mandate exclusion of Ramsland's testimony. *See, e.g.*, *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (affirming exclusion of testimony where proffered expert did not test or consider alternatives); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1240 (11th Cir. 2005) (determining it inappropriate to admit expert testimony that was "not support[ed] . . . with sufficient data or reliable principles" and did not "follow the basic methodology" used by experts in the relevant field).

## C. Braynard is not qualified and his report does not utilize generally accepted methodology.

Nearly a week after filing their motion, on December 3, Plaintiffs filed a report from Matthew Braynard. Braynard seeks to offer opinions on the estimated number of Georgia voters: (1) who received an absentee ballot but did not request one; (2) who returned an absentee ballot but the state database reflects the voter as not having returned a ballot; (3) recorded as having voted but who deny voting; (4) who were not Georgia residents when they voted; (5) who were registered with a postal box disguised as a residential address; and (6) who voted in multiple states. Report of Matthew Braynard ("Braynard Rep.") ECF No. 45-1, at 7-10. Braynard, however, does not have the appropriate qualifications to opine on these topics, he does not follow standard methodology in the relevant scientific field, and the survey underlying several of his opinions is fatally flawed.

12

Braynard has a Bachelor of Business Administration and a Master of Fine Arts in "Writing." Braynard Rep. at Ex. 1. He has worked for, among others, the Republican National Committee and Donald J. Trump for President. *See id.* Braynard does not identify any education or experience in political science, statistics, or survey design, nor does he list any publications, research projects, or speaking engagements on those or any other subjects. He has not offered any expert testimony in court or deposition in the last four years, if ever. *Id.* at 4. While he has worked in the data analysis field, including in analysis of voter data, nothing in his resume indicates education, experience, or knowledge in survey design or statistical methods in social sciences. Because he lacks the requisite education, training, experience, knowledge, and skill to offer his opinions, his report should be excluded. *See*, *e.g.*, *Smith*, 770 F. Supp. at 1566; *Chapman*, 766 F.3d at 1313-14.

Even if Braynard could qualify as an expert in the relevant fields, his report is unreliable and therefore inadmissible. As more fully explained in the rebuttal report of Stephen Ansolabehere, "none of the[] claims meets scientific standards" in the appropriate field and Braynard has "no scientific basis for drawing any inferences or conclusions from the data presented."[4] Rebuttal Report of Stephen Ansolabehere

---

[4] Dr. Ansolabehere is the Frank G. Thompson Professor of Government in the Department of Government at Harvard University. Ansolabehere Rep. I at ⁋ 10. His

Regarding Braynard ("Ansolabehere Rep. I") ⁋ 3. Troublingly, none of Braynard's estimates are presented with a measure of statistical precision or uncertainty which is standard in the field. *Id.* at ⁋⁋ 17, 23. Measures of uncertainty such as standard errors, confidence intervals, or margins of error "are necessary for gauging how informative estimates are, and what inferences and conclusions may be drawn," and "[w]ithout such quantities it is impossible to draw statistical inferences from data." *Id.* at ⁋⁋ 22-23. Moreover, Braynard's conclusions are couched as having a "reasonable degree of scientific certainty," Braynard Rep. at 7-10, but that phrase is meaningless in scientific research. Ansolabehere Rep. I at ⁋⁋ 24-26. As Dr. Ansolabehere explains, errors in recordkeeping readily account for each of the claims made in Braynard's report. *See id.* at 30-33. Finally, the study on which several of Braynard's opinions rely is riddled with errors as more fully explained in Section III.D below. *See id.* at ⁋⁋ 34-68. Braynard's opinions should be excluded. *See McClain*, 401 F.3d at 1240 (determining it inappropriate to admit expert testimony that was "not supported with sufficient data or reliable principles" and did not "follow the basic methodology" used by experts in the relevant field).

---

areas of expertise include statistical methods in social sciences and survey research methods. *Id.* at ⁋ 12.

