# Exhibit D

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| L. LIN WOOD, JR.,<br><br>Plaintiff,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of the State of Georgia; REBECCA N. SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board; and AHN LE, in her official capacity as a member of the Georgia State Election Board,<br><br>Defendants. | Civil Action No.<br>1:20-cv-04651-SDG |

## DECLARATION OF CHRIS HARVEY

Pursuant to 28 U.S.C. § 1746, I, Chris Harvey, make the following declaration:

1

1.

My name is Chris Harvey. I am over the age of 21 years, and I am under no legal disability that would prevent me from giving this declaration. If called to testify, I would testify under oath to these facts.

2.

I currently am the Director of Elections for the State of Georgia. I have held that position since July 2015. From August 2007 to July 2015, I was the Chief Investigator and Deputy Inspector General for the Secretary of State's office, investigating, among other things, potential violations of state election law. For more than a decade, I have acquired firsthand knowledge of Georgia's election processes at both the state and county level.

3.

In Georgia, elections are administered at the county level, and the counties are responsible for receiving and processing absentee ballots. Thus, the counties are responsible for verifying the elector's information and signature on the outer envelope of the absentee ballot when it is received before processing and tabulating the ballot. The Secretary of State's office strengthened the signature verification process for the 2020 general election. County elections officials received training on signature matching from experts with the Georgia Bureau of Investigation.

2

Additionally, voter signatures go through two layers of signature verification in the absentee ballot process. The voter's signature is first checked against the signatures on file with the county elections office when the voter submits an application for an absentee ballot. If the voter requests an absentee ballot through the Secretary's online absentee ballot request portal, the voter's identity is verified by matching the voter's name, date of birth, and Georgia driver's license or state identification card number contained in the state voter registration system pursuant to State Election Board Emergency Rule 183-1-14-0.10-.16. The voter's signature is matched a second time when the absentee ballot is received by the county election office.

4.

In my capacity as Director of Elections, I occasionally send out Official Election Bulletins to county elections officials and county registrars, which provide updates on changes in state election laws and rules and guidance on election administration to assist county officials in their duties. The guidance is simply recommendations on best practices and does not supplant or replace Georgia law; county officials are still bound to follow the election code and the rules and regulations of the State Election Board.

5.

On May 1, 2020, my office distributed an OEB providing guidance on absentee ballot signature review. A true and correct copy of this guidance is attached as **Exhibit 1**. The purpose of the OEB was to remind county elections officials of the recent updates to Georgia law and regulations regarding verifying signatures on absentee ballots and provide guidance on the procedures that should be followed when a signature on an absentee ballot does not match. The OEB advised county officials on HB 316's reforms to absentee ballot procedures set forth in O.C.G.A. § 21-2-386, as well as State Election Board Rule 183-1-14-.13, which addressed how quickly and by what methods electors need to be notified concerning absentee ballot issues. The OEB in no way is contrary to or inconsistent with the procedures in O.C.G.A. § 21-2-386(a)(1)(C). To the contrary, the OEB clearly states, **"If the signature does not appear to be valid, registrars and clerks are required to follow the procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C)."**

6.

Following the November 3, general election, the Secretary of State's office conducted an analysis of the number of absentee ballot rejections for signature issues for 2020 as compared to 2018. We found that the total number of absentee ballot rejections for signature issues in the November 2020 election increased 343% from the 2018 election, about the same rate of increase as the total number of absentee

4

ballots accepted. The rejection rate for absentee ballots with missing or non-matching signatures in the 2020 General Election was 0.15%, the same rejection rate for signature issues as the 2018 General Election.

7.

Out of the 1,322,529 absentee ballots cast in the November 2020 election, 2,011 absentee ballots were rejected for missing or non-matching signatures. For the November 2018 election, 454 absentee ballots were rejected for missing or non-matching signatures out of 284,393 absentee ballots cast. The 0.15% rejection rate for signature issues was the same in both the 2018 and 2020 General Elections. The rejection numbers from 2018 cited above are the ones cited by the plaintiffs in the *Democratic Party of Georgia, et al. v. Raffensperger, et al.*, Civil Action No. 1:19cv5028.

8.

Last week, the Secretary of State ordered a statewide audit of all ballots cast in the presidential election, which was conducted by manual tabulation. Political parties were permitted to have certified monitors present in every county to observe the audit. An OEB was distributed to county election officials that included the following instructions: "The State Executive Committee of each political party

(Republicans and Democrats) shall have the right to have one properly designated person act as monitor of the audit for each ten audit teams that are conducting the audit, with a minimum of two designated monitors in each county per party per room where the audit is being conducted." A true and correct copy of the OEB is attached as **Exhibit 2**.

9.

The results of the audit are still being tabulated and will be released prior to certification of the election results. Four counties discovered that some ballots had not been tabulated in the original count, and those counties are re-certifying their results to include those ballots.

10.

