# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

   **Plaintiffs,**

**v.**

BRAD RAFFENSPERGER, *et al.*,

   **Defendants.**

CIVIL ACTION FILE NO.

**1:18-CV-5391-SCJ**

## <u>ORDER</u>

This matter is before the Court on Plaintiffs' Motion for Preliminary

Injunction concerning the State of Georgia's recent voter list maintenance

activities in which the status of a large number of Georgia voters on the State's

inactive elector list was changed to cancelled status. Doc. No. [159].[1]

---

[1] The Court recognizes that Plaintiffs use the words "removed" and "purged" throughout their arguments. However, Defendants have presented evidence and assert that the use of these words to describe the present circumstances is not correct, because no voter is ever removed from the voter rolls. In the process of voter list maintenance (which is permitted under applicable federal law, specifically the National Voter Registration Act, "NVRA," 52 U.S.C. § 20501, *et al.*), the affected voter's

According to a press release from the Secretary of State's Office, the list was comprised of 313,243 inactive voters.[2] Of these 313,243, there were 108,306, who had filed a change of address request with the United States Postal Service showing they have moved to a different county or state and 84,376, who had election mail returned as undeliverable, totaling 192,682. For purposes of the pending motion, Plaintiffs are **not** contesting the cancellation of the registrations of these 192,682 voters.  It is the remaining 120,561 voters (defined as having had no contact with their county election officials since January 1, 2012 and did not respond to two notices), which are at issue. Subsequent to the filing of Plaintiffs' motion, the Secretary of State returned 22,000 of the 120,561 voters to the voting roll (after review of Plaintiffs' briefing

---

status is changed from inactive to cancelled, which means that the voter is no longer eligible to vote. Doc. No. [172], p. 10, n.6 (citing Harvey Dec. ¶ 5). Notwithstanding Defendants' argument, the Court recognizes that the applicable Georgia statute utilizes the word "removed." See O.C.G.A. § 21-2-235(b) ("the elector shall be *removed* from the inactive list of electors.") (emphasis added).

[2] https://sos.ga.gov/index.php/elections/georgia_secretary_of_states_office_cleans _voter_file_by_4_as_required_by_law (last visited Dec. 23, 2019); see also Defs. Hearing Ex. 1 (Dec. 19, 2019).

and based upon the definition of a calendar year). Thus, it is now approximately 98,000 voters that are at issue.[3]

## I. BACKGROUND[4]

In 2018, Plaintiffs Fair Fight Action, Inc. ("Fair Fight Action"), Care in Action, Inc. ("Care in Action"), Ebenezer Baptist Church of Atlanta, Georgia, Inc. ("Ebenezer"), Baconton Missionary Baptist Church, Inc. ("Baconton"), Virginia-Highland Church, Inc. ("Virginia-Highland"), and The Sixth Episcopal District, Inc. ("Sixth Episcopal District") (collectively, the "Plaintiffs") sued Defendants Brad Raffensperger (in his official capacity as Secretary of State of the State of Georgia and as Chair of the State Election Board of Georgia), Members of the State Election Board in their official capacities (Rebecca N. Sullivan, David J. Worley, and Seth Harp), and the State Election

---

[3] At the December 16, 2019 hearing, Defense Counsel indicated that there were about 50,000 of these individuals who would have been canceled under Plaintiffs' interpretation of the law. However, Plaintiffs state that this number is incorrect and was probably based on the misunderstanding as to the calendar year for purposes of counting inactivity. Plaintiffs expert also explained that other corrections were also made by the Secretary of State based on a data transfer issue. See Dec. 19, 2019 Hearing Transcript at 27:7–10.

[4] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

Board (collectively, the "Defendants"), alleging that there are "serious and unconstitutional flaws in Georgia's elections process" and that Defendants' actions have "deprived Georgia citizens . . . particularly citizens of color, of their fundamental right to vote." Doc. No. [41], ¶ 2. More specifically, Plaintiffs allege that Defendants enforced unconstitutional and otherwise unlawful legislation, such as O.C.G.A. § 21-2-234, which Plaintiffs refer to as "Use it or Lose it" and Defendants characterize as voter list maintenance.[5]

At the time of the filing of Plaintiffs' lawsuit, Georgia's statutory voter list maintenance authority was found in O.C.G.A. §§ 21-2-234 and 235 and required the Secretary of State to send a postcard to voters with whom there had been "no contact" for *three* calendar years. If the voter failed to return the postcard, the voter's status was changed to "inactive." If the voter still did not vote in the next two general elections, he or she was removed from the registration rolls (or as Defendants' assert, the registration status was changed to cancelled).

---

[5] Plaintiffs also refer to the statute as "voter list purge," which as stated above, Defendants have presented evidence showing that this is an inaccurate description. See n.1, *supra*.

