**Report of Kenneth R. Mayer, Ph.D.**
**December 5, 2020**

## I.      Introduction and Summary of Conclusions

I have been asked by counsel for the Democratic Party of Georgia, the DSCC, and the DCCC to evaluate claims made by Russell James Ramsland, Jr. in his affidavit of November 25, 2020, and by Dr. Benjamin A. Overholt in his affidavit of November 29, 2020.[1]

Ramsland asserts that that "red flags" in mail absentee data show that 96,000 mail absentee ballots were voted but not recorded as received by counties, and that 5,990 ballots had "impossible mail out and received back complete dates" (Ramsland Affidavit, paragraph 15).   Based on these findings, Ramsland concludes "to a reasonable degree of professional certainty that at least 96,600 votes were illegally counted in the Georgia general election" (Ramsland Affidavit, paragraph 15). I show that this a fundamental mistake in interpreting the data, as there are 96,600 cancelled mail absentee ballots with no return date, denoted by a "C" value in the ballot status field that Ramsland mistakenly thinks means "counted" instead of *cancelled*.

Overholt claims generally the existence of "anomalies" or "discrepancies" in the Georgia's 2020 general election absentee files, which he defines as differences in the rates of mail absentee ballots spoiled, rejected, or cancelled in the 2020 general election when compared to rates in previous elections (Overholt Affidavit, paragraphs 5 and 14).   The result, he asserts, is that somewhere between 1,600 and 17,500 ballots counted in the November 2020 election should have been rejected. Overholt also claims there are issues with how the Secretary of State calculated rejection rates (Overholt Affidavit, paragraph 15).   These conclusions reflect a fundamental misunderstanding of what the data actually show, and do not in any sense suggest that these ballots should have been rejected.

As discussed further below, I have significant expertise working with voter files, absentee files, and other large election- and voting-related data sets, including in the state of Georgia.  Based on that expertise, it is my conclusion that the claims made by both Ramsland and Overholt are unsupported and incorrect.  Ramsland's and Overholt's reports do not comport with scientifically acceptable data standards or methodology in my field of expertise.  It is clear that neither knows even the basics of the data they purport to examine, election administration or how elections are actually conducted in Georgia or how election practices changed in 2020.  Both reports use inaccurate definitions of crucial terms, make completely unsubstantiated claims based on pure speculation and personal opinion, and reach unsupported and incorrect inferences about what the data show.

Even on things as basic as describing what files they are examining and the methodologies they use in arriving at their conclusions, their reports do not meet the most fundamental requirements of conducting a reliable and replicable analysis.

---

[1] It is actually not clear when Overholt submitted his report, as he does not show a date.  The report was notarized on November 29, 2020.

To more specifically summarize the issues with these reports:

1. Ramsland falsely insinuates that absentee ballots sent to voters but not returned or cancelled by voters, suggest fraud.
2. Ramsland erroneously conflates routine administrative recordkeeping anomalies with fraud, and presents wildly inaccurate figures regarding the number of absentee ballots accepted but not recorded as being returned. These errors would be immediately obvious to anyone familiar with election administration or the details of Georgia's absentee and voter history files, and no reputable expert would make such mistakes.
3. Overholt, similarly, insinuates that so-called "anomalies" indicate fraudulent ballots were accepted in the 2020 presidential election.  Yet the "anomalies" he claims to have found actually reflect normal variations that regularly occur from one election to another.
4. Overholt does not take into account that Georgia law and election practices eliminated the address and birthdate section of the absentee ballot return envelope in 2020. He also does not take into account that the methods used to conduct signature matching changed before the 2020 primary election.
5. Overholt seizes on what he insists is a "misleading" and "flawed" calculation of ballot rejection percentages, again insinuating that a trivial difference in how one percentage was calculated on what amounts to a press release on the Secretary of State's web-site suggests some impropriety.  This analysis ultimately demonstrates that the mail ballot signature rejection rate in the 2020 presidential primary was 0.26% and 0.15% in the 2018 general election on the Secretary of State web-site when, according to his calculations, it should have been 0.28%. and 0.20%, respectively.

## II.    Qualifications and Expertise

I have a Ph.D. in political science from Yale University, where my graduate training included courses in econometrics and statistics. My undergraduate degree is from the University of California, San Diego, where I majored in political science and minored in applied mathematics. I have been on the faculty of the political science department at the University of Wisconsin-Madison since August 1989. My curriculum vitae is attached to this report as Appendix A.

All publications that I have authored and published in the past ten years appear in my curriculum vitae. Those publications include the following peer-reviewed journals: *Journal of Politics*, *American Journal of Political Science*, *Election Law Journal*, *Legislative Studies Quarterly*, *Presidential Studies Quarterly*, *American Politics Research*, *Congress and the Presidency*, *Public Administration Review*, *Political Research Quarterly*, and *PS: Political Science and Politics*. I have also published in law reviews, including the *Richmond Law Review*, the *UCLA Pacific Basin Law Journal*, and the *University of Utah Law Review*. My work on campaign finance has been published in *Legislative Studies Quarterly*, *Regulation*, *PS: Political Science and Politics*, *Richmond Law Review*, the *Democratic Audit of Australia*, and in an edited volume on electoral competitiveness published by the Brookings Institution Press. My research on campaign finance has been cited by the U.S. Government Accountability Office and by legislative research offices in Connecticut and Wisconsin.

My work on election administration has been published in the *Election Law Journal*, *American Journal of Political Science*, *Public Administration Review*, *Political Research Quarterly*, and *American Politics Research*. I was part of a research group retained by the Wisconsin Government Accountability Board to review their compliance with federal mandates and reporting systems under the Help America Vote Act and to survey local election officials throughout the state. I serve on the Steering Committee of the Wisconsin Elections Research Center, a unit within the UW-Madison College of Letters and Science.      In 2012, I was retained by the U.S. Department of Justice to analyze data and methods regarding Florida's efforts to identify and remove claimed ineligible noncitizens from the statewide file of registered voters.

In the past nine years, I have testified as an expert witness in trial or deposition or submitted a report in the following cases:

Federal: *The New Georgia Project et al. v. Raffensperger et al.* No. 1:20-CV-01986-EL0052 (N.D. Ga.); *Fair Fight Action v. Raffensperger,* No. 1:18-cv-05391-SCJ (N.D. Ga. 2019); *Kumar v. Frisco Independent School District*, No. 4:19-cv-00284 (E.D. Tex. 2019); *Vaughan v. Lewisville Independent School District*, No. 4:19-cv-00109 (E.D. Tex. 2019); *Dwight, et al. v Raffensperger*, No: 1:18-cv-2869-RWS (N.D. Ga. 2018); *League of Women Voters of Michigan, et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich. 2018); *One Wis. Institute, Inc. v. Thomsen* 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012).

State: *North Carolina Alliance for Retired Americans et al. v. North Carolina State Board of Elections* (Wake Cty., NC),; *LaRose et al. v. Simon*, No. 62-CV-20-3149 (2d Jud. Dist. Ct., Ramsey Cty., MN);  *Michigan Alliance for Retired Americans et al. v Benson et al*. No 2020-000108-MM (Mich. Court of Claims); *Driscoll v. Stapleton*, No. DV 20 0408 (13th Judicial Ct. Yellowstone Cty., Mont. 2020); *Priorities U.S.A, et al. v. Missouri, et al.*, No. 19AC-CC00226 (Cir. Ct. of Cole Cty., M. 2018); *Milwaukee Branch of the NAACP v. Walker*, 851 N.W. 2d 262 (Wis. 2014); *Kenosha Cty. v. City of Kenosha*, No. 11-CV-1813 (Wis. Cir. Ct., Kenosha Cty., Wis. 2011).

