IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CORECO JA'QAN PEARSON, *et al.*,      )
                                       )
        Plaintiffs,                    )
                                       )   CIVIL ACTION NO.
v.                                     )   1:20-cv-4809-TCB
                                       )
BRIAN KEMP, *et al.*,                  )
                                       )
        Defendants.                    )

---

## DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

---

| | |
|---|---|
| Christopher M. Carr<br>Attorney General<br>Bryan K. Webb<br>Deputy Attorney General<br>Russell D. Willard<br>Senior Assistant Attorney General<br>Charlene S. McGowan<br>Assistant Attorney General<br><br>Office of the Georgia Attorney General<br>40 Capitol Square SW<br>Atlanta, GA 30334<br><br>*Counsel for the State Defendants* | Carey Miller<br>Josh Belinfante<br>Melanie Johnson<br><br>Robbins Ross Alloy Belinfante<br>Littlefield LLC<br>500 14th Street NW<br>Atlanta, GA 30318 |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND ...................................................................4

  **I.** **Georgia's Electronic Voting System is Secure and Has Not Been Compromised.** ...........................................................................4

    **A**. Adoption and selection of Georgia's electronic voting system.............5

    **B.** Testing and certification of Georgia's voting system. ............................7

    **C.** Georgia's electronic voting system has not been compromised and Plaintiffs' assertions to the contrary are disproven by the Risk-Limiting Audit. .......................................................................9

  **II.** **Absentee Ballots Were Validly Processed According to Law** .................12

ARGUMENT AND CITATION OF AUTHORITIES .......................................15

  **I.** **The Court Lacks Subject Matter Jurisdiction because Plaintiffs Cannot Establish Article III Standing.** ...................................................15

    **A.** Plaintiffs have not Alleged an Injury in Fact Sufficient to Form a Basis for Standing. ................................................................17

    **B.** Plaintiffs do not have Standing as Presidential Electors. ......................19

    **C.** Plaintiffs' Alleged Injuries are not Traceable to the State Defendants. ...........................................................................21

  **II.** **Plaintiffs' Claims are Moot.** ..........................................................24

  **III.** **Plaintiffs' Claims are Barred by the Eleventh Amendment.** ...................25

  **IV.** Laches Bars Plaintiffs' Claims for Post-Election Relief. .........................27

  **V.** **The Court should Abstain from Granting Relief.** ...................................30

**VI. Plaintiffs' Motion for Injunctive Relief Should be Denied.**......................34

   **A.  Plaintiffs are not likely to succeed on the merits of their claims.** ..........34

   **B.  The loss of Plaintiffs' preferred candidate is not irreparable harm.** ....44

   **C.  The balance of equities and public interest weigh heavily against an injunction.**.................................................................................45

**CONCLUSION**.................................................................................47

## **INTRODUCTION**

Plaintiffs, a group of disappointed Republican presidential electors, filed a Complaint alleging widespread fraud in the November general election in Georgia, weaving an unsupported tale of "ballot stuffing," the switching of votes by an "algorithm" uploaded to the state's electronic voting equipment that switched votes from President Trump to Joe Biden, hacking by foreign actors from Iran and China, and other nefarious acts by unnamed actors. Plaintiffs did not bring this election challenge in state court as provided by Georgia's Election Code.  Instead, they ask this Court to change the election outcome by judicial fiat and order the Governor, the Secretary, and the State Election Board to "de-certify" the results of the election and replace the presidential electors for Joe Biden (who were selected by a majority of Georgia voters by popular vote as provided by state law) with presidential electors for President Trump. Their claims would be extraordinary if true, but they are not. Much like the mythological "kraken" monster[1] after which Plaintiffs have named this lawsuit, their claims of election fraud and malfeasance belong more to the kraken's realm of mythos than they do to reality.

---

[1] A "kraken" is a mythical sea monster appearing in Scandinavian folklore, being "closely linked to sailors' ability to tell tall tales." *See* https://en.wikipedia.org/wiki/Kraken.

The truth is that the 2020 general election was, according to the federal agency tasked with overseeing election security, "the most secure in history." (*See* **Exhibit B**.)[2] Cybersecurity experts have determined that there is "***no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised***." (*Id.*) The accuracy of the presidential election results has been confirmed through at least (1) the statewide risk-limiting audit; (2) a hand recount; and (3) independent testing, which has confirmed that the security of the state's electronic voting equipment was not compromised.

As a threshold matter, the Eleventh Circuit issued an opinion today that mandates dismissal of this action for lack of standing and mootness in the related case of *Wood v. Raffensperger*, No. 20-14418, which raised many of the same claims as this case and sought similar relief. (*See* slip opinion attached as **Exhibit A**). In affirming the district court's decision denying Wood's motion to enjoin certification of the election results, the panel held:

> We agree with the district court that Wood lacks standing to sue because he fails to allege a particularized injury. And because Georgia has already certified its election results and its slate of presidential electors, Wood's requests for emergency relief are moot to the extent they concern the 2020 election. The Constitution makes clear that

---

[2] *See* Cybersecurity & Infrastructure Security Agency's Joint Statement From Elections Infrastructure Government Coordinating Council & the Election Infrastructure Selector Coordinating Committees, November 12, 2020. A true and correct copy of this statement is attached as **Exhibit B**.

> federal courts are courts of limited jurisdiction, U.S. Const. art. III; we
> may not entertain post-election contests about garden-variety issues of
> vote counting and misconduct that may properly be filed in state courts.

(slip op. at 1). This decision squarely controls, and the Court should dismiss the
action because Plaintiffs lack an injury in fact sufficient to establish Article III
standing. Certification of the election results also moots Plaintiffs' claims, as the
Court has no authority under federal law to undo what has already been done.

Other threshold issues bar the relief Plaintiffs seek. Even if they were not
moot, Plaintiffs' claims are barred by laches because of their inexcusable delay in
raising their challenge to the State's electronic voting system and absentee ballot
procedures until after their preferred candidate lost. Plaintiffs' claims are also barred
by the Eleventh Amendment to the U.S. Constitution, which bars suits for
retrospective relief against state officials acting in their official capacity absent a
waiver by the State. Similarly, despite their attempts to raise constitutional claims,
Plaintiffs' lawsuit is really an election contest challenging the Presidential election,
which can and should be brought in a Georgia court as some of Plaintiffs' allies have
recently done.

But most importantly, there is no credible evidence to support the drastic and
unprecedented remedy of substituting certified presidential election results with the
Plaintiffs' preferred candidate. Without this, Plaintiffs cannot clearly establish the

required elements for injunctive relief. Like every state, Georgia has a compelling interest in preserving the integrity of its election process. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Public confidence in the electoral process would certainly be undermined by a court invalidating the certified results of a presidential election in which nearly 5 million Georgians cast ballots. This Court should decline Plaintiffs' unsupportable efforts to overturn the expressed will of the voters, and should deny their request for relief and dismiss this action.

