# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

| | |
|---|---|
| CORECO JA'QAN PEARSON, et al., | CASE NO. |
| **Plaintiffs,** | |
| v. | 1:20-cv-4809-TCB |
| BRIAN KEMP, et al., | |
| **Defendants.** | |

## PLAINTIFFS' CONSOLIDATED RESPONSE TO THE MOTIONS TO DISMISS AND REPLY IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTIVE RELIEF

L. Lin Wood
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
(404) 891-1402
lwood@linwoodlaw.com

Sidney Powell
*Counsel of Record*
SIDNEY POWELL PC
2911 Turtle Creek Blvd., Suite 300
Dallas, TX 75219
(214) 717-1775
sidney@federalappeals.com

Harry W. MacDougald
CALDWELL, PROPST & DELOACH, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
(404) 843-1956

Howard Kleinhendler
HOWARD KLEINHENDLER ESQUIRE
369 Lexington Avenue, 12th Floor
New York, NY 10017
(917) 793-1188

*Counsel for Plaintiffs-Petitioners*

# TABLE OF CONTENTS

Introduction ................................................................................................3

Statement of Facts .......................................................................................5

Argument and Citation of Authority ...........................................................12

   I.    Plaintiffs as Presidential Electors and a Political Party
       Organization have Standing ..............................................................12

     1.   Defendants' Standing Arguments.......................................................12

     2.   State Defendants' Standing Arguments..............................................18

   II.   The Court Has Subject Matter Jurisdiction Over Count V. ...............20

   III.  Laches Does Not Bar Claims For De-Certification Based on
       Election Fraud and Illegality Asserted Three Business Days after
       Certification and Before Post-Recount Certification. .........................22

   IV.  Plaintiffs Have Stated Claims For Relief ...........................................25

     1.   The 12(b)(6) Standard......................................................................25

     2.   Allocation of the Burden of Proof with Respect to Electronic
        Election Fraud. .................................................................................28

     3.   Plaintiffs' Claims are Plausible..........................................................32

     4.   Plaintiffs Have Pleaded a Claim Under the Elections and Electors
        Clause. ..............................................................................................34

     5.   Plaintiffs Have Pleaded an Equal Protection Violation .....................35

     6.   Plaintiffs Have Pleaded a Due Process Violation ..............................37

   V.   The Plaintiffs' Claims are Ripe and not Moot. ..................................39

   VI.  The Eleventh Amendment does not Bar Claims for Injunctive
       Relief.................................................................................................42

   VII. Plaintiffs' Claims are not subject to Dismissal Under Abstention
       Doctrines. .........................................................................................43

   VIII. Reply in Support of Motion for Emergency Injunctive Relief.............48

     1.   Expert Testimony .............................................................................49

Conclusion.................................................................................................51

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

| | |
|---|---|
| **CORECO JA'QAN PEARSON, et al,** | **CASE NO.** |
|     **Plaintiffs,** | |
| **v.** | **1:20-cv-4809-TCB** |
| **BRIAN KEMP, et al,** | |
|     **Defendants.** | |

## PLAINTIFFS' CONSOLIDATED RESPONSE TO THE MOTIONS TO DISMISS AND REPLY IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTIVE RELIEF

Come now the Plaintiffs and submit this Conslidiated Response to the Motions to Dismiss and Reply in Support of Emergency Motion for Injunctive Relief.

## INTRODUCTION

The motions to dismiss contends that Plaintiffs' claims are baseless. In fact, they are based on the Constitution, and are supported by substantial and voluminous evidence filed with the Complaint showing in multiple dimensions that the election was conducted in an unconstitutional manner and was infected with fraud, politically biased counting, and illegality more than sufficient to put the outcome in doubt. The evidence presented shows a substantial disregard for the State Legislature's Election Code for federal

elections, which are clearly within the jurisdiction and power of a federal court to redress. *Bush v. Gore*, 531 U.S. 98 121 S.Ct. 525 (2000). There is no question that Plaintiffs have alleged sufficient facts to conduct an inquiry into whether the acts of the State's administrative agents in this regard constituted a significant departure from the legislative scheme and that this Court has jurisdiction and authority to redress these grievances.

In response to Plaintiffs' substantial body of evidence from many credible fact and expert witnesses substantiating the allegations (further discussed below), the Defendants put their fingers in their ears. They address this evidence with self-serving press releases that cover the ugly and unconstitutional political malfeasance at the heart of this case. Instead, they offer a series of slogans – standing, subject matter jurisdiction, and failure to state a claim for relief – the evidence being the last thing they want the Court to notice. They contend that presidential electors, who legally are candidates in the election, O.C.G.A. § 21-2-10, have no standing to complain that the election was stolen from them by fraud, illegality, unconstitutional political discrimination in the counting of the votes and a wholesale "departure from the legislative scheme." They invoke an equitable doctrine, laches, to shield clearly unconstitutional election fraud and illegality from judicial scrutiny, as if equity would lend itself to such a purpose.

Plaintiffs could not claim the election was stolen until it actually was stolen and evidence of that theft emerged with sufficient clarity to support the allegations of this case. As the world now knows, the wrongdoing for which this case seeks relief was completed on and after November 3, 2020. This case was filed on the third business day after certification, well within the most closely analogous state law limitations period, which requires election contests be filed within five days of certification.[1] *See* O.C.G.A. § 21-2-524(a). *Cf. SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC,* 137 S. Ct. 954, 960 (2017) (laches does not generally apply within statutory limitations period). Even more to the point, this lawsuit was filed *before* the certification of the recount results.[2] Arguments that Plaintiffs have failed to state a claim betray unfamiliarity with the allegations, the evidence and the relevant law. The motion should be denied.

## STATEMENT OF FACTS

Plaintiffs have alleged and submitted fact and expert witness testimony to multiple serious illegalities in the election which may be summarized in pertinent part as follows:

---

[1] For periods less than seven days, intervening weekends and legal holidays are not counted. See O.C.G.A. § 1-3-1(c)(3)

[2] See https://www.cnn.com/2020/12/02/politics/georgia-recount-results-brad-raffensperger/index.html (Raffensperger on December 2, 2020 "expects to re-certify President-elect Joe Biden as the winner.")

1.  Illegal tabulation of a significant volume of absentee ballots in Fulton County out of public view in violation of O.C.G.A. § 21-2-483(b). *See* Complaint, paras. 10-11, 116-119. Republican observers were told to leave around 10:30 PM. Doc. 1-28 and 1-29. This has recently been confirmed by surveillance video obtained from State Farm Arena which clearly shows this activity, and further shows that the same ballots were scanned over and over, another clear election fraud. This video evidence will be filed with the Court Monday December 7, 2020.

2.  Eye-witness testimony from a poll manager with 20 years' experience that stacks of utterly pristine mail-in ballots were counted – impossible for any absentee ballot returned in the mail (as they all are) because they have to be folded twice to fit in the envelope. To the witness' observation, 98% of these ballots were voted for Vice President Biden. Complaint ¶ 75; Doc. 1-16 (Affidavit of Susan Voyles, ¶¶ 14-16, 27). This evidence is supplemented by a declaration from another experienced observer that he also observed pristine ballots during the recount which were voted for Joe Biden. *See* Declaration of Wilburn J. Winter, filed December 6, 2020.

3.  Expert testimony that 20,311 non-residents voted illegally. William. M. Briggs, Ph.D., a statistician, estimated based on survey data rigorously collected by Matt Braynard and the Voting Integrity Project, that 20,311 absentee or *early* voters voted in Georgia despite having moved out of state – sufficient in itself to put the outcome of the election in doubt. *See* Complaint ¶ 122(d); Doc. 1-1 (Briggs Declaration and Report); Doc. 45-1 (Expert Report of Matthew Braynard).

4.  A massive number of unrequested absentee ballots were sent in violation of the legislative scheme, estimated to a 95% confidence interval to be between 16,938 and 22,771 ballots – sufficient in itself to put the outcome of the election in doubt. Complaint ¶ 122(b); Doc. 1-1 (Briggs Declaration and Report); Doc. 45-1 (Expert Report of Matthew Braynard).