**D.     Briggs' report is built on a faulty foundation and is not helpful.**

Briggs has a Ph.D. in Statistics and considers himself a "statistical consultant." Declaration of William M. Briggs ("Briggs Decl.") ECF No. 1-1, at 3, 21. But his report, which purports to quantify the magnitude of  "troublesome"[5] unreturned absentee ballots, is unreliable because, among other reasons, it rests entirely on faulty data collected by a fatally flawed survey and fails to account for a variety of unremarkable reasons for the existence of the so-called "troublesome" ballots. Additionally, Briggs' conclusion that there may have been "error[s] of some kind" for certain ballots does not assist the trier of fact in that Briggs does not conclude or even suggest that these purported "errors" had the possibility to change the result of the presidential election in Georgia.[6]

Briggs' report is based entirely on survey data from a survey performed by Braynard. *Id.* at 1. Briggs notes at the outset that his analysis "assume[s] survey respondents are representative and the data is accurate." *Id.* at 2. Briggs, however, offers no explanation as to why it is reasonable for him to assume the data is accurate

---

[5] Briggs categorizes an unreturned absentee ballot as "troublesome" if it is: (1) a ballot sent to a voter who did not request one, or (2) a voted ballot that was returned but not recorded. Briggs Rep. at 1.

[6] Briggs' report includes information relating to multiple states. Though there are errors in the survey methodology and data analysis for the other states, Intervenors focus only on issues relating to Briggs' analysis of Georgia ballots. *See, e.g.*, Ansolabehere Rep. II at ¶¶ 20-24, 63, 67-74.

or the sample size representative. *McDowell*, 392 F.3d at 1299 ("[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive." (citation omitted)).

As fully described in the Rebuttal Report of Stephen Ansolabehere Regarding Briggs ("Ansolabehere Rep. II"), Briggs' report is unreliable. First, the survey used to collect the data on which Briggs' opinions are based was flawed because, among other reasons, it allowed individuals other than the survey "target," individuals whose ballots were marked as unreturned, to answer survey questions. This error contaminates the data, "and is of sufficient magnitude to alter the results significantly." Ansolabehere Rep. II at ⁋ 51. Second, Braynard's survey had an unacceptably low response rate. Braynard was only able to reach 0.4% of the individuals he sought to interview. *Id*. at ⁋ 39. Put another way, 99.6% of the individuals targeted by the survey did not respond. *Id.* This is not an acceptable response rate. *Id*. at ⁋ 41. Further compounding this issue, without information about the target population or the responding population, it is impossible to know whether the responding population is representative and therefore whether there is any scientific value to the survey. *Id.* at ⁋ 42. Third, Briggs' report fails to account for unremarkable reasons, such as late arriving ballots, missing or mismatched signature

rejections, or spoiled or voided ballots, for why returned absentee ballots might not be recorded or counted. *Id.* at ℙ 58. These serious issues render the report unreliable and warrant its exclusion. *Chapman*, 766 F.3d at 1305-06 (finding a court "is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'").

Finally, Briggs' report is not relevant to the question presented to the Court. Setting aside the problems with the data, Briggs does not opine regarding the exact nature of the "errors" or how any error would or even could have impacted the outcome of the election. Plaintiffs claim that "[t]ens of thousands of votes counted toward Vice President Biden's final tally were the product of illegality, and physical and computer-based fraud leading to 'outright ballot stuffing.'" Pl.'s Mot. for TRO, ECF No. 6, at 1. Briggs' report, however, does not speak to these issues and is therefore not helpful to the Court. The report should be disregarded on this ground as well. *See* Fed. R. Evid. 702(a).