The Secretary of State also ordered Pro V&V, an independent certified testing laboratory, to conduct an additional audit of a random sample of the Dominion Systems voting equipment to determine if it had been tampered with or hacked. Pro V&V conducted an audit of a random sample of Dominion Voting Systems voting machines throughout the state using forensic techniques, including equipment from Cobb, Douglas, Floyd, Morgan, Paulding, and Spalding Counties. ICP (precinct

6

ballot scanners), ICX (ballot marking devices), and ICC (central absentee ballot scanners) components were all subject to the audit. In conducting the audit, Pro V&V extracted the software or firmware from the components to check that the only software or firmware on the components was certified for use by the Secretary of State's office. The testing was conducted on a Pro V&V laptop independent of the system. According to the Pro V&V audit, all of the software and firmware on the sampled machines was verified to be the software and firmware certified for use by the Office of the Secretary of State.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of November, 2020.

_____
CHRIS HARVEY

# EXHIBIT 1



# OFFICIAL ELECTION BULLETIN
May 1, 2020

---

**TO:** County Election Officials and County Registrars

**FROM:** Chris Harvey, State Elections Director

**RE:** Absentee Ballot Signature Review Guidance

---

Verifying that a voter's signature on his or her absentee ballot matches his or her signature on the absentee ballot application or in the voter registration record is required by Georgia law and is crucial to secure elections. Ensuring that signatures match is even more crucial in this time of increased absentee voting due to the COVID-19 crisis. The purpose of this OEB is to remind you of some recent updates to Georgia law and regulations regarding verifying signatures on absentee ballots and to make you aware of the procedures that should be followed when a signature on an absentee ballot does not match. HB 316, which passed in 2019, modified the absentee ballot laws and the design of the oath envelope. The State Election Board also adopted Rule 183-1-14.13 this year, which addresses how quickly and by what methods electors need to be notified concerning absentee ballot issues. What follows are the procedures that should be followed when the signature on the absentee ballot does not match the voter's signature on his or her application or voter registration record:

> **County registrars and absentee ballot clerks are required, upon receipt of each mail-in absentee ballot, to compare the signature or mark of the elector on the mail-in absentee ballot envelope with the signatures or marks in eNet and on the application for the mail-in absentee ballot. If the signature does not appear to be valid, registrars and clerks are required to follow the procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C).**

When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot.[1] If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks.

A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application. If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under OCGA 21-2-386(a)(1)(C). Then, the registrar or absentee ballot clerk shall commence the notification procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C) and State Election Board Rule 183-1-14-.13.

---

[1] Once the registrar or clerk verifies a matching signature, they do not need to continue to review additional signatures for the same voter.

RULE 183-1-14-.13 Prompt Notification of Absentee Ballot Rejection

When a timely submitted absentee ballot is rejected, the board of registrars or absentee ballot clerk shall send the elector notice of such rejection and opportunity to cure by mailing written notice, and attempt to notify the elector by telephone and email, if a telephone number or email is on the elector's voter registration record or absentee ballot application, no later than the close of business on the third business day after receiving the absentee ballot.  However, for any timely submitted absentee ballot that is rejected within eleven days of Election Day, the board of registrars or absentee ballot clerk shall send the elector notice of such rejection and opportunity to cure by mailing written notice, and attempt to notify the elector by telephone and email, if a telephone number or email is on the elector's voter registration record or absentee ballot application, no later than close of business on the next business day.

# EXHIBIT

Case 1:20-cv-04651-SDB Document 64-4 Filed 12/09/20 Page 13 of 17



# OFFICIAL ELECTION BULLETIN
November 12, 2020

---

**TO:** County Election Officials and County Registrars

**FROM:** Chris Harvey, Elections Division Director

**RE:** Audit Instructions

---

Pursuant to O.C.G.A. § 21-2-498 and SEB Rule 183-1-15-.04, the Secretary has selected the contest for President of the United States to audit. While many risk-limiting audits rely on samples of ballots, the design of risk-limiting audits combined with the margin of this race mean that this risk-limiting audit is required to be a full manual tally of the votes cast. SEB Rule 183-1-15-.04 requires that the Superintendent follow instructions issued by the Secretary of State on how to specifically conduct the audit. While there will be additional instructions issued regarding more specific processes, initial instructions are below:

1. **Start and Completion Times**

Each county must start their audit no later than 9:00 a.m. on Friday, November 13, 2020 and must complete their audit no later than 11:59 p.m. on Wednesday, November 18, 2020.

Public notice of the date, time, and location of the audit must be posted on the county election office's website, or, if the county election's office does not have a website, in another prominent location.

2. **Public Access and Political Party Monitors**

The audit shall be open to the public and the press, but no person except the persons designated by the Superintendent shall touch any ballot or ballot container. The Superintendent shall designate a viewing area from which members of the public and press may observe the audit for the purpose of good order and maintaining the integrity of the audit. The Superintendent may also choose to make the audit proceeding available via livestream or webcast. If any member of the public or press interferes with

the process or persists in not following reasonable regulations and instructions set by the Superintendent, that person shall be removed.