4

During the 2019 Legislative Session, the Georgia General Assembly passed House Bill 316 ("HB 316"). HB 316, which was signed into law by the Governor on April 2, 2019, amends the Georgia Election Code to, among other things, provide for more notice under Georgia's voter-list-maintenance process. HB 316 amended O.C.G.A. § 21-2-234 to mandate that the Secretary of State cannot remove voters from registrations rolls unless there has been "no contact" with them for *five* calendar years—as opposed to the previous *three* calendar years. See O.C.G.A. § 21-2-234(a)(2). HB 316 also amended O.C.G.A. § 21-2-234 to require notice to the voter not less than thirty days but no more than sixty days prior to the cancellation of the voter's registration.  Id. § 235(b).

The approximately 98,000 voters presently at issue are the voters who were placed on the inactive list (for no contact) under the prior statutory provision of three years "no contact" and prior to the enactment of HB 316's five year "no contact" provisions.  Defendants do not see HB 316 as retroactive or "backward" looking and have subjected the voters at issue to voter registration cancellation, even though they had less than five calendar years of no contact prior to being placed on the inactive elector list. Doc. No. [159-2], p. 11.

5

Case 1:18-cv-04789-TCB   Document 185   Filed 12/05/19   Page 7 of 32

In Count IV of their Complaint, *as amended*, Plaintiffs allege that Georgia's voter-list-maintenance process violates Georgia voters' rights to procedural Due Process under the First and Fourteenth Amendments of the United States Constitution. Doc. No. [41], ¶¶ 69–81, 205. The Complaint further states: "[t]he "use it or lose it" statute, as well as its enforcement by Defendants, unlawfully disenfranchise voters or severely burden their right to vote by penalizing voters based on their voting choices, providing voters inadequate notice, and failing to ameliorate the [registration cancellations] by offering same-day registration." Id. ¶ 77.

On December 16, 2019, Plaintiffs filed an emergency Motion for Temporary Restraining Order and Preliminary Injunction in which they seek to enjoin Defendants from canceling the voter registrations of 98,561 "inactive" voters. Doc. No. [159].[6] The Court held a hearing on the same date. During this hearing, Defense Counsel indicated that the "nuclear silo start process" began

---

[6] Plaintiffs indicated at the hearing that a supplemental pleading was unnecessary to address the recent circumstances presented in their motion. However, the Court finds that because the events at issue happened after the filing of the complaint, the better practice is to supplement the complaint. See Fed. R. Civ. P. 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.").

on September 24, 2019 and the system completes the program on December 16, 2019, without anyone taking an action to "push the button," to complete the process. Counsel also indicated that undoing the coding to stop the process, was challenging because there were other categories of cancellation in the program (besides the active voter cancellation). Counsel further indicated that if the already-running automated list maintenance process were stopped, the process becomes manual, which introduces the possibility for human error. Counsel also indicated that the State of Georgia was already within the ninety-day federal statutory timeline in which it could perform list maintenance and stopping the process would render the State of Georgia not being able to perform list maintenance again until the year 2021. Counsel further indicated that it is easier to reinstate the voters rather than stop the ongoing automated process, because the voter registrations could be restored in an overnight, twenty-four to forty-eight-hour process.

The Court declined to grant an emergency restraining order, finding the absence of imminent irreparable injury, based in large part on Defense Counsel's representation as to the ease of ability to restore the registrations of the voters at issue within twenty-four to forty-eight hours. Doc. No. [164].

7

The parties thereafter briefed the preliminary injunction portion of the motion (Doc. Nos. [172] and [177]) and the Court held a second hearing on December 19, 2019. Doc. No. [180]. As stated above, in the interim time period between the emergency December 16, 2019 hearing and the December 19, 2019 preliminary injunction hearing, Defendants returned approximately 22,000 Georgia voters to the voter roll by changing their status from cancelled to inactive status. During the December 19, 2019 hearing, the parties presented testimony (from expert witness, Dr. Michael McDonald and Georgia Elections Director, Chris Harvey) and exhibits. Doc. Nos. [180], [181].

Post-hearing, the Court posed two additional questions to the parties, concerning the asserted injury and state interests.[7] The parties submitted their responses on December 23, 2019. Doc. Nos. [184], [185].

---

[7] The Court's exact questions are as follows:

> The Court notes the parties' different statutory interpretations of HB 316.

> Pursuant to <u>Anderson v. Celebrezze</u>, 460 U.S. 779 (1983), the Court must consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff[s] seek[] to vindicate." <u>Id.</u> at 789. The Court asks Plaintiffs to address the following question: What is the precise injury that will be suffered by the

This matter is now ripe for review.