Courts consistently have accepted my expert opinions, and the basis for those opinions. No court has ever excluded my expert opinion under *Daubert* or any other standard. Courts have cited my expert opinions in their decisions, finding my opinions reliable and persuasive. *See Driscoll v. Stapleton*, No. DV 20 0408 (13th Judicial Ct. Yellowstone Cty., Mont., 2020); *Priorities U.S.A., et al. v. Missouri, et al.*, No. 19AC-CC00226 (Cir. Ct. Cole Cty., Mo. 2018); *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012); *Milwaukee Branch of the NAACP v. Walker*, 851 N.W. 2d 262 (Wis. 2014); *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471 (E.D. Wis. May 30, 2002).

### III.   Ramsland Affidavit

#### A.  The Claim That 96,600 Mail Absentee Ballots With No Return Record Were Counted

Ramsland claims that county voter records show that 96,600 mail absentee ballots were counted but never recorded as received.  He does not explain how he derived this number, and does not disclose which data files or methodologies he used to reach this conclusion (whether county-level absentee files, the statewide absentee voter file, or the voter history file), which fields in these files he relied on to conclude that a ballot was counted but not recorded as received, the dates on which the voter files or absentee request files were generated, or, in fact, information about the methodologies he relied on to generate this number. More importantly, he does not explain *why* a blank return date field indicates an illegal ballot rather than an administrative error. These failures, by themselves, would warrant rejection of his conclusions as completely unreliable.

But an even greater – indeed fatal – flaw exists in Ramsland's analysis, which is that his numbers are entirely incorrect. As I show below, he appears to arrive at this number through a basic error in interpreting the absentee request file.

On December 1, 2020, I downloaded voter history files and absentee request files available on the Georgia Secretary of State website. The statewide absentee request file includes all 159 county-level absentee request files.  After merging the two files using the unique voter registration number, I identified the following figures for the November 2020 general election.

The most important data point from these files is the number of mail absentee ballots recorded as accepted and counted, but which do not have a return date recorded in the absentee ballot request file (what Ramsland claims is a ballot counted but never received by election officials).  Ramsland claims that there are 96,600 such ballots.  He does not explain how he generated this quantity, but I believe I have identified how he derived this figure.

In the absentee ballot request file, there are 96,600 *cancelled mailed absentee ballots* that do not have a date of return recorded, matching exactly the total of mailed ballots that Ramsland claims were counted but never submitted.  This figure almost certainly represents the ballots Ramsland is referring to, as no other aggregation of ballots could plausibly lead to this precise match. These ballots are recorded in the ballot status field as "C" (cancelled).  I suspect that Ramsland mistakenly thinks that "C" means *counted*, rather than *cancelled*, and does not realize that counted ballots are noted as "A" (accepted) in the ballot status field.  This is an egregious error that no qualified expert familiar with Georgia's voter files would make.[2]

---

[2] Ramsland incorrectly claims that 134,588 mail ballots have no return date and were cancelled (Ramsland Affidavit, paragraph 15).  He does not explain how he arrived at this figure, but as explained, the number of cancelled mail ballots with no return date is not 134,588, but rather 96,600. I suspect Ramsland added together mailed ballots with no return date *and* a ballot status of either A (accepted) (4 ballots), R (rejected) (468 ballots), S (spoiled) (235 ballots) or blank (133,880 ballots), to incorrectly generate the 134,588 number. The one ballot difference is

The statewide absentee ballot file shows that the *actual* number of mail ballots accepted with no date of receipt recorded is not 96,600, but rather 4.[3]   This is almost certainly a recordkeeping issue that affected a trivially small number (0.0003%) of mail absentee ballots.

Further, the merged absentee request and voter history file show the following for the November 2020 general election:

1. The absentee request file shows that 4,018,064 absentee voters requested and submitted an accepted absentee ballot.  1,308,440 were mail absentee, 2,695,547 were in person absentee, and 14,077 were electronic absentee.
2. The voter history file shows that 4,018,800 voters cast absentee ballots.  The voter file does not record whether an absentee ballot was mail, in person or electronic.
3. The two files do not match exactly, but the difference between the absentee ballot file and the voter history file is 736 votes, not 96,600 votes.  736 votes is 0.018% of the number of absentee ballots recorded in the voter history file.
4. This difference – 736 – is the kind of administrative error ubiquitous in voter registration files, and is the result of recordkeeping errors, recording mistakes, or other anomalies that have occurred in every statewide voter file I have examined over more than 20 years of studying election administration.
5. In the merged file, 86 voters are shown as casting an accepted absentee ballot but not recorded as voting absentee in the voter history file.  This is 0.007% of all mail absentee ballots recorded as accepted, and is again almost certainly a recordkeeping issue.

Ramsland's numbers are wildly incorrect and reflect an astounding lack of understanding of how the data are organized and the meaning of the ballot status field in the absentee request file. His conclusion  – that at least 96,600 ballots were counted illegally – is ludicrous.

### B.  Administrative Discrepancies in Sent and Return Dates

Ramsland asserts that the sent and returned dates recorded in the absentee voter file – reflecting the date an absentee ballot was sent, and the date an absentee ballot was received in a clerk's office – also raise "red flags." He claims that 1,887 mail ballots were received the same day they were sent out; 1,786 ballots were received one day after being mailed out; 2,275 ballots received two days after being mailed out; and 42 ballots were received the day before they were sent out.  He concludes that this is "impossible."

This conclusion is based entirely on Ramsland's personal opinion that such delivery and return times are impossible.  As I show below, some of these send and return dates are likely correct, and the remainder are recordkeeping issues.

---

almost certainly due to the fact that the underlying data files were generated on two different dates.

[3] I calculated this number by identifying accepted mail absentee ballots with a blank entry in the ballot return date field in the absentee ballot request file.

Again, Ramsland does not disclose what methodologies he used to generate his estimates or reach his conclusion. And once again, his numbers are incorrect. The absentee ballot request file shows the following results:

1. 89 mail ballots are recorded as received before the date sent out (not 42)
2. 467 ballots are recorded as received the same day they were sent out (not 1,887)
3. 374 ballots are recorded as received 1 day after being sent out (not 1,786)
4. 963 ballots are recorded as received 2 days after being sent out (not 2,275)

Many of these sent and return dates are in fact plausible. A mailed absentee ballot returned by a voter *in person* at a clerk's office will be recorded as a received mail ballot on that date, because what is recorded in the absentee file is the type of ballot requested, not the manner in which it is returned (whether by mail or in person). Many of these ballots were, likely, accurately recorded on the date received because they were returned in person rather than by mail. Any remaining anomalies are almost certainly recordkeeping mistakes.

It is true that it is not possible for a mailed ballot to arrive before it was sent out. But this is clearly a recording error affecting a very small number of mailed ballots (89 out of 1,308,440 ballots, or 0.0068%)

Moreover, the numbers are not material. The total number of ballots recorded as received with 2 days of being sent out is 1,893, or 0.14% of all accepted mail ballots, not 5,990 as Ramsland claims. As I note above, some of this information is most likely correct, and any expert familiar with statewide voter files would immediately recognize the remaining anomalies as a recordkeeping issue, not an indication of fraud.

### C. Conclusion

Ramsland's conclusions about mail absentee ballots are meritless, and show a complete lack of understanding of statewide absentee voter and voter history files. An analysis of the correct absentee request and voter history files from the November 2020 general election shows clearly that Ramsland's numbers are wildly wrong, and his conclusions are based on faulty data, errors in how he interprets the data, unsupported personal opinions, and completely unwarranted inferences.