## FACTUAL BACKGROUND

I. **Georgia's Electronic Voting System is Secure and Has Not Been Compromised.**

Plaintiffs allege wide-ranging conspiracy theories that Georgia's electronic voting system has been compromised by Hugo Chavez and the Venezuelan government (or China and Iran, depending on which "expert" is asked), is infected with a vaguely described "weighted" algorithm that switches votes between candidates, and otherwise produces fraudulent results. In support of their argument, Plaintiffs cite to the un-signed declaration of Dr. Shiva Ayyadurai,[3] other redacted

---

[3] Dr. Ayyadurai claims he is "an engineer with vast experience in engineering systems, pattern recognition, mathematical and computational modeling and analysis." [Doc. 6-1, ¶ 2]. Elsewhere, Dr. Ayyadurai claims to be the inventor of

declarations, hearsay in the form of various news articles, and contested evidentiary filings in the case *Curling v. Raffensperger*, No. 1:17-cv-2989 (N.D. Ga.).[4]

The Plaintiffs—blinded by either willful ignorance or a lack of basic knowledge of Georgia elections—are incorrect. Georgia's electronic voting system was adopted in compliance with state and federal law, is certified by the Election Assistance Commission following inspection and testing conducted by independent Voting System Test Laboratories ("VSTLs"), and has not been compromised. A review of the *facts*, as opposed to Plaintiffs' conspiracies, confirms the inaccuracy of Plaintiffs' allegations.

**A**. **Adoption and selection of Georgia's electronic voting system.**

In 2019, the Georgia General Assembly enacted House Bill 316 ("HB 316"), a sweeping and comprehensive reform of Georgia's election laws, which also modernized and further secured Georgia's voting system. Specifically, the General Assembly chose to require a new unified system of voting throughout the State—

---

electronic mail. *See* Sam Biddle, *The Crazy Story of the Man Who Pretended to Invent Email*, Business Insider (Mar. 6, 2012), https://www.businessinsider.com/the-crazy-story-of-the-man-who-pretended-to-invent-email-2012-3. State Defendants object to any consideration of Dr. Ayyadurai's report as he is not qualified to offer the opinions proffered and utilizes unreliable methodology.

[4] The *Curling* matter is now subject to two appeals pending in the Eleventh Circuit Court of Appeals, docket numbers 20-13730 and 20-14067.

moving the State away from the secure, but older, direct-recording electronic ("DRE") voting system to a voting system utilizing Ballot-Marking Devices ("BMDs") and optical scanners. The General Assembly determined this replacement of DREs with BMDs should occur "as soon as possible." O.C.G.A. § 21-2-300(a)(2). The legislation placed the responsibility of selecting the equipment for the new voting system on the Secretary of State. O.C.G.A. § 21-2-300(a). However, contrary to Plaintiffs' assertions that Governor Kemp and Secretary Raffensperger "rushed through the purchase of Dominion voting machines and software," (Doc. 6, p. 15), the procurement of Georgia's new voting system was completed through an open and competitive bidding process as required by Georgia's State Purchasing Act, O.C.G.A. § 50-5-50. Secretary Raffensperger did not make the purchasing decision alone, but established a Selection Committee comprised of seven individuals who were tasked with reviewing bid proposals.[5] Selection Committee members evaluated those proposals using criteria and processes set forth on a Master Technical Evaluation spreadsheet.[6] Of the three requests for proposals evaluated by the Selection Committee, Dominion Voting Systems ("Dominion") received the highest overall score. *Id.*

---

[5] *See* https://sos.ga.gov/admin/uploads/Selection%20Committee%20Bios.pdf
[6] *See* https://sos.ga.gov/admin/uploads/MasterTechnicalEvaluation_redacted.xls

On July 29, 2019, Secretary Raffensperger posted a Notice of Intent to Award the contract for the statewide voting system to Dominion. No bid protests were received by the State, and Secretary Raffensperger issued a final Notice of Intent to Award on August 9, 2019. *Id.* The voting system consists of BMDs that print ballots by way of a connected printer and optical scanners connected to a locked ballot box. The Dominion BMD allows the voter to make selections on a screen and then prints those selections onto a paper ballot. The voter has an opportunity to review the paper ballot for accuracy before placing it into the scanner. After scanning, the paper ballot drops into a locked ballot box connected to the scanner. BMDs thus create an auditable, verifiable ballot, as required by statute. O.C.G.A. § 21-2-300(a)(2) ("electronic ballot markers shall produce paper ballots which are marked with the elector's choices **in a format readable by the elector**") (emphasis added).

## B. Testing and certification of Georgia's voting system.

Georgia's voting system is subject to two different certification requirements. First, the voting system must have been certified by the United States Election Assistance Commission ("EAC") at the time of procurement. O.C.G.A. § 21-2-300(a)(3). Second, the voting system must also be certified by the Secretary of State as safe and practicable for use. Georgia's BMD system meets both requirements.

The Help America Vote Act ("HAVA") created the EAC, which set up a rigorous process for voting-equipment certification, working with committees of experts and coordinating with the National Institute of Standards and Technology. 52 U.S.C. § 20962; *see also* 52 U.S.C. §§ 20962, 20971 (test lab standards). The EAC certifies voting systems as in compliance with the Voluntary Voting System Guidelines ("VVSG"), version 1.0, and does so by utilizing approved, independent Voting System Test Laboratories ("VSTL"). In the case of the voting system utilized in Georgia, SLI Compliance served as the VSTL tasked with testing the system for EAC purposes. The system utilized by Georgia, Democracy Suite 5.5-A, was certified by the EAC on January 30, 2019.[7]

Separately, the Secretary of State utilized another independent EAC-certified VSTL, Pro V&V, to conduct testing for *state* certification of the voting system. Following the VSTL's testing, the Secretary issued a Certification of the Dominion Voting Systems as meeting all applicable provisions of the Georgia Election Code and Rules of the Secretary of State on August 9, 2019.[8] That certification has been

---

[7] *See* United States Election Assistance Commission, Agency Decision — Grant of Certification, https://www.eac.gov/sites/default/files/voting_system/files/Decision.Authority.Grant.of.Cert.D-Suite5.5-A.pdf

[8] Plaintiffs erroneously claim that both the Certificate and a test report signed by Michael Walker were "undated" and have attached altered documents that have been cropped to remove the dates of the documents. *See* Compl., ¶12 and Exhibits 5 and 6 thereto. A correct copy of the Certificate showing the date of August 9,

updated due to de minimis changes in system components on two different occasions since, on February 19, 2020, and again on October 5, 2020.

### C. Georgia's electronic voting system has not been compromised and Plaintiffs' assertions to the contrary are disproven by the Risk-Limiting Audit.

Plaintiffs' conjecture and speculation does not rebut the reality that Georgia's voting system has not been compromised. Not only have two separate EAC-Certified independent VSTLs confirmed that the system operates as intended, but Georgia's risk-limiting audit ("RLA") further confirms that no "weighted" vote switching occurred.