5.  A massive number of absentee ballots that were returned by the voters but never counted, estimated to a 95% confidence interval to be between 31,559 to 38,886. Complaint ¶ 122(a); Doc 1-1, Briggs Declaration; Doc. 45-1, Braynard Report.

6.   A statistical analysis of Fulton County precinct voting results by Eric Quinnell, Ph.D. identifies 32,347 votes in Fulton County alone as statistically anomalous, and notes that in certain precincts Biden gained more than 100% of the increase in new registrations from the 2016 general election. Complaint ¶ 123; Doc. 1-27, ¶¶ 7-8. A second declaration from Dr. Quinnell and S. Stanley Young, Ph.D., a member of the American Association for the Advancement of Science in the area of statistics, further analyzes Fulton County absentee ballots and finds glaring statistical anomalies that are so extreme as to be mathematically impossible to co-exist in the absentee ballot data. *See* Doc. 45-2.

7.   An analysis by Russell Ramsland of absentee ballot statistics showing that 5,990 absentee ballots had impossibly short intervals between the dates they were mailed out and the dates they were returned, and that at least 96,000 absentee ballots were voted but are not reflected as having been returned. Complaint ¶¶ 16 & 190; Doc. 1-10, ¶¶ 15 (Ramsland Declaration).

8.   The absentee ballot signature rejection rate announced by the Secretary of State was .15%. Only 30 absentee ballot *applications* were rejected statewide for signature mismatch, with nine in tiny Hancock County, population 8,348, eight in Fulton County and *zero* in any other metropolitan county. Under the faulty consent decree, signatures could be matched (if there was any matching done at all) with the applications alone – allowing unfettered injection of bootstrapped signatures into the valid absentee ballot pool. Plaintiffs allege that these facts represent the de facto abolition of the statutory signature match requirement of O.C.G.A. § 21-2-386 in violation of state statute, the Elections and Electors Clause, and the Equal Protection and Due Process Clauses.

9.   An analysis by Benjamin Overholt, filed at Doc. 45-3, calculates that the signature rejection rate in Georgia for absentee ballots in the 2020 election was .15%, and that the Secretary of State has used inconsistent methodologies in calculating the 2016, 2018 and 2020 rejection rates to make the 2020 rejection rate seem better by comparison. Overholt says the Secretary of State's press release is "misleading" and uses inconsistent methodologies and faulty comparisons.

10.    The Dominion voting system ballots marked by Ballot Marking
       Devices are not voter-verifiable or auditable in a software-
       independent way. Complaint ¶¶ 13, 110(a) Doc. 1-5, ¶ 7; Doc. 1-8
       *passim*). This issue has been litigated and decided against the
       State Defendants in *Curling v. Raffensperger*, 2020 WL 5994029
       (N.D. Ga. 10/11/20), giving rise to issue preclusion against the
       Defendants.

11.    The electronic security of the Dominion system is so lax as to
       present a "extreme security risk" of undetectable hacking, and
       does not include properly auditable system logs. Complaint ¶ 8, ;
       Doc. 1-4 (Hursti Declaration ¶¶ 37, 39, 45-48; Doc. 1-5, at p. 29, ¶
       28). Judge Totenberg's decision in *Curling v. Raffensperger*, 2020
       WL 5994029 (N.D. Ga. 10/11/20) also gives rise to issue preclusion
       on this problem.

12.    The process of uploading data from memory cards to the Dominion
       servers is fraught with serious bugs, frequently fails and is a
       serious security risk. Doc. 1-4 (Hursti Declaration ¶¶ 41-46).

13.    There has been no inventory control over USB sticks, which were
       regularly taken back and forth from the Dominion server to the
       Fulton County managers' offices, another extreme security risk.
       *Id*. at ¶ 47

14.    "The security risks outlined above – operating system risks, the
       failure to harden the computers, performing operations directly on
       the operating systems, lax control of memory cards, lack of
       procedures, and potential remote access, are extreme and destroy
       the credibility of the tabulations and output of the reports coming
       from a voting system." *Id*. at ¶ 49.

15.    The Spider Affidavit, Doc. 1-2, reports on cyber security testing
       and analysis, penetration testing, and network connection tracing
       and analysis with respect to Dominion Voting Systems servers and
       networks. The Affiant is formerly of the 305th Military
       Intelligence Battalion with substantial expertise and experience in
       cyber security. In testing conducted November 8, 2020, he found
       shocking vulnerabilities in the Dominion networks, with
       unencrypted passwords, network connections to IP addresses in
       Belgrade, Serbia, and reliable records of Dominion networks being
       accessed from China. Doc. 1-2, ¶¶ 7-10. The Spider affidavit also

finds that Edison Research, an election reporting affiliate of Dominion, has a directly connected Iranian server, which is in turn tied to a server in the Netherlands which correlates to known Iranian use of the Netherlands as a remote server. *Id*. at ¶¶ 10-11. The Spider affidavit identifies a series of other Iranian and Chinese connections into Dominion's networks and systems. The affidavit concludes in ¶ 21:

> In my professional opinion, this affidavit presents unambiguous evidence that Dominion Voter Systems and Edison Research have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, these organizations neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. This represents a complete failure of their duty to provide basic cyber security.

16.   The Declaration of Russell Ramsland, Doc. 1-10, finds similar shocking vulnerabilities in the Dominion networks and systems, and confirms the findings of the Spider affidavit. He further shows that malware on SCTYL's servers can capture log in credentials used in the Dominion networks. *Id*. at ¶¶ 4-5. Ramsland finds that Dominion's source code is available on the Dark Web, and that Dominions election systems use unprotected logs, making undetectable hacking by sophisticated hackers possible. *Id*. at 6-7. This latter point confirms Judge Totenberg findings about the vulnerabilities in the Dominion system in *Curling v. Raffensperger*, 2020 WL 5994029 (N.D. Ga. 10/11/20).

17.   In further analysis, Ramsland finds through sophisticated mathematical techniques that there was a distinct political bias in favor of Joe Biden and against Donald Trump in the results reported from Dominion machines vs. those reported on other systems. *Id*. at ¶¶ 8-10. Biden averaged 5% higher on Dominion and Hart systems than on other systems. *Id*. Looking at counties where Biden overperformed Ramsland's predictive model, where other machines were used Biden overperformed only 46% of the

time, indicating machine neutrality. However, in the Dominion/Hart system counties, Biden overperformed the model 78% of the time, an anomalous or unnatural result to the 99.99% confidence level. *Id*. at 10-12. This analysis was confirmed by checking it by another machine learning method. *Id*. at ¶ 12. See also ¶13 ("**This indicates the fraud was widespread** and impacted vote counts in a systematic method **across many machines and counties**.") (Emphasis in original).

18. Ramsland reaches the same conclusion as the Spider affidavit, and adds the following:

> Based on the foregoing, we believe this presents unambiguous evidence that using multiple statistical tools and techniques to examine if the use of voting machines manufactured by different companies affected 2020 US election results, we found the use of the Dominion X/ICE BMD (Ballot Marking Device) machine, manufactured by Dominion Voting Systems, and machines from Hart InterCivic, appear to have abnormally influenced election results and **fraudulently and erroneously attributed from 13,725 to 136,908 votes to Biden in Georgia**. (Emphasis in original).

19. Dominion's Chief Technical Officer, strategy director, and co-inventor on several patents assigned to Dominion, and primary defense expert witness in *Curling v. Raffensperger*, and holder of multiple patents on Dominion's software, is a member of Antifa, a violent revolutionary communist group, responsible for months of mayhem in Portland, Oregon, and violent rioting all over the United States. Dr. Coomer is consumed with an intense loathing and frothing psychotic rage towards Donald Trump and all of his supporters. Dr. Coomer said in an Antifa conference call "Don't worry. Trump won't win the election, we fixed that." Complaint ¶ 120. Dr. Coomer thus had motive, means and opportunity to rig the election through the Dominion software and openly declared he had done so.