**E.    Watkins is not qualified and his report rests entirely on speculation.**

On December 1, Plaintiffs belatedly filed a declaration from Ronald Watkins. Watkins is a "network and information defense analyst and a network security engineer" with nine years of experience. Declaration of Ronald Watkins ("Watkins Decl.") ECF No. 31-1, at ℙ 5. He was the administrator of 8chan, an

anonymous online forum, and administered its successor forum, 8kun. Chris Francescani, *The men behind QAnon* (Sept. 22,2020), ABC NEWS, https://abcnews.go.com/Politics/men-qanon/story?id=73046374. Watkins seeks to provide testimony to "alert the public and let the world know the truth about actual voting tabulation software designed . . . to facilitate digital ballot stuffing." Watkins Decl. at ¶ 4. While the declaration is not labeled as an expert report (though Watkins claims he is an expert) and it is missing key components of an expert report (for example, Watkins' CV), to the extent Plaintiffs seek to offer Watkins as an expert in support of their motion, it should be excluded.

Plaintiffs present no evidence that Watkins is qualified to offer any opinion regarding election software. Watkins' stated experience—as a "network and information defense analyst and a network security engineer"—does not qualify him to offer testimony regarding purported vulnerabilities in voting systems. *See id.* at 5. Moreover, it is not clear whether Watkins has ever used or even examined the software at issue or whether he has any experience in election administration. Second, Watkins' opinions are not helpful. His declaration appears to consist entirely of unsupported speculation regarding purported vulnerabilities in election software based on a review of publicly available documents including user manuals. *See, e.g.*, *id.* at ¶¶ 6-13. If it wishes, the Court can review these public documents

18

itself; Watkins' speculation is not helpful. Such testimony should be disregarded. *See Frazier*, 387 F.3d at 1260; *see also Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("caution[ing courts] not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles").

**F.     Overholt discloses no relevant qualifications and his report contains serious errors.**

Plaintiffs recently filed the Affidavit of Benjamin A. Overholt ("Overholt Aff."). Overholt seeks to offer opinions on whether "anomalies existed that could change the outcome of the presidential race in the 2020 General Election" based on a review of public data from the Georgia Secretary of State. Overholt Aff., ECF No. 45-3, at ⁋ 4. As with many of the other proffered experts, Overholt provides only a cursory explanation of his credentials and his report is riddled with errors.

Overholt states that he has a Ph.D. in Applied Statistics and Research Methods, he is an "active federal civil servant" and has spent time reviewing "election results" for the Civil Rights Division of the Justice Department. *Id.* at ⁋ 2. He does not further describe his education, experience or other credentials or how his prior work is similar or relates to, if at all, the work he performed for this matter. He does not appear to have any experience with Georgia elections or analyzing Georgia election data. The only other information that Overholt provides is his assertion that he is qualified "[b]ased on [his] experience and because of [his]

19

personal interest in the matter." *Id.* at ¶ 4. This is patently insufficient to qualify Overholt to offer opinions on whether there are "anomalies" in Georgia election data that could change the outcome of the 2020 presidential election, and his opinions should not be considered. *See*, *e.g.*, *Smith*, 770 F. Supp. at 1566; *Chapman*, 766 F.3d at 1313-14.

Even if the Court finds Overholt qualified, his affidavit contains serious errors. As Intervenor's rebuttal expert, Dr. Mayer, explains, "the claims made by . . . Overholt are unsupported and incorrect." Mayer Rep. at 1. Overholt does not know "even the basics of . . . election administration or how elections are actually conducted in Georgia or how election practices changed in 2020." *Id.* Moreover, Overholt's report contains "inaccurate definitions of crucial terms (such as what a 'spoiled' ballot is) make[s] completely unsubstantiated claims based on pure speculation and personal opinion, and reach[es] unsupported and incorrect inferences about what the data show." *Id.* For example, among other issues, Overholt's claim that there are 500,000 missing votes, is completely wrong. *See id.* at ¶ 20. There are, in fact, no missing votes, Overholt used the absentee voter request file for his analysis which is not a record of all individuals who voted in the 2020 election but instead is a record of all absentee ballot requests. Mayer Rep. at 9. This failure to understand the data being analyzed is a serious error and is one of many

examples demonstrating the unreliability of Overholt's report. *See also*, Mayer at 6-9. Overholt's report should be excluded. *See McClain*, 401 F.3d at 1240; *Rider*, 295 F.3d at 1202.