The State Executive Committee of each political party (Republicans and Democrats) shall have the right to have one properly designated person act as monitor of the audit for each ten audit teams that are conducting the audit, with a minimum of two designated monitors in each county per party per room where the audit is being conducted. Properly designated monitors shall have complete access to monitor the audit. They do not have to remain in the public viewing areas. The designated monitors shall be given a letter by the designating entity containing the name of the monitor, his or her address, and the county in which he or she may monitor the audit. A copy of the letter shall be delivered to the county elections superintendent prior to the monitor being allowed to monitor the process. The designating entity shall provide their monitors with name tags that clearly indicate their names and the entity the designated them. Such name tags shall be worn at all times while monitoring the audit.

The Superintendent may make reasonable regulations, including regulations regarding social distancing measures and required personal protective equipment, that designated monitors and public observers shall follow so that they do not interfere with the auditing process. If a designated monitor or public observer interferes with the audit after being warned by an election official, or if he or she violated any of the prohibited activities listed herein, the superintendent may revoke the person's designation to monitor the process, remove them from any further monitoring or observing, and refer the incident to the Secretary of State's office for investigation. Any infraction or irregularity observed by a monitor or observer shall be reported to the superintendent or to the Secretary of State. If a monitor's designation is revoked by the Superintendent, the designating entity shall have the right to designate a new monitor in the manner set forth herein.

While monitoring the process, designated monitors are prohibited from:

> (a) In any way interfering with the audit process;
>
> (b) Speaking to any member of the audit team or vote review panel;
>
> (c) When outside of the public viewing area, using any photographic, electronic monitoring or recording devices, cellular telephones, or other electronic equipment;
>
> (d) Touching any ballot or ballot container; or
>
> (e) Engaging in any form of campaigning or campaign activity.

Before being allowed to monitor the process, each designated monitor shall execute an oath swearing or affirming, under penalty of perjury, that they understand the prohibitions set forth above, that they will not engage in any prohibited activity, and that

they understand any violations of this rule will be punishable by the State Election Board.

3. **Audit Teams**

Audit teams shall consist of at least two sworn designees. The Superintendent may designate non-employees to be a member of an audit team, but any non-employees designated to audit teams shall be residents of the State of Georgia. Every member of the audit team shall be a person of good moral character and shall take and sign an oath that they will conduct the audit fairly and accurately prior to conducting the audit. In determining the candidate for which the vote was cast, the audit teams shall refer to and rely on SEB Rule 183-1-15-02 (Definition of a Vote) for Optical Scan Voting Systems.

4. **Vote Review Panels**

Any ballot where the audit team does not agree on the selection for President shall be sent to a Vote Review Panel. Each Vote Review Panel shall consist of a designee of the Election Superintendent and a nominee of the county or state executive committee of each political party (Republican and Democrat) designated via letter provided to the Superintendent. Notice of the members and location of any Vote Review Panels shall be posted prominently at the office of the Superintendent. Prior to beginning its work, each member of the Vote Review Panel shall take and sign an oath The panel shall manually review all ballots sent to it by any audit team and shall determine by a majority vote "if the elector has marked his or her ballot in such a manner that he or she has indicated *clearly and without question* the candidate for whom he or she desires to cast his or her vote." O.C.G.A. 21-2-438(c). The determination of the Vote Review Panel shall be final. The Superintendent may create multiple Vote Review Panels

In making its determination, the Vote Review Panel shall refer to and rely on SEB Rule 183-1-15-.02 (Definition of a Vote) for Optical Scan Voting Systems.

5. **Re-Certifying if Vote Counts Change**

In cases like this, where the risk-limiting audit of the selected contest has led to a full manual tally of the ballots cast, the vote counts according to the manual tally shall replace the vote previously reported vote counts and each county shall re-certify the new counts for the audited race, if necessary, prior to November 20, 2020.



# OFFICIAL ELECTION BULLETIN
November 13, 2020

**TO:** County Election Officials and County Registrars

**FROM:** Chris Harvey, Elections Division Director

**RE:** Allowing More Credentialed Monitors at Risk Limiting Audit
Allowing Libertarian Party Monitors

There has been some concern about the appropriate number of political party monitors eligible to view the audit process. The rules that the Secretary of State's office put out require that Superintendents allow a minimum of two political party monitors from each party, with additional monitors if there are more than twenty audit teams. For example, if DeKalb has 75 audit teams, they would have to allow a minimum of 8 designated monitors for each party. Additionally, as the Libertarian Party (technically a political body) has a candidate on the ballot for President, the same standards should be applied to the designated monitors from the Libertarian Party.

As an addendum to the rules on political parties monitors and because transparency should be a guiding principle throughout this process, if Election Superintendents can safely allow more than the minimum number of designated political party monitors consistent with maintaining an orderly process, space limitations, social distancing/public health guidelines then you should. Please allow as much transparency as you can while maintaining a secure, orderly process and abiding your public health regulations.