## II. LEGAL STANDARD

The Court considers four factors when deciding whether to issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65: (1) whether there is a substantial likelihood of success on the merits of the complaint;[8] (2) whether the preliminary injunction is necessary to prevent

---

approximately 120,000 people at issue here if this preliminary injunction is denied?

Additionally, pursuant to <u>Anderson</u>, the State must put forward "precise interests" as "justifications for the burden imposed by its rule." <u>Id.</u> at 789. "[T]he Court must not only determine the legitimacy and strength of those interests, it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights." <u>Id.</u> The Court asks Defendants to address the following question: Notwithstanding its Eleventh Amendment argument, what interest does the State have in applying its interpretation of H.B. 316 to the approximately 120,000 people at issue here?

[8] It appears to the Court that Plaintiffs are arguing the likelihood of success on the merits of their motion for preliminary injunction; however, the Court's review of applicable authority indicates that the standard involves likelihood of success on the merits of the *complaint*. <u>See</u> <u>Forsyth Cty. v. U.S. Army Corps of Engineers</u>, 633 F.3d 1032, 1042 (11th Cir. 2011) (noting that "[t]he County failed to establish a substantial likelihood of success on the merits of its complaint."); <u>Mann v. Palmer</u>, 713 F.3d 1306, 1310 (11th Cir. 2013) (indicating that the petitioner had to establish "a substantial likelihood of success on the merits of his complaint."); <u>Indigo Room, Inc. v. City of Fort Myers</u>, 710 F.3d 1294, 1299 (11th Cir. 2013) (noting that the district court did not

irreparable injury; (3) whether the threatened injury outweighs the harm that the preliminary injunction would cause to the non-movant; and (4) whether the preliminary injunction would be adverse to the public interest.[9] <u>Parker v. State Bd. of Pardons and Paroles</u>, 275 F.3d 1032, 1034–35 (11th Cir. 2001). Injunctive relief is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of these four factors. <u>Siegel v. LePore</u>, 234 F. 3d 1163, 1176 (11th Cir. 2000).[10] In addition, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of

---

abuse its discretion in denying injunction motion because it properly concluded that movants failed to show a substantial likelihood of success on the merits of two counts of their complaint); and <u>Common Cause/Georgia v. Billups</u>, 554 F.3d 1340, 1348 (11th Cir. 2009) (noting that the district court ruled that the organizations and voters had proved a substantial likelihood of success on the merits of their complaint).

[9] Factors three and four also involve consideration of whether the movant has shown reasonable diligence. <u>See</u> <u>Benisek v. Lamone</u>, --- U.S. ----, 138 S. Ct. 1942, 1944, 201 L. Ed. 2d 398 (2018) ("a party requesting a preliminary injunction must generally show reasonable diligence.").

[10] However, if a movant is unable to show a substantial likelihood of success on the merits, the court need not consider the other preliminary injunction requirements. <u>See</u> <u>Bloedorn v. Grube</u>, 631 F.3d 1218, 1229 (11th Cir. 2011).

the injunctive proceeding.'" <u>Levi Strauss & Co. v. Sunrise Int'l Trading Inc.</u>, 51 F.3d 982, 985 (11th Cir. 1995). The decision to grant preliminary injunctive relief is within the broad discretion of the district court. <u>Majd–Pour v. Georgiana Cmty. Hosp., Inc.</u>, 724 F.2d 901 (11th Cir. 1984).

## III. ANALYSIS

The crux of Plaintiffs' preliminary injunction motion involves the question of what should happen to the approximately 98,000 voters that were placed on the State of Georgia's inactive list (for no contact) prior to the enactment of HB 316.  Plaintiffs assert that a constitutional question is presented by the circumstances and this Court should apply the Supreme Court's <u>Anderson-Burdick</u> balancing test (involving consideration of the asserted injury and the state's interest) to evaluate whether the voting restriction at issue violates Due Process or the First Amendment. Plaintiffs also assert that the State of Georgia has no interest in removing voters from the rolls in violation of its own laws. Doc. No. [176], p. 2. In contrast, Defendants assert the Eleventh Amendment and the <u>Pullman</u> Doctrine *inter alia* to challenge the propriety of Plaintiffs' motion. As the Defendants' arguments are

11

jurisdictionally based, the Court will consider those arguments first.[11] The Court will thereafter consider Plaintiffs' constitutional claim.