The absentee request file and voter history file from 2020 show minor discrepancies that are entirely consistent with administrative errors in prior years and other states, and do not, by any stretch, indicate fraud.

### IV. Overholt Affidavit

Overholt's main conclusions consist of assertions that (a) there are "discrepancies in the number of mail ballots that were 'rejected' and 'spoiled' when comparing previous elections to the 2020 General Election" (Overholt Affidavit, paragraph 5); (b) the Secretary of State web-site uses "misleading" and inconsistent methods when calculating signature rejection rates between 2018 and 2020 (Overholt Affidavit, paragraphs 15-19); (c) that 500,000 votes are missing in a the 2020 data when compared to  the "official" election results (Overholt Affidavit, paragraph 20);

and (d) that other unspecified "anomalies in the reported data. . . many (*sic*) raise significant questions" about the 2020 election results.

Overholt concludes, based on these results, that between 1,600 and 17,500 ballots "should have been rejected" in the 2020 general election (Overholt Affidavit, paragraphs 11 and 13).

Overholt is correct about only one minor, and ultimately irrelevant, detail in this cavalcade of unsupported and inaccurate claims: calculations on the Georgia Secretary of State web-site do, in fact, use different denominators in calculations of mail absentee ballot signature rejection rates in the 2018 general, the 2020 primary, and the 2020 general elections.  As I show below, this is a trivial result that has no substantive significance.

Moreover, Overholt completely misunderstands the data that he is using, and fails to account for changes that occurred before the 2020 elections, including a 2019 state law that changed required information on absentee ballot return envelopes, as well as changes to the methodologies for conducting signature matching. As explained further below, he also confuses the number of absentee ballot requests with the number of votes cast. This error is so elementary that it calls into question the entirety of his opinion.

### A.  Alleged "Discrepancies" in Spoiled and Rejected Mail Absentee Rates

Overholt alleges that number of rejected mail ballots and mail ballot rejection rates in 2020 general election differed from the numbers and rates in the 2020 primary, the 2018 general, and the 2016 general election. He calculates that the rejection rate for signature reasons was 0.15% in the 2020 general, compared to 0.28% in the 2016 general and 2020 primary elections.  This, he asserts, "would suggest somewhere around 1,600 additional ballots should have been rejected for signature issues."

This conclusion is entirely wrong.  He makes two fundamental errors.  First, he incorrectly assumes that the 2016 general and 2020 primary rejection rates should be viewed as the "true" or expected rejection rate for all other elections. There is no basis for such a conclusion. One could just as easily assert that the 2020 general election rejection rate (0.15%) is the "true" rejection rate, and that excess rejections occurred in 2016 and 2018 (he also conveniently ignores the rejection rate in the 2018 general election, which at 0.20% is closer to the 2020 general rate than either the 2016 general or 2020 primary rejections rates).

Second, he ignores (or is unaware of) the fact that the signature matching and oath requirements *changed* between 2018 and 2020.  In March 2020, the Secretary of State entered into a settlement agreement that required  2 of 3 election judges to agree that a signature does not match, and required clerks to notify voters that their ballots were rejected.[4]   403 mail absentee voters whose initial absentee ballots were rejected for signature reasons were able to either cure their ballot or submit another absentee ballot that was accepted.[5]

---

[4] *Democratic Party of Georgia v. Raffensperger*, Joint Notice of Settlement as to State Defendants, No. 1:19-ccv-5028-WMR (N.D. Ga. March 6, 2020).

[5] These data are in the absentee ballot request file.

In addition, the oath requirements changed in April 2019 to eliminate the requirement that voters include their address and date of birth on the oath (errors or omissions on either would result in a rejected ballot).[6]

Consequently, Overholt's application of the oath-related rejection rates in 2016 and 2018 to the 2020 election and his resulting claim that "an additional 7,900 or 17,500 ballots should have been rejected" (Overholt Affidavit, paragraph 13) are simply wrong, because the oath requirements changed, and a defect that would result in a rejected ballot in 2018 could not have resulted in a rejection in 2020.

Next, Overholt claims that discrepancies existed with respect to spoiled ballots (Overholt Affidavit, paragraph 14). It is not clear what point Overholt is making here, because the spoiled ballot rate was *higher* in 2020 than it was in 2016 and 2018. This entire section of his report amounts only to an observation that the spoiled ballot rate in 2020 was higher than in previous elections, which, Overholt insinuates without explanation, indicates some unspecified irregularity.

## B. Differences in Signature Rejection Rate Calculations

Overholt devotes considerable time to a claim that a single page on the Georgia Secretary of State's web-site (which he inaccurately describes as "an article") calculates the rejected ballot rate in the 2020 primary and 2018 general elections incorrectly (Overholt Affidavit, paragraphs 15-19). He exaggerates the scope of this error to assert that the "[Secretary of State] Analysis is flawed" (Overholt Affidavit, paragraph 15) and that the calculation was "generated improperly and inconsistently and is misleading" (Overholt Affidavit, paragraph 19).

This is a tremendous amount of weight to place on a trivial error. On the web page in question, a different denominator *is* used in a calculation of the 2020 primary election signature rejection rate (accepted mail ballots) and the 2018 general (issued absentee ballots) than in the calculation of rejection rates in November 2020 (accepted, rejected, and spoiled absentee ballots). But the amount of attention Overholt devotes to this issue is vastly disproportionate to the insignificance of the error itself, and he fails to explain *why* these differences matter (they do not). He merely insinuates that these minor errors constitute an intentional misrepresentation of what the data indicate.

The signature rejection rate on the web page is 0.26% in the 2020 primary election and 0.15% in the 2018 general, using what Overholt claims are the wrong denominators. Correcting this, and using the same denominator in all three calculations, produces a rejection rate of 0.20% in the 2018 general and 0.28% in the 2020 primary. This is an entirely immaterial difference that has no substantive relevance.

## C. "Further Anomalies"

---

[6] House Bill 319 (effective April 2, 2019), http://www.legis.ga.gov/legislation/en-US/Display/20192020/HB/316.

At the end of his report, Overholt asserts that several additional anomalies raise "significant questions" about the 2020 election. The relevance of these claims is unclear, and they demonstrate Overholt's complete lack of understanding of the data he claims to analyze in his report, casting further doubt on the credibility of his analysis and conclusions.

His first claim is that "the dataset for the 2020 General Election . . . contains records for 4,505,778 ballots, while Georgia's official election totals currently show a total of 4,998,482 votes cast" (Overholt Affidavit, paragraph 20). The difference in these two numbers, he asserts, suggest something amiss, particularly because the datafile he uses "is missing around 500,000 votes."[7] "The effect of the difference in ballot totals on this analysis," he concludes, "is unknown and cannot be calculated without better understanding of the underlying conduct of the election throughout Georgia (Overholt Affidavit, paragraph 21).

Here, Overholt is mistaking each record in the absentee ballot request file as a counted vote, unaware of the difference between the *absentee ballot request file* and the *voter history file*. He does not seem to know that the absentee ballot request file is not a record of everyone who voted in the 2020 presidential election, but a record of *voters who requested absentee ballots.*

The absentee ballot file indeed contains 4,505,778 records, but each record in this file is an *absentee ballot requests*, not a file all votes cast in November 2020. This file cannot be compared to the number of votes *cast*, because the latter total includes those who voted in person on election day (982,630) *who do not appear in the absentee ballot request file* Overholt is comparing proverbial apples and oranges (or, perhaps more accurately, raisins and pumpkins).

There is no discrepancy.  There are no "missing" 500,000 votes.  There is nothing "surprising" about any of this, except, perhaps, that no expert who had any understanding of Georgia's voter files would make such a glaring and basic error.