Shockingly, the basis for Plaintiffs' outlandish claims of system compromise are rooted in suspect statistical—not software—analyses that they suggest irrefutably proves vote switching occurred. For example, in Dr. Ayyadurai's unsigned declaration, the author references (without citation) vote totals in certain precincts for the proposition that a "weighted race" algorithm must be responsible. (*See generally* Doc. 6-1.) The author, however, makes no attempt to evaluate any other reasons voters may have chosen not to vote for President Trump. Indeed, the

---

2019 may be viewed at
https://sos.ga.gov/admin/uploads/Dominion_Certification.pdf. A copy of the test report showing a date of August 7, 2019 may be found at
https://sos.ga.gov/admin/uploads/Dominion_Test_Cert_Report.pdf.

author of that declaration speculates that 48,000 of 373,000 votes cast in Dekalb County were switched in this manner from Trump to Biden, (Doc. 6-1, p. 28), meaning that (under the author's theory) the results in Dekalb County would be 106,373 for Trump to 260,227 for Biden (or approximately 28.6% to 70%). Of course, this would be extraordinarily unusual for heavily democratic Dekalb County, in which President Trump received 51,468 votes (16.47%) in 2016, when the State was using an entirely different voting system.[9]

Moreover, the existence of such a "weighted" algorithm would have been detected in the RLA conducted this year. Following the counties' tabulation of the November election results, but prior to certification, Secretary Raffensperger was required by law to conduct a risk-limiting audit in accordance with O.C.G.A. § 21-2-498. State Election Board Rule 183-1-15-.04 provides that the Secretary of State shall choose the particular election contest to audit. Recognizing the importance of clear and reliable results for such an important contest, Secretary Raffensperger selected the presidential race for the audit.[10] *See* **Exhibit C**.

---

[9] *See* Dekalb County Election Results, 2016, *available at* https://results.enr.clarityelections.com/GA/DeKalb/64036/183321/en/summary.html.

[10] *See* Statement of Secretary Raffensperger, "Historic First Statewide Audit of Paper Ballots Upholds Results of Presidential Race, attached as Exhibit C hereto and available at

County election officials were then required to count by hand all absentee ballots and paper ballots printed by the Dominion BMDs. *See id*. The audit confirmed the same outcome of the presidential race as the original tabulation using the Dominion voting systems equipment. *Id.* While there was a slight differential between the audit results and the original machine counts, the differential was well within the expected margin of error that occurs when hand-counting ballots. *Id.* A 2012 study by Rice University and Clemson University found that hand counting ballots in post-election audit or recount procedures can result in error rates of up to 2 percent. *Id.* In Georgia's audit, the highest error rate reported in any county recount was 0.73%, and most counties found no change in their final tally. *Id.*

The audit results refute Plaintiffs' speculation that Dominion machines or software might have somehow flipped, switched, or "stuffed" ballots in the 2020 presidential election. *Id.* Because Georgia voters can verify that their paper ballots (whether hand-marked absentee ballots or ballots marked by BMDs) accurately reflect their intended votes, any actual manipulation of the initial electronic vote count would have been revealed when the hand count of paper ballots presented a different result. The fact that this did not happen forecloses the possibility that

https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race

11

Dominion equipment or software had been manipulated to somehow record false votes for one candidate or to eliminate votes from another.

In sum, the components of Georgia's voting system have been evaluated, tested, and certified by two different independent laboratories as compliant with both state and federal requirements and safe for use in elections. Neither of those two VSTLs identified any "weighted" vote counting algorithm, nor any other impropriety. And, in Georgia's 2020 general election, the correct operation of the voting system was again confirmed by the state's risk-limiting audit.

## II.   Absentee Ballots Were Validly Processed According to Law

Plaintiffs' claim that the rules under which county elections officials verified absentee ballots are contrary to Georgia law is also without merit. Absentee ballots for the 2020 general election were processed by county election officials according to the procedures established by the Georgia legislature. These procedures were part of HB 316, bipartisan legislation passed in 2019 to reform the state's election code and implement a new electronic voting system. The reforms kept in place Georgia's policy of "no excuse" absentee voting, but modified the technical requirements for absentee ballots. HB 316 modified the language of the oath on the outer absentee ballot envelope to leave the signature requirement but remove the elector's address and date of birth. *See* O.C.G.A. § 21-2-384. Further, HB 316 added a "cure"

provision, which requires election officials to give a voter until three days after the date of the election to cure an issue with the voter's signature before rejecting an absentee ballot for a missing or mismatched signature on the outer envelope. *See* O.C.G.A. § 21-2-386(a)(1)(C). The "cure" provision was added to the statute's requirement that election officials "promptly notify" the voter of a rejected absentee ballot due to a missing or mismatched signature.

On November 6, 2019, the Democratic Party of Georgia, DSCC, and DCCC (collectively, "Political Party Organizations") sued the State Defendants, alleging that the "promptly notify" language of O.C.G.A. § 21-2-386(a)(1)(C) was vague and ill-defined and left counties without standards for verifying signatures on absentee ballots. (App'x Vol. I at 144-49).

While that action was pending, the State Election Board ("SEB") approved a rule that established a uniform standard for counties to follow to "promptly notify" voters when their absentee ballot is rejected as required by O.C.G.A. § 21-2-386(a)(1)(C). The rule provides that when a timely submitted absentee ballot is rejected, the board of registrars or absentee ballot clerk must send the voter notice of the rejection and opportunity to cure within three business days, or by the next business day if within ten days of Election Day. Ga. Comp. R. & Regs. r. 183-1-14-.13 (the "Prompt Notification Rule").

The Prompt Notification Rule was adopted pursuant to the SEB's rule-making authority under O.C.G.A. § 21-2-31(2). It provides a uniform three-day standard for "prompt" notification required by O.C.G.A. § 21-2-386(a)(1)(C) when an absentee ballot is rejected, so that all counties give notice in a uniform manner. The Prompt Notification Rule was promulgated pursuant to the Georgia Administrative Procedure Act, published for public comment, and discussed at multiple public hearings before it became effective on March 22, 2020.

Because the Prompt Notification Rule resolved the issues in the pending lawsuit, the parties resolved the matter in a settlement agreement that included, among other terms, an agreement that (1) the State Election Board would promulgate and enforce the Prompt Notification Rule; and (2) the Secretary of State would issue guidance to county election officials regarding the signature matching process.

On May 1, 2020, the Secretary of State distributed an Official Election Bulletin ("OEB"), advising county election officials of the Prompt Notification Rule and providing guidance for reviewing signatures on absentee-ballot envelopes. (Declaration of Chris Harvey ¶ 5).[11] The OEB instructed that after an election official makes an initial determination that the signature on the absentee ballot envelope does

---

[11] The Harvey Declaration was submitted in the related case of *Wood v. Raffensperger*, Civil Action No. 1:20-CV-4651-SDG and is attached as **Exhibit D**.

not match the signature on file for the voter pursuant to O.C.G.A. § 21-2-386(a)(1)(B) and (C), two additional registrars, deputy registrars, or absentee ballot clerks should also review the signature, and the ballot should be rejected if at least two of the three officials agree that the signature does not match. (*Id.*) The OEB expressly instructs county officials to comply with state law. (*Id.*)

Contrary to Plaintiff's claim that the Prompt Notification Rule and the OEB have significantly disrupted the signature verification process, these measures have had no detectable effect on the absentee ballot rejection rate since the last general election in 2018. (Harvey Dec. ¶¶ 6, 7). An analysis of the number of absentee-ballot rejections for signature issues for 2020 as compared to 2018 found that the rejection rate for absentee ballots with missing or non-matching signatures in the 2020 general election was 0.15%; the same rejection rate for signature issues as in 2018 before the new measures were implemented. (*Id.*)