It is claimed by the Defendants that the hand audit precludes the

possibility of electronic election fraud. Not only is this not true, the State

Defendants are collaterally estopped from making this argument because it
has been decided against them by Judge Totenberg in *Curling v.
Raffensperger*, 2020 WL 5994029 (N.D. Ga. 10/11/20). As Judge Totenberg
held:

> Georgia's Election Code mandates the use of the BMD system
> as the uniform mode of voting for all in-person voters in federal and
> statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory
> provisions mandate voting on "electronic ballot markers" that: (1)
> use "electronic technology to independently and privately mark a
> paper ballot at the direction of an elector, interpret ballot selections,
> communicate such interpretation for elector verification, and print
> an elector verifiable paper ballot;" and (2) "produce paper ballots
> which are marked with the elector's choices in a format readable by
> the elector" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2).
>
> Plaintiffs and other voters who wish to vote in-person **are
> required to vote on a system that does none of those things.**
> Rather, the evidence shows that the Dominion BMD system **does
> not produce a voter-verifiable paper ballot or a paper ballot
> marked with the voter's choices in a format readable by the
> voter because the votes are tabulated solely from the
> unreadable QR code**. Thus, under Georgia's mandatory voting
> system for "voting at the polls" voters must cast a BMD-generated
> ballot tabulated using a computer generated barcode that has the
> potential to contain information regarding their voter choices that
> does not match what they enter on the BMD (as reflected in the
> written text summary), or could cause a precinct scanner to
> improperly tabulate their votes.

*Id*. at 34-35 (emphasis added). These properties render the election
unauditable by hand recount. Plaintiffs' evidence, and the evidence reviewed
at length by Judge Totenberg, shows that BMD ballots are not auditable in
any software-independent way. *See* e.g. Doc. 1-8, *passim*. Claims to the

contrary rest on a fallacious assumption that the veracity *vel non* of the BMD ballots is independent of the BMDs themselves – a classic case of circular reasoning.

In the face of all this evidence from the Complaint and before the Court, Defendants travel under the 12(b)(6) standard of review that requires the Court to assume all of the foregoing is true. They then argue there is "nothing to see here" and that we should all just move along. That argument is utterly without merit and should be rejected.

## ARGUMENT AND CITATION OF AUTHORITY

### I. PLAINTIFFS AS PRESIDENTIAL ELECTORS AND A POLITICAL PARTY ORGANIZATION HAVE STANDING

#### 1. DEFENDANTS' STANDING ARGUMENTS

The Defendants first contend that Plaintiffs do not have standing. However, Plaintiffs Correco Ja'Quan Pearson, Vikki Townsend Consiglio, Gloria Kay Godwin, James Kenneth Carroll, Carolyn Hall Fisher, and Cathleen Alston Latham are all nominated Republican Presidential Electors for the State of Georgia. As such, in legal contemplation they are candidates in the election under O.C.G.A. § 21-2-10, which provides:

> At the November election to be held in the year 1964 and every fourth year thereafter, there shall be elected by the electors of this state persons to be known as electors of President and Vice President of the United States and referred to in this chapter as presidential electors, equal in number to the whole number of senators and representatives to which this state may be entitled in the Congress of the United States.

Pursuant to O.C.G.A. § 21-2-11, the duties of presidential electors are as follows:

> The presidential electors chosen pursuant to Code Section 21-2-10 shall assemble at the seat of government of this state at 12:00 Noon of the day which is, or may be, directed by the Congress of the United States and shall then and there perform the duties required of them by the Constitution and laws of the United States.

The standing of presidential electors to challenge fraud, illegality and unconstitutional political discrimination in a presidential election stands, as it were, on a different footing than that of an ordinary citizen elector. They are candidates, not voters. Theirs is not a generalized grievance, it is a particularized grievance. The election was not stolen from their preferred candidate, it was stolen *from them individually and particularly*. There are only 16 Republican Presidential electors in the whole state – six of them are plaintiffs in this case – versus 7,233,584 registered voters in Georgia.[3]

The Eighth Circuit case of *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) is directly on point and highly persuasive, leading the Defendants to deride it as an outlier. In fact, the reasoning of *Carson* is directly analogous. *Carson* reviewed Minnesota law, including Minn. Stat. § 208.03, which provides that a vote for a presidential and vice-presidential candidate "shall be deemed to be a vote for that party's electors." *Carson* then concluded

---

[3] *See* https://sos.ga.gov/index.php/Elections/voter_registration_statistics, last visited November 5, 2020.

"Because Minnesota law plainly treats presidential electors as candidates, we do, too." *Id*. at 1057. Georgia law similarly treats presidential electors as candidates, and has a statute nearly identical to Minn. Stat. § 208.03, O.C.G.A. § 21-2-480(g), which provides that "[a] vote for the candidates for President and Vice President of a political party or body shall be deemed to be a vote for each of the candidates for presidential electors of such political party or body."

As the court in *Carson* explained, this drove its conclusion that presidential electors have standing:

> As candidates, the Electors argue that they have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast. An inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors. The Secretary's use of the consent decree makes the Electors' injury certainly-impending, because the former necessarily departs from the Legislature's mandates. Thus, the Electors meet the injury-in-fact requirement."

*Id*. at 1058.

The causal-connection test is satisfied because the injury – an inaccurate vote tally – flows from the fraud, illegality and unconstitutionality in the conduct of the election as alleged in the Complaint.

The redressability test is satisfied because decertification of the election results, and/or certification of the Trump Electors, or prohibition of

the Biden Electors from voting in the Electoral College would redress the injury. *See id*.

Prudential standing is also satisfied because "[a] significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 112, 121 S.Ct. 525, 533-534 (2000) (Rehnquist, Scalia and Thomas concurring).

As the Eighth Circuit concluded, "[f]or these reasons, we conclude the Electors have Article III standing as candidates." *Id*. So should this Court.

The Defendants rely principally on *Bognet v Sec'y of Commonwealth*, No. 20-2314, 2020 WL 6686120 (3rd Cir. Nov. 13, 2020), where the court found that electors lacked standing based on the particularities of a Pennsylvania law that are not present here. In particular, the *Bognet* court did not discuss the significance of State law provisions pursuant to which Presidential Electors are candidates for office – the linchpin of the *Carson* decision. Moreover, none of the plaintiffs in *Bognet* were Presidential Electors.

Plaintiff Jason M. Shepherd is the Chairman of the Cobb County Republican Party and sues in his official capacity on its behalf.[4] All of the

---

[4] Mr. Shepherd's status as a plaintiff is alleged in paragraph 29 of the Complaint. He was not included in the caption due to inadvertence.

15

authorities cited by the Intervenors to support their right to intervene in this case support this Plaintiff's standing.

Plaintiffs' allege, first, and with great particularity, that Defendants have violated the Georgia Election Code to dilute the votes of Georgia's Republican voters (or voters for Republican candidates) with illegal, ineligible, duplicate or fictitious ballots that Defendants, in collaboration with public employees, Dominion and Democratic poll watchers and activists, have caused to be counted as votes for Democratic candidates. The fact and expert witness testimony describes and quantifies the myriad means by which Defendants and their collaborators illegally inflated the vote tally for Biden, including: double counting of the same vote, non-resident voters, impossible sent and received dates on absentee ballots, failure to match signatures, etc., etc. Thus, the vote dilution resulting from this systemic and illegal conduct did not affect all Georgia presidential electors or political parties equally; it had the intent and effect of inflating the number of votes for Biden and reducing the number of votes for Trump.

Further, Plaintiffs have presented evidence that Defendants disenfranchised Republican and Trump voters to reduce their voting power, in clear violation of "one person, one vote." *See generally Baker v. Carr*, 369 U.S. 186 (1962); *Reynolds v. Sims*, 377 U.S. 533 (1964). Defendants engaged in several schemes to devalue Republican votes as detailed in the Complaint,

including absentee ballots being returned but not counted, or **"1 person, 0 votes,"** and Dominion algorithmic manipulation, or for Republicans, **"1 person, 1/2 votes,"** and for Democrats, **"1 person, 1.5 votes."** *See e.g.,* Doc. 1-1 (Dr. Briggs Testimony regarding ballots not requested but sent, ballots returned but not counted), Doc. 1-10 (Ramsland testimony regarding additive algorithm), ¶¶ 116-119 (allegations of illegal tabulation at State Farm Arena, validated by video surveillance obtained December 2, 2020).