## G.   Quinnell and Young are not qualified and their declarations are unreliable.

The Court should exclude the declarations of Eric Quinnell and S. Stanley Young. Neither are qualified to offer opinions on voting patterns in Georgia, and, unsurprisingly, the opinions they do offer are not reliable. Two reports authored by Quinnell (the second in collaboration with S. Stanley Young) have been submitted in this matter. The first purports to analyze the results of the 2020 general election in Fulton County. Declaration of Eric Quinnell ("Quinnell Decl.") ECF No. 1-27. The second seeks to corroborate Quinnell's original findings. Declarations of Eric Quinnell and S. Stanley Young ("Quinnell/Young Decl.") ECF No. 45-2.

As pointed out by Intervenors' rebuttal expert Dr. Rodden, Quinnell's methodologies are nonsensical, and his data analysis is flawed and meaningless. Rodden Rep. at 7-8. Quinnell's novel opinion is that election results should display a normal distribution—a bell curve—and any departure from this indicates nefarious activity, such as voter fraud. Quinnell Decl. at ¶ 18. As Dr. Rodden explains, academically accepted literature dating back decades (as well as common sense) confirms that partisan preferences are not uniformly distributed. Rodden Rep. at 9-

21

11. More frequently—and simply digesting the news over the course of the last few decades would confirm—relevant social groups (such as young people, racial minorities, or college graduates) are clustered and it is typical to see skewed voting distributions. *Id*. at 11.

Quinnell's second report is equally flawed. In that report, Quinnell and Young sought to corroborate Quinnell's earlier findings and identify what they characterize as "anomalies in the voting patterns or new inferences that may explain some existing results." Quinnell/Young Decl. at ¶ 6. Primarily, they assert that their data shows that nearly all of the absentee ballots for Trump were received by November 4, while the vast majority of absentee votes for Biden were received on or after November 5, resulting in a distribution for Biden that "mathematically represents a peculiar, non-linear external constraint unexplainable and unrelated to the arrival and counting of absentee ballots." *Id*. at ¶ 13.

Rather than corroborate Quinnell's earlier report, the second report merely compounds its errors. As Dr. Rodden explains in detail in his supplemental report addressing the Quinnell/Young Declaration ("Rodden Supp. Rep."), the declaration utilizes unofficial data that may not reflect the running total of votes. Rodden Supp. Rep. at 3-4. The report is also riddled with numerous unexplained, unsubstantiated, and questionable assumptions built into their data and analysis (which, as before, is

not provided). Rodden Supp. Rep. at 4-7. In addition, the Quinnell/Young Declaration claims that there is a "pattern" that represents a worrying anomaly in voting patterns. Quinnell/Young Decl. at ¶ 6. But this is nonsense. As Dr. Rodden explains, this "pattern" they purportedly discovered, even if it did exist, is entirely consistent with *what could happen naturally* and is far from being anomalous. Rodden Supp. Rep. at 8-9. This is because, at a very high level, there are many precincts in Fulton County that are small and/or have very few absentee votes for Trump. *Id*. at 9-11.

In addition, Quinnell/Young make fundamental errors in their analysis. For instance, they note that "[a]ccording to the rules established in Georgia for the 2020 election, absentee ballots were allowed to be opened and counted for a full 3 weeks leading up to and including election day." Quinnell/Young Decl. at ¶ 20. But, as was widely reported, this is false; Georgia election workers were only permitted to open and scan—but not count—absentee ballots *15* days before election day.[7] In the analysis they conducted, where every day impacts the distribution, such a gross error speaks to the lack of familiarity with the subject matter. The Quinnell and Young

---

[7] *See*, *e.g.*, Mark Niesse, *Absentee ballots can begin to be opened, but not counted, in Georgia*, The Atlanta Journal-Constitution (Oct 19, 2020), https://www.ajc.com/politics/absentee-ballots-can-begin-to-be-opened-but-not-counted-in-georgia/BRBLHVUJOFHB5OEHAMZV34HPDA/.

declarations should be excluded.