### A. Eleventh Amendment

In opposition to Plaintiffs' motion, Defendants argue that Plaintiffs' motion and legal theory are barred by the Eleventh Amendment, because Plaintiffs are essentially asking this Court to adjudicate state law for the first time (and otherwise address state-law claims in federal court). Doc. No. [172], pp. 2, 8, 16. More specifically, Defendants' argument recognizes that Plaintiffs and Defendants have different interpretations of the effect of HB 316 on the approximately 98,000 voters at issue. Defendants argue that Plaintiffs' requested injunctive relief requires this Court to endorse Plaintiffs' interpretation of state law, which is barred by the Eleventh Amendment and State sovereign immunity. Id. at p. 16. Defendants assert that the reality of

---

[11] "Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power established in Article III, federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment." McClendon v. Ga. Dep't of Cmty. Health, 261 F.3d 1252, 1256 (11th Cir. 2001) (citations omitted); see also Edelman v. Jordan, 415 U.S. 651, 678 (1974) ("the Eleventh Amendment defense . . . partakes of the nature of a jurisdictional bar") and Duke v. James, 713 F.2d 1506, 1510 (11th Cir. 1983) (discussing the Pullman abstention (from the exercise of federal jurisdiction) doctrine).

Plaintiffs' motion is that "it is a declaratory judgment claim regarding compliance with HB 316 masquerading as a constitutional argument." Id. at p. 17. Defendants further argue that "Plaintiffs cannot succeed in suggesting their relief is based in federal law when it requires this Court to determine a novel issue of state law." Id. at p. 18.

In opposition, Plaintiffs state that their claims arise from the First and Fourteenth Amendments of the United States Constitution, not state law—and that their arguments do not require the Court to analyze novel issues of state law. Doc. No. [177], p. 3.

The Eleventh Amendment states in relevant part: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." U.S. Const. amend. XI. The United States Supreme Court has held that "a suit against state officials on the basis of state law contravenes the Eleventh Amendment." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984).[12] The Court also indicated that when injunctive relief is

---

[12] "The Supreme Court [in Pennhurst] has explained that the rationale for the

sought, "an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief effectively is against it." Id. at 113 (citations omitted). The Court further stated: "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Id. at 106.

The Eleventh Circuit Court of Appeals has addressed the Pennhurst decision on numerous occasions. In their briefing, Plaintiffs primarily rely upon the Eleventh Circuit's 1989 decision in Brown v. Georgia Department of Revenue, 881 F.2d 1018, 1023 (11th Cir. 1989). In Brown, the Eleventh Circuit held that the Supreme Court's decision in Pennhurst does not apply when a plaintiff alleges a violation of the federal Constitution. Id. at 1023. The Eleventh Circuit stated that under Pennhurst, "the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal

---

[exception to the Eleventh Amendment that allows state officials to be sued for prospective relief, i.e., Ex parte Young doctrine] 'rests on the need to promote the vindication of federal rights,' but in a case alleging that a state official has violated state law, this federal interest 'disappears.'" Ala. v. PCI Gaming Auth., 801 F.3d 1278, 1290 (11th Cir. 2015) (citations omitted).

14

law." Id. In the case *sub judice*, no relief has been ordered, so the Court cannot

necessarily answer this determinative question.[13]

Additional Eleventh Circuit authority indicates that when the gravamen

of the complaint appears to be that the State improperly interpreted and failed

to adhere to a state statute, there is a Pennhurst problem—as despite references

to the United States Constitution in the pleadings, the claims necessarily rely

on a determination that a state official has not complied with state law,[14] a

determination that is barred by sovereign immunity. See S&M Brands, Inc. v.

Georgia ex rel. Carr, 925 F.3d 1198, 1205 (11th Cir. 2019) and DeKalb Cty. Sch.

Dist. v. Schrenko, 109 F.3d 680, 688 (11th Cir. 1997); see also Hand v. Scott, 888

F.3d 1206, 1213–14 (11th Cir. 2018) (holding that "the district court cannot

---

[13] Phrased a different way, in Pennhurst, the Supreme Court indicated that "the general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought." Pennhurst, 465 U.S. at 107 (emphasis added). In the case *sub judice*, the Court finds that the effect of the relief sought by Plaintiffs is a determination by this Court that Defendants have not complied with state law.

[14] For example, Plaintiffs use the phrase "violation of state law" at numerous times in their briefing and hearing exhibit/PowerPoint. See e.g., Doc. Nos. [159-1], p. 23; [176], pp. 2, 7 n.1.

15

enjoin [a state] to follow the district court's interpretation of [the state's] own constitution.").[15]

While the Court recognizes Plaintiffs' arguments and citation of authority to the contrary, as well as its ability to review state statutes,[16] the gravamen of the Plaintiffs' pending motion appears to be that the Secretary of State (and therefore the State of Georgia) has improperly interpreted and failed to adhere to Georgia's new voter list maintenance statute (HB 316).[17] This is evidenced by the motion's numerous references to violation of state law and the fact that Plaintiffs are not seeking an injunction as to the entirety of the

---

[15] This Court's independent research only found one case to the contrary, <u>Duncan v. Poythress</u>, 657 F.2d 691 (5th Cir. 1981); however, the applicability and precedential weight of that case is doubtful, considering that it was decided pre-<u>Pennhurst</u> and involved a substantive due process claim, as opposed to the procedural due process claim at issue here.