Finally, at the end of his report, Overholt asserts that "other anomalies in the reported data" raise questions about the conduct of the 2020 election.  Overholt never identifies what these alleged anomalies are, what "reported data" he is using, or what "questions" he thinks these unspecified and unsupported anomalies raise.  This unspecified and unsupported claim require no response.

### D. Conclusion

Overholt's report is a string of errors and unfounded assertions that reflects a lack of knowledge about Georgia's election practices and how to properly analyze statewide voter files. He does not account for changes in absentee ballot requirements between 2018 and 2020, and confuses absentee ballot requests with actual vote counts.  He erroneously concludes that variation in ballot rejection rates in different elections constitute "anomalies" that suggest fraud.

His opinions, to put it mildly, should be regarded as uninformative.

---

[7] Presumably the "dataset" in question is the absentee ballot request file, though Overholt does not specify as much.

Kenneth R. Mayer, Ph.D.

December 5, 2020

**Appendix A – CV**

**Kenneth R. Mayer**

Department of Political Science                          Phone:  608-263-2286
Affiliate, La Follette School of Public Affairs          Email: krmayer@wisc.edu
110 North Hall / 1050 Bascom Mall
University of Wisconsin – Madison
Madison, WI 53706

**Education**
Yale University, Department of Political Science, Ph.D., 1988.
Yale University, Department of Political Science, M.A., M.Phil.,1987.
University of California, San Diego, Department of Political Science, B.A., 1982.

**Positions Held**
University of Wisconsin, Madison. Department of Political Science.
    Professor, July 2000-present.
    Associate Professor, June 1996-June 2000.
    Assistant Professor, August 1989-May 1996.
Fulbright-ANU Distinguished Chair in Political Science, Australian National University (Canberra, ACT), July-December 2006.
Director, Data and Computation Center, College of Letters and Science, University of Wisconsin-Madison, June 1996-September 2003
Consultant, The RAND Corporation, Washington DC, 1988-1994. Conducted study of acquisition reform, and the effects of acquisition policy on the defense industrial base. Performed computer simulations of U.S. strategic force posture and capabilities.
Contract Specialist, Naval Air Systems Command, Washington D.C., 1985-1986. Responsible for cost and price analysis, contract negotiation, and contract administration for aerial target missile programs in the $5 million - $100 million range.

**Awards**
American Political Science Association, State Politics and Policy Section. Award for best Journal Article Published in the *American Journal of Political Science* in 2014. Awarded for Burden, Canon, Mayer, and Moynihan, "Election Laws, Mobilization, and Turnout."
Robert H. Durr Award, from the Midwest Political Science Association, for Best Paper Applying Quantitative Methods to a Substantive Problem Presented at the 2013 Meeting. Awarded for Burden, Canon, Mayer, and Moynihan, "Election Laws and Partisan Gains."
Leon Epstein Faculty Fellow, College of Letters and Science, 2012-2015
UW Housing Honored Instructor Award, 2012, 2014, 2017, 2018
Recipient, Jerry J. and Mary M. Cotter Award, College of Letters and Science, 2011-2012
Alliant Underkofler Excellence in Teaching Award, University of Wisconsin System, 2006
Pi Sigma Alpha Teaching Award, Fall 2006
Vilas Associate, 2003-2004, University of Wisconsin-Madison Graduate School.
2002 Neustadt Award. Awarded by the Presidency Research Group of the American Political Science Association, for the best book published on the American presidency in 2001. Awarded for *With the Stroke of a Pen: Executive Orders and Presidential Power.*
Lilly Teaching Fellow, University of Wisconsin-Madison, 1993-1994.
Interfraternity Council award for Outstanding Teaching, University of Wisconsin-Madison, 1993.
Selected as one of the 100 best professors at University of Wisconsin-Madison, Wisconsin Student

Association, March 1992.

Olin Dissertation Fellow, Center for International Affairs, Harvard University, 1987-1988

**Service as an Expert Witness**

1. *North Carolina Alliance for Retired Americans et al. v. North Carolina State Board of Elections* (Wake Cty., NC), absentee ballots (2020).
2. *LaRose et al. v. Simon*, No. 62-CV-20-3149 (2d Jud. Dist. Ct., Ramsey Cty., MN), absentee ballots (2020).
3. *Michigan Alliance for Retired Americans et al. v Benson et al*. No 2020-000108-MM (Mich. Court of Claims), absentee ballots (2020).
4. *The New Georgia Project et al. v. Raffensperger et al*. No. 1:20-CV-01986-EL0052 (N.D. Ga.), absentee ballots (2020).
5. *Driscoll v. Stapleton*, No. DV 20 0408 (13th Judicial Ct. Yellowstone Cty., MT), absentee ballots (2020)
6. *The Andrew Goodman Foundation v. Bostelmann*, No. 19-cv-955 (W.D. Wisc.), voter ID (2020).
7. *Kumar v. Frisco Independent School District et al.*, No,4:19-cv-00284 (E.D. Tex.), voting rights (2019).
8. *Fair Fight Action v. Raffensperger* No. 1:18-cv-05391-SCJ (N.D. Ga.), voting rights (2019)
9. *Vaughan v. Lewisville Independent School District*, No. 4:19-cv-00109 (E.D. Texas), voting rights (2019).
10. *Dwight et al. v Raffensperger*, No: 1:18-cv-2869-RWS (N.D. Ga.), redistricting, voting rights (2018).
11. *Priorities U.S.A.et al. v. Missouri et al.,* No. 19AC-CC00226 (Cir. Ct. of Cole Cty., MO), voter ID (2018).
12. *Tyson v. Richardson Independent School District*, No. 3:18-cv-00212 (N.D. Texas), voting rights (2018).
13. *League of Women Voters of Michigan, et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich.), redistricting (2018).
14. *One Wisconsin Institute, Inc., et al. v. Nichol, et al.*, 198 F. Supp. 3d 896 (W.D. Wis.), voting rights (2016).
15. *Whitford et al. v. Gill et* al, 218 F. Supp. 3d 837, (W.D. Wis.), redistricting (2016).
16. *Milwaukee NAACP et al. v. Scott Walker et. al*, N.W.2d 262 (Wis. 2014), voter ID (2012).
17. *Baldus et al. v. Brennan et al.,* 849 F. Supp. 2d 840 (E.D. Wis.), redistricting, voting rights (2012).
18. *County of Kenosha v. City of Kenosha,* No. 22-CV-1813 *(*Wis. Cir. Ct., Kenosha Cty.) municipal redistricting (2011).
19. *McComish et al. v Brewer et al.*. 2010 WL 2292213 (D. Ariz.), campaign finance (2009).
20. *Baumgart et al. v. Wendelberger et al.*, 2002 WL 34127471 (E.D. Wis.), redistricting (2002).

**Grants**

"A Multidisciplinary Approach for Redistricting Knowledge." Principal Investigator. Co-PIs Adeline Lo (UW Madison, Department of Political Science), Song Gao (UW Madison, Department of Geography), and Barton Miller and Jin-Yi Cai (UW Madison, Department of Computer Sciences). University of Wisconsin Alumni Research Foundation (WARF), and UW Madison Office of the Vice Chancellor for Research and Graduate Education. July 1, 2020-June 30, 2022. $410,711.

"Analyzing Nonvoting and the Student Voting Experience in Wisconsin." Dane County (WI) Clerk, $44,157. November 2016-December 2017. Additional support ($30,000) provided by the Office of the Chancellor, UW-Madison.

Campaign Finance Task Force, Stanford University and New York University, $36,585. September 2016-August 2017.