## ARGUMENT AND CITATION OF AUTHORITIES

## I.  The Court Lacks Subject Matter Jurisdiction because Plaintiffs Cannot Establish Article III Standing.

Plaintiffs raise three constitutional counts in their Complaint: (1) that the State Defendants violated the Electors and Elections Clauses of Articles I and II ("Count I"); that the State Defendants violated the equal protection clause of the U.S. Constitution ("Count II"); that the State Defendants denied Plaintiffs Due Process

15

related to "alleged disparate treatment of absentee/mail-in voters among different counties" ("Count III"); and that the State Defendants denied Plaintiffs Due Process "on the right to vote" ("Count IV"). Plaintiffs also bring a state law election contest claim against Defendants pursuant to O.C.G.A. § 21-5-522, invoking the Court's supplemental jurisdiction under 28 U.S.C. § 1367. However, because Plaintiffs cannot establish standing as to any of these causes of action, the Court lacks jurisdiction to consider the merits of Plaintiffs' claims and the case should be dismissed.

Federal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (vacating and ordering dismissal of voting rights case due to lack of standing). "For a court to pronounce upon . . . the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Id.* (citation omitted). "If at any point a federal court discovers a lack of jurisdiction, it must dismiss the action." *Id.*

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. A party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As an

irreducible constitutional minimum, Plaintiffs must show they have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 561. As the party invoking federal jurisdiction, Plaintiffs bear the burden at the pleadings phase of "clearly alleg[ing] facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

### A. Plaintiffs have not Alleged an Injury in Fact Sufficient to Form a Basis for Standing.

Injury in fact is the "first and foremost" of the standing elements. *Spokeo*, 136 S. Ct. at 1547. An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020); *see also Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 U.S. App. LEXIS 35639 at *16 (3d Cir. Nov. 13, 2020) ("To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests.").

The alleged injury must be "distinct from a generally available grievance about government." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). This requires more than a mere "keen interest in the issue." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018); *see also Lance v. Coffman*, 549 U.S. 437, 440– 41 (2007) ("Our refusal

to serve as a forum for generalized grievances has a lengthy pedigree. . . . [A] generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing).

It is for this reason that the Eleventh Circuit found lack of standing in the *Wood* case. The plaintiff in that case could not "explain how his interest in compliance with state election laws is different from that of any other person. Indeed, he admits that any Georgia voter could bring an identical suit. But the logic of his argument sweeps past even that boundary. All Americans, whether they voted in this election or whether they reside in Georgia, could be said to share [plaintiff's] interest in "ensur[ing] that [a presidential election] is properly administered." (slip op., **Ex. A**, at 11).

Plaintiffs have fared no better at articulating a particularized grievance that is somehow different than that of the general voting public. In fact, throughout their Complaint, Plaintiffs allege that their interests are one and the same as any Georgia voter. *See, e.g.* Compl. at ¶ 156 ("Defendants…diluted the lawful ballots of Plaintiffs and of other Georgia voters and electors…"); ¶ 163 ("Defendants further violated Georgia voters' rights…"), ¶ 199 ("all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process"). Having

18

confirmed that their interests are no different than the interests of all Georgia voters, Plaintiffs have articulated only generalized grievances insufficient to confer standing upon them to pursue their claims.

## B. Plaintiffs do not have Standing as Presidential Electors.

Plaintiffs assert that by virtue of their status as Republican presidential electors, they are "candidates" that have standing to raise whatever variety of election complaints that they may choose. For this proposition, they cite to only a single case: *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020). However, *Carson* was predicated on Minnesota election laws that differ from Georgia's and upon facts that are distinguishable from the Plaintiffs' case. Further, the Third Circuit in *Bognet* recently rejected Plaintiff's broad reading of *Carson*. In that case, the court found that a congressional candidate lacked standing to pursue claims under the Elections and Elector clauses based on a generalized "right to run." It specifically noted its disagreement with *Carson*, saying "The Carson court appears to have cited language from [*Bond v. United States*, 564 U.S. 211 (2011)] without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding Bond beyond this context, and the *Carson* court cited none." 2020 U.S. App. LEXIS 35639 at *24, fn. 6; *see also Hotze v. Hollins*, No. 4:20-CV-03709, 2020 WL

19

6437668 at *2 (S.D. Tex. Nov. 2, 2020) (holding candidate lacked standing under Elections Clause); *Looper v. Boman*, 958 F.Supp. 341, 344 (M.D. Tn. 1997) (candidate lacked standing to claim that violations of state election laws had disenfranchised voters as "[h]ow other people vote…does not in any way relate to plaintiff's own exercise of the franchise and further does not constitute concrete and specific judicially cognizable injury."); *Moncier v. Haslam*, 1 F.Supp.3d 854 (E.D. Tn. 2014) (plaintiff denied opportunity to be placed on ballot as candidate for judicial office shared the same generalized grievance as a large class of citizens and failed to demonstrate concrete and particularized injury).

In finding that presidential elector did have standing to challenge purported violations of state election laws, *Carson* relies heavily on specific provisions of Minnesota elections law that treated presidential electors the same as other candidates for office. However, in Georgia, unlike in Minnesota, all persons possessing the qualifications for voting and who have registered in accordance with the law are considered "Electors." O.C.G.A. § 21-2-2(7). Presidential electors in Georgia are not elected to public office, but perform only a limited ministerial role in which they appear at the Capitol on the designated date and time to carry out the expressed will of Georgia's electors by casting their votes for President and Vice President in the Electoral College. O.C.G.A. § 21-2-11. Presidential electors need

not file notices of candidacy otherwise required of political candidates. O.C.G.A. § 21-2-132. Their names do not appear on the ballot; instead, the names of the candidates for President and Vice President appear on the ballot. O.C.G.A. § 21-2-325. Georgia electors do not elect any presidential electors individually; instead, "that slate of candidates shall be elected to such office which receives the highest number of votes cast." O.C.G.A. § 21-2-501(f).

The Eleventh Circuit has held that voters do not suffer a "concrete and particularized injury" simply because their preferred candidate loses an election (*see Jacobson,* 974 F.3d at 1252), and that such a harm would be based on "generalized partisan preferences" which are insufficient to establish standing. *Id.*; *see also Gill v. Whitford,* 138 S.Ct. 1916, 1933 (2018) (rejecting standing based on "group political interests, not individual legal rights"). Plaintiffs have failed to articulate how they, as presidential electors, have suffered any injury not common to their partisan group political interests, or that would not have also been suffered by all Georgia electors generally.

### C. Plaintiffs' Alleged Injuries are not Traceable to the State Defendants.

Not only have Plaintiffs failed to demonstrate an injury in fact, they cannot satisfy the causation requirement of standing, which requires that "a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result

21

of the independent action of some third party not before the court.'" *Jacobson*, 974 F.3d at 1253 (citation omitted); *see also Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011) (holding that an injury sufficient to establish standing cannot "result [from] the independent action of some third party not before the court.").