Plaintiffs' injury is that the relative values of their particular votes, and those of similarly situated voters for Republican candidates were devalued or disregarded, rather than a "generalized grievance" "no different than the interests of all Georgia voters as Defendants claim. Doc. 63-1 at 19. ,"Federal courts in Georgia and the Eleventh Circuit have long recognized that "plaintiffs have standing to bring Due Process and Equal Protection claims where they allege that their votes would likely be improperly counted," as they were here.  *Curling v. Kemp*, 334 F.Supp.3d 1303, 1316 (N.D. Ga. 2018) (*citing Stewart v. Blackwell*, 444 F.3d 843, 855 (6th Cir. 2006) (finding voter plaintiffs had standing and substantial likelihood of success on equal protection and due process claims challenging use of voting machines likely to debase or devalue their votes).

## 2.   STATE DEFENDANTS' STANDING ARGUMENTS

What has already been said covers much of the State Defendants' standing arguments, except for one, after which we address their traceability and redressability arguments here.

The State Defendants rely on *Wood v. Raffensperger*, 2020 WL 7094866 (11th Cir. Case No. 201-14418 Dec. 5, 2020) for their argument that Plaintiffs here present only non-justiciable generalized grievances. While *Wood* applies this rule to Wood as a citizen elector, it expressly notes that if he had been a candidate – like the presidential elector plaintiffs in this case – he would have had standing:

> Wood asserts only a generalized grievance. A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). For example, if Wood were a political candidate harmed by the recount, he would satisfy this requirement because he could assert a personal, distinct injury. *Cf. Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995)

*Id.*

As for traceability and redressability, according to the State Defendants, they are mere bystanders to the election just conducted, having virtually nothing to do with any of the fraud and irregularity alleged by the Plaintiffs. The State Defendants' role is not so limited. Plaintiffs seek the remedy of de-certification (unlike Wood who sought only to delay certification in the district court proceedings) and an injunction against the State

Defendants' empowering and empaneling the Biden Electors to vote in the Electoral College on December 14, 2020. These remedies go directly to the statutory role of the Governor and Secretary of State in a presidential election under Georgia law.

With respect to certification, O.C.G.A. § 21-2-493(i) provides that election superintendents are not permitted to certify election results they know or have reason to know include fraudulent, illegal or erroneous results: "**If any error or fraud is discovered, the superintendent shall compute and certify the votes *justly, regardless of any fraudulent or erroneous returns presented to him or her***, and shall report the facts to the appropriate district attorney for action." (Emphasis added).

Similarly, as particularly applicable to the Secretary of State as the chief elections officer in Georgia, O.C.G.A. § 21-2-499 provides that

> [i]n the event **an error is found in the certified returns** presented to the Secretary of State or in the tabulation, computation, or canvassing of votes as described in this Code section, **the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns**." (Emphasis added).

The pretense that the officials made responsible by O.C.G.A. § 21-2-31 for ensuring the legality and purity of Georgia elections are powerless to do the very job they are authorized and commanded to do is preposterous.

The State Defendants, after this lawsuit was filed, have re-certified the election following a machine recount despite the evidence presented in this case and in the public square. The injury caused by certification of results marred by fraud, illegality and error in an amount sufficient to put the outcome of the election in doubt is directly traceable to the actions of the State Defendants under controlling provisions of the Georgia Election Code. It is also redressable by the remedies prayed against the State Defendants. They cannot pretend they are blameless for the problems or helpless to correct them. They picked the Dominion system. Their polices lead to the de facto abolition of the signature match requirement. Their regulation to permit early processing of absentee ballots is unlawful and unconstitutional. Their Settlement Agreement breached the citadel for absentee ballots and is unlawful and unconstitutional. The claims against the State Defendants satisfy all elements of standing and justiciability.

## II. THE COURT HAS SUBJECT MATTER JURISDICTION OVER COUNT V.

The Intervenor Defendants devote two sentences in a single paragraph to the top-level heading argument that the Court lacks subject matter jurisdiction over the state law election contest claim in Count V, relying on O.C.G.A. § 21-2-523(a) which states that an election contest under the relevant article of the Election Code shall be tried and determined in the

superior court of the county where the defendant resides. That is the extent of their argument.

But, as noted elsewhere in this brief, we are dealing here with a departure from the legislative scheme for appointing presidential electors. 20,188 non-residents were allowed to vote, in violation of the Georgia Election Code. The signature match requirement for absentee ballot applications was *de facto* abolished and applied in a highly unequal fashion between counties, in violation of the Equal Protection clause. The signature rejection rate for absentee ballots themselves was only .15%. Either nearly all Georgia voters have perfect penmanship, or the statutory requirement was effectively abolished. Ballots were tabulated after hours and out of public view, in violation of the Georgia Election Code. Ballots were scanned over and over again in violation of the Georgia Election Code. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 112 (2000). Therefore, Count V of the Complaint presents not just a state law question, but a federal constitutional question as well, over which the Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (Presidential election) and 28 U.S.C. §1367 (supplemental jurisdiction for state law and constitutional claims).

### III. LACHES DOES NOT BAR CLAIMS FOR DE-CERTIFICATION BASED ON ELECTION FRAUD AND ILLEGALITY ASSERTED THREE BUSINESS DAYS AFTER CERTIFICATION AND BEFORE POST-RECOUNT CERTIFICATION.

Defendant Intervenors assert that Plaintiffs claims are barred by laches.

> Laches is "a defense developed by courts of equity" to protect defendants against "unreasonable, prejudicial delay in commencing suit." *Petrella, supra*, at ___, ___ (slip op., at 1, 12). *See also* 1 D. Dobbs, Law of Remedies §2.3(5), p. 89 (2d ed. 1993) (Dobbs) ("The equitable doctrine of laches bars the plaintiff whose unreasonable delay in prosecuting a claim or protecting a right has worked a prejudice to the defendant").

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 960 (2017).

Here there is no unreasonable delay in asserting Plaintiffs' rights and no resulting prejudice to the defending parties. Plaintiffs could not file a lawsuit claiming the election was stolen by fraud and illegality, fraudulent ballots, non-resident voting, unrequested absentee ballots, absentee ballots returned but not counted, politically discriminatory counting, illegal tabulation, scanning the same ballots multiple times, and apparent fraudulent electronic manipulation of votes until the election actually was stolen through those means.

The de facto abolition of the signature match requirement, and the State Defendants' failure to enforce the requirement and the other massive

irregularities surrounding absentee ballots did not happen until the election occurred. The appalling failure to protect this election against massive fraud through absentee ballots did not happen until Defendants caused or let it happen.

The claims of prejudice to the Defendants and to lawful voters who cast their legal votes in the election presume the point in controversy – whether the election was lawful or fraudulent. No Defendant, no candidate, no intervenor, no political party and no citizen can claim a legally protectible interest in a fraudulent election result. In legal contemplation, there can be no prejudice to anyone from invaliding such an election. Defendants would have us believe there is no cognizable legal, equitable or constitutional remedy for an election that has been won through fraudulent means. This notion is obnoxious to history, law, equity, the Constitution and common sense. Elections are regularly invalidated for fraud and illegality. There is no reason this one cannot also be invalidated if the evidence is sufficient to support that remedy.

The election was certified on November 20, 2020. Plaintiffs filed their Complaint on November 25, three business days later, and well within the state law limitations period for election contests of five days. *See* O.C.G.A. § 21-2-524(a). Plaintiffs seek de-certification. De-certification presumes prior certification. The claim was not ripe until then. Moreover, much of the

misconduct identified in the Complaint was not apparent on Election Day, as the evidence of voting irregularities was not discovered until weeks after the election and through very careful expert analysis. Finally, as noted, the election was *re-certified* after this lawsuit was filed.