**H.      It is impossible to assess the qualifications of the unnamed individual known as "Spyder" and his declaration consists of nothing more than speculation.**

In support of their motion, Plaintiffs cite the "expert testimony" of an individual whose name is redacted but is referred to by Plaintiffs as "Spyder." *See* Mot. to File Under Seal, ECF 5 at 9. Spyder claims to be an "electronic intelligence analyst . . . with experience gathering SAM missile system electronic intelligence" and "extensive experience as a white hat hacker used by some of the top election specialists in the world." Declaration of "Spyder" ("Spyder Decl.") ECF No. 1-9, ⁋ 2. Other than claiming to work for "top election specialists," Spyder does not disclose whether s/he has any experience with election administration or the companies, software and machines used by states to conduct elections. Because Spyder is not named, it is impossible to verify or even research what Spyder's credentials may be. On the record before the Court, Spyder cannot qualify as an expert given his/her lack of relevant education, training, experience, knowledge, and skill. *See*, *e.g.*, *Smith*, 770 F. Supp. at 1566.

Spyder's declaration should also be disregarded because it relies on nothing more than speculation and s/he uses no discernable methodology in reaching his/her conclusions. *See Frazier*, 387 F.3d at 1260; *see also Rider*, 295 F.3d at 1202; *Greater*

*Hall Temple Church of God v. S. Mutual Church Ins. Co.*, 820 Fed. App'x 915, 919 (11th Cir. 2020). Following a dizzying array of screenshots, Spyder comes to the startling conclusion that "Dominion Voter Systems and Edison Research" were "accessible" and "compromised by rogue actors" and that these companies "intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020." Spyder. Decl. ¶ 21. It does not appear that Spyder applied any methodology other than a series of online and other searches in reaching this conclusion which appears to rest entirely on speculation regarding purported security issues and connections between various individuals and entities. *See McClain*, 401 F.3d at 1240. And, in any event, s/he does not opine that any alleged interference changed or had the ability to change the trajectory of the election making his/her opinions unhelpful to the Court. *See Chapman*, 766 F.3d at 1304, 1306-07; Fed. R. Evid. 702(a). Spyder's declaration should not be considered.

## IV.   CONCLUSION

For the reasons set forth above, Intervenors respectfully request that the Court exclude these "experts" and their reports in their entirety.

25

Dated: December 5, 2020                    Respectfully submitted,

**<u>Adam M. Sparks</u>**
Halsey G. Knapp, Jr.
Joyce Gist Lewis
Susan P. Coppedge
Adam M. Sparks
**KREVOLIN AND HORST, LLC**
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
coppedge@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
ACallais@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
KHamilton@perkinscoie.com
ABeane@perkinscoie.com

Matthew J. Mertens*
Georgia Bar No: 870320
**PERKINS COIE LLP**
1120 NW Couch Street, 10th Floor
Portland, OR 97209
Telephone: (503) 727-2000
Facsimile: (503) 727-2222
MMertens@perkinscoie.com

*Counsel for Intervenors-Defendants*

*\*Admitted Pro Hac Vice*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM, and BRIAN JAY VAN GUNDY, | CIVIL ACTION FILE NO. 1:20-cv-04809-TCB |
| Plaintiffs, | |
| v. | |
| BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N. SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board, | |
| Defendants. | |

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: December 5, 2020.             **Adam M. Sparks**
                                     *Counsel for Intervenor-Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM, and BRIAN JAY VAN GUNDY, <br><br> Plaintiffs, <br><br> v. <br><br> BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N. SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board, <br><br> Defendants. | CIVIL ACTION FILE NO. 1:20-cv-04809-TCB |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2020, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send a

notice of electronic filing to all counsel of record.

Dated: December 5, 2020.                    **Adam M. Sparks**
                                            *Counsel for Intervenor-Defendants*