[16] As stated by Judge Gerald Tjoflat, the Supremacy Clause of the United States Constitution "allows federal courts to review state statutes, but federal courts are limited to refusing to apply the provisions they find unconstitutional." <u>Democratic Exec. Comm. of Fla. v. Lee</u>, 915 F.3d 1312, 1348 (11th Cir. 2019) (Tjoflat, J., dissenting). Here, the Court is not being asked to find a statute unconstitutional. Plaintiffs are asking the Court to find a state official's interpretation of a statute unconstitutional.

[17] More specifically, the case of <u>Democratic Executive Committee v. Lee</u>, 915 F.3d 1312 (11th Cir. 2019) cited by Plaintiffs is distinguishable in that the arguments in that case did not center upon a violation of state law.

approximately 300,000 voter registrations that were subject to cancellation. Accordingly, in light of the above-stated authority, the Eleventh Amendment bars Plaintiffs' motion to the extent that it requires a conclusion by this Court that Plaintiffs' interpretation of HB 316 is correct.[18]

### B. <u>Pullman Doctrine</u>

While the Court considers the Eleventh Amendment analysis determinative, in the interest of caution, the Court will consider Defendants' <u>Pullman</u> abstention doctrine argument. Defendants assert the <u>Pullman</u> abstention doctrine, on the ground that "Plaintiffs' Motion is predicated upon only one discrete subset of list-maintenance activities that has not been adjudicated by state courts [and further argue that] this Court should refrain from adopting Plaintiffs' arguments on an unsettled issue of state law." Doc. No. [172], p. 20.

"Under the <u>Pullman</u> abstention doctrine, a federal court will defer to 'state court resolution of underlying issues of state law,'" before a substantial

---

[18] The Court recognizes that Plaintiffs also present an alternative argument in the event that the Court declines to engage in statutory interpretation or otherwise finds that HB 316 is ambiguous as to the voters at issue. To this regard, the Court will continue with its analysis and consider the constitutional question, *infra*.

federal constitutional question can be decided. <u>Siegel</u>, 234 F.3d at 1174; <u>see also</u> <u>Railroad Comm'n v. Pullman Co.</u>, 312 U.S. 496 (1941). In considering abstention, the court "must take into account the nature of the controversy and the importance of the right allegedly impaired." <u>Id.</u> In light of said consideration, the Eleventh Circuit has held that "voting rights cases are particularly inappropriate for abstention." <u>Id.</u> In lieu of abstention, the Eleventh Circuit has indicated that "the preferable way to obtain state court resolution of those state law issues is through the certification process established by" the state supreme court. <u>Pittman v. Cole</u>, 267 F.3d 1269, 1288 (11th Cir. 2001); <u>cf.</u> <u>Roe v. State of Ala.</u>, 43 F.3d 574, 582 (11th Cir. 1995) ("We agree that federal courts should refrain from holding a state election law unconstitutional when a reasonable alternative course of action exists. We are, therefore, reluctant to reach a final decision in this case while the proper application of the [State] Election Code remains muddled. There are two ways to show deference to the state decisionmakers in this matter: we can leave the plaintiffs to their state remedies; or we can certify a question to the Supreme Court of [the state], retain jurisdiction, and await that court's answer.") (citations omitted). In light of this authority, the Court finds that it would not

be appropriate to apply the <u>Pullman</u> abstention doctrine to this voting rights case. Nevertheless, the Court still does not proceed to interpreting the statute, because from this Court's brief review, the answer as to how HB 316 applies to the voters who were already on the State of Georgia's inactive elector list (prior to enactment of HB 316) is not clear cut and both Plaintiffs and Defendants have offered reasonable interpretations for how HB 316 affects the voters at issue. <u>Cf.</u> <u>Duncan</u>, 657 F.2d at 699 (providing an overview of authority concerning clear and vague statutes in the context of the <u>Pullman</u> abstention doctrine). In essence, HB 316 is open to interpretation and could reasonably be interpreted as either party contends. In addition, an interpretation of HB 316 by this Court at this stage of the case creates a possibility for conflicting interpretations in the event that a state court later decides the issue—there would be an interpretation by the federal court and an interpretation by the state court. <u>Cf.</u> <u>Pennhurst</u>, 465 U.S. at 122 n.32 ("when a federal decision on state law is obtained, the federal court's construction often is uncertain and ephemeral").