Participant and Board Member, 2016 White House Transition Project, PIs Martha Joynt Kumar (Towson State University) and Terry Sullivan (University of North Carolina-Chapel Hill).

"How do You Know? The Structure of Presidential Advising and Error Correction in the White House." Graduate School Research Committee, University of Wisconsin, $18,941. July 1, 2015-June 30, 2016.

"Study and Recommendations for the Government Accountability Board Chief Inspectors' Statements and Election Incident Report Logs." $43,234. Co-PI. With Barry C. Burden (PI), David T. Canon (co-PI), and Donald Moynihan (co-PI). October 2011-May 2012.

"Public Funding in Connecticut Legislative Elections." Open Society Institute. September 2009-December 2010. $55,000.

"Early Voting and Same Day Registration in Wisconsin and Beyond." Co-PI. October 2008- September 2009. Pew Charitable Trusts. $49,400. With Barry C. Burden (PI), David T. Canon (Co-PI), Kevin J. Kennedy (Co-PI), and Donald P. Moynihan (Co-PI).

City of Madison, Blue Ribbon Commission on Clean Elections. Joyce Foundation, Chicago, IL. $16,188. January-July 2008.

"Wisconsin Campaign Finance Project: Public Funding in Connecticut State Legislative Elections." JEHT Foundation, New York, NY. $84,735. November 2006-November 2007.

"Does Public Election Funding Change Public Policy? Evaluating the State of Knowledge." JEHT Foundation, New York, NY. $42,291. October 2005-April 2006.

"Wisconsin Campaign Finance Project: Disseminating Data to the Academic, Reform, and Policy Communities." Joyce Foundation, Chicago, IL. $20,900. September 2005- August 2006.

"Enhancing Electoral Competition: Do Public Funding Programs for State and Local Elections Work?" Smith Richardson Foundation, Westport, CT. $129,611. December 2002-June 2005

WebWorks Grant (implementation of web-based instructional technologies), Division of Information Technology, UW-Madison, $1,000. November 1999.

"Issue Advocacy in Wisconsin during the 1998 Election." Joyce Foundation, Chicago, IL. $15,499. April 1999.

Instructional Technology in the Multimedia Environment (IN-TIME) grant, Learning Support Services, University of Wisconsin. $5,000. March 1997.

"Public Financing and Electoral Competitiveness in the Minnesota State Legislature." Citizens' Research Foundation, Los Angeles, CA, $2,000. May-November 1996.

"The Reach of Presidential Power: Policy Making Through Executive Orders." National Science Foundation (SBR-9511444), $60,004. September 1, 1995-August 31, 1998. Graduate School Research Committee, University of Wisconsin, $21,965. Additional support provided by the Gerald R. Ford Library Foundation, the Eisenhower World Affairs Institute, and the Harry S. Truman Library Foundation.

The Future of the Combat Aircraft Industrial Base." Changing Security Environment Project, John M. Olin Institute for Strategic Studies, Harvard University (with Ethan B. Kapstein). June 1993-January 1995. $15,000.

Hilldale Student Faculty Research Grant, College of Letters and Sciences, University of Wisconsin (with John M. Wood). 1992. $1,000 ($3,000 award to student)

"Electoral Cycles in Federal Government Prime Contract Awards" March 1992 – February 1995. National Science Foundation (SES-9121931), $74,216. Graduate School Research Committee at the University of Wisconsin, $2,600. MacArthur Foundation, $2,500.

C-SPAN In the Classroom Faculty Development Grant, 1991. $500

## Professional and Public Service

Education and Social and Behavioral Sciences Institutional Review Board, 2008-2014. Acting Chair, Summer 2011. Chair, May 2012- June 2014.

Participant, U.S. Public Speaker Grant Program. United States Department of State (nationwide speaking tour in Australia, May 11-June 2, 2012).

Expert Consultant, Voces de la Frontera. Milwaukee Aldermanic redistricting, (2011).
Expert Consultant, Prosser for Supreme Court. Wisconsin Supreme Court election recount (2011).
Chair, Blue Ribbon Commission on Clean Elections (Madison, WI), August 2007-April 2011.
Consultant, Consulate of the Government of Japan (Chicago) on state politics in Illinois, Indiana,
    Minnesota, and Wisconsin, 2006-2011.
Section Head, Presidency Studies, 2006 Annual Meeting of the American Political Science Association.
Co-Chair, Committee on Redistricting, Supreme Court of Wisconsin, November 2003-December 2009.
Section Head, Presidency and Executive Politics, 2004 Annual Meeting of the Midwest Political Science
    Association, Chicago, IL.
Presidency Research Group (organized section of the American Political Science Association) Board,
    September 2002-present.
Book Review Editor, *Congress and the Presidency*, 2001-2006.
Editorial Board, *American Political Science Review*, September 2004-September 2007.
Consultant, Governor's Blue Ribbon Commission on Campaign Finance Reform (Wisconsin), 1997.

## PUBLICATIONS
### Books
*Presidential Leadership: Politics and Policymaking*, 11th edition. Lanham, MD: Rowman and Littlefield,
    forthcoming 2019. With George C. Edwards, III and Steven J. Wayne. Previous editions 10th
    (2018).
*The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham,
    MD: Lexington Press, 2017. Co-edited with Amnon Cavari and Richard J. Powell.
*The Enduring Debate: Classic and Contemporary Readings in American Government*. 8th ed. New York:
    W.W. Norton & Co. 2017. Co-edited with David T. Canon and John Coleman. Previous editions
    1st (1997), 2nd (2000), 3rd (2002), 4th (2006), 5th (2009), 6th (2011), 7th (2013).
*Faultlines: Readings in American Government*, 5th ed. New York: W.W. Norton & Co. 2017. Co-edited
    with David T. Canon and John Coleman. Previous editions 1st (2004), 2nd (2007), 3rd (2011), 4th
    (2013).
*The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and
    Littlefield, 2014. Co-edited with Amnon Cavari and Richard J. Powell.
*Readings in American Government*, 7th edition. New York: W.W. Norton & Co. 2002. Co-edited with
    Theodore J. Lowi, Benjamin Ginsberg, David T. Canon, and John Coleman). Previous editions
    4th (1996), 5th (1998), 6th (2000).
*With the Stroke of a Pen: Executive Orders and Presidential Power*.  Princeton, NJ: Princeton
    University Press. 2001. Winner of the 2002 Neustadt Award from the Presidency Studies
    Group of the American Political Science Association, for the Best Book on the Presidency
    Published in 2001.
*The Dysfunctional Congress? The Individual Roots of an Institutional Dilemma*. Boulder, CO: Westview
    Press. 1999. With David T. Canon.
*The Political Economy of Defense Contracting*. New Haven: Yale University Press. 1991.

### Monographs
*2008 Election Data Collection Grant Program: Wisconsin Evaluation Report*. Report to the Wisconsin
    Government Accountability Board, September 2009. With Barry C. Burden, David T. Canon,
    Stéphane Lavertu, and Donald P. Moynihan.
*Issue Advocacy in Wisconsin: Analysis of the 1998 Elections and A Proposal for Enhanced Disclosure*.
    September 1999.
*Public Financing and Electoral Competition in Minnesota and Wisconsin*. Citizens' Research
    Foundation, April 1998.

*Campaign Finance Reform in the States*. Report prepared for the Governor's Blue Ribbon
Commission on Campaign Finance Reform (State of Wisconsin). February 1998. Portions
reprinted in Anthony Corrado, Thomas E. Mann, Daniel Ortiz, Trevor Potter, and Frank J.
Sorauf, ed., *Campaign Finance Reform: A Sourcebook.* Washington, D.C.: Brookings
Institution, 1997.