Plaintiffs have introduced declarations and affidavits from witnesses that raise disparate complaints about a variety of events that occurring at various times and places during the November election and subsequent audit. These complaints focus on actions allegedly taken by local elections officials and other third parties that are not named as defendants in this case.[12] Whatever one might conclude from these varied allegations, they all have one thing in common: none of the actions complained of are attributable in any way to any of the State Defendants. Instead, they were taken by local elections officials not named as parties to this case, and any

---

[12] Examples of these complaints include allegations that Dekalb County elections workers were "more hostile" to Republican observers than Democratic observers (Silva Aff. 06-9 Ex. 18, ¶14), that a Cobb County volunteer audit monitor witnessed "already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray" (Johnson Aff., Compl., Ex. 17, ¶¶4-5), and that an audit observer at the Lithonia location was too far away from ballots to see how they had been voted and that some auditors were validating ballots without reading them aloud to another auditor. (O'Neal Aff., 6-10, Exhibit J, ¶5-8).

injuries that might have resulted from those actions are not traceable to and cannot be redressed by the State Defendants.

With regard to Plaintiffs' conspiratorial claims related to Dominion equipment and software, there has been no allegation whatsoever that any of the State Defendants participated in any conspiracy or collusion with Dominion or any other third party malicious actor to cause any harm to Plaintiffs or any Georgia voters. The only allegation made against any of the State Defendants is that Governor Kemp and Secretary Raffensperger somehow "rushed" through the equipment selection process. However, this process was an open, competitive bidding process, conducted pursuant to Georgia procurement law, and during *Curling* hearings, and no allegation has been made as to how *any* action or inaction taken by any of the State Defendants during that bidding process might have caused any of Plaintiffs' alleged injuries.

Finally, to the extent that Plaintiffs claim injury as a result of any improprieties in the mailing, processing, validation or tabulation of absentee ballots, these injuries again would not be traceable to any of the State Defendants. Absentee ballots are mailed, processed, validated, and tabulated by local elections officials. *See* O.C.G.A. § 21-2-386. Having failed to establish that any of their purported injuries are traceable to or redressable by the State Defendants, Plaintiffs lack standing and their

23

claims should be dismissed. *See Jacobson*, 974 F.3d at 1253. *See also Anderson v. Raffensperger*, 1:20-CV-03263, 2020 WL 6048048, at \*22 (N.D. Ga. Oct. 13, 2020) (applying *Jacobson* to dismiss election related claims against State Defendants).

## II.   Plaintiffs' Claims are Moot.

The Eleventh Circuit held in the *Wood* decision today that federal challenges to the certification of the presidential election results in Georgia are now moot. "'We cannot turn back the clock and create a world in which' the 2020 election results are not certified." *Wood v. Raffensperger*, slip op. at 17 (quoting *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015)). Accordingly, the case "no longer presents a live controversy with respect to which the court can give meaningful relief." *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla*., 382 F.3d 1276, 1282 (11th Cir. 2004). Mootness is jurisdictional—because a federal court may only adjudicate cases and controversies, and a ruling that cannot provide meaningful relief is an impermissible advisory opinion. *Id.*

The Court "cannot prevent what has already occurred." *De La Fuente v. Kemp*, 679 F. App'x 932, 933 (11th Cir. 2017); *Yates v. GMAC Mortg. LLC*, No. 1:10-CV-02546-RWS, 2010 WL 5316550, at \*2 (N.D. Ga. Dec. 17, 2010) ("The Court is powerless to enjoin what has already occurred."). While Plaintiffs purportedly seek "decertification" of the certifications that Secretary Raffensperger

24

and Governor Kemp have already executed, they cite no authority whatsoever to support the notion that a court could order such relief. If the Plaintiffs believed that the results certified by Secretary Raffensperger and Governor Kemp were invalid for fraud or other grounds specified in O.C.G.A. § 21-2-522, Georgia provides an adequate remedy at law by setting forth the procedures for a state law election contest to be initiated in the Superior Court of Fulton County. O.C.G.A. §§ 21-2-520, *et seq*. However, there is simply no precedent for a federal court to issue an injunction requiring either Governor Kemp or Secretary Raffensperger to "decertify" their already-issued certifications or to certify results in direct contravention of the actual election result.

### III.  Plaintiffs' Claims are Barred by the Eleventh Amendment.

Plaintiffs' federal claims are asserted against the individually named State Defendants in their official capacities. (Doc. 1 at ¶¶ 31-33). These claims are barred by the Eleventh Amendment. The Eleventh Amendment bars suit against a State or one of its agencies, departments or officials, absent a waiver by the State or a valid congressional override, when the State is the real party in interest. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  Because claims against public officials in their official capacities are merely another way of pleading an action against the entity of which the officer is an agent, "official capacity" claims against a state officer are

included in the Eleventh Amendment's bar. *Kentucky*, 473 U.S. at 165. While an exception to Eleventh Amendment immunity exists under *Ex parte Young*, 209 U.S. 123 (1908), it is limited to suits against state officers for **prospective** injunctive relief. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n. 24 (1997). "A federal court cannot award retrospective relief, designed to remedy past violations of federal law." *Id.*

Plaintiffs' claims for injunctive and declaratory relief, premised on the conduct of the November 3, 2020 General Election and the certification of results that have already taken place, are barred because they are retrospective in nature. "Retrospective relief is backward-looking, and seeks to remedy harm 'resulting from a past breach of a legal duty on the part of the defendant state officials.'" *Seminole Tribe of Fla. v. Fla. Dep't of Revenue*, 750 F.3d 1238, 1249 (11th Cir. 2014) (quoting *Edelman v. Jordan,* 415 U.S. 651, 668 (1974)). "Simply because the remedy will occur in the future, does not transform it into 'prospective' relief. The term, 'prospective relief,' refers to the ongoing or future threat of harm, not relief." *Fedorov v. Bd. of Regents*, 194 F. Supp. 2d 1378, 1387 (S.D. Ga. 2002). Plaintiffs' claims for any relief related to the rules and regulations governing the conduct of the November 3, 2020, election or any alleged past security lapses, miscounting of votes,

or election irregularities are entirely retrospective and barred by the Eleventh Amendment.

## IV.   Laches Bars Plaintiffs' Claims for Post-Election Relief.

In *Wood v. Raffensperger*, 2020 U.S.Dist. LEXIS 218058 (Nov. 20. 2020), this Court found that claims raised by Plaintiffs' counsel Lin Wood were barred by the doctrine of laches. While Plaintiffs' claims overlap significantly with Wood's claims, the facts here are even more compelling when it comes to a finding of laches. Plaintiffs waited even longer than Wood did to file this action. As in *Wood,* virtually all of the complaints that Plaintiffs allege regarding the security of Georgia's voting system or the propriety of State Election Board rules or regulations could have been raised prior to the election.

To establish laches, State Defendants must show "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [them] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019) ("To succeed on a laches claim, [defendant] must demonstrate that [p]laintiffs inexcusably delayed bringing their claim and that the delay caused it undue prejudice.").