Finally, the election was re-certified after the recount *after this case was filed.*[5] Laches cannot reach backward in time to bar a case filed before one of the events complained of

Under the heading of laches, the Defendants also argue that Plaintiffs claims must be barred because the requested relief would "erode the public's confidence in the electoral process" citing *Wood v. Raffensperger,* No. 1:20-cv-04561, ECF No. 54 at 22 (N.D. Ga. Nov. 20, 2020). That ship has sailed. Millions of people have seen the surveillance video from State Farm Arena showing two hours of illegal tabulation not in public view – after the press and partisan observers were unlawfully told to leave. Millions of people have seen election workers on this video scanning the same ballots over and over again. Millions of people who have seen this flagrant, large-scale, systematic, intentional and knowing election fraud by workers in the Fulton County Board of Registrations and Elections are utterly shocked and disgusted. There is no confidence left to preserve. Instead, it must be restored by

---

[5] *See* n. 2 above.

invalidating a fraudulent result and allowing the electors to be chosen by the Legislature under the plenary power granted them for this purpose by the Elections and Electors Clause. U.S. Const. Art. II, § 1, cl. 2. Ramming a fraudulent election result down the throats of the American people in the name of preserving confidence in the electoral process would be one of the most ridiculous and provocative acts of betrayal in our long and tumultuous history.

## IV.   PLAINTIFFS HAVE STATED CLAIMS FOR RELIEF

### 1.   THE 12(b)(6) STANDARD.

Fed.R.Civ.P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." In order to survive a motion to dismiss, a plaintiff must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While it is true that a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" may subject to dismissal under Rule 12(b)(6),

25

the "facial plausibility" standard does not give rise to a "probability requirement" at the pleading stage. *Twombly* at 556. The standard merely "calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Id.* In doing so, the Court must accept all of the plaintiff's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell,* 516 F.3d 1282, 1284 (11th Cir.2008).

*Twombly* suggests that the Court adopt a "two-pronged approach" in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Under *Twombly* and *Iqbal,* courts may infer from the factual allegations in the complaint "obvious alternative explanation[s]," which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.

Defendant Intervenors argue the Court should apply Rule 9(b) to this election case and require that the alleged fraud be plead with particularity. This rule has no application to the context of election fraud or illegality because of the problems of proof in such cases arising from a constitutional guarantee of a private ballot. In election contests, it is only necessary to show enough fraud or illegality or irregularity to put the outcome in doubt – one does not have to be prove conclusively what the outcome would have been but

for the fraud. O.C.G.A. § 21-2-522. Therefore, pleading standards applicable to common law fraud claims, which always involve a claim of but for causation of actual damages, should not be applied to election disputes. In an election contest it is not necessary to show how the illegal ballots were voted because once ballots have been introduced into the pool that will be counted, it is normally not possible to identify which were illegally cast or counted. Recognizing this reality, the Georgia Supreme Court has held,

> The fallacy in the trial court's analysis is demonstrated by the impossibility of determining how the 481 electors would have voted had they been supplied with proper ballots. … It is precisely for this reason that we have held that the focus in an election contest involving illegal ballots is on whether they "exceeded … the margin of victory." *Howell v. Fears*, supra at 628, 571 S.E.2d 392. Thus,
>
>> [i]t was not incumbent upon [Plaintiff] to show how the [] voters would have voted if their [absentee] ballots had been regular. [Plaintiff] only had to show that there were enough irregular ballots to place in doubt the result.

*Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (2004) (citing *Howell v. Fears*, 275 Ga. 627, 571 S.E.2d 392 (2002). *See also Miller v. Picacho Elementary Sch. Dist. No.* 33, 179 Ariz. 178, 180, 877 P.2d 277, 279, (S. Ct.1994) ("We therefore hold that a showing of fraud is not a necessary condition to invalidate absentee balloting. It is sufficient that an express non-technical statute was violated, and ballots cast in violation of the statute affected the election.")

Moreover, even if Rule 9(b) were applicable, the Complaint as summarized above particularizes the precise fraudulent conduct alleged here.

### 2. ALLOCATION OF THE BURDEN OF PROOF WITH RESPECT TO ELECTRONIC ELECTION FRAUD.

The difficulties of proof just discussed warrant further consideration.

Forensic examination of the black boxes inside which the election software operates is necessary to even approximately obtain direct evidence of electronic fraud in elections. Even that may be impractical or impossible due to the lack of protected audit and system logs inside the in *Curling v. Raffensperger*, 2020 WL 5994029 (N.D. Ga. 10/11/20) and due to the compressed time frame for resolving the controversy. A practical and appropriate method of allocating the burden and order of proof of electronic election fraud should be developed and applied.

The Supreme Court has laid down the mechanics for allocating the burden of proof in analyzing discriminatory-treatment cases where the evidence will depend on circumstantial or statistical evidence, as is the case here. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court laid out a three-step analysis. *First*, plaintiffs must make out a *prima facie* case of the discrimination, *see id.* at 802, just as the Plaintiffs here have demonstrated harm by the statistical analysis of the results. *Second*, the burden shifts to the defendant to articulate a legitimate reason for the

challenged action – there is none here. *See id.* at 802-03. *Finally*, the plaintiff must establish that the reason articulated is mere pretext and that discrimination occurred. *See McDonnell Douglas*, 411 U.S. at 803.[6] Plaintiffs have already provided evidence of that discrimination – it is now time to look at the software and how it was used.

Plaintiffs have discharged the burden of the first step by pleading and proving a *prima facie* case showing in their Complaint that (1) Dominion vote-collection-aggregation-tabulation software was employed on November 3 in Georgia; and (2) the specific software so employed included at relevant times a capability of collecting, aggregating, and/or tabulating votes in discriminatory fashion. *See* Doc. 1-10 (Ramsland Affidavit). Competent evidence establishes unmistakably that this software was both fraud-enabled and audit-disabled. The *prima facie* showing in this case could hardly be more persuasive.

---

[6] Courts have readily adapted the framework set forth in *McDonnell Douglas* in other cases where discrimination claims are "based principally on circumstantial evidence." *Reeves*, 530 U.S. at 141. Although originally decided under Title VII of the Civil Rights Act of 1964, courts have deployed *McDonnell Douglas* adaptations when analyzing other constitutional and statutory claims based on Sperino, BEYOND MCDONNELL DOUGLAS, U. Cinn. (2013) (*McDonnell Douglas* structure used in cases under the Americans with Disabilities Act ('ADA')," "Age Discrimination in Employment Act ('ADEA')," and "discrimination cases brought pursuant to 42 U.S.C. sections 1983 and 1981," and "various state antidiscrimination statutes."). It makes sense to consider this as a useful paradigm to determine whether there is discrimination against one group of voters over another.

Further, there has been no adequate rejoinder to this compelling *prima facie* showing. Given the foundational constitutional importance of the right to vote, Defendants bear the burden of presenting, in response to a *prima facie* demonstration of electronic electoral discrimination, conclusive evidence that negates the risk that the software was used in a discriminatory fashion.

Algorithms that discriminate based on political preference or affiliation are never permissible. Vote collection-aggregation-tabulation software, especially when applied in multiple locations in a multi-precinct election, poses a new challenge in analyzing discrimination, but the same judicial analysis should apply. Further, just as discrimination in other contexts, software engineered to produce disparate treatment of different voters will also be engineered to cover its own tracks and will be deployed by politicians only where the software's role will be difficult to show after the fact, particularly in the short window for mounting electoral challenges.[7]

Although conclusive evidence of actual discrimination perpetrated through voting software may well be available in some instances, just as

---

[7] A further consideration concerns synchronization of electoral decisions. The timing of determinations of electoral outcomes, unlike outcomes in making multiple employment decisions, is an issue of great practical moment and independent constitutional significance. See, e.g., U.S. Const Amend XX. One cannot un-ring bells, unscramble omelets, get second chances at first impressions, or re-run the same election after an extended adjudication contesting the vote-counting algorithms employed in the first instance.

direct statements of discriminatory intentions are sometimes available, in the more usual case direct, timely, and comprehensible evidence of the precise operation and effects of fraud-enabled election software may be hard to come by, especially where time is short and political tempers run hot.

There can be no legitimate reason—none whatever—for vote-collection-aggregation-tabulation software to include the capability or potential for discriminating on a basis of political preference or affiliation, or for covering up the potential for such disparate treatment. Accordingly, in adapting *McDonnell Douglas* to electronic electoral frauds, the second and third steps of this paradigm should be combined, thus streamlining its application to these cases of alleged political discrimination. While one can argue that software algorithms may be appropriate in employment decisions, or even in cases involving political drawing of voting districts, employing fraud-enabled software that opens the door to invidious political discrimination is quite a different matter.