As stated above, the preferable way to obtain resolution of the state law issue is through the certification process by the state supreme court. However,

19

neither party has asked to certify a question to the Georgia Supreme Court.[19]

Plaintiffs also have an additional remedy in the form of seeking a mandamus

in the state courts. Nevertheless, as stated above, the Court considers the

Eleventh Amendment analysis, *supra*, determinative to the extent that the

issues involve proper interpretation (and violation) of state law.[20]

---

[19] The Court recognizes that it may *sua sponte* certify a question the Georgia Supreme Court; however, as indicated at the December 19, 2019 hearing, the Court is concerned as to timing in that the date that the Georgia Supreme Court will return an answer is unknown and Plaintiffs have continuously expressed a desire to resolve this case in March of 2020.

[20] The interplay between the Pennhurst/Eleventh Amendment ruling and the Pullman abstention doctrine has been described as follows.

> The configuration of the Pennhurst litigation was identical to the litigation in Pullman. Both cases involved lawsuits filed in federal court, which raised both state claims and federal constitutional claims against state officials, but which could have been resolved on the state law claims alone. The Supreme Court, however, did not consider Pullman abstention as a potential resolution of the Pennhurst litigation. Instead, the Court replaced the methodology of a discretionary stay envisioned in Pullman with a rule of mandatory dismissal. As a result, the role of Pullman abstention in allocating decisionmaking responsibility in suits against state officials was transmuted substantially without a word of explanation by the Court.

Keith Werhan, Pullman Abstention After Pennhurst: A Comment on Judicial Federalism, 27 Wm. & Mary L. Rev. 449, 454 (1986).

### C. **Constitutional Claim**

Assuming, *arguendo,* that Plaintiffs' motion does not seek a ruling by the Court regarding the correct statutory interpretation of HB 316 and whether the three-year or five-year "no contact" provision applies to the approximately 98,000 voters at issue, the Court proceeds with the following constitutional analysis of HB 316 and, in particular, the "no contact" scheme therein.

The Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." Dunn v. Blumstein, 405 U.S. 330, 336 (1972). This equal right to vote, however, "is not absolute; the States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." Id.; see also Burdick v. Takushi, 504 U.S. 428, 433 (1992) ("It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute.").

"The Supreme Court has rejected a litmus-paper test for constitutional challenges to specific provisions of a State's election laws and instead has applied a flexible standard." Common Cause/Georgia v. Billups, 554 F.3d 1340, 1351 (11th Cir. 2009) (internal quotation marks omitted). Consequently, a

21

reviewing court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). A court must then "identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule." Id. "Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." Id.; see also Burdick, 504 U.S. at 434. If a State's election law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. Burdick, 504 U.S. at 434 (citing Anderson, 460 U.S. at 788). But if a State's election law imposes a "severe" burden, it must be "narrowly drawn to advance a state interest of compelling importance." Id. (citing Norman v. Reed, 502 U.S. 279, 289 (1992)). In other words, "lesser burdens . . . trigger less exacting review." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997).

Accordingly, the Court begins by evaluating the burden of this "no contact" scheme on Plaintiffs' First and Fourteenth Amendment rights.

"Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe." Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 205 (2008) (Scalia, J., concurring) (quotation omitted). However, burdens "are severe if they go beyond the merely inconvenient." Id. Plaintiffs argue that the burden imposed on voters by the "no contact" scheme is "severe" and that, should their motion for preliminary injunction be denied, the "precise injury" the approximately 98,000 voters at issue will suffer is "complete disenfranchisement." See generally Doc. Nos. [159-1]; [184]. Plaintiffs contend that removing voters solely due to inactivity—without any other evidence that said voters have moved—raises a substantial risk that individuals will be erroneously deprived of their constitutional right to vote. See Doc. No. [169-1], p. 19. They specifically cite to a 2018 Election Assistance Commission Report, in which statistics show that the State of Georgia mailed 478,295 voter confirmation notices in advance of the 2018 election to individuals it suspected of having moved. See Doc. No. [184-2]. Of those confirmation notices, more than 75% of the notices were neither responded to nor returned as

23

undeliverable, suggesting that a substantial number of the notices were never read.[21] Id.

Additionally, Plaintiffs argue that once a voter is removed from the voter roll under the "no contact" scheme, the likelihood of complete disenfranchisement is high for two reasons. See Doc. No. [184], pp. 3–5. First, the State of Georgia does not notify individuals that their voter registration has been cancelled. Thus, Plaintiffs argue that the first moment that many voters learn that they have been removed from the voter rolls is when they arrive at the polls on Election Day. Because the State of Georgia does not offer same-day registration, said individuals are therefore ineligible to vote. Second, for the individuals who have learned that they have been removed from the voter rolls, there is only a narrow window of time for said individuals to re-register before the next election, as Georgia law requires voters to register weeks before any election. See O.C.G.A. § 21-2-224.