"Does Public Financing of Campaigns Work?" *Trends in Campaign Financing*. Occasional Paper Series,
Citizens' Research Foundation, Los Angeles, CA. 1996. With John M. Wood.

*The Development of the Advanced Medium Range Air-to-Air Missile: A Case Study of Risk and Reward
in Weapon System Acquisition*. N-3620-AF. Santa Monica: RAND Corporation. 1993.

*Barriers to Managing Risk in Large Scale Weapons System Development Programs*. N-4624-AF. Santa
Monica: RAND Corporation. 1993. With Thomas K. Glennan, Jr., Susan J. Bodily, Frank
Camm, and Timothy J. Webb.

## Articles

"Voter Identification and Nonvoting in Wisconsin - Evidence from the 2016 Election." *Election Law
Journal* 18:342-359 (2019). With Michael DeCrescenzo.

"Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-county Study." *Political
Research Quarterly* 71 (2019). With Robert M. Stein, Christopher Mann, Charles Stewart III, et
al.

"Learning from Recounts." *Election Law Journal* 17:100-116 (No. 2, 2018). With Stephen Ansolabehere,
Barry C. Burden, and Charles Stewart, III.

"The Complicated Partisan Effects of State Election Laws." *Political Research Quarterly* 70:549-563
(No. 3, September 2017). With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"What Happens at the Polling Place: Using Administrative Data to Look Inside Elections." *Public
Administration Review* 77:354-364 (No. 3, May/June 2017). With Barry C. Burden, David T.
Canon, Donald P. Moynihan, and Jacob R. Neiheisel.

"Alien Abduction, and Voter Impersonation in the 2012 U.S. General Election: Evidence from a Survey
List Experiment." *Election Law Journal* 13:460-475 No.4, December 2014). With John S.
Ahlquist and Simon Jackman.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform."
*American Journal of Political Science*, 58:95-109 (No. 1, January 2014). With Barry C. Burden,
David T. Canon, and Donald P. Moynihan. Winner of the State Politics and Politics Section of the
American Political Science Association Award for the best article published in the *AJPS* in 2014.

"Executive Power in the Obama Administration and the Decision to Seek Congressional Authorization
for a Military Attack Against Syria: Implications for Theories of Unilateral Action." *Utah Law
Review* 2014:821-841 (No. 4, 2014).

"Public Election Funding: An Assessment of What We Would Like to Know." *The Forum* 11:365-485
(No. 3, 2013).

"Selection Method, Partisanship, and the Administration of Elections." *American Politics Research*
41:903-936 (No. 6, November 2013). With Barry C. Burden, David T. Canon, Stéphane Lavertu,
and Donald Moynihan.

"The Effect of Administrative Burden on Bureaucratic Perception of Policies: Evidence from Election
Administration." *Public Administration Review* 72:741-451 (No. 5, September/October 2012).
With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election
Reform." *Election Law Journal* 10:89-102 (No. 2, 2011). With Barry C. Burden, David T.
Canon, and Donald Moynihan.

"Is Political Science Relevant? Ask an Expert Witness," *The Forum*: Vol. 8, No. 3, Article 6 (2010).

"Thoughts on the Revolution in Presidency Studies," *Presidential Studies Quarterly* 39 (no. 4, December
2009).

"Does Australia Have a Constitution? Part I – Powers: A Constitution Without Constitutionalism."

*UCLA Pacific Basin Law Journal* 25:228-264 (No. 2, Spring 2008). With Howard Schweber.

"Does Australia Have a Constitution? Part II: The Rights Constitution." *UCLA Pacific Basin Law Journal* 25:265-355 (No. 2, Spring 2008). With Howard Schweber.

"Public Election Funding, Competition, and Candidate Gender." *PS: Political Science and Politics* XL:661-667 (No. 4,October 2007). With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" In Michael P. McDonald and John Samples, eds., *The Marketplace of Democracy: Electoral Competition and American Politics* (Washington, DC: Brookings Institution Press, 2006). With Timothy Werner and Amanda Williams. Excerpted in Daniel H. Lowenstein, Richard L. Hasen, and Daniel P. Tokaji, *Election Law: Cases and Materials.* Durham, NC: Carolina Academic Press, 2008.

"The Last 100 Days." *Presidential Studies Quarterly* 35:533-553 (No. 3, September 2005). With William Howell.

"Political Reality and Unforeseen Consequences: Why Campaign Finance Reform is Too Important To Be Left To The Lawyers," *University of Richmond Law Review* 37:1069-1110 (No. 4, May 2003).

"Unilateral Presidential Powers: Significant Executive Orders, 1949-1999." *Presidential Studies Quarterly* 32:367-386 (No. 2, June 2002). With Kevin Price.

"Answering Ayres: Requiring Campaign Contributors to Remain Anonymous Would Not Resolve Corruption Concerns." *Regulation* 24:24-29 (No. 4, Winter 2001).

"Student Attitudes Toward Instructional Technology in the Large Introductory US Government Course." *PS: Political Science and Politics* 33:597-604 (No. 3 September 2000). With John Coleman.

"The Limits of Delegation – the Rise and Fall of BRAC." *Regulation* 22:32-38 (No. 3, October 1999).

"Executive Orders and Presidential Power." *The Journal of Politics* 61:445-466 (No.2, May 1999).

"Bringing Politics Back In: Defense Policy and the Theoretical Study of Institutions and Processes." *Public Administration Review* 56:180-190 (1996). With Anne Khademian.

"Closing Military Bases (Finally): Solving Collective Dilemmas Through Delegation." *Legislative Studies Quarterly*, 20:393-414 (No. 3, August 1995).

"Electoral Cycles in Federal Government Prime Contract Awards: State-Level Evidence from the 1988 and 1992 Presidential Elections." *American Journal of Political Science* 40:162-185 (No. 1, February 1995).

"The Impact of Public Financing on Electoral Competitiveness: Evidence from Wisconsin, 1964-1990." *Legislative Studies Quarterly* 20:69-88 (No. 1, February 1995). With John M. Wood.

"Policy Disputes as a Source of Administrative Controls: Congressional Micromanagement of the Department of Defense." *Public Administration Review* 53:293-302 (No. 4, July-August 1993).

"Combat Aircraft Production in the United States, 1950-2000: Maintaining Industry Capability in an Era of Shrinking Budgets." *Defense Analysis* 9:159-169 (No. 2, 1993).

**Book Chapters**

"Is President Trump Conventionally Disruptive, or Unconventionally Destructive?" In *The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham, MD: Lexington Press, 2017. Co-edited with Amon Cavari and Richard J. Powell.

"Lessons of Defeat: Republican Party Responses to the 2012 Presidential Election. In Amnon Cavari, Richard J. Powell, and Kenneth R. Mayer, eds. *The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield. 2014.

"Unilateral Action." George C. Edwards, III, and William G. Howell, *Oxford Handbook of the American Presidency* (New York: Oxford University Press, 2009).

"Executive Orders," in Joseph Bessette and Jeffrey Tulis, *The Constitutional Presidency*. Baltimore: Johns Hopkins University Press, 2009.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." In Gerald C. Lubenow, ed., *A User's Guide to Campaign Finance Reform.* Lanham, MD: Rowman &

Littlefield, 2001.

"Everything You Thought You Knew About Impeachment Was Wrong." In Leonard V. Kaplan and Beverly I. Moran, ed., *Aftermath: The Clinton Impeachment and the Presidency in the Age of Political Spectacle.* New York: New York University Press. 2001. With David T. Canon.

"The Institutionalization of Power." In Robert Y. Shapiro, Martha Joynt Kumar, and Lawrence R. Jacobs, eds. *Presidential Power: Forging the Presidency for the 21st Century*. New York: Columbia University Press, 2000. With Thomas J. Weko.