Where, as here, a challenge to an election procedure is not filed until *after* an election has already been conducted, the prejudice to the state and to the voters that have cast their votes in the election becomes particularly severe. Once the election has been conducted, any harm that might arise from a purported constitutional violation must be weighed against "such countervailing equitable factors as the extremely disruptive effect of election invalidation and the havoc it wreaks upon local political continuity." *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176, 1177 (9th Cir. 1988). For this reason, "if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election." *Id*. at 1180-81 (*citing Hendon v. North Carolina State Bd. of Elections*, 710 F.2d 177, 182-83 (4th Cir. 1983); *see also Curtin v. Va. State Bd. of Elections*, No. 1:20-cv-0546, 2020 U.S. Dist. LEXIS 98627, *16-17 (E.D. Va. May 29, 2020) (rejecting a similar challenge to state official guidance as barred by laches due to plaintiffs' failure to raise the challenge prior to the election). To hold otherwise "permit[s], if not encourage[s], parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973).

28

Plaintiffs delayed considerably in asserting their claims. To the extent that they had any concerns regarding the vulnerability of Dominion's voting systems, they could have raised those claims long before the election. Each of the absentee ballot regulations and procedures that Plaintiffs now complain of were adopted well before the November 3, 2020 election, and any claims related to the application of those rules during that election are subject to dismissal here for the same reasons that they were dismissed in *Wood*. And, with regard to the purported "irregularities" reported by Plaintiffs' voter and observer declarants, Plaintiffs offer no explanation why they did not attempt to address those issues with the relevant local election officials at the time, but instead waited until after the election officials completed the initial count and audit and certified those results.

As the *Wood* court recognized, Defendants and the public at large would be significantly injured if Plaintiffs were permitted to raise these challenges after the election has already taken place. 2020 U.S.Dist. LEXIS 218058 at *23 ("Wood's requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process."); *see also Arkansas United v. Thurston*, No. 5:20-cv-5193, 2020 WL 6472651, at *5 (W.D. Ark. Nov. 3, 2020) ("[T]he equities do not favor intervention where the election is already in progress and the requested relief would change the rules of the game mid-play.").

29

## V.    The Court should Abstain from Granting Relief.

The relief Plaintiffs seek is nothing short of overturning the November election. The ad damnum clause asks this Court to (1) order the Defendants to de-certify the election results; (2) enjoin the Governor from transmitting the certified results to the Electoral College; and instead (3) require the Governor to transmit a certification that President Trump received the majority of votes in Georgia.  (Doc. 1 ¶ 211(1-3); Doc. 101 at 100.) There are numerous problems with this proposed relief. First, it violates the principles of federalism. Second, the *Pullman* doctrine warrants dismissal. Finally, and at the very least, this lawsuit should be stayed pending the outcome of state election challenges pursuant to the *Colorado River* doctrine.

On federalism, the Eleventh Circuit recently held that it is "doubtful" that a federal court could compel a state to promulgate a regulation. *Jacobson*, 974 F.3d at 1257. First, federal courts are only able to order state defendants from "refrain[ing] from violating federal law." *Id.* (citing *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011)). Much of Plaintiffs' proposed relief cannot be reconciled with this binding precedent. Specifically, Plaintiffs do not seek to just refrain the Governor and the Secretary, they seek to compel them to certify a different candidate than the election laws demand, which is wholly inconsistent with Georgia's Election

30

Code and the thrice-audited results. The relief sought is particularly offensive to federalism principles in the light of the election challenges pending in state court that significantly mirror the claims brought in this lawsuit. As the Plaintiffs themselves now recognize, "Georgia law makes clear that post-election litigation may proceed in state Court." *Wood v. Raffensperger*, slip op. at 9. Indeed, Plaintiffs' Complaint repeatedly claims that they are bringing their lawsuit pursuant to Georgia statutes that provide the very basis to challenge elections. (Doc. No. 1 ¶¶ 150 (O.C.G.A. § 21-2-522), 183-207 (O.C.G.A. §§ 21-2-521, 21-2-522). It is hard to imagine a more significant challenge to federalism than for a party to come to federal court asking that court to reverse certified election results without giving the State an opportunity to act pursuant to its own statutory scheme.

These concerns are recognized by the *Pullman* doctrine, which is "appropriate 'in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law.'" *3637 Corp., Inc. v. City of Miami*, 314 F. Supp. 3d 1320, 1334 (S.D. Fla. 2018) (citing *Moheb, Inc. v. City of Miami*, 756 F.Supp.2d 1370, 1372 (S.D. Fla. 2010) (quoting *Abell v. Frank*, 625 F.2d 653, 656–57 (5th Cir. 1980)). Here, the constitutional issue presented—whether the legislature's delegation of rulemaking authority to the SEB is valid, and whether the SEB exceeded that authority when

promulgating various emergency rules—violates the federal constitution. In other words, the Court cannot answer the constitutional question without first deciding that the state agency exceeded its authority *under State law*. This is a classic *Pullman* situation, which examines and requires that "(1) there must be an unsettled issue of state law; and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised." *Id.* at 1372–73 (citing *Abell*, 625 F.2d at 657). Judge Jones reached the same conclusion last December in another election-related lawsuit, *Fair Fight, Inc. v. Raffensperger*.[13] This Court should do the same and dismiss the lawsuit.

For a similar reason, Plaintiffs' requested relief violates the *Colorado River Doctrine.* There are numerous pending challenges to the November election that have properly been filed in Georgia's courts, including, according to press statements by Mr. Wood's counsel in the *Wood* litigation, one filed late on December 4, 2020, by President Trump. At least one seeks nearly identical relief as the Plaintiffs' lawsuit. Under similar circumstances, the Eleventh Circuit has indicated that a stay of federal proceedings is warranted under the *Colorado River* doctrine, which "authorizes a federal 'district court to dismiss or stay an action when there is an ongoing parallel action in state court.'" *Moorer v. Demopolis Waterworks &*

---

[13] A true and accurate copy of the December Order is attached as **Exhibit E**.

*Sewer Bd.*, 374 F.3d 994, 997–98 (11th Cir. 2004) (citing *LaDuke v. Burlington Northern Railroad Co.,* 879 F.2d 1556, 1558 (7th Cir.1989)). Factors considered in the *Colorado River* analysis include: the desire to "avoid piecemeal litigation," whether state or federal law governs the issue, and whether the state court can protect all parties' rights. *Id.* at 987 (citation omitted).

Each of these factors warrants staying the litigation. The bulk of Plaintiffs' complaint addresses issues of state law: how absentee ballot requests and ballots are inspected, the authority of the General Assembly to delegate authority to the SEB and the Secretary, and the criteria for certifying elections. Moreover, the state court election challenges are to move swiftly. Thus, the possibility of piecemeal litigation is real and concrete. Finally, the relief that the parties in the state court challenges can obtain would protect all parties' rights. The remedies available to Georgia courts when ruling on election challenges are spelled out in state law. *See* O.C.G.A. § 21-2-527(d). Under these circumstances, *Colorado River* factors are satisfied, and the election challenge should proceed in state court under the same state laws that the Plaintiffs raised in their Complaint.