As with any fraud, there was ample motive, opportunity, and capability to use the software as it was designed to change the outcome of the tabulation, and scant evidence has been presented to show that it was not used in that way. Defendants have made no arguments as to why the software employed the features it contained, and no evidence that its capabilities were not used in this election. Given the foundational

constitutional importance of the right to vote, the standard for upholding the use of fraud-enabled or audit-disabled software must be demanding, and Defendants have not satisfied their burden in rebutting the allegations and the evidence presented. Mere certification of the software and Logic and Accuracy testing are inadequate, as Judge Totenberg found in *Curling v. Raffensperger.*

Judge Posner remarks that "one of the most persistent fallacies" in commentary on *Bush v. Gore* and the 2000 election is "the notion that the winner of an election can be determined without reference to election rules." Posner, *Breaking the Deadlock,* at 2. Once use of fraud-enabling and/or audit-disabling software has been established, Defendants should bear the burden of showing that such software did not affect the outcome that would be generated by the election rules but for the presence of the software. Otherwise, the only resort is invalidation of the compromised election.

### 3.   PLAINTIFFS' CLAIMS ARE PLAUSIBLE.

Turning to the plausibility inquiry, the Defendants contend that the Plaintiffs' claims are "simply not plausible."

All Defendants contend that the hand audit necessarily precludes there having been anything amiss in the Dominion software. The premise of this argument is that the paper ballots printed by the Dominion Ballot Marking Devices are auditable in a software-independent independent manner. Not

only is this not true, the State Defendants are collaterally estopped from making this argument, for it has been decided against them by Judge Totenberg in *Curling v. Raffensperger*, 2020 WL 5994029 (N.D. Ga. 10/11/20). Reviewing the evidence, Judge Totenberg explained why the Dominion BMD ballots are not auditable in a software independent way:

> A voting system is strongly software independent "if an undetected change or error in its software cannot cause an undetectable change or error in an election outcome, and moreover, a detected change or error in an election outcome (due to change or error in the software) can be corrected without re-running the election." (Stark Suppl. Decl., Doc. 640-1 at 42 ¶ 10.) "Systems based on optically scanning hand-marked paper ballots (with reliable chain of custody of the ballots) are strongly software independent, because inspecting the hand-marked ballots allows an auditor to determine whether malfunctions altered the outcome, and a full manual tabulation from the paper ballots can determine who really won, without having to re-run the election." (*Id.*) Therefore, a risk-limiting audit of an election conducted using hand-marked paper ballots "can guarantee a large chance of correcting the outcome if the outcome is wrong." (*Id.*)
>
> **Dr. Stark's affidavits and hearing testimony address the impossibility of conducting a reliable audit of ballots and voting totals derived from QR codes for purposes of verifying the accuracy or integrity of election results or processes**. In Dr. Stark's view, the risk-limiting audit methodology **cannot be properly utilized to assess the accuracy of election results in the context of a BMD system where ballots are tabulated based on a humanly non-readable QR code that is not voter verifiable and where the computer voting system is vulnerable to data hacking or manipulation that can alter votes cast in untraceable ways – including in the votes actually shown on the ballots that are audited**.

*Id.* at 28 (emphasis added). *See also* Doc. 1-8, (academic article presenting

behavioral research that Dominion's BMD ballots are not actually verified by voters and showing they are not auditable independent of the software). This finding is crucially significant because the evidence is overwhelming that Dominion's systems, including BMDs, are easily hacked and can rig the votes printed in the QR codes, which are not human-readable and which contain the actual vote read by the scanners. Summing up, Judge Totenberg ruled that "Absent such an injunction [prohibiting the use of BMDs], **there is no audit remedy that can confirm the reliability and accuracy of the BMD system, as Dr. Stark has stressed**." *Id.* at 33 (emphasis added).

Plaintiffs easily meet the pleading stage plausibility analysis because their claims are copiously supported with eye-witness and expert testimony. This is more than enough to surpass the 12(b)(6) standard under *Twombly* and *Iqbal*.

####     4.    PLAINTIFFS HAVE PLEADED A CLAIM UNDER THE ELECTIONS AND ELECTORS CLAUSE.

Plaintiffs have alleged the following violations of the Elections and Electors Clause:

1. Secretary of State Rule 183-1-14-0.9-.15, permitting absentee ballots to be opened up to three weeks before election day, is directly and irreconcilably contrary to O.C.G.A. § 21-2-386(a)(2).

2. The Settlement Agreement is facially unconstitutional because it varies from the specified statutory procedures for handling and adjudicating absentee ballots.

3. The de facto abolition of the signature match requirement in violation of O.C.G.A. § 21-2-386.

Defendants contend none of this matters and cannot be remedied in any event so the Complaint should be dismissed. To the contrary, "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 112, (2000). The Elections and Electors clause effectively federalizes and constitutionalizes state election codes for the selection of presidential electors. When those procedures are substantially altered by means other than a duly enacted statute as they have been in Georgia, the Constitution is violated. This is the teaching of *McPherson v. Blacker*, 146 U.S. 1 (1892) and *Bush v. Gore*.

In Georgia, changes to the absentee balloting procedures have opened an 8-lane superhighway for fraudulent ballots, which the supporters of Biden have fully exploited. Plaintiffs have stated a claim for violation of the Elections and Electors Clause.

5.   PLAINTIFFS HAVE PLEADED AN EQUAL PROTECTION VIOLATION

Defendants also absurdly contend that plaintiffs have failed to state a claim that the Equal Protection clause was violated. There is an Equal Protection violation in the dilution of votes for Trump by the injection of tens of thousands of illegal ballots for Biden. There is an Equal Protection

violation in the use of Dominion equipment that confers a politically
discriminatory 5% advantage to Biden as compared to other election systems.
There is an Equal Protection violation in the de facto abolition of the
signature match requirement for absentee ballots as compared to in person
voting in which voters have to provide proof of their identity. The receipt and
counting of more than one million absentee ballots for which there was no
effective signature match violates the Georgia Election Code and the Electors
and Elections Clause and subjects absentee voters and in person voters to
disparate treatment. Counting 20,188 votes from non-residents
unconstitutionally dilutes the votes of legal residents. The Equal Protection
violations in this case are plain and obvious under a large body of "one person
one vote" case law from *Baker v. Carr*, 369 U.S. 186 (1962), *Reynolds v. Sims*,
377 U.S. 533 (1964) and *Bush v. Gore*.

> In Equal Protection cases, it has been made clear that
>
> [o]ur treatment of anecdotal evidence in *Cone Corp.* and *Ensley
> Branch* is consistent with the formulation in Justice
> O'Connor's *Croson* plurality opinion that 'evidence of a pattern of
> individual discriminatory acts can, *if supported by appropriate
> statistical proof,* lend support to a local government's determination
> that broader remedial relief is justified,' 488 U.S. at 509, (citation
> omitted) (emphasis added). In light of *Croson* 's guidance on the
> point, and our decisions in *Cone Corp.* and *Ensley Branch,* we
> believe that anecdotal evidence can play an important role in
> bolstering statistical evidence, but that only in the rare case will
> anecdotal evidence suffice standing alone.

*Engineering Contrs. Ass'n v. Metropolitan Dade County*, 122 F.3d 895, 925

(11th Cir. 1997) (*citing Richmond v. J. A. Croson Co.*, 488 U.S. 469, 509,

(1989). "Moreover, evidence of a pattern of individual discriminatory acts can,

if supported by appropriate **statistical** proof, lend support to a local

government's determination that broader remedial relief is justified." *Id*.

Plaintiffs have offered such statitistical evidence.

### 6.   PLAINTIFFS HAVE PLEADED A DUE PROCESS VIOLATION

Similarly, the Complaint states a claim for violation of the Due Process

clause. The Settlement Agreement and Rule 183-1-14-0.9-.15 were adopted in

violation of the Georgia Election Code and the Elections and Electors clause,

depriving Plaintiffs of their rights thereunder without Due Process. The

fundamental right to vote protected by the Fourteenth Amendment is

cherished in our nation because it "is preservative of other basic civil and

political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a

ballot in an election free from the taint of intimidation and fraud," *Burson v.

Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our

electoral processes is essential to the functioning of our participatory

democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

"Obviously included within the right to [vote], secured by the

Constitution, is the right of qualified voters within a state to cast their ballots

and have them counted" if they are validly cast. *United States v. Classic*, 313

U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); see also *Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

Practices that promote the casting of illegal or unreliable ballots or that fail to contain basic minimum guarantees against such conduct can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a

debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

The argument that Plaintiffs have not stated a Due Process claim is without merit and should be rejected.

## V.   THE PLAINTIFFS' CLAIMS ARE RIPE AND NOT MOOT.

The State Defendants' mootness argument is based on the false premise that this Court cannot order any of the relief requested in the Complaint or the TRO Motion. As this Court held in a recent decision granting a TRO enjoining Defendant Secretary Kemp, "Defendant's claim that the Secretary cannot redress Plaintiff's injury fails because the Secretary of State is the state official in charge of enforcing Georgia's election laws." *Common Cause Ga. v. Kemp,* 347 F.Supp.3d 1270, 1291 (N.D. Ga. 2018) (*citing Grizzle v. Kemp*, 634 F.3d 1314, 131 (11th Cir. 2011)). Accordingly, "Defendant's role as the chief election official of the state, a ruling by the Court directed at Defendant can redress Plaintiff's injuries." *Id.*

Without an immediate temporary injunction, electoral votes will be cast, electors will be appointed and this Court will lose any authority to provide relief to Plaintiffs. There is no harm to Respondents by the potential relief fashioned by this Court. As recently held by a court considering claims similar to those asserted here.

> 3 U.S.C. §5 makes clear that the Safe Harbor does not expire until December 8, 2020, and the Electoral College does not vote for president and vice president until December 14, 2020. According to an October 22, 2020 white paper from the Congressional Research Service titled "The Electoral College: A 2020 Presidential Election Timeline," the electors will meet and vote on December 14, 2020. https://crsreports.congress.gov/product/pdf/IF/ IF11641. December 8, 2020—six days prior to the date the College of Electors is scheduled to meet—is the "safe harbor" deadline under 3 U.S.C. §5. That statute provides that if a state has provided, "by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State," and that final determination has been made "at least six days before the time fixed for the meeting of the electors," that determination—if it is made *under the state's law* at least six days prior to the day the electors meet— "shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution . . . ." It appears, therefore, that December 8 is a critical date for resolution of any state court litigation involving an aggrieved candidate who is contesting the outcome of an election.

*Feehan v. Wisconsin Board of Elections*, Case No. 20-cv-1771(E.D. Wis.

12/4/20) (Attached as Exh. A).

This Court can grant the primary relief requested by Plaintiffs, i.e., de-certification of Georgia's election results and an injunction prohibiting State Defendants from transmitting the results. There is also no question that this Court can order other types of declaratory and injunctive relief requested by Plaintiffs, in particular, impounding Dominion voting machines and software for inspection, nor have State Defendants claimed otherwise.

In *Siegel v. Lepore*, 234 F.3d 1163 (11th Cir. 2000), a case arising from the 2000 General Election, the Eleventh Circuit held that certification did not moot the claim:

> This Court has held that "[a] claim for injunctive relief may become moot if: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Reich v. Occupational Safety & Health Review Comm'n,* 102 F.3d 1200, 1201 (11th Cir.1997).
>
> We conclude that neither of these elements is satisfied in this case. The Democratic candidate, Vice President Gore, and others are currently contesting the election results in various lawsuits in numerous Florida state courts. There are still manual recount votes from at least Volusia and Broward Counties in the November 26th official election results of the Florida Secretary of State. **In view of the complex and ever-shifting circumstances of the case, we cannot say with any confidence that no live controversy is before us.**

*Id*. at 1172-73 (emphasis added). ).  *See also Common Cause*, 347 F.Supp.3d at 1291 (holding that certification of election results did not moot post-election claim for emergency injunctive relief).  The State Defendants cannot be allowed to certify the results after this case has been filed and then claim the lawsuit is moot because they have certified.

The case of *Wood v. Raffensberger*, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020) also does not support Defendants' mootness or standing arguments. The key difference between this case and *Wood* is that the plaintiff in *Wood* requested delay of certification, rather than de-

certification, so in the Court's view certification rendered his request moot. Plaintiffs here also request several additional types of injunctive relief (as well as declarative relief) to preserve evidence and maintain the status quo that are not moot, e.g., access to voting machines and records as well as declaratory relief.

## VI. THE ELEVENTH AMENDMENT DOES NOT BAR CLAIMS FOR INJUNCTIVE RELIEF.

State Defendants assert that Plaintiffs' claims are barred by the Eleventh Amendment. While the contours of the Eleventh Amendment's jurisdictional bar are ambiguous in many cases, this is not one of them. As the Court held in *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251 (N.D. Ga. 2019):

> Under the doctrine enunciated in *Ex parte* Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), ... a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (citations omitted); *see also Alden v. Maine*, 527 U.S. 706, 756–57, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("The rule [of sovereign immunity], however, does not bar certain actions against state officers for injunctive or declaratory relief.") and *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10, 109 S.Ct. 2304 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'").

*Id*. at 1278. The Court further held:

In addition, the remedy of prospective injunctive relief is "not the 'functional equivalent' of a form of relief barred by the Eleventh Amendment." Id. The proposed remedy also will not resolve "for all time," Georgia's election system.

*Id.* at 1280.

This is precisely what the Plaintiffs request in the Complaint, namely, equitable and injunctive relief to prospectively enjoin the Defendants from taking actions that are within the scope of their statutory authority, in particular, the Secretary of State as the State's chief election officer, including but not limited to seeking a permanent injunction to de-certify the election results and against transmitting the currently certified election results to the Electoral College."  The Eleventh Amendment is no bar to this Court granting the requested relief.

## VII. PLAINTIFFS' CLAIMS ARE NOT SUBJECT TO DISMISSAL UNDER ABSTENTION DOCTRINES.

The State Defendants next argue that the Court should dismiss the Complaint to permit State court resolution under the abstention doctrines announced in *Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941) and *Colorado River Water Conservation District v. United States,* 424 U.S. 800(1976); State Defendants' Brief at pp. 30–33. As to *Pullman* abstention, a federal court may stay or dismiss proceedings for "a state court resolution of underlying issues of state law" when (1) the case presents an unsettled question of state law, and (2) the question of state law is dispositive of the

case or would materially alter the constitutional question presented. *Harman v. Forssenius*, 380 U.S. 528, 534, 85 S.Ct. 1177 (1965). As a preliminary matter, Defendants have not identified any "unsettled question of state law" that must be resolved to address Plaintiffs' constitutional claims, nor have they identified any specific state proceeding in which such an unsettled question is before a state court.   *See* Doc. 63-1 at 30-33.  The state law "questions" raised in the Complaint are relatively straightforward – and involve bright-line factual determinations – *e.g.,* did Georgia election officials *de facto* eliminate the absentee ballot signature matching requirement, were absentee ballots sent to voters who did not request them, were Republican ballots destroyed, lost or disqualified at a higher rate than comparable ballots for Democratic candidates, etc.

While it is true that "abstention is discretionary" *Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000), the Supreme Court has made clear that "the power to dismiss under the *Burford* doctrine, *as with other abstention doctrines*, ... derives from the *discretion* historically enjoyed by courts of equity." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727–28, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (emphases added). In exercising its discretion, a federal court must consider whether "certain classes of cases, and certain federal rights" are more appropriately "adjudicated in federal court." *Id.* at 728, 116 S.Ct. 1712; *Edwards v. Sammons*, 437 F.2d 1240, 1243 (5th Cir.

1971) (federal courts "must also take into consideration the nature of the controversy and the particular right sought to be enforced.").