---

[21] Plaintiffs also point to Mr. Harvey's testimony at the preliminary injunction hearing, in which he acknowledged that "[t]here are a lot of people that don't check their mail" and that, upon receiving confirmation notices, voters may think it's a "mailer," "an advertisement," or "marketing things that look like . . . official documents." See Dec. 19, 2019 Hearing Transcript at 79:1–79:18.

Defendants, in response, argue that Plaintiffs have provided no evidence of *any* burden that the "no contact" scheme imposes on the right to vote, let alone a "severe" burden. See generally Doc. Nos. [172]; [185]. In support of this contention, Defendants rely on the Eleventh Circuit's ruling in Billups. Therein, the Eleventh Circuit upheld the constitutionality of a state law requiring voters to produce photo identification prior to casting a ballot. See 554 F.3d at 1355. Employing the Anderson-Burdick balancing test, the Eleventh Circuit found that the plaintiffs "failed to prove that any individual would bear a significant burden" because they could not "identify a single individual who would be unable to vote because of the Georgia statute or would face an undue burden to obtain a free voter identification card." Id. at 1354. Accordingly, the Eleventh Circuit found that "the burden on Georgia voters is 'slight'" and, thus, that the state interest need not be "compelling." Id. (citing Burdick, 504 U.S. at 439).

Defendants argue that, like the plaintiffs in Billups, Plaintiffs have failed to prove that any individual would bear a significant or "severe" burden due to the "no contact" scheme. Namely, in support of their motion, Plaintiffs include eight declarations from Georgia voters. See Doc. Nos. [159-3]; [159-4]; [159-5]; [159-6]; [159-7]; [159-8]; [159-9]; [159-12]. Plaintiffs initially stated that

25

all eight of these voters were due to be removed from the voter rolls under the "no contact" scheme despite that fact that none of these voters had ever moved. Doc. No. [159-1], p. 15. In response, however, Defendants contend that four of the voters (Linda Bradshaw, Keme Hawkins, Tommie Jordan, and Deepak Eidnani) remain on the official list of voters as "active" voters. See Doc. No. [172], pp. 13–14. Thus, these four voters are eligible and able to vote.

Moreover, Defendants contend that the other four voters (Clifford Thomas, David Hopkins, Charlesetta Young, and Kilton Smith) were removed from the voter rolls after failing to respond to the two confirmation notices sent pursuant to the "no contact' scheme under HB 316.[22] At this time, there is no evidence that any of these four voters were burdened or precluded from returning the two confirmation notices, which are prepaid and preaddressed.

---

[22] The Court notes that these four voters dispute that they ever actually received confirmation notices. However, Defendants contend that Secretary of State records show that confirmation notices were in fact sent to these four voters. See Doc. No. [172-1]. "The common law has long recognized a rebuttable presumption than an item properly mailed was received by the addressee." Chung v. JPMorgan Case Bank, N.A., 975 F. Supp. 2d 1333, 1348 (N.D. Ga. 2013) (quoting In re Farris, 365 F. App'x 198, 199 (11th Cir. 2010)). Plaintiffs' conclusory allegation that these four voters never actually received confirmation notices "is insufficient to rebut the presumption." In re Farris, 365 F. App'x at 200 ("The mere denial of receipt, without more, is insufficient to rebut the presumption.").

26

Additionally, there is no evidence at this time that any of the four voters are precluded or burdened by registering to vote again. In fact, at the preliminary injunction hearing, Mr. Harvey testified that re-registering to vote after being removed from the voter rolls for "no contact" is no different from registering to vote in the first instance. <u>See</u> Dec. 19, 2019 Hearing Transcript at 47:23–48:4. A voter can re-register to vote by going online to use the Online Voter Registration system or renewing one's driver's license or identification card with the Department of Driver Services. <u>Id.</u>

Based on the limited factual record before the Court, the Court finds that Plaintiffs have not shown a substantial likelihood of success that the burden imposed by the "no contact" scheme (*i.e.*, returning a prepaid, preaddressed confirmation notice and/or re-registering to voter) is severe.

The Court now turns to the State's purported interests in enforcing the "no contact" provision under its interpretation of HB 316. Because the burden of said provision is "slight," the state interest need not be "compelling . . . to tip the constitutional scales in its direction." <u>Burdick</u>, 504 U.S. at 439. Rather, "the State's important regulatory interests are generally sufficient to justify" the restrictions. <u>Id.</u> at 434.