 "Congressional-DoD Relations After the Cold War: The Politics of Uncertainty." In *Downsizing Defense*, Ethan Kapstein ed. Washington DC: Congressional Quarterly Press. 1993.

"Elections, Business Cycles, and the Timing of Defense Contract Awards in the United States." In Alex Mintz, ed. *The Political Economy of Military Spending*. London: Routledge. 1991.

"Patterns of Congressional Influence In Defense Contracting." In Robert Higgs, ed., *Arms, Politics, and the Economy: Contemporary and Historical Perspectives*. New York: Holmes and Meier. 1990.

**Other**

"Campaign Finance: Some Basics." Bauer-Ginsberg Campaign Finance Task Force, Stanford University. September 2017. With Elizabeth M. Sawyer.

"The Wisconsin Recount May Have a Surprise in Store after All." *The Monkey Cage* (Washington Post), December 5, 2016. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

Review of Jason K. Dempsey, *Our Army: Soldiers, Politicians, and American Civil-Military Relations. The Forum* 9 (No. 3, 2011).

"Voting Early, but Not Often." *New York Times*, October 25, 2010. With Barry C. Burden.

Review of John Samples, *The Fallacy of Campaign Finance Reform* and Raymond J. La Raja, *Small Change: Money, Political Parties, and Campaign Finance Reform*. *The Forum* 6 (No. 1, 2008).

Review Essay, *Executing the Constitution: Putting the President Back Into the Constitution*, Christopher S, Kelley, ed.; *Presidents in Culture: The Meaning of Presidential Communication*, David Michael Ryfe; *Executive Orders and the Modern Presidency: Legislating from the Oval Office*, Adam L. Warber. In *Perspective on Politics* 5:635-637 (No. 3, September 2007).

"The Base Realignment and Closure Process: Is It Possible to Make Rational Policy?" Brademas Center for the Study of Congress, New York University. 2007.

"Controlling Executive Authority in a Constitutional System" (comparative analysis of executive power in the U.S. and Australia), manuscript, February 2007*.*

 "Campaigns, Elections, and Campaign Finance Reform." *Focus on Law Studies*, XXI, No. 2 (Spring 2006). American Bar Association, Division for Public Education.

"Review Essay: Assessing The 2000 Presidential Election – Judicial and Social Science Perspectives." *Congress and the Presidency* 29: 91-98 (No. 1, Spring 2002).

Issue Briefs (Midterm Elections, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform) *2006 Reporter's Source Book*. Project Vote Smart. 2006. With Meghan Condon.

"Sunlight as the Best Disinfectant: Campaign Finance in Australia." Democratic Audit of Australia, Australian National University. October 2006.

"Return to the Norm," *Brisbane Courier-Mail*, November 10, 2006.

"The Return of the King? Presidential Power and the Law," *PRG Report* XXVI, No. 2 (Spring 2004).

Issue Briefs (Campaign Finance Reform, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform), *2004 Reporter's Source Book*. Project Vote Smart. 2004. With Patricia Strach and Arnold Shober.

"Where's That Crystal Ball When You Need It? Finicky Voters and Creaky Campaigns Made for a Surprise Electoral Season. And the Fun's Just Begun." *Madison Magazine*. April 2002.

"Capitol Overkill." *Madison Magazine*, July 2002.

Issue Briefs (Homeland Security; Foreign Affairs and Defense Policy; Education; Economy, Budget and Taxes; Social Welfare Policy), *2002 Reporter's Source Book*. Project Vote Smart. 2002. With

Patricia Strach and Paul Manna.

"Presidential Emergency Powers." *Oxford Analytica Daily Brief*. December 18, 2001.

"An Analysis of the Issue of Issue Ads." *Wisconsin State Journal*, November 7, 1999.

"Background of Issue Ad Controversy." *Wisconsin State Journal*, November 7, 1999.

"Eliminating Public Funding Reduces Election Competition." *Wisconsin State Journal*, June 27, 1999.

Review of *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability*, by Mark J. Rozell. *Congress and the Presidency* 24 (No. 1, 1997).

"Like Marriage, New Presidency Starts In Hope." *Wisconsin State Journal*. March 31, 1996.

Review of *The Tyranny of the Majority: Fundamental Fairness in Representative Democracy*, by Lani Guinier. *Congress and the Presidency* 21: 149-151 (No. 2, 1994).

Review of *The Best Defense: Policy Alternatives for U.S. Nuclear Security From the 1950s to the 1990s*, by David Goldfischer. *Science, Technology, and Environmental Politics Newsletter* 6 (1994).

Review of *The Strategic Defense Initiative*, by Edward Reiss. *American Political Science Review* 87:1061-1062 (No. 4, December 1993).

Review of *The Political Economy of Defense: Issues and Perspectives*, Andrew L. Ross ed. *Armed Forces and Society* 19:460-462 (No. 3, April 1993)

Review of *Space Weapons and the Strategic Defense Initiative*, by Crockett Grabbe. *Annals of the American Academy of Political and Social Science* 527: 193-194 (May 1993).

"Limits Wouldn't Solve the Problem." *Wisconsin State Journal*, November 5, 1992. With David T. Canon.

"Convention Ceded Middle Ground." *Wisconsin State Journal*, August 23, 1992.

"CBS Economy Poll Meaningless." *Wisconsin State Journal*, February 3, 1992.

"It's a Matter of Character: Pentagon Doesn't Need New Laws, it Needs Good People." *Los Angeles Times*, July 8, 1988.


## Conference Papers

"Voter Identification and Nonvoting in Wisconsin – Evidence from the 2016 Election." Presented at the 2018 Annual Meeting of the Midwest Political Science Association, Chicago, IL April 5-8, 2018. With Michael G. DeCrescenzo.

"Learning from Recounts." Presented at the Workshop on Electoral Integrity, San Francisco, CA, August 30, 2017, and at the 2017 Annual Meeting of the          American Political Science Association, San Francisco, CA, August 31-September 3, 2017. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"What Happens at the Polling Place: Using Administrative Data to Understand Irregularities at the Polls." Conference on New Research on Election Administration and Reform, Massachusetts Institute of Technology, Cambridge, MA, June 8, 2015. With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R Neiheisel.

"Election Laws and Partisan Gains: What are the Effects of Early Voting and Same Day Registration on the Parties' Vote Shares." 2013 Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 11-14, 2013. Winner of the Robert H. Durr Award.

"The Effect of Public Funding on Electoral Competition: Evidence from the 2008 and 2010 Cycles." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011. With Amnon Cavari.

"What Happens at the Polling Place: A Preliminary Analysis in the November 2008 General Election." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011.  With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R. Neiheisel.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." 2010 Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 2010. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"Selection Methods, Partisanship, and the Administration of Elections. Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 22-25, 2010. Revised version presented at the

Annual Meeting of the European Political Science Association, June 16-19, 2011, Dublin, Ireland. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"The Effects and Costs of Early Voting, Election Day Registration, and Same Day Registration in the 2008 Elections." Annual Meeting of the American Political Science Association, Toronto, Canada, September 3-5, 2009. With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"Comparative Election Administration: Can We Learn Anything From the Australian Electoral Commission?" Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1, 2007.

"Electoral Transitions in Connecticut: Implementation of Public Funding for State Legislative Elections." Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1, 2007. With Timothy Werner.

"Candidate Gender and Participation in Public Campaign Finance Programs." Annual Meeting of the Midwest Political Science Association, Chicago IL, April 7-10, 2005. With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" 4th Annual State Politics and Policy Conference," Akron, OH, April 30-May 1, 2004. With Timothy Werner and Amanda Williams.