## VI.  Plaintiffs' Motion for Injunctive Relief Should be Denied.

Even if Plaintiffs could overcome the jurisdictional defects that are fatal to their claims, they still fail to satisfy the requirements for the extraordinary injunctive relief they seek.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). To prevail on their motion, Plaintiffs are required to show: (1) a substantial likelihood of prevailing on the merits; (2) that the plaintiff will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Duke v. Cleland*, 954 F.2d 1526, 1529 (11th Cir. 1992). The Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

### A. Plaintiffs are not likely to succeed on the merits of their claims.

*1.  Plaintiffs' equal protection claims fail because they cannot show arbitrary and disparate treatment among different classes of voters.*

Plaintiffs' equal protection claims fail for the same reason their counsel's equal protections claims failed in *Wood*. In the voting rights context, equal protection means that "[h]aving once granted the right to vote on equal terms, the state may

not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104 (2000) (citation omitted). Typically, when deciding a constitutional challenge to state election laws, federal courts apply the *Anderson-Burdick* framework that balances the burden on the voter with the state's interest in the voting regulation. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008); *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1318-19 (11th Cir. 2019).

But, as the *Wood* court recognized, Plaintiffs' claims do not fit within this framework. 2020 U.S. Dist. LEXIS 218058 at *25. Plaintiffs have not articulated a cognizable harm that invokes the Equal Protection Clause. Any actions taken by the State Defendants were taken "in a wholly uniform manner across the entire state." *Id.* at 26. No voters – including the Plaintiffs – were treated differently than any other voter. *Id.* (*citing Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020).

Nor have Plaintiffs set forth a "vote dilution" claim. None of the Plaintiffs have alleged that any action of Defendants have burdened their ability to cast their own votes. Instead, their claims, like Wood's, appear to be that because some votes were improperly counted or illegally cast, these illegal or improperly counted votes somehow caused the weight of ballots cast lawfully by Georgia voters to be somehow weighted differently than others. *Id.* at 27. Both the district court in *Wood*

court and the Third Circuit Court of Appeals in *Bognet* "squarely rejected" this theory. *Bognet*, 2020 WL 6686120, at *31-2 ("if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law…into a potential federal equal-protection claim"); *see also Jacobson*, 974 F.3d at 1247 (rejecting partisan vote dilution claim).

The Supreme Court's decision in *Bush v. Gore* does not support Plaintiff's case (*see* Doc. 6 at 16-17), as that case found a violation of equal protection where certain counties were utilizing varying standards for what constituted a legal vote in the 2000 Florida recount. 531 U.S. at 105 ("The question before us … is whether the recount procedures … are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate"). Here, any actions taken by the State Defendants were undertaken state-wide. The isolated "irregularities" complained of by Plaintiff's various declarants, if true, would have taken place at the county level under the supervision of elections officials that are not parties to this case. All actions of the State Defendants have been uniform and applicable to all Georgia counties and voters, in order to avoid the kind of ad hoc standards that varied from county to county as found unconstitutional in *Bush*. They are the exact opposite of arbitrary and disparate treatment.

2. *Plaintiffs' claim under the Electors and Elections Clauses fails.*

The electors clause of the United States Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, "who, in turn, cast the State's votes for president. U.S. Const. art. II, § 1, cl. 2. The General Assembly established the manner for the appointment of presidential electors in O.C.G.A. § 21-2-10, which provides that electors are *selected by popular vote* in a general election. Plaintiffs fail to show how any act of the State Defendants has altered this process.

Similarly, Plaintiffs fail to show how State Defendants have violated the elections clause, which provides that "[t]he Times, Places, and Manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Plaintiffs complain about a variety of regulations or procedures related to absentee ballot processing, without articulating precisely how those regulations or procedures run afoul of the elections clause. In any event, the State Election Board has the authority, delegated by the legislature, "[t]o formulate, adopt, and promulgate such rules and regulations … as will be conducive to the fair, legal, and orderly conduct of primaries and elections" so long as those rules are "consistent with law." O.C.G.A. 21-2-31(2). Thus, while no one disagrees that State Defendants are not members of the Georgia legislature,

Plaintiff's claim depends on the assumption that the rules and procedures used to process absentee ballots during the November 3, 2020, election were somehow inconsistent with Georgia's election code.

But this simply is not so. The SEB Rule is consistent with State law, and a Georgia court would likely say the same. Under Georgia precedent, when an agency empowered with rulemaking authority (like the SEB is), the test applied to regulation challenges is quite deferential. Georgia courts ask whether the regulation is authorized by statute and reasonable. *Albany Surgical, P.C. v. Dep't of Cmty. Health*, 257 Ga. App. 636, 637 (2002). The answer to both questions is an unqualified "yes."

As shown, the SEB is empowered to promulgate regulations. O.C.G.A. § 21-2-31(1). As recognized by Judge Grimberg in *Wood*, it is normal and constitutional for state legislatures to delegate their authority in such a manner. 2020 U.S.Dist. LEXIS 218058 at *10. The regulations are also reasonable. There is no conflict between the signature verification regulation and statutes cited by the Plaintiffs, O.C.G.A. §§ 21-2-386(a)(1)(C). (Doc. No. 1 at 23.) The statute requires an absentee ballot where a signature "does not appear to be valid" to be rejected and notice provided to the voter. *Id*. The challenged SEB Rule, which merely requires "an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot

38

is rejected," is consistent with this approach. *Wood*, 2020 U.S.Dist. LEXIS 218058 at *10. No statute cited by the Plaintiffs mandates that only one county official examine the absentee ballot, and that the review process involves several officials does not make it any less rigorous or inconsistent with the statutory law. (*See* Harvey Decl. ¶¶ 3, 5). A Georgia court would likely hold the same, because state courts have said that a "regulation must be upheld if the agency presents *any evidence* to support the regulation." *Albany Surgical, P.C. v. Dep't of Cmty. Health*, 257 Ga. App. 636, 640 (2002). Mr. Harvey's declaration certainly satisfies that standard, and it should be obvious that having a verification process in place designed to ensure uniform statewide application of the laws for determining consideration of an absentee ballot does not lead to invalid votes.

Any remaining doubt must be resolved in the State's favor, as the Plaintiffs have not identified any conflict in the language. This is what Judge Grimberg rightly concluded when he held that: "The record in this case demonstrate that, if anything, Defendants' actions in entering into the Settlement Agreement sought to achieve consistency among county election officials in Georgia, which ***furthers*** Wood's stated goals of conducting "[f]ree, fair, and transparent elections." *Wood* at * 10 (emphasis and brackets in original). This ends the inquiry and is fatal to Plaintiffs' claims in Counts I, III, IV, and V.

3. *Plaintiffs' due process claims fail.*

Plaintiffs' motion fails to articulate a discernable claim under the due process clause. It is unclear what process Plaintiffs claim that they were due or how any of the State Defendants failed to provide that process. Count II of Plaintiffs' Complaint, while captioned "Denial of Due Process" vaguely describes an undefined "disparate treatment" with regard to cure processes and argues that the disparate treatment "violates Equal Protection guarantees." *See* Compl. at ¶172. Count IV of Plaintiffs' Complaint is captioned "Denial of Due Process on the Right to Vote", and appears to describe a claim of vote dilution or debasement – citing to various equal protection cases. *See* Compl. at ¶§176-80. Plaintiffs' Motion for Preliminary Injunction does not include any discussion of due process at all.