The Supreme Court has repeatedly held abstention is inappropriate when First Amendment rights, rights related to school desegregation, *and voting rights are alleged at issue. Id., citing Harman v. Forssenius*, 380 U.S. 528, 537 (1965) (abstention improper when voting rights violation being alleged), *Baggett v. Bullitt*, 377 U.S. 360, 375–80 (1964) (abstention improper when First Amendment violation being alleged), *and Griffin v. County Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218, (1964) (abstention improper when school desegregation violations being alleged)); *see also Siegel*, 234 F.3d at 1174 (collecting cases holding abstention improper).

The Eleventh Circuit has rejected the argument that a federal court should abstain under *Pullman* in voting rights cases in no uncertain terms. Drawing from decades of precedent, the Eleventh Circuit in *Siegel* concluded that "[o]ur cases have held that voting rights cases are particularly inappropriate for abstention." *Id.* This conclusion was "strengthened by the fact that Plaintiffs allege a constitutional violation of their voting rights." *Id.*

The law is crystal clear in the Eleventh Circuit. Federal courts do not abstain when voting rights are alleged to be violated. The unambiguous holdings from binding precedent, mentioned nowhere in the State's Defendants' Brief, sharply confine the Court's discretion to abstain from

exercise of its Article III jurisdiction over this case. *See* e.g. *Harman*, 380 U.S. at 537 ("Given the importance and immediacy of the problem [of voting rights], and the delay inherent in referring questions of state law to state tribunals, [ ] it is evident that the District Court did not abuse its discretion in refusing to abstain.") (citations omitted).

The very nature of this controversy and the inapplicability of discretionary abstention is dispositive on this issue. Abstention would result in substantial delay as the various state court challenges work their way through the state court system. Abstention, were it applied, would by its nature last well beyond the current certification and electoral college process and moot the Plaintiffs' claims. "The delay which follows from abstention is not to be countenanced in cases involving such a strong national interest as the right to vote." *Edwards*, *supra*, 437 F.2d at 1244.

The State Defendants also argue that the Court should decline to reach the merits of this dispute under the doctrine of constitutional avoidance—a doctrine that is part and parcel of the *Pullman* analysis — because it "might be mooted or presented in a different posture by a state court determination of pertinent state law." State Defendants" Brief, pg. 31 (citing cases); *See Duke v. James*, 713 F.2d 1506, 1510 (11th Cir. 1983) (explaining how *Pullman* applies when there is an unsettled question of state law and "that the question be dispositive of the case and would avoid, or substantially

modify, the constitutional question."). However, constitutional avoidance does not permit federal courts to avoid federal questions under the federal constitution. *See Pittman v. Cole*, 267 F.3d 1269, 1285–87 (11th Cir. 2001); ("federal courts should not abstain in order to avoid the task of deciding the federal constitutional issues in a case."); *Duke,* 713 F.2d at 1510 ("It is improper ... to view abstention as a tool merely to extract from the state courts an alternative state law ground for the judgment.

Abstention is not intended to serve in this manner when state law is clear. Similarly, if the state court will merely apply federal constitutional law, then the state construction will *not* moot or modify the constitutional question.").

> It is not for the courts to withdraw that jurisdiction which Congress has expressly granted under section 1983 where such a withdrawal is contrary to the purpose of Congress in extending that alternative forum. In this regard, the *Pullman* doctrine is narrow and is tightly circumscribed. A federal court must grapple with difficult constitutional questions that confront it squarely. The abstention doctrine is an exception to this rule, to be exercised only in *special* or "*exceptional* " circumstances."

*Id.* (emphasis in original).

As to *Colorado River* abstention, the State Defendants fail to provide any basis for its application in this case. The *Colorado River* analysis is applicable when federal and state proceedings involve substantially the same parties and substantially the same issues. *Ambrosia Coal and Const. Co. v.*

*Pages Morales,* 368 F.3rd. 1320, 1329-1330 (11th Cir. 2004). While the State Defendants generally allege that the existence of "numerous pending challenges to the November election that have properly been filed in Georgia's courts," other than a vague reference to supposed "statements by Mr. Wood's counsel in the no-longer-pending *Wood* litigation," there is no sufficient showing that any ongoing parallel state court action involves "substantially the same parties and substantially the same issues" that would properly invoke application of the *Colorado River* abstention doctrine to permit this Court to avoid its "virtually unflagging obligation" to exercise its jurisdiction over these claims. *Moses v. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1 (1983) (primary purpose of *Colorado River* abstention is avoidance of piecemeal litigation between same parties).

There is no reason for this Court to abstain from deciding this case.

## VIII. REPLY IN SUPPORT OF MOTION FOR EMERGENCY INJUNCTIVE RELIEF.

The Intervenor Defendants' response to the motion for emergency injunctive relief is largely a rehash of the arguments made in their motion to dismiss – standing, mootness, laches, failure to state a claim dressed up as not likely to succeed on the merits, no irreparable harm and balancing of the equities. All of these contentions are addressed in the earlier arguments in

this brief in response to the motions to dismiss. Two bites at the dismissal apple ought to be enough for the vast swarms of lawyers defending this case.

Plaintiffs reiterate that they have demonstrated that they have satisfied the requirements for the grant of a TRO, in particular, substantial likelihood of success, and highlight this Court's decision to grant a TRO where plaintiffs brought a post-election challenge regarding Defendant Secretary Kemp's implementation of Georgia election laws supported by substantial statistical evidence and witness declarations showing that the "infringement of the rights of the voters to cast their votes and have their votes counted." *Common Cause*, 347 F.Supp.3d at 1295.

## 1.   EXPERT TESTIMONY

Intervenor Defendants move to exclude all of Plaintiffs' expert testimony and offer reports of their own experts.

The objections to Plaintiffs' experts all go to weight, not admissibility. Defendants' own experts are subject to many of the same criticisms, with the additional criticism that several of them are paid mouthpieces, while all of Plaintiffs' experts are working for free and with great courage, as they have undertaken a great career risk due to the incredibly toxic nature of our current political environment.

The most important point to make is that this is not a jury trial. The Court is well-able to discern the wheat from the chaff and determine what

weight and credibility should be afforded to competing experts. Because there is no jury, this not a case in which the cause of justice needs to be protected from unsophisticated jurors' having excess credulity for expert testimony – the whole animating purpose of *D'aubert* and its progeny. Each side has its experts. The Court should exercise its discretion over evidentiary questions and weigh them all for what they are worth.

Responses from Plaintiffs' experts are submitted contemporaneously herewith.

Russell Ramsland has also offered a reply to the reports critiquing his work.

Eric Quinnell, Ph.D. and S. Stanley Young offer a very brief rebuttal which demonstrates that the Rodden-Marble report, which purports to critique their analysis, actually confirms it. Quinnell and Young find that the statistical properties of the data set of Fulton County absentee ballots are mathematically and statistically *impossible* absent some external intervention. This is compelling prima facie evidence to support Plaintiffs' allegations of wrongdoing and complements the State Farm Arena video tape. The after-hours counting out of public view, in which batches of ballots were scanned over and over again, concluded just before 1:00 AM on November 4, 2020. The first upload of Fulton County's absentee ballot results, consisting of 73,523 ballots, is time-stamped at 12:59 AM, December 4, 2020.

## CONCLUSION

For the foregoing reasons, the motions to dismiss should be denied, and the motion for emergency injunctive relief should be granted.

Respectfully submitted, this 6th day of December 2020.

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219
(214) 707-1775
*Application for admission pro hac vice
forthcoming

CALDWELL, PROPST & DELOACH, LLP

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

CALDWELL, PROPST & DELOACH, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
(404) 843-1956 – Telephone
(404) 843-2737 – Facsimile
hmacdougald@cpdlawyers.com

Counsel for Plaintiffs

*Attorneys for Plaintiffs*

The undersigned certifies that the foregoing document was prepared in 13-point Century Schoolbook font and in accordance with the margin and other requirements of Local Rule 5.1.

<u>s/ Harry W. MacDougald</u>
Harry W. MacDougald
Georgia Bar No. 463076

# CERTIFICATE OF SERVICE

This is to certify that I have on this day e-filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause electronic service to be made upon all counsel of record.

This 6th day of December 2020.

<u>s/ Harry W. MacDougald</u>
Harry W. MacDougald
Georgia Bar No. 463076

Caldwell, Propst & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
404-843-1956