27

Defendants have identified three State interests in enforcing the "no contact" provision under its interpretation of HB 316. First, Defendants state that State of Georgia has an interest—both generally and as compelled by federal law—in maintaining reliable lists of electors. See Doc. No. [185], p. 4. Under the NVRA, states are required to make "a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters."[23] 52 U.S.C. § 21083(a)(4)(a). Congress mandates this, in part, "to protect the integrity of the electoral process; and . . . [to] ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. §§ 20501(b)(3) and (b)(4). Second, Defendants state that the State of Georgia and the Secretary of State have an interest in applying election laws as written specifically. See Doc. No. [185], p. 5. Finally, Defendants maintain that the "no contact" scheme eliminates voter confusion and improves election-day operations. Doc. No. [185], p. 5. For example, Defendants argue that inaccurate voter lists that

---

[23] The method employed by the State of Georgia—both prior to and after the enactment of HB 316—is contemplated by the NVRA and has been upheld by the Supreme Court in Husted v. A. Philip Randolph Inst., ---U.S.----, 138 S. Ct. 1833, 1842 (2018). As Plaintiffs correctly note, however, the Supreme Court in Husted only addressed whether the challenged voter-list-maintenance process complied with the NVRA and did not address the constitutionality of said process.

incorporate individuals who have moved and are no longer eligible may cause local election officials to improperly assess where equipment and personnel should be deployed on election day in 2020. Id. at pp. 5–6.

Plaintiffs, in response, argue that the State has waived or disclaimed any such interest in applying a three-year "no contact" provision to the approximately 98,000 individuals at issue since HB 316 amended the "no contact" provision to require five years of inactivity. In doing so, Plaintiffs overstate the burden on the State under the Anderson-Burdick test. As discussed *supra*, Plaintiffs failed to show a substantial likelihood of success that the burden imposed by the "no contact" scheme is "severe." Accordingly, under the Anderson-Burdick, the State is only required to articulate an important regulatory interest in enforcing their interpretation of said provision. See Burdick, 504 U.S. at 439. The Court finds that all three of the above-stated regulatory interests are sufficient to satisfy that obligation under the Anderson-Burdick test.

The Court therefore concludes that, at this time, Plaintiffs have not met their burden of showing a substantial likelihood of success that the "no contact" scheme set forth in HB 316 violates the First and Fourteenth Amendments.

Because Plaintiffs have failed to establish a substantial likelihood of success on the merits, the Court need not examine whether Plaintiffs have will irreparable harm, or whether a balance of hardships weighs in Plaintiffs' favor, or, finally, whether the public interest would support the issuance of a preliminary injunction. See Bloedorn, 631 F.3d at 1242.

## IV. CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (Doc. No. [159]) is **DENIED** on the ground that the Eleventh Amendment of the United States Constitution and the principles of sovereign immunity do not permit a federal court to enjoin a state (or its officers) to follow a federal court's interpretation of the State of Georgia's laws. Such interpretation is within the province of the state court. As to the remainder of Plaintiffs' constitutional claim, the motion is also **DENIED** on the ground that Plaintiffs have failed to show a substantial likelihood of success on the merits of their claim that the "no contact" provision violates the First and Fourteenth Amendments. It is important to note that the Court has not conclusively determined the rights of the parties, but in accordance with

30

Case 1:18-cv-05391-SCJ   Document 188   Filed 12/27/19   Page 32 of 33

applicable authority, only balanced the equities in the interim as this litigation proceeds.[24]

　　　While the denial of this motion is based upon the Eleventh Amendment and respect for state sovereignty, the Court has not ignored the fundamental significance of voting under our constitutional structure.[25] In recognition of this important right, the Court would be remiss not to express its serious concern that there needs to be an immediate and accurate interpretation by the state court of HB 316 as to its effect on the voters who were already on the State's inactive list prior to the effective date of HB 316. To this regard, the Court will allow Plaintiffs, upon request, to stay the pending litigation to seek emergency relief at the state court level (or otherwise certify a question the Georgia Supreme Court). In light of the immediacy of the situation in District 171, it is within the authority of the Secretary of State to return any cancelled voters to inactive status to allow Plaintiffs reasonable time to seek a decision from the state court.

---

[24] See Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1327 (11th Cir. 2019) (noting that "the purpose of the injunction is not to conclusively determine the rights of parties, but only to balance the equities in the interim as the litigation proceeds.").

[25] Burdick, 504 U.S. at 432.

The Court also, pursuant to its inherent authority to control the conduct of the parties, **ORDERS** Defendants to make additional diligent and reasonable efforts (through notices on the Secretary of State's website and press releases) to inform the general public (especially those in House District 171, who face a December  30, 2019 deadline to re-register) of this Court's order in regard to the voter list maintenance process and the need for the canceled voters to re-register to vote during the applicable registration time period. [26]

**IT IS SO ORDERED** this 27th day of December, 2019.

s/Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

---

[26] See generally Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1335 (11th Cir. 2002) (discussing inherent authority).