"The Last 100 Days." Annual Meeting of the American Political Science Association, Philadelphia, PA, August 28-31, 2003. With William Howell.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." Citizens' Research Foundation Forum on Campaign Finance Reform, Institute for Governmental Studies, University of California Berkeley. August 2000.

"The Importance of Moving First: Presidential Initiative and Executive Orders." Annual Meeting of the American Political Science Association, San Francisco, CA, August 28-September 1, 1996.

"Informational vs. Distributive Theories of Legislative Organization: Committee Membership and Defense Policy in the House." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Department of Defense Contracts, Presidential Elections, and the Political-Business Cycle." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Problem? What Problem? Congressional Micromanagement of the Department of Defense." Annual Meeting of the American Political Science Association, Washington DC, August 29 - September 2, 1991.

## Talks and Presentations

"Turnout Effects of Voter ID Laws." Rice University, March 23, 2018; Wisconsin Alumni Association, October 13, 2017. With Michael DeCrescenzo.

"Informational and Turnout Effects of Voter ID Laws." Wisconsin State Elections Commission, December 12, 2017; Dane County Board of Supervisors, October 26, 2017. With Michael DeCrescenzo.

"Voter Identification and Nonvoting in Wisconsin, Election 2016. American Politics Workshop, University of Wisconsin, Madison, November 24, 2017.

"Gerrymandering: Is There A Way Out?" Marquette University. October 24, 2017.

"What Happens in the Districting Room and What Happens in the Courtroom" Geometry of Redistricting Conference, University of Wisconsin-Madison  October 12, 2017.

"How Do You Know? The Epistemology of White House Knowledge." Clemson University, February 23, 2016.

Roundtable Discussant, Separation of Powers Conference, School of Public and International Affairs, University of Georgia, February19-20, 2016.

Campaign Finance Task Force Meeting, Stanford University, February 4, 2016.

Discussant, "The Use of Unilateral Powers." American Political Science Association Annual Meeting, August 28-31, 2014, Washington, DC.

Presenter, "Roundtable on Money and Politics: What do Scholars Know and What Do We Need to Know?" American Political Science Association Annual Meeting, August 28-September 1, 2013,

Chicago, IL.

Presenter, "Roundtable: Evaluating the Obama Presidency." Midwest Political Science Association Annual Meeting, April 11-14, 2012, Chicago, IL.

Panel Participant, "Redistricting in the 2010 Cycle," Midwest Democracy Network,

Speaker, "Redistricting and Election Administration," Dane County League of Women Voters, March 4, 2010.

Keynote Speaker, "Engaging the Electorate: The Dynamics of Politics and Participation in 2008." Foreign Fulbright Enrichment Seminar, Chicago, IL, March 2008.

Participant, Election Visitor Program, Australian Electoral Commission, Canberra, ACT, Australia. November 2007.

Invited Talk, "Public Funding in State and Local Elections." Reed College Public Policy Lecture Series. Portland, Oregon, March 19, 2007.

Fulbright Distinguished Chair Lecture Tour, 2006. Public lectures on election administration and executive power. University of Tasmania, Hobart (TAS); Flinders University and University of South Australia, Adelaide (SA); University of Melbourne, Melbourne (VIC); University of Western Australia, Perth (WA); Griffith University and University of Queensland, Brisbane (QLD); Institute for Public Affairs, Sydney (NSW); The Australian National University, Canberra (ACT).

Discussant, "Both Ends of the Avenue: Congress and the President Revisited," American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Presenter, "Researching the Presidency," Short Course, American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Discussant, Conference on Presidential Rhetoric, Texas A&M University, College Station, TX. February 2004.

Presenter, "Author Meets Author: New Research on the Presidency," 2004 Southern Political Science Association Meeting, January 8-11, New Orleans, LA.

Chair, "Presidential Secrecy," American Political Science Association Meeting, August 28-31,2003, Philadelphia, PA.

Discussant, "New Looks at Public Approval of Presidents." Midwest Political Science Association Meeting, April 3-6, 2003, Chicago, IL.

Discussant, "Presidential Use of Strategic Tools." American Political Science Association Meeting, August 28-September 1, 2002, Boston, MA.

Chair and Discussant, "Branching Out: Congress and the President." Midwest Political Science Association Meeting, April 19-22, 2001, Chicago, IL.

Invited witness, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives. *Hearing on Executive Order and Presidential Power*, Washington, DC. March 22, 2001.

"The History of the Executive Order," Miller Center for Public Affairs, University of Virginia (with Griffin Bell and William Howell), January 26, 2001.

Presenter and Discussant, Future Voting Technologies Symposium, Madison, WI May 2, 2000.

Moderator, Panel on Electric Utility Reliability. Assembly Staff Leadership Development Seminar, Madison, WI. August 11, 1999.

Chair, Panel on "Legal Aspects of the Presidency: Clinton and Beyond." Midwest Political Science Association Meeting, April 15-17, 1999, Chicago, IL.

Session Moderator, National Performance Review Acquisition Working Summit, Milwaukee, WI. June 1995.

American Politics Seminar, The George Washington University, Washington D.C., April 1995.

Invited speaker, Defense and Arms Control Studies Program, Massachusetts Institute of Technology, Cambridge, MA, March 1994.

Discussant, International Studies Association (Midwest Chapter) Annual Meeting, Chicago IL, October 29-30, 1993.

Seminar on American Politics, Princeton University, January 16-17,1992.
Conference on Defense Downsizing and Economic Conversion, October 4, 1991, Harvard University.
Conference on Congress and New Foreign and Defense Policy Challenges, The Ohio State University,
    Columbus OH, September 21-22, 1990, and September 19-21, 1991.
Presenter, "A New Look at Short Term Change in Party Identification," 1990 Meeting of the American
    Political Science Association, San Francisco, CA.

## University and Department Service

Cross-Campus Human Research Protection Program (HRPP) Advisory Committee, 2019-present.
UW Athletic Board, 2014-present.
General Education Requirements Committee (Letters and Science), 1997-1998.
Communications-B Implementation Committee(Letters and Science), 1997-1999
Verbal Assessment Committee (University) 1997-1998.
College of Letters & Science Faculty Appeals Committee (for students dismissed for academic reasons).
Committee on Information Technology, Distance Education and Outreach, 1997-98.
Hilldale Faculty-Student Research Grants, Evaluation Committee, 1997, 1998.
Department Computer Committee, 1996-1997; 1997-1998, 2005-2006. Chair, 2013-present.
Faculty Senate, 2000-2002, 2002-2005. Alternate, 1994-1995; 1996-1999; 2015-2016.
Preliminary Exam Appeals Committee, Department of Political Science, 1994-1995.
Faculty Advisor, Pi Sigma Alpha (Political Science Honors Society), 1993-1994.
Department Honors Advisor, 1991-1993.
Brown-bag Seminar Series on Job Talks (for graduate students), 1992.
Keynote speaker, Undergraduate Honors Symposium, April 13 1991.
Undergraduate Curriculum Committee, Department of Political Science, 1990-1992; 1993-1994.
Individual Majors Committee, College of Letters and Sciences, 1990-1991.
Dean Reading Room Committee, Department of Political Science, 1989-1990; 1994-1995.

## Teaching

### Undergraduate
Introduction to American Government (regular and honors)
The American Presidency
Campaign Finance
Election Law
Classics of American Politics
Presidential Debates
Comparative Electoral Systems
Legislative Process
Theories of Legislative Organization
Senior Honors Thesis Seminar

### Graduate
Contemporary Presidency
American National Institutions
Classics of American Politics
Legislative Process