Plaintiffs have not articulated a cognizable procedural due process claim. A procedural due process claim raises two inquires: "(1) whether there exists a liberty or property interest which has been interfered with by the State and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient." *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 229 (5th Cir. 2020) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). The party invoking the Due Process Clause's procedural protections bears the "burden . . . of establishing a cognizable liberty or property interest." *Richardson*, 978 F.3d at 229

40

(citing *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). Plaintiffs have not clearly articulated what liberty or property interest has been interfered with by the State Defendants, or how any procedures attendant to the purported deprivation were constitutionally sufficient. As the *Wood* court noted:

> …the Eleventh Circuit does "assume that the right to vote is a liberty interest protected by the Due Process Clause." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020). But the circuit court has expressly declined to extend the strictures of procedural due process to "a State's election procedures." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("The generalized due process argument that the plaintiffs argued for and the district court applied would stretch concepts of due process to their breaking point.").

2020 U.S. Dist. LEXIS 218058 at *33.

Nor have Plaintiffs articulated a cognizable substantive due process claim. The types of voting rights covered by the substantive due process clause are considered narrow. *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). This does not extend to examining the validity of individual ballots or supervising the administrative details of an election. *Id.* In only "extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Id.*

As the *Wood* court recognized:

> Although Wood generally claims fundamental unfairness, and the declarations and testimony submitted in support of his motion speculate as to wide-spread impropriety, the actual harm alleged by Wood concerns merely a "garden variety" election dispute.

41

2020 U.S. Dist. LEXIS 218058 at *35. Further, "[p]recedent militates against a finding of a due process violation regarding such an ordinary dispute over the counting and marking of ballots." *Id.* (*citing Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980) for the proposition that "If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute.").

The same is true here. Plaintiffs have introduced only speculative, conclusory and contradictory testimony from "experts" that would do no more than establish a possibility of irregularities if their analysis were correct, along with a hodge-podge of disparate claims by third-party voters and observers claiming that they observed a variety of different purported irregularities in a handful of different counties (none of which are parties to this action). Plaintiffs have failed to demonstrate the "extraordinary circumstances" rising to the level of a constitutional deprivation that are necessary to support a substantive due process claim. Plaintiffs have therefore failed to demonstrate a substantial likelihood of success on the merits of any claim for violation of the 14th Amendment's guarantee of either procedural or substantive Due Process.

### 4. *Plaintiffs' Election Contest Claims Fail.*

As shown, the Plaintiffs have effectively filed an election challenge under Georgia law. Seeking to stop certification does not save the Plaintiffs' Complaint for at least two additional reasons. First, it has long been the rule that electors are state and not federal officials. *See Walker v. United States*, 93 F.2d 383, 388 (8th Cir. 1937). Consequently, it is state law that determines how challenges to electors are made, and Georgia law sets forth that process as explained above. This also demonstrates why abstention is appropriate. Second, to the extent that the Plaintiffs argue that county election officials did not properly count mail-in and absentee ballots, there are state remedies available to challenge the acts of those county officials. Indeed, Georgia's laws governing election challenges provide for just that.

Finally, and as addressed elsewhere in this brief, the *Jacobson* decision makes clear that challenges to acts of county officials must be brought against those county officials. 974 F.3d at 1254. It is insufficient to rely on the Secretary's general powers "to establish traceability." *Anderson*, 2020 WL 6048048 at *23. Similarly, reliance on the phrase "chief election official" or statements about the uniformity in the administration of election laws have been deemed insufficient by the *Anderson* court when it applied *Jacobson*. *Id.*

In sum, because Plaintiffs are not likely to succeed on the merits of any of their claims, injunctive relief must be denied.

## B. The loss of Plaintiffs' preferred candidate is not irreparable harm.

Plaintiffs fail to articulate any specific harm that he faces if his requested relief is not granted, other than the vague claim that an infringement on the right to vote constitutes irreparable harm. However, Plaintiffs do not allege that their right to vote was denied or infringed in any way—only that their preferred candidate lost. It is not irreparable harm if they are not able to "cast their votes in the Electoral College for President Trump," because "[v]oters have no judicially enforceable interest in the outcome of an election." *Jacobson*, 974 F.3d at 1246 ("Voters have no judicially enforceable interest in the outcome of an election.").

Irreparable harm goes to the availability of a remedy—not a particular outcome. Certifying the expressed will of the electorate is not irreparable harm, but rather inevitable and legally required within our constitutional framework. There is a remedy available to extent that the losing candidate—rather than a dissatisfied voter, supporter, or presidential elector—seeks post-certification remedies, and such election contests have been filed in state court and remain pending.

**C. The balance of equities and public interest weigh heavily against an injunction.**

These remaining injunction factors—balancing the equities and public interest—are frequently considered "in tandem" by courts, "as the real question posed in this context is how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018), *aff'd in part, appeal dismissed in part*, 761 F. App'x 927 (11th Cir. 2019); *see also Purcell*, 549 U.S. at 4. The Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," paying "particular regard as well for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

Here, "the threatened injury to Defendants as state officials and the public at large far outweigh any minimal burden on [Plaintiffs]. *Wood*, 2020 U.S. Dist. LEXIS 218058 at *38. "Confidence in the integrity of our electoral process is essential to the functioning of our participatory democracy," and court orders affecting elections "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U. S. at 4-5. For this reason, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the

45

election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (April 6, 2020) (per curiam).

The Eleventh Circuit recently held that the *Purcell* principle applies with even greater force when voting has already occurred. *See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) ("[W]e are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute."); *see also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented.").

Here, the election *has already been conducted*, and the slate of presidential electors has been certified. Granting Plaintiffs' extraordinary relief would only serve to "disenfranchise [] voters or sidestep the expressed will of the people." *Donald J. Trump for President,* 2020 U.S. App. LEXIS 37346 at *28. As the district court in *Wood* correctly recognized, "To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways." 2020 U.S. Dist. LEXIS 218058 at *37-38. Plaintiffs seek even broader relief than that sought in *Wood*. If granted, Plaintiffs' requested relief would disenfranchise not

only Georgia's absentee voters but would invalidate **all** votes cast by Georgia electors.

## CONCLUSION

For the foregoing reasons, Plaintiffs' emergency motion for injunctive relief must be denied and the Court should dismiss the action with prejudice. Furthermore, the current TRO entered by the Court should be immediately dissolved to prevent ongoing harm to the ability of county elections officials to begin early voting for the January run-off, for the reasons shown in State Defendants' motion to modify the TRO.

Respectfully submitted, this 5th day of December, 2020.

Christopher M. Carr                  112505
Attorney General
Bryan K. Webb                        743580
Deputy Attorney General
Russell D. Willard                   760280
Senior Assistant Attorney General

/s/ *Charlene S. McGowan*
Charlene S. McGowan                  697316
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
404-458-3658 (tel)

Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com

**Robbins Ross Alloy Belinfante Littlefield LLC**
500 14th Street NW
Atlanta, GA 30318
Telephone:  (678) 701-9381
Facsimile:   (404) 856-3250

*Attorneys for State Defendants*

48

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been formatted using Times New Roman font in 14-point type in compliance with Local Rule 7.1(D).

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

49

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **STATE DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS AND RESPONSE TO PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for all parties of record via electronic notification.

Dated: December 5, 2